**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In the Matter of the Trusts established under
the Pooling and Servicing Agreements relating
to the Wachovia Bank Commercial Mortgage
Trust Commercial Mortgage Pass-Through
Certificates, Series 2007-C30; COBALT
CMBS Commercial Mortgage Trust 2007-C2
Commercial Mortgage Pass-Through
Certificates, Series 2007-C2; Wachovia Bank
Commercial Mortgage Trust Commercial
Mortgage Pass-Through Certificates, Series
2007-C31; ML-CFC Commercial Mortgage
Trust 2007-5 Commercial Mortgage Pass-
Through Certificates, Series 2007-5; and ML-
CFC Commercial Mortgage Trust 2007-6
Commercial Mortgage Pass-Through
Certificates, Series 2007-6

Docket No. 1:17-cv-01998–KPF

ECF Case

---

**MEMORANDUM OF LAW OF OBJECTORS APPALOOSA INVESTMENT L.P. I**
**AND PALOMINO MASTER LTD IN SUPPORT OF THEIR MOTION**
**FOR JUDGMENT ON THE PLEADINGS**

---

Lawrence M. Rolnick
Thomas E. Redburn (*pro hac vice*)
Michael J. Hampson
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Fax:  (212) 262-7402
lrolnick@lowenstein.com
tredburn@lowenstein.com
mhampson@lowenstein.com

*Attorneys for Appaloosa Investment L.P. I and*
*Palomino Master Ltd.*

# TABLE OF CONTENTS

**PAGES**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY...............................3

    A.    The PSA and the Acquisition and Disposition of Stuy Town ................3

    B.    CWC's Improper Diversion of "Gain on Sale" Proceeds from the Sale of Stuy Town to Purported "Penalty Interest" .........................................7

    C.    Proceedings in the Minnesota Courts ....................................................9

    D.    The Relief Sought ...............................................................................11

STANDARD OF REVIEW .................................................................................11

ARGUMENT .....................................................................................................13

I.    CWC'S CLAIM TO DEFAULT INTEREST VIOLATES THE PLAIN TERMS OF THE PSA ...................................................................................13

    A.    CWC's Unqualified Obligation to Segregate Gain-on-Sale Proceeds Following Sale of an REO Property and Remit Them to the Paying Agent..........14

    B.    Any Unpaid and Accrued Penalty Interest on an REO Property Is Not Deductible from the Gain-on-Sale Proceeds Realized If That Property Is Sold ....................................................................................................15

    C.    Neither Section 3.11(d), Nor Any Other Provision of the PSA, Relieves CWC of Its Unqualified Contractual Obligation to Remit the Entirety of the Gain-on-Sale Proceeds to the Paying Agent for the Benefit of Certificateholders ................................................................................19

II.    FOLLOWING ENTRY OF THE FORECLOSURE JUDGMENT, POST-JUDGMENT INTEREST ACCRUED, NOT PENALTY INTEREST............................25

III.    FANNIE MAE AND FREDDIE MAC ARE NOT ENTITLED TO YIELD MAINTENANCE CHARGES.............................................................................29

CONCLUSION..................................................................................................35

i

# TABLE OF AUTHORITIES

**PAGES**

**C**ASES

*Am. Tax Funding, LLC v. City of Syracuse,*
　41 F. Supp. 3d 188 (N.D.N.Y. 2014) ....................................................................21

*Bank of N.Y. Trust Co., N.A. v. Franklin Advisers, Inc.,*
　726 F.3d 269 (2d Cir. 2013) ...............................................................................13

*Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.,*
　674 F. Supp. 2d 458 (S.D.N.Y. 2009) (2d Cir. 2013) ...........................................13

*Bolt Elec., Inc. v. City of New York,*
　223 F.3d 146 (2d Cir. 2000) ...............................................................................13

*Chem. Bank v. Meltzer,*
　93 N.Y.2d 296 (1999) ........................................................................................13

*Goldman Sachs Grp., Inc. v. Almah LLC,*
　924 N.Y.S.2d 87 (1st Dep't 2011) .......................................................................13

*Greenfield v. Philles Records, Inc.,*
　98 N.Y.2d 562 (2002) ........................................................................................12

*Harris v. Mills,*
　572 F.3d 66 (2d Cir. 2009) .................................................................................12

*Herr v. Herr,*
　97 A.D.3d 961 (2012) ...................................................................................21, 23

*Hirsch v. Food Res., Inc.,*
　24 A.D.3d 293 (1st Dep't 2005) ..........................................................................12

*Int'l Klafter Co. v. Cont'l Cas. Co.,*
　869 F.2d 96 (2d Cir. 1989) .............................................................................13, 20

*Kaiser Aluminum & Chem. Corp. v. Bonjorno,*
　494 U.S. 827 (1990) ..........................................................................................26

*Kass v. Kass,*
　91 N.Y.2d 554 (1998) ........................................................................................13

*L-7 Designs, Inc. v. Old Navy, LLC,*
　647 F.3d 419 (2d Cir. 2011) ...............................................................................12

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
　595 F.3d 458 (2d Cir. 2010) ...............................................................................13

*Poleto v. Consol. Rail Corp.*,
   826 F.2d 1270 (3d Cir. 1987)..................................................................................26

*SDF9 COBK LLC v. AF & NR LLC*,
   No. 12-cv-3078, 2014 WL 4244296 (E.D.N.Y. Aug. 26, 2014) ...............................25

*Sellers v. M.C. Floor Crafters, Inc.*,
   842 F.2d 639 (2d Cir. 1988)....................................................................................11

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)......................................................................................12

*In re Trusteeships Created by Tropic CDO I Ltd.*,
   92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) ............................................11, 12, 13, 20

*VoiceAge Corp. v. RealNetworks, Inc.*,
   926 F. Supp. 2d 524 (S.D.N.Y. 2013).............................................................11, 12

*W.W.W. Assocs, Inc. v. Giancontieri*,
   77 N.Y.2d 157 (1990) ..............................................................................................12

**RULES**

Fed. R. Civ. P. 12(b)(6)....................................................................................................12

Fed. R. Civ. P. 12(c) ................................................................................................. passim

**OTHER AUTHORITIES**

PwC, *Fair Value Measurements* (2015) .........................................................................33

Objectors Appaloosa Investment L.P. I and Palomino Master Ltd. (collectively, "Appaloosa") respectfully submit this Memorandum of Law in support of their motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as to all claims and issues except their request for an accounting.

## PRELIMINARY STATEMENT

This action arises from the wrongful diversion of more than $600 million dollars of gain-on-sale proceeds by a special servicer. As a result of that diversion, funds that were meant to repay realized losses suffered by the beneficiaries of the trusts have been removed from the trusts. On October 20, 2015, it was publicly announced that the Peter Cooper Village & Stuyvesant Town property ("Stuy Town") was to be sold for $5.3 billion. In connection with the pending sale, it was reported – and subsequently confirmed in court documents – that CWCapital Asset Management LLC ("CWC"), as the special servicer of the trusts that owned Stuy Town, was intending to take more than $600 million of the sale proceeds, claiming that such funds were default interest that had purportedly accrued on Stuy Town's senior mortgage loan since 2010. According to one expert interviewed by the *Wall Street Journal*, CWC's claim to such a large fee was unprecedented: "Comb through structured finance – there's nothing like this . . . . That's a pretty flippin' crazy amount of money." Indeed, the amount claimed by CWC was *ten times* the amount that investors were told CWC's "principal compensation" would be for the special servicing of Stuy Town. Following CWC's improper diversion of the funds, U.S. Bank National Association ("U.S. Bank" or the "Trustee") filed this proceeding seeking judicial instructions about the interpretation of the contracts that govern the disputed amount.

The plain language of the governing documents – the PSA and the Co-Lender Agreement – clearly prohibits CWC's diversion of the funds. Under the PSA, upon the disposition of Stuy Town (which was an asset of the trusts), CWC was required to calculate any "Gain-on-Sale

Proceeds" from the sale of the property, segregate those funds from the other amounts realized from the sale, and forward them to the paying agent of the trusts for deposit into the trusts' fully segregated "Gain-on-Sale Reserve Accounts."  Any amounts deposited in the Gain-on-Sale Reserve Accounts are used to offset past and future realized losses suffered by the beneficiaries of the trusts from the other assets held by the trusts.

There is nothing in the governing agreements that permits CWC to withhold – and retain for itself – any of the Gain-on-Sale Proceeds from the sale of Stuy Town as "Penalty Interest." Indeed, "Gain-on-Sale Proceeds" are defined in the PSA as "the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received."  The definitions of "Liquidation Expenses" and "Purchase Price" do not include Penalty Interest; thus, Penalty Interest is not something that can be deducted from the Liquidation Proceeds from the sale of Stuy Town in calculating the Gain-on-Sale Proceeds.  Accordingly, under the clear and unambiguous terms of the governing agreements, the gains from the sale of Stuy Town were required to be deposited into fully segregated reserve accounts for the benefit of the trusts' beneficiaries, and not diverted by an agent of the trusts for its own benefit.

Even if CWC were entitled to divert allegedly accrued and unpaid Penalty Interest from the Gain-on-Sale Proceeds – which it clearly is not – CWC's calculation of default interest is incorrect as a matter of law.  In 2010, a judgment of foreclosure was entered against the Stuy Town senior loan.  That judgment expressly provided that default interest would stop running as of June 21, 2010, the date judgment was entered, and that post-judgment interest would accrue thereafter at the legal rate.  The amount of default interest under the foreclosure judgment

2

through that date was approximately $38.2 million, a far cry from the more than $600 million CWC has taken. Moreover, the post-judgment interest that ran since 2010 does not meet the definition of "Penalty Interest" under the PSA, so CWC – even assuming it is entitled to divert Penalty Interest from the Gain-on-Sale Proceeds – is *at best* entitled to a payment of $38.2 million.

The plain language of the governing agreements also precludes Freddie Mac's and Fannie Mae's claim to yield maintenance. Yield maintenance is a prepayment penalty designed to compensate the lender for the lost interest payments that will not be paid if the borrower actually repays the loan principal ahead of its scheduled maturity. Critically, the definition of "Yield Maintenance Charges" in the PSA is limited to payments *actually paid* by the mortgagor. Here, the mortgagor did not pay anything since the loan went into default. Rather, all proceeds to fund any distributions under the PSA concerning Stuy Town are coming from the sale of the property. Because there was no principal prepayment for Stuy Town, there are no yield maintenance payments owed to Freddie Mac and Fannie Mae.

For these reasons, and as set forth more fully below, Appaloosa's motion for judgment on the pleadings should be granted in its entirety.

<u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

### A.      The PSA and the Acquisition and Disposition of Stuy Town

Appaloosa is a beneficiary of the Wachovia Bank Commercial Mortgage Trust 2007-C30 (the "C30 Trust") and the other Trusts identified on Exhibit A to the Trustee's Petition (collectively, the "Stuy Town CMBS Trusts" or the "Trusts"). (Appaloosa Obj. at 2.)[1] CWC is

---

[1] Citations to "Pet." are to the Petition of U.S. Bank, as Trustee, filed in Minnesota state court on December 17, 2015, which is attached as Exhibit A to the Declaration of Lawrence M. Rolnick in Support of Appaloosa's Motion for Judgment on the Pleadings ("Rolnick Decl."), filed herewith. Citations to

the "Special Servicer" of the C30 Trust.  (Pet. at 2.)  As Special Servicer, CWC services mortgage loans held by the C30 Trust when the borrower is behind in its payment.  (Appaloosa Obj. ¶ 7.)  CWC is also responsible for selling properties securing loans held by the C30 Trust where the borrower has defaulted and the C30 Trust has obtained title to the properties.  (*See id.*)  The "Paying Agent" of the C30 Trust, Wells Fargo, is responsible for establishing a fully segregated "Gain-on-Sale Reserve Account" in which to deposit gains from the sale of such properties (the "Gain-on-Sale Proceeds"), and distributing such gains to investors to offset losses suffered on other properties held by the C30 Trust.  (*Id.* ¶ 15.)

One of the C30 Trust's most significant assets was a $1.5 billion-share of a $3 billion senior loan (the "Senior Loan") secured by a mortgage on the Stuy Town apartment complex in New York City.  (Appaloosa Obj. ¶ 19.)[2]  In 2006, Stuy Town was purchased by special purpose entities (the "Borrowers") for a price of $5.4 billion.  (*Id.* ¶ 21.)  To finance their acquisition of Stuy Town, the buyers obtained, among other things, a $3 billion senior loan secured by a mortgage on the property ("Senior Loan").  (*Id.*)  The Senior Loan was split into six promissory notes that were sold to five trusts that hold commercial mortgage loans.  (*Id.* ¶ 22.)  The remainder of the purchase price was financed with eleven mezzanine loans totaling $1.4 billion, secured by a lien on the equity interests in certain of the Borrowers (collectively the "Mezzanine Loans" and each a "Mezzanine Loan"), and $1 billion in cash.  (*Id.* ¶ 21.)

The Trusts are securitization vehicles created to sell investment interests to finance the acquisition of a pool of commercial mortgage loans held by each of them.  (Pet. ¶ 19.)  Each Trust is governed by a Pooling and Servicing Agreement ("PSA"), among other documents.  The

---

"Appaloosa Obj." are to the Objection part of the February 3, 2016 Objection and Answer of Appaloosa in response to the Trustee's Petition, which is attached as Exhibit B to the Rolnick Declaration.

[2] Because the C30 Trust held only a portion of the $3 billion Senior Loan, the Senior Loan qualified as a "Loan Pair" under the C30 Trust's Pooling and Servicing Agreement.

C30 Trust was designated the "Lead Lender" of the Senior Loan, with the right to administer the Senior Loan on behalf of all of the Trusts.  (*Id.* ¶ 26.)

In the ordinary course, payments made on the mortgage loans held by the Trusts are collected by the "Master Servicer," and, following certain events of default, such duties fall to CWC as the Special Servicer.  (Pet. ¶ 19.)  As an agent of the Trusts, the Special Servicer is compensated through the payment of special servicing fees, workout fees, and liquidation fees. (Appaloosa Obj. ¶¶ 8-10.)  Under certain circumstances (none of which are present here), the Special Servicer may also receive ancillary forms of compensation.  (*Id.* ¶ 11.)  One goal of a special servicer is to make a non-performing loan a performing loan again.  In order to create an incentive on the part of the special servicer to get the borrower paying again, the special servicer gets additional compensation in the form of default interest that is *actually paid* by a borrower during a period of delinquency.  It is difficult to make delinquent borrowers pay default interest, however, and ordinarily delinquent borrowers do not become current.  Instead, foreclosure proceedings usually ensue and the asset is often sold to satisfy the loan.

Because of the enormous size of the Senior Loan, the fees payable to CWC in connection with foreclosure proceedings were carefully circumscribed.  The PSA contains special provisions capping the fees payable to CWC in connection with Stuy Town.  Specifically, CWC's workout fee for the Senior Loan and its liquidation fee for the Senior Loan were each capped at $15 million.  (*Id.* ¶ 23.)  Such a cap makes perfect sense.  Even a fractional percentage of the principal and interest payments paid on the $3 billion Senior Loan or the proceeds from the sale of the property (sold for more than $5 billion), would result in a payment completely disproportionate to any work performed by CWC in making the loan current or liquidating the loan.  (*Id.* ¶ 24.)  The elements of CWC's special servicing compensation were confirmed by the

C30 Trust's marketing documents, which represented to investors that CWC's "principal compensation" as Special Servicer would consist of its ordinary course special servicing fee, along with any liquidation or workout fee. (*Id.* ¶ 8.)

In late 2009, the Senior Loan was placed into special servicing after the borrowers fell behind on their interest payments. (Pet. ¶ 28.) On or about January 8, 2010, CWC sent a notice of an event of default to the Borrowers. (*Id.* ¶ 29.) On or about January 29, 2010, after the Borrowers failed to cure the event of default, CWC accelerated the unpaid loan debt. (*Id.*) As a result, the full outstanding principal balance of the Senior Loan, plus all accrued and unpaid interest thereon, immediately became due and payable. (*Id.*) In early 2010, CWC, in its role as Special Servicer of the C30 Trust, instituted foreclosure proceedings in federal court. (*Id.* ¶ 30.) Throughout this period, it appears CWC was not successful in collecting any default interest from the borrowers, and no default interest was actually paid.

On June 21, 2010, the court issued a Judgment of Foreclosure and Sale (the "Foreclosure Judgment"), appointing a referee to conduct the sale of the property and calculating the amounts owed on the Senior Loan. (Pet. ¶ 31.) The district court computed that the amount owed on the Senior Loan was $3,666,734,464.70, which represented: (1) the unpaid principal balance of $3 billion; (2) plus ordinary interest of $48,225,000 through April 7, 2010; (3) plus default interest on unpaid principal through April 7, 2010, of $22,500,000; (4) plus default interest on unpaid interest of $220,423.67 through April 7, 2010; (5) plus per diem interest on principal and unpaid interest of $11,916,443.70 between April 7, 2010, and April 22, 2010; (6) plus yield maintenance charges of $622,110,023.31; (7) plus other charges incurred under the loan documents of $956,427.96; (8) less $39,223,853.94 in cash flow from operations, escrow balances and interest reserves. (Appaloosa Obj. ¶ 27.) The Court further found that additional interest on the

outstanding principal balance and unpaid interest would continue to run at a rate 6.434%, and that default interest on the outstanding principal balance and unpaid interest would continue to run at a rate of 3%, through the date of the Foreclosure Judgment. (*Id.*) Thereafter, post-judgment interest would run on the amount of the judgment at the legal rate, but default interest would cease to accrue. (*Id.*) The amount of default interest that accrued up to the date of entry of the Foreclosure Judgment is approximately $38.2 million. (*Id.* ¶ 68.)

Once a foreclosure proceeding occurs, the subject property may be sold to satisfy the judgment. However, in many cases, the lender takes title to the property and it becomes "real estate owned" or "REO" property. In this case, the foreclosure sale of Stuy Town never occurred. (Pet. ¶ 32.) Instead, four years later, following a series of complex machinations and litigation involving the Mezzanine Loans, title to Stuy Town passed to special purpose entities that are nominees to hold Stuy Town on behalf of the Stuy Town CMBS Trusts through a deed in lieu of foreclosure executed in 2014. (*Id.* ¶ 33.) Thus, the Trusts became the beneficial owners of Stuy Town. (*Id.*) Under the PSAs, Stuy Town became an "REO Property" of the Trusts and the Senior Loan became an "REO Loan." (*Id.* ¶ 34.)

In late 2015, the REO property was sold at a price that generated a substantial gain. On October 20, 2015, it was publicly announced that Blackstone Group LP ("Blackstone") and Ivanhoe Cambridge Inc. ("Ivanhoe") had agreed to purchase Stuy Town from the Trusts for $5.3 billion. (Pet. ¶ 36.) The net proceeds of the sale exceeded the unpaid principal and interest due on the Senior Loan at the time of the Foreclosure Judgment by more than $1 billion. (*Id.* ¶ 37.)

B.  **CWC's Improper Diversion of "Gain on Sale" Proceeds from the Sale of Stuy Town to Purported "Penalty Interest"**

Payments of principal and interest received by the Trusts from the borrowers of the mortgage loans are distributed to the beneficiaries of the Trusts ("Certificateholders") according

to a payment waterfall set forth in the PSAs. (*See* Appaloosa Obj. ¶ 6.)  When a borrower defaults on a mortgage loan and the Trusts liquidate the property, recouping less than the outstanding principal and interest payments left on the loan, the Trusts recognize a realized loss on the asset, which is passed through to certain Certificateholders, with the more junior tranches of certificates incurring a loss first. (*Id.* ¶ 12.)

Conversely, if the Trusts achieve a gain from the sale of REO property, the "gain on sale" is used to offset past or future realized losses suffered by the Certificateholders on other assets of the Trusts. (Appaloosa Obj. ¶ 14.)  To ensure that any gains are used for this purpose, Section 3.04(e) of the C30 Trust PSA *requires* the Paying Agent to establish a segregated "Gain-on-Sale Reserve Account" and mandates that it deposit into that account the "Gain-on-Sale Proceeds" received from the Special Servicer. (*Id.* ¶ 15.)[3]  Gain-on-Sale Proceeds are defined in Section 1.01 of the PSA as the excess of (i) the "Liquidation Proceeds" net of any "Liquidation Expenses" over (ii) the "Purchase Price." (*Id.* ¶ 16.)  "Liquidation Proceeds" are the proceeds received in connection with the liquidation of a mortgaged property, "Liquidation Expenses" are the actual out-of-pocket expenses incurred by the C30 Trust in liquidating the mortgaged property, and the "Purchase Price" is generally equal to the outstanding principal balance of the mortgage loan, plus any accrued but unpaid interest on the mortgage loan, plus any servicing advances that have been made on the mortgage loan and are still owed to the Master Servicer or Special Servicer. (*Id.*)[4]  Pursuant to Section 4.01(*l*) of the PSA, the amounts required to be deposited into the Gain-on-Sale Reserve Account must be distributed by the Paying Agent to

---

[3] In the COBALT CMBS Commercial Mortgage Trust 2007-C2 (the "C2 Trust"), the Gain-on-Sale Reserve Account is referred to as the "Excess Liquidation Proceeds Account."

[4] Thus, for example, if the servicer paid the borrower's homeowner insurance premiums but those advances by the servicer were never repaid because the borrower stopped making her monthly mortgage payments, such unreimbursed advances would be deducted from the Liquidation Proceeds.

reimburse Certificateholders for prior or future realized losses. (*Id.* ¶ 17.)

The proceeds from the sale of Stuy Town resulted in a more than $1 billion gain on sale to the Stuy Town CMBS Trusts. (*Id.* ¶ 31.) However, instead of remitting the gain from the sale of Stuy Town to the Gain-on-Sale Reserve Accounts, as required under the PSA, CWC diverted to itself over $600 million of the gain-on-sale proceeds (the "Diverted Funds"). (*Id.* ¶ 33.) CWC has argued that although such amounts were never collected or paid by the borrower when it was servicing the loan, they should be characterized as Penalty Interest that had purportedly *accrued* on the Senior Loan since 2010. (*Id.* at ¶ 56.) CWC took the position that it was entitled to retain more than one-half billion dollars as "additional" special servicing compensation rather than using the gain-on-sale proceeds to offset Certificateholders' prior and future realized losses in the Trusts as required by the PSA.

Appaloosa does not dispute that, in connection with the sale of Stuy Town to Blackstone and Ivanhoe, CWC was permitted to receive its Special Servicing Fee and its Liquidation Fee. (Appaloosa Obj. ¶ 32.) As noted above, CWC's Liquidation Fee is capped at $15 million. (*Id.* ¶ 23.) CWC's Special Servicing Fee was approximately $45 million. Together, these fees totaled $60 million – a substantial sum. (*Id.* ¶ 32.) However, CWC claims that it is entitled to more than $600 million in unpaid default interest that purportedly "accrued" on the Senior Loan since 2010 and that it can divert such amount from the gain-on-sale proceeds. Thus, CWC asserts that it should receive more than one-half billion dollars, ***ten times its "principal compensation" as Special Servicer***, from amounts required to be used to offset the Stuy Town CMBS Trusts' prior and future realized losses on the loan. (*Id.* ¶ 33.)

### C.    Proceedings in the Minnesota Courts

On December 17, 2015, the Trustee filed a Petition for Instructions in Minnesota pursuant to the Minnesota Trust Code, which is the operative Petition in this litigation. The

Trustee asked the Minnesota court to issue instructions concerning the proper interpretation of the PSAs. (Pet. ¶ 13.) Specifically, the Trustee presented two discrete issues to the Minnesota court (now before this Court) for judicial decision and instruction: (1) "whether any amounts paid for [Stuy Town] properly constitute 'Penalty Interest' that will be due to the Special Servicer following the sale of the Property, as opposed to Gain-on-Sale Proceeds that must be deposited into the Gain-on-Sale Reserve Account"; and (2) what "is the amount of 'penalty interest (arising out of a default)' [if any] that has accrued on the [Senior Loan] relating to each Trust's interest in [Stuy Town]?" (*Id.* ¶¶ 43, 51.)

Appaloosa filed its objection to the Petition on February 3, 2016. In addition to arguing that the disputed sale proceeds were Gain-on-Sale Proceeds that were required to be deposited into the Gain-on-Sale Reserve Accounts for the benefit of Certificateholders, Appaloosa's objection sought a full and complete accounting from CWC of its management and sale of Stuy Town. (Appaloosa Obj. ¶¶ 74-78.) Instead of filing an objection, CWC moved to dismiss the Petition for lack of subject matter and personal jurisdiction, lack of standing, forum non conveniens, and mootness. While CWC's motion to dismiss was pending, on April 28, 2016, the Federal National Mortgage Association ("Fannie Mae") filed an objection to the Petition contesting Appaloosa's interpretation of the governing agreements to the extent such interpretation denies Fannie Mae distributions of "Yield Maintenance Charges." Similarly, on May 6, 2016, the Federal Home Loan Mortgage Corporation ("Freddie Mac," and collectively with Fannie Mae, the "GSEs") filed an objection taking essentially the same position as Fannie Mae.

On July 19, 2016, the Minnesota state court issued an Order and Memorandum denying CWC's motion to dismiss the Petition. Soon thereafter, Freddie Mac removed the Petition to the

U.S. District Court for the District of Minnesota, and the case was subsequently transferred to this Court.  CWC filed its Answer and Objection to the Petition in this Court on May 2, 2017.

### D.     The Relief Sought

Based on the undisputed facts and unambiguous language of the governing contracts, Appaloosa respectfully seeks judgment on the pleadings instructing the Trustee that (1) the Diverted Funds are Gain-on-Sale Proceeds that must be deposited into the Gain-on-Sale Reserve Account, (2) no portion of the Diverted Funds properly constitute "Penalty Interest" due to the Special Servicer, (3) the GSEs are not entitled to deduct Yield Maintenance Charges from the Gain-on-Sale Proceeds, and (4) even if CWC were entitled to some amount of Penalty Interest – which it is not – such interest stopped accruing on the Senior Loan as a matter of law when the Foreclosure Judgment was entered in June 2010 (which caps any Penalty Interest to which CWC could be entitled at approximately $38 million) because any interest that accrued thereafter was post-judgment interest on the Foreclosure Judgment.  The Objections of CWC and the GSEs seeking contrary instructions to the Trustee should be dismissed with prejudice.  Appaloosa at this time does not seek judgment on its claim for an accounting against CWC.

### STANDARD OF REVIEW

In this case, all parties (other than the Trustee) have stated they intend to move for judgment on the pleadings, with each party affirmatively pursuing its interpretation of the governing contracts.  Pursuant to Rule 12(c), judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).  Such motions are "particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *Id.* (quoting *VoiceAge Corp. v.*

*RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013)).  Just as with Rule 12(b)(6), to survive a Rule 12(c) motion, the non-moving party must plead facts stating a plausible claim to relief.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  Plausibility "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 430 (internal quotation marks and citation omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).

The Court must accept the non-moving party's well-pleaded allegations as true and draw all reasonable inferences in that party's favor.  *Tropic CDO I*, 92 F. Supp. 3d at 171.  "The pleadings are 'deemed to include any written instrument attached to [them] as an exhibit, materials incorporated in [them] by reference, and documents that, although not incorporated by reference, are integral to the complaint.'"  *Id.* (alterations in original) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  Where a party's allegations are contradicted by documents properly considered on a Rule 12(c) motion, the documents control.  *Id.*

All of the relevant agreements in this case are governed by New York law, which has well-established principles governing judicial interpretation of contracts.  Because the "best evidence of what parties to a written agreement intend is what they say in their writing . . . , a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal quotation and citations omitted); *see also W.W.W. Assocs, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  Whether or not a contract is ambiguous is a question of law for the Court, *Giancontieri*, 77 N.Y.2d at 162, as is the correct construction of an unambiguous contract, *Hirsch v. Food Res., Inc.*, 24 A.D.3d 293, 295 (1st Dep't 2005).  "A

contract is ambiguous only if 'the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'" *Tropic CDO I*, 92 F. Supp. 3d at 172 (quoting *Goldman Sachs Grp., Inc. v. Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011)). But a contract "is not ambiguous simply because the parties would construe it differently." *Id.* The "primary objective" in construing an agreement "is to give effect to the intent of the parties as revealed by the language they chose to use." *Id.* (quoting *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000)).

In contract interpretation, form can never be allowed to prevail over substance. *See Chem. Bank v. Meltzer*, 93 N.Y.2d 296, 304 (1999) (rejecting reading that "would elevate form over substance, obfuscate the nature of [a party's] legal obligations and gloss over the essential character of this transaction"); *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (same). Furthermore, the Court must avoid an interpretation that would render any provision of the contract superfluous, *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 463 (S.D.N.Y. 2009), *aff'd in pertinent part*, 726 F.3d 269 (2d Cir. 2013); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010), and should read the language "to conform to the parties' reasonable expectations," *Bank of N.Y. Trust Co.*, 726 F.3d at 279. The "Court will 'look to all corners of the document rather than view sentences or clauses in isolation.'" *Tropic CDO I*, 92 F. Supp. 3d at 172 (quoting *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989)).

## **ARGUMENT**

## I. **CWC'S CLAIM TO DEFAULT INTEREST VIOLATES THE PLAIN TERMS OF THE PSA**

CWC's claim that more than $600 million in allegedly accrued but unpaid default interest can be diverted from the gain on sale in connection with the sale of Stuy Town violates the plain

terms of the PSA. That money constitutes Gain-on-Sale Proceeds that must be deposited in the

Gain-on-Sale Reserve Accounts and belongs to the Certificateholders.

**A.      CWC's Unqualified Obligation to Segregate Gain-on-Sale Proceeds Following Sale of an REO Property and Remit Them to the Paying Agent**

Section 3.04(e) of the PSA requires the Paying Agent to establish a Gain-on-Sale Reserve

Account for the benefit of the Certificateholders whenever the C30 Trust recognizes a gain on

sale from a foreclosed property. Specifically:

> The Paying Agent, on behalf of the Trustee for the benefit of the Certificateholders, *shall* establish (upon notice from Special Servicer of an event occurring that generates Gain-on-Sale Proceeds) and maintain the Gain-on-Sale Reserve Account in the name of the Paying Agent on behalf of the Trustee for the benefit of the Certificateholders. The Gain-on-Sale Reserve Account *shall be maintained as a segregated account, separate and apart from* trust funds for mortgage pass-through certificates of other series administered by the Paying Agent *and other accounts* of the Paying Agent. *Upon the disposition of any REO Property . . . the Special Servicer will calculate the Gain-on-Sale Proceeds, if any, realized in connection with such sale and remit such funds to the Paying Agent for deposit into the Gain-on-Sale Reserve Account.*

(PSA §3.04(e) (emphasis added).)[5]  The PSAs for the other Stuy Town CMBS Trusts contain

identical Gain-on-Sale Reserve Account provisions, although in the case of the C2 Trust, the

segregated account is referred to as the "Excess Liquidation Proceeds Account." (Appaloosa

Obj. ¶ 43.)

Thus, when the Special Servicer sold Stuy Town (which was, by that point in time, an

REO Property of the Trusts), it was required to determine whether any Gain-on-Sale Proceeds

(as defined in the PSA) were realized from the sale and remit them to the Paying Agent to be

deposited into the Trusts' Gain-on-Sale Reserve Accounts. CWC's obligation upon the

disposition of an REO Property to calculate the Gain-on-Sale Proceeds, segregate them from the

---

[5] A copy of the PSA, which is filed herewith as Exhibit C to the Rolnick Declaration, was attached as an exhibit to Appaloosa's Objection to the Petition.

other amounts realized from the sale, and forward them to the Paying Agent is express and unconditional.

### B. Any Unpaid and Accrued Penalty Interest on an REO Property Is Not Deductible from the Gain-on-Sale Proceeds Realized If That Property Is Sold

"Gain-on-Sale Proceeds" is clearly and unambiguously defined in Section 1.01 of PSA as:

> With respect to any Mortgage Loan, the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received.

(PSA at 41.)  All cash proceeds received by CWC from the sale of Stuy Town are deemed to be "Liquidation Proceeds" under the PSA.  "Liquidation Proceeds" is defined in Section 1.01 of the PSA, in pertinent part, as:

> *All cash amounts . . . received* by the Master Servicer or the Special Servicer *in connection with*: . . . (ii) the liquidation of a Mortgaged Property or other collateral constituting security for a Defaulted Mortgage Loan, through trustee's sale, foreclosure sale, *REO Disposition*[6] or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage . . . .

(*Id.* at 47.)  While not expressly defined in the PSA, the ordinary meaning of the term "Liquidation Expenses" is limited to actual out-of-pocket expenses, such as appraisal and attorneys' fees, incurred in connection with "liquidating" or selling the property.  Therefore, the Special Servicer must segregate, and the Paying Agent must deposit into the Stuy Town CMBS Trusts' Gain-on-Sale Reserve Accounts, the cash received from the sale of Stuy Town less out-of-pocket expenses incurred in connection with consummating the sale of Stuy Town, less the "Purchase Price" of the Senior Loan.

---

[6] An REO Disposition means the sale or other disposition of an REO Property.  (PSA at 74.)

"Purchase Price" is defined in Section 1.01 of the PSA, in pertinent part, as:

> [A] cash price equal to the outstanding principal balance of such Mortgage Loan or REO Loan, as of the date of purchase, together with (a) all accrued and unpaid interest on such Mortgage Loan or REO Loan at the related Mortgage Rate . . . plus any accrued interest on P&I Advances made with respect to such Mortgage Loan, (b) all related and unreimbursed Servicing Advances plus any accrued and unpaid interest thereon, (c) any reasonable costs and expenses, including, but not limited to, the cost of any enforcement action, incurred by the Master Servicer, the Special Servicer or the C30 Trust Fund in connection with any such purchase . . . and (d) any other Additional Trust Fund Expenses in respect of such Mortgage Loan (including any Additional Trust Fund Expenses previously reimbursed or paid by the C30 Trust Fund but not so reimbursed by the related Mortgagor or other party or from Insurance Proceeds or condemnation proceeds or any other collections in respect of the Mortgage Loan or the related Mortgaged Property from a source other than the C30 Trust Fund), ***or in the case of any Loan Pair, the purchase price specified in the related Intercreditor Agreement***; provided that the Purchase Price shall not be reduced by any outstanding P&I Advance.

(*Id.* at 68-69.)  A "Loan Pair" is defined in Section 1.01 as "[c]ollectively, any Co-Lender Loan and its related Companion Loan(s)." (*Id.* at 48.)  The share of the Senior Loan held by the C30 Trust is defined in the PSA as a "Co-Lender Loan," and the shares of the Senior Loan held by the other Stuy Town CMBS Trusts are defined as "Companion Loans" in the PSA.  (*Id.* at 3-4.) Thus, the Senior Loan is a Loan Pair under the PSA.  Because the Senior Loan is a Loan Pair under the PSA, the applicable purchase price is as defined in the related Intercreditor Agreement, which is the Co-Lender Agreement.

Section 3(b) of the Co-Lender Agreement sets forth the purchase price at which the Controlling Class Representative of the C30 Trust may purchase the other Stuy Town CMBS Trusts' shares of the Senior Loan in the event that a default is declared on the C30 Trust's share

of the Senior Loan.  (Co-Lender Agreement § 3(b).)[7]  That provision states as follows (in

pertinent part):

> In the event that Loan A-1 becomes a Defaulted Mortgage Loan
> (as defined in the Pooling Agreement), the Controlling Class
> Representative with respect to such Securitization shall have an
> assignable right to purchase all of the Loans, as a collective whole,
> at a price equal to (i) the Purchase Price (as defined in the Pooling
> Agreement) with respect to the Loans, as a collective whole, if the
> Special Servicer has not yet determined the fair value of the Loans,
> or (ii) the fair value of the Loans as determined by the Special
> Servicer pursuant to the Pooling Agreement.

(*Id.*)  In other words, if CWC has not determined the "fair value" of the Senior Loan, then under

clause (i) the Purchase Price under the Co-Lender Agreement is the Purchase Price as defined in

the PSA.  In doing so, the Co-Lender agreement refers back to the Purchase Price in the PSA.

However, if CWC has made a fair value determination, then the Purchase Price for the Senior

Loan under the Co-Lender Agreement (and, hence, under the PSA) is their fair value as

determined by CWC.

Clause (i) applies here, which means the PSA's definition of Purchase Price governs the

calculation of Gain-on-Sale Proceeds.   Neither the Trustee nor Appaloosa has alleged the

existence of a "fair value" determination of the Senior Loan by CWC.  Nor, for that matter, has

CWC.  These parties' pleadings, and the exhibits attached thereto, are devoid of any mention of a

Special Servicer fair value determination.   Although the GSEs allege in their respective

Objections that such a determination exists, for the reasons set forth in Point II *infra*, that

allegation does not even come close to satisfying Rule 12(c)'s plausibility standard.  Given this

state of the record, the absence of any evidence – or even a well-pled allegation – that CWC

made a determination of the fair value of the Senior Loan means that clause (i) of Section 3(b)

---

[7] A copy of the Co-Lender Agreement, which is filed herewith as Exhibit D to the Rolnick Declaration, was attached as an exhibit to Appaloosa's Objection to the Petition.

governs.  Thus, following the definition in the PSA, the Co-Lender Agreement's definition of Purchase Price includes the outstanding principal balance, all accrued and unpaid interest at the mortgage rate plus any accrued interest on principal and interest advances, servicing advances plus any accrued and unpaid interest thereon, any reasonable costs and expenses, and any other "Additional Trust Fund Expenses."  (PSA at 68-69.)

None of the components of the calculation of a loan's Purchase Price includes default interest or Penalty Interest.  Accrued interest (subdivision (a) of the PSA definition) is limited to interest that has accrued at the "Mortgage Rate," which is the rate set forth in the mortgage documents.  (PSA at 69 (definition of "Purchase Price").)  "P&I Advances" are advances on principal and interest actually made by the servicer to the trust and have nothing to do with default interest.  (*See id.* § 4.03.)  "Servicing Advances" (subdivision (b)) consist of hard, out-of-pocket expenses actually paid by the Special Servicer in administering an REO Property, which would not include default interest accruing against the borrower.  (*See id.* at 79-80.)  The costs of an enforcement action to effectuate repurchase of the mortgage loan by its original seller (subdivision (c)) are irrelevant where the Purchase Price is being calculated for purposes of determining Gain-on-Sale Proceeds from the sale of an REO Property.

Finally, Additional Trust Fund Expenses (subdivision (d)) encompass a wide variety of actual out-of-pocket expenses paid by the C30 Trust, including the ordinary course Special Servicing Fees paid to the Special Servicer, but do not include Penalty Interest.  (PSA at 7-8, 82.)  Indeed, although the definition of Additional Trust Fund Expenses includes various expenses that may be withdrawn from the Certificate Account under Section 3.05(a), it *excludes* 3.05(a)(xii), (*id.* at 7-8), which allows payment of "additional servicing compensation in accordance with Section 3.11(d)" (*id.* at 123).  Penalty Interest purportedly owed to CWC as

additional servicing compensation under Section 3.11(d) does not constitute an Additional Trust Fund Expense.   In fact, Penalty Interest is not included in the Purchase Price for an REO Property at all.

Accordingly, upon the sale of Stuy Town, the default interest claimed by CWC is not deducted from the Liquidation Proceeds for purposes of calculating the Gain-on-Sale Proceeds. CWC was obligated to remit the entirety of the Gain-on-Sale Proceeds, as calculated under the terms of the PSA, to Wells Fargo for deposit into the Stuy Town CMBS Trusts' Gain-on-Sale Reserve Accounts.   It was not entitled to divert any portion of those proceeds – including any alleged Penalty Interest – to itself.

> **C.     Neither Section 3.11(d), Nor Any Other Provision of the PSA, Relieves CWC of Its Unqualified Contractual Obligation to Remit the Entirety of the Gain-on-Sale Proceeds to the Paying Agent for the Benefit of Certificateholders**

CWC's claim to the Penalty Interest is based on Section 3.11(d) of the PSA, which permits it to retain "Penalty Interest" it has "actually collected" as additional servicing compensation in certain circumstances.  (PSA § 3.11(d).)  But that provision does not authorize CWC to do so when the Penalty Interest was never actually collected from the borrower and instead there is a sale of an REO Property that generates Gain-on-Sale Proceeds.  After setting forth the various categories of "[a]dditional servicing compensation" to which the Special Servicer is entitled, Section 3.11(d) provides that the "actually collected" amounts "shall be retained by the Special Servicer or promptly paid to the Special Servicer by the Master Servicer ***and shall not be required to be deposited in the Certificate Account***."  (*Id.* (emphasis added); *see also id.* § 3.04(a).)    Section 3.11(d) thus creates an incentive on the part of the Special Servicer to get the borrower paying again by allowing it to retain any amounts that it actually collects while the loan is in default.  To the extent CWC "actually collect[s]" any penalty interest from the borrower, it is allowed to retain it as additional servicer compensation without having to

deposit that money into the Certificate Account.   By contrast, CWC's interpretation would create a perverse incentive for an unscrupulous Special Servicer to indefinitely delay resolution of a defaulted loan in order to maximize the accrual of Penalty Interest while needlessly exposing the Trust to downside market risk in the underlying property – all for the purpose of maximizing the value of a Special Servicer "lottery ticket."

CWC cannot dip into Gain-on-Sale Proceeds to divert those proceeds to pay allegedly accrued but unpaid default interest.  In construing a contract, the Court must "look to all corners of the document rather than view sentences or clauses in isolation." *Tropic CDO I*, 92 F. Supp. 3d at 172 (quoting *Int'l Klafter Co.*, 869 F.2d at 99).  CWC cannot prevail by simply looking to Section 3.11(d) by itself without reference to other provisions in the PSA that limit its reach. And, on the issue of Gain-on-Sale Proceeds, the PSA is as clear as can be.  Where, as here, an REO Property is sold for a gain over and above the amounts owed under the mortgage, the Gain-on-Sale Proceeds must be deposited in the Gain-on-Sale Reserve Account (not in the Certificate Account) after CWC transfers them to the Paying Agent.  (PSA § 3.04(e) (requiring that "[u]pon the disposition of any REO Property" in accordance with the PSA's applicable provisions, "the Special Servicer will calculate the Gain-on-Sale Proceeds, if any, realized in connection with such sale *and remit such funds to the Paying Agent for deposit into the Gain-on-Sale Reserve Account*" (emphasis added).)  This is made abundantly clear by Section 3.18(*l*) of the PSA:

> The amount paid for a Defaulted Mortgage Loan . . . or related REO Property . . . purchased under this Agreement shall be deposited into the Certificate Account, or if applicable, applied in accordance with the related Intercreditor Agreement (*except that portion of any purchase price constituting Gain-on-Sale Proceeds which shall be deposited in the Gain-on-Sale Reserve Account*).

(PSA § 3.18(*l*) (emphasis added).)  Gain-on-Sale Proceeds never go in the Certificate Account.

Reading (i) the PSA's definition of Gain-on-Sale Proceeds (which do not permit

deduction of allegedly accrued but unpaid Penalty Interest from Gain-on-Sale Proceeds) in combination with (ii) its provisions imposing an unqualified obligation on CWC to segregate Gain-on-Sale Proceeds following sale of an REO Property and remit them to the Paying Agent and (iii) the provisions prohibiting Gain-on-Sale Proceeds from being deposited in the Certificate Account leads inexorably to one conclusion:  in the specific situation where a sale of an REO Property generates Gain-on-Sale Proceeds, CWC is not entitled to Penalty Interest *regardless of whether it would be allowed to retain such interest as additional servicing compensation under Section 3.11(d) in general circumstances where the PSA's Gain-on-Sale provisions do not apply*.  *See Herr v. Herr*, 97 A.D.3d 961, 963 (3d Dep't) (where "a contract . . . employs contradictory language, specific provisions control over general provisions" (quoting *Green Harbour Homeowners' Assn. v. G.H. Dev. & Constr., Inc.*, 14 A.D.3d 963, 965 (3d Dep't 2005))), *leave to appeal dismissed*, 20 N.Y.3d 904 (2012).

Nothing in Section 3.11(d) even arguably permits the Special Servicer to withhold amounts claimed as additional servicing compensation from the funds that are required to be deposited in the Gain-on-Sale Reserve Account.  Indeed, the fact that Section 3.11(d) explicitly authorizes CWC to withhold additional servicing compensation from the Certificate Account – but not the Gain-on-Sale Reserve Account – confirms that it must remit the entire amount of the Gain-on-Sale Proceeds – including any alleged Penalty Interest – to the Paying Agent for deposit into the Gain-on-Sale Reserve Account without deductions, and then deposit the remainder in the Certificate Account.  (PSA §§ 3.04(e), 3.18(*l*).).  *See, e.g., Am. Tax Funding, LLC v. City of Syracuse*, 41 F. Supp. 3d 188, 194 (N.D.N.Y. 2014) (holding that parties' inclusion of particular language in one part of a contract suggests its omission from other parts of the same contract was intentional).  Additional servicing compensation claimed by the Special Servicer in the form of

Penalty Interest cannot be diverted from money that is required to be deposited in the Gain-on-Sale Reserve Account.

This basic point, which follows naturally from the PSA's plain language, is fatal to CWC's entire argument that it can deduct and retain the alleged Penalty Interest on the Stuy Town Senior Loan.  Retention by CWC of any portion of the uncollected, unpaid Penalty Interest is simply not authorized by the PSA when disposition of an REO Property results in Gain-on-Sale Proceeds.  CWC must remit the entire amount of the Gain-on-Sale Proceeds to the Paying Agent for deposit into the Gain-on-Sale Reserve Account without deductions, and then deposit the remainder in the Certificate Account.  (PSA §§ 3.04(e), 3.18(*l*).)

That remainder is essentially the same amount as the Purchase Price, which is what is left over once the Gain-on-Sale Proceeds are calculated and transferred to the Paying Agent.  (PSA at 41 (providing that Gain-on-Sale Proceeds equal the excess of Liquidation Proceeds (net of Liquidation Expenses) over the loan's Purchase Price).)  In the case of Stuy Town, that remainder amount will consist of the outstanding principal balance on the Senior Loan plus (i) accrued interest at the (non-default) Mortgage Rate on the loan and on P&I Advances, (ii) Servicing Advances, and (iii) Additional Trust Fund Expenses.  (*Id.* at 68-69.)  It will not include Penalty Interest.  In other words, if the sale proceeds flow in accordance with the PSA's plain terms, the Certificate Account will not contain any money that can be applied to cover supposed Penalty Interest on the Stuy Town Loan.

Section 3.02 of the PSA and the definition of "REO Loan" are not to the contrary.  Under Section 3.02, "[a]mounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof."  (PSA § 3.02(b) (emphasis added).)  In turn, the REO Loan definition provides that "[c]ollections in respect of each REO Loan . . . shall be treated: . . .

*fourth*, in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums and Penalty Interest, and (ii) Additional Interest and other amounts, in that order." (*Id.* at 74-75 (emphasis added).)  Again, however, these two provisions cannot be read in isolation without reference to the Gain-on-Sale Proceeds provisions.  The waterfall works differently where funds "collected" while the loan is being serviced are involved, rather than proceeds of a sale that constitute Gain-on-Sale Proceeds.  For example, amounts paid on the loan out of income generated from the Special Servicer's operation of the property (such as rent collected from tenants) might qualify as "[c]ollections in respect of" the REO Loan.  (*Id.* at 74.)  In those circumstances, where a sale of the REO Property is not involved, there are no Gain-on-Sale Proceeds to speak of, and the amounts collected are treated in accordance with Section 3.02(b) and the REO Loan definition.  But where Gain-on-Sale Proceeds are generated as a result of a sale of the REO Property, then the more specifically tailored PSA provisions governing Gain-on-Sale Proceeds prevail over the general terms of the REO Loan definition's waterfall.  *See Herr*, 97 A.D.3d at 963.  Interpreting the PSA in this way does not render either Section 3.02(b) or the REO Loan definition superfluous, as both provisions operate fully in the absence of a transaction generating Gain-on-Sale Proceeds.

Also irrelevant is Section 3.05(a)(xii), which allows withdrawals from the Certificate Account to pay additional servicing compensation.  Because of the requirement that Gain-on-Sale Proceeds be deposited in the specially-segregated Gain-on-Sale Reserve Account and are never allowed to be diverted to the Certificate Account, no funds from will be available in the Certificate Account to be applied as Penalty Interest and withdrawn to pay additional servicing compensation.  Instead, the Gain-on-Sale Proceeds belong to the Certificateholders.

Nor may CWC withdraw funds from the Stuy Town CMBS Trusts' Gain-on-Sale Reserve Accounts after the proceeds of the sale have been deposited. To the contrary, the funds in those accounts are to be used exclusively for the purpose of reimbursing certain Certificateholders for realized losses incurred by their respective tranches.

Section 4.01(*l*) of the PSA provides that the Paying Agent "shall withdraw amounts from the Gain-on-Sale Reserve Account and shall distribute such amounts to reimburse the Holders of each Class of Sequential Pay Certificates . . . up to an amount equal to all Realized Losses and Additional Trust Fund Expenses, if any, previously deemed allocated to such Classes and unreimbursed after application of the Available Distribution Amount for such Distribution Date." (PSA § 4.01(*l*).) If any funds are remaining in the Gain-on-Sale Reserve Account after such distributions are made, the residue "shall be applied to offset future Realized Losses and Additional Trust Fund Expenses" and, upon the ultimate termination of the trust, are to be distributed to certain Certificateholders. (*Id.*)

Indeed, it would be commercially unreasonable to believe that the PSA contemplated a payment to CWC of more than one-half billion dollars in purported default interest. The Stuy Town CMBS Trusts are structured so that the losses incurred on the mortgage loans held by those trusts are borne by the Certificateholders. But, when the trusts achieve a gain from the sale of property securing a non-performing loan, that gain must be passed through to Certificateholders to offset the past losses they have suffered and the future losses they will suffer. It is hard to imagine why anyone would intend to allow that gain to be diverted to the Special Servicer as a windfall.

In sum, under the unambiguous terms of the governing contracts, CWC is not entitled to divert accrued but unpaid default interest out of the sale proceeds from Stuy Town. Instead,

CWC must (i) calculate the Gain-on-Sale Proceeds without deducting default interest from the Liquidation Proceeds, (ii) inform the Paying Agent that a specially-segregated Gain-on-Sale Reserve Account must be created (if one has not already been set up) for each Stuy Town CMBS Trust, and (iii) remit the full amount of the Gain-on-Sale Proceeds to the Paying Agent for deposit into the Stuy Town CMBS Trusts' Gain-on-Sale Reserve Accounts. That money then becomes a reserve that is to be used to reimburse certain Certificateholders for realized losses they have incurred (or may incur in the future) because other loans in the trusts have failed to perform (or may fail to perform later). The Trustee should be so instructed. Appaloosa is entitled to judgment on the pleadings as to this issue.

## II.   FOLLOWING ENTRY OF THE FORECLOSURE JUDGMENT, POST-JUDGMENT INTEREST ACCRUED, NOT PENALTY INTEREST

As explained above, the PSA clearly prohibits CWC from diverting alleged default interest from the Gain-on-Sale Proceeds. However, even if the PSA did not contain such a prohibition, CWC's calculation of default interest is incorrect. The Foreclosure Judgment – to which CWC is bound in its capacity as Special Servicer – expressly mandated that default interest would stop running as of June 21, 2010, the date judgment was entered, and that post-judgment interest would accrue thereafter at the legal rate. (Foreclosure Judgment at 5 ¶ 1 (providing that plaintiffs "have judgment herein on their claim for foreclosure in the amount of . . . plus default interest on the outstanding principal balance and previously unpaid interest at the interest rate of 3.000% per annum, in the amount of $258,262.91, *to the date of this judgment, with interest at the legal rate from the date of this judgment*[.]" (emphasis added)).)[8] *See SDF9 COBK LLC v. AF & NR LLC*, No. 12-cv-3078, 2014 WL 4244296, at *2 (E.D.N.Y. Aug. 26, 2014) (holding that contractual default interest did not accrue following entry of foreclosure

---

[8] A copy of the Foreclosure Judgment, which is filed herewith as Exhibit E to the Rolnick Declaration, was attached as an exhibit to Appaloosa's Objection to the Petition.

judgment).   At that point, the Trusts were judgment creditors against the Borrowers with the ability to sell the property; allowing them to continue to accrue default interest at a near usurious rate would only inflict gratuitous harm on the Borrowers.   The amount of default interest under the Foreclosure Judgment through the date judgment was entered is approximately $38.2 million. (Appaloosa Obj. ¶ 68.)

Post-judgment interest is not grounded in the loan agreement.   Rather, it is awarded by the Court to compensate the plaintiff for time value of money during the period before the judgment can be executed. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36, (1990) ("[T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." (alteration in original) (quoting *Poleto v. Consol. Rail Corp.*, 826 F.2d 1270, 1280 (3d Cir. 1987)).   It does not constitute a "penalty" on the Borrowers, and, thus, does not meet the PSA's definition of "Penalty Interest."   (PSA at 61 (defining "Penalty Interest" as "any amounts collected thereon, other than late payment charges, Additional Interest, Prepayment Premiums or Yield Maintenance Charges, that represent penalty interest (arising out of a default) in excess of interest on the Stated Principal Balance of such Mortgage Loan or Companion Loan (or successor REO Loan) accrued at the related Mortgage Rate.").)   Because CWC can only claim as additional servicing compensation Penalty Interest "actually collected that . . . accrued during the time that the related Mortgage Loan was a Specially Serviced Mortgage Loan"   (PSA § 3.11(d)), CWC has no claim to the post-judgment interest awarded by the Court.

As the Trustee's Petition notes (Pet. ¶ 53), CWC has claimed that Penalty Interest continued to accrue because it "abandoned" the Foreclosure Judgment under Section 18.20 of the

Amended and Restated Loan and Security Agreement (the "Loan Agreement") with the
Borrowers, which provides that

> [i]n case Lender shall have proceeded to enforce any right under
> this Loan Agreement or the Mortgage by foreclosure sale, entry or
> otherwise, and such proceedings shall have been discontinued or
> abandoned for any reason or shall have been determined adversely,
> then, in every such case, Borrower and Lender shall be restored to
> their former positions and rights hereunder with respect to the
> Property subject to the lien hereof and the lien of the Mortgage.

(Rolnick Decl. Ex. F § 18.20.)  This provision contemplates a situation in which a foreclosure

proceeding is "abandoned" or "determined adversely" to the lender.  In such circumstances, the

loan is "restored" and the borrower and lender are returned to their former positions.  However,

the foreclosure proceedings here were never "abandoned" or "determined adversely," and the

loan was never "restored."  The judicially-noticeable docket entries in the Foreclosure Action do

not support CWC's claim of "abandonment."  Instead, the docket entries reflect that CWC

simply *adjourned* the foreclosure sale on October 4, 13 and 22, 2010.  (*See* Rolnick Decl. Ex. G

(Dkt. Nos. 96, 98, 100).)  Then, on December 14, 2010, the district court entered an order noting

that on October 29, 2010, CWC had "adjourned the sale [of Stuy Town] *sine die **while reserving**

***their rights to proceed with the foreclosure sale at a later date***."  (*Id.* Ex. H at 1 (bold emphasis

added).)  The Foreclosure Judgment, which according to the docket has never been vacated, thus

remained in effect, with CWC enjoying the option over the ensuing four years to schedule a

foreclosure sale.  That is in no way "abandoning" the foreclosure proceedings, "restoring" the

loan, and "returning" the borrower and lender to their former positions.  The Foreclosure

Judgment was entered, was in full force and effect, and was accruing post-judgment interest.

Notwithstanding CWC's transparent attempts at delaying the property's sale, Penalty Interest did

not continue to accrue under Section 18.20 at any time following entry of the Foreclosure Judgment.[9]

Although a sale of the property was a remedy available to satisfy the Foreclosure Judgment, CWC was not required to force a sale but was instead permitted to accept the deed in lieu of a foreclosure sale in 2014.  But that does not help CWC.  At that point the Stuy Town Senior Loan became an REO Loan, and under the PSA no default interest accrues on an REO Loan.  Under the plain language of the PSA's definition of REO Loan,

> [e]ach REO Loan shall be deemed to be outstanding for so long as the related REO Property remains part of REMIC I and deemed to provide for Periodic Payments of principal and/or interest equal to its Assumed Scheduled Payment and otherwise to have the same terms and conditions as its predecessor Mortgage Loan (*such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan* and the acquisition of the related REO Property as part of the Trust Fund).

(PSA at 74 (emphasis added).)  In other words, for so long as the Trust owns an REO Property, the PSA treats the corresponding REO Loan as if it were continuing to make periodic principal and interest payments under the applicable loan documents as a performing (*i.e.*, non-defaulted) loan.  Because no Penalty Interest accrues on a loan that is not in default, the PSA does not permit the accrual of Penalty Interest on an REO Loan.

CWC has no contractual end-around that would allow it to circumvent the Foreclosure Judgment's cutoff of Penalty Interest accrual.  No such interest accrued under the Loan Agreement before the deed-in-lieu of foreclosure transaction, and none accrued under the PSA after that transaction.  The maximum amount of default interest that CWC could claim – even though such a claim is improper under the PSA for the reasons discussed above – is

---

[9] To the extent CWC tries to argue otherwise based on alleged facts different from those that can be gleaned from undisputed portions of the parties' pleadings or documents that can properly be considered on a Rule 12(c) motion, such an argument would raise factual disputes that can only be resolved on a full record compiled with the benefit of discovery.

approximately $38.2 million.   The remainder (over $500 million) must be returned to the Certificateholders by deposit into the specially-segregated Gain-on-Sale Reserve Accounts.

## III.   FANNIE MAE AND FREDDIE MAC ARE NOT ENTITLED TO YIELD MAINTENANCE CHARGES

The GSEs' Objections assert that "Yield Maintenance Charges" in some unspecified amount may be deducted from the Gain-on-Sale Proceeds and paid to senior Certificateholders. This contention contradicts the plain language of the relevant contracts.

"Yield maintenance" is generally designed to allow a lender to "maintain" the agreed-upon loan "yield" over the term of the loan in the event that the borrower prepays the loan before its maturity date.   The amounts claimed by the GSEs as "yield maintenance" purportedly arise from Section 2.3(b) of each of the Notes for the Stuy Town Senior Loan, which provides that, if the loan is accelerated as a result of an event of default, then, "in addition to the indebtedness evidenced by this Note being immediately due and payable, there shall also be immediately due and payable a prepayment fee in an amount equal to the Yield Maintenance Premium (as hereinafter defined) based on the Debt then outstanding on the date of such acceleration."   (*See, e.g.*, Rolnick Ex. I § 2.3(b).)   Section 2.3(b) defines "Yield Maintenance Premium" to mean "an amount equal to the greater of (A) one percent (1.0%) of the principal amount being prepaid, and (B) the present value of a series of payments each equal to the Payment Differential (as hereinafter defined) and payable on each Payment Date over the remaining original term of this Note and on the Maturity Date, discounted at the Reinvestment Yield (as hereinafter defined) for the number of  months remaining as of the date of such prepayment to each such Payment Date and the Lockout Expiration Date."   (*Id.*)[10]   The GSEs contend that these Yield Maintenance Premium fees (the "Fees") fall within the definition of "Yield Maintenance Charge" under the

---

[10] "Payment Deferential" and "Reinvestment Yield" are also defined in Section 2.3(b). (*See, e.g.*, Rolnick Ex. H  2.3(b).)

PSA.  As explained below, they do not, and, in any event, Yield Maintenance Charges are not deducted from the calculation of Gain-on-Sale Proceeds.

According to the GSEs, CWC initially calculated the Fees at $622,110,023 when it sought entry of the Foreclosure Judgment.  But, by the time the Property was sold in December 2015, the GSEs contend, "upon information and belief," that CWC calculated the Fees at just over $150 million (or over $100 million, according to Freddie Mac's objection).  (Rolnick Decl. Ex. J at 4; *id.* Ex. K at 7.)  The GSEs then erroneously rely on Section 3.02(b) and the REO Loan definition in the PSA (which includes Yield Maintenance *Charges* in its fourth level of the waterfall), as well as clause (ii) of Section 3(b) of the Co-Lender Agreement, in support of their contention that Yield Maintenance Charges can be diverted from Gain-on-Sale Proceeds and paid to the Trusts for distribution to themselves.  It bears noting that not even CWC has advanced the GSEs' reading of the relevant agreements.

The GSEs are wrong.  *First*, the GSEs' objections are moot because the funds they claim are not "Yield Maintenance Charges" as defined under the PSA, and the PSA is what governs here.  Yield Maintenance Charges must have been ***actually paid by the Mortgagor*** (which did not happen here).  Specifically, Yield Maintenance Charges are defined in the PSA as amounts "paid or payable, as the context requires, on a Mortgage Loan ***as the result of a Principal Prepayment thereon*** . . . ."  (PSA at 92 (emphasis added).)  "Any other prepayment premiums, penalties and fees not so calculated will not be considered 'Yield Maintenance Charges.'"  (*Id.*)  Thus, unless a Principal Prepayment has occurred, there is no Yield Maintenance Charge – regardless of how the Notes characterize the fees being charged to the Borrowers.

"Principal Prepayment" is defined in the PSA as "[a]ny payment of principal ***made by*** the Mortgagor on a Mortgage Loan or Companion Loan that is received in advance of its scheduled

Due Date; *provided* that it shall not include a payment of principal that is accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment." (PSA at 68 (bold emphasis added).) Putting the provisions together, Yield Maintenance Charges are amounts paid or payable as a result of a Principal Prepayment, and a Principal Prepayment can only be a payment "made by" the Mortgagor. This dooms the GSEs' argument. Here, the Mortgagor (the former owner(s) of Stuy Town) has not paid anything since the loan went into default – all proceeds to fund any distributions under the PSA concerning Stuy Town are coming from the sale of the Property. Because there was no Principal Prepayment for Stuy Town, there are no Yield Maintenance Charges. And, since the Fees claimed by the GSEs are not Yield Maintenance Charges *as that term is defined in the PSA*, the GSEs are not entitled to receive them under the waterfalls in the definition of REO Loan and Section 4.01(b) of the PSA, which means the central basis for their objection falls apart.

*Second*, even if the Fees were Yield Maintenance Charges, the GSEs' reliance on Section 3.02(b) of the PSA and the PSA's definition of "REO Loan" fails for the same reasons that CWC's does. When the sale of an REO Property generates Gain-on-Sale Proceeds, the PSA's more specific provisions concerning the disposition of Gain-on-Sale Proceeds govern over the generally-applicable terms of Section 3.02(b) and the waterfall in the definition of REO Loan. The GSE's are simply wrong when they assert that, "[f]unds treated as Yield Maintenance Charges" are "deposited in the Certificate Account" for distribution to holders of Regular Certificates, with Gain-on-Sale Proceeds deposited in the Gain-on-Sale Reserve Account "[o]nly after these allocations are made." (Rolnick Decl. Ex. J at 6.) Section 3.18(*l*) of the PSA says exactly the opposite: Following the sale of an REO Property, Gain-on-Sale Proceeds are

calculated first and deposited into the Gain-on-Sale Reserve Account; the remainder (essentially the Purchase Price) is only then deposited in the Certificate Account.  (PSA § 3.18(*l*) ("The amount paid for a[n] . . . REO Property . . . purchased under this Agreement shall be deposited into the Certificate Account, or if applicable, applied in accordance with the related Intercreditor Agreement (except that portion of any purchase price constituting Gain-on-Sale Proceeds which shall be deposited in the Gain-on-Sale Reserve Account).").)  Just as is the case with Penalty Interest, when Gain-on-Sale Proceeds are generated from the sale of REO Property they go to the Certificateholders to reimburse them for Realized Losses on the Certificates.

*Third*, the GSEs incorrectly argue that "Appaloosa applies the wrong definition of Purchase Price" in calculating Gain-on-Sale Proceeds because clause (ii) of Section 3(b) of the Co-Lender Agreement applies, instead of clause (i).  (Rolnick Decl. Ex. J at 7.)  As discussed in Point I, *supra*, clause (i) provides that the PSA's definition of Purchase Price governs if CWC "has not yet determined the fair value of the" loan but that, if CWC actually has determined the loan's fair value, the loan's Purchase Price is that calculated value.[11]  (Co-Lender Agreement § 3(b).)  The problem for the GSEs is that they have not plausibly alleged that CWC ever made a fair value determination for the Stuy Town Senior Loan or what that determination is, and no other party (including CWC) has alleged such a valuation was made either.  In the absence of such a well-pleaded allegation, the GSEs have no plausible basis for alleging that clause (ii) of Section 3(b) applies, rather than clause (i).  As a result, Appaloosa has correctly applied clause (i) – which reverts to the PSA's definition of Purchase Price – in calculating the Gain-on-Sale Proceeds, and is entitled to judgment on the pleadings against the GSEs.

---

[11] As discussed above, the definition in Section 3(b) of the Co-Lender Agreement is used to determine the purchase price at which the Controlling Class Representative of the C30 Trust may purchase the other Stuy Town CMBS Trusts' shares of the Senior Loan in the event that a default is declared on the C30 Trust's share of the Senior Loan.

To see why the GSEs argument fails at inception, it is important to understand what a "fair value" determination of a loan is.  Under Section 3.18(b) of the PSA, within sixty days after a loan has become a Defaulted Mortgage Loan, CWC "shall determine the fair value of such Mortgage Loan in accordance with the Servicing Standard[.]"[12]  (PSA § 3.18(b).)  "Fair value" is a well-understood term in accounting that means the "price that would be received to sell an asset . . . in an orderly transaction between market participants at the measurement date."  PwC, *Fair Value Measurements*, § 4.2 (2015) (citing ASC 820-10-20 and IFRS 13.9) (attached as Ex. L to Rolnick Decl.).  Fair value of the Senior Loan thus means the price a third party would be willing to pay the Trusts to purchase the loan in an orderly transaction.  Consistent with this understanding of fair value, Section 3.18(b) instructs that, in making the fair value determination, CWC must exercise reasonable efforts to obtain an appraisal of the property serving as collateral and "shall take into account, among other factors, the period and amount of delinquency on such Mortgage Loan, the occupancy level and physical condition of the related Mortgaged Property, the state of the local economy in the area where the Mortgaged Property is located, and the time and expense associated with a purchaser's foreclosing on the related Mortgaged Property."  (PSA § 3.18(b).)  All of these factors are obviously relevant to what a third party would pay for a loan, since (for example) no one is going to buy a loan at par if they believe they can recover only 70 cents on the dollar from efforts to rehabilitate or sell the collateral.  There is nothing in the record – *i.e.*, no well-pled allegations in the pleadings or documents that can properly be considered on a Rule 12(c) motion – indicating that CWC ever made a fair value determination for the Stuy Town Senior Loan or what CWC determined the fair value to be.

---

[12] The Servicing Standard is defined at pages 80-81 of the PSA.  The Special Servicer's fair value determination is used, among other things, to determine the governing price for the "Purchase Option" accorded to the "Majority Subordinate Certificateholder" and the Special Servicer to purchase the defaulted loan from the Trust.  (*See* PSA § 3.18(c).)

Nevertheless, the GSEs assert that CWC conducted a fair value determination "[a]s reflected in the Foreclosure Judgment" and valued the Stuy Town Senior Loan as approximately $3.67 billion (including approximately $622 million of yield maintenance fees). (*See* Rolnick Decl. Ex. K at 9.) But all the Foreclosure Judgment reflects is the amount due as a result of the acceleration of the mortgage on default, and the $3.67 billion figure is the "amount computed by the Court to be due to plaintiffs on the notes and mortgage[.]" (Foreclosure Judgment at 3 ¶ 6.) That was not a "fair value determination" of the "fair value of the loan." The loan may well have been worth less than the computational amount of the accelerated debt. Appraisal and other valuation techniques would need to be employed to determine the "fair value." As should be apparent, a fair value determination is not the same thing as simply tallying up the amounts owed on the loan at a given point in time. Instead, evaluating fair value requires determining what a third-party purchaser is willing to pay for that loan, taking into account all relevant circumstances (*e.g.*, the value and condition of the property, the state of the real estate market, etc.) Because the figures quoted in the Foreclosure Judgment do not constitute such an analysis, the listing of amounts accelerated and due on the Senior Loan contained in the Foreclosure Judgment as a matter of law cannot be a fair value determination.

Beyond the Foreclosure Judgment, the GSEs only allege that "upon information and belief" CWC "updated" its valuation of the Stuy Town loan to include a reduced amount of over $100-150 million in alleged Yield Maintenance Charges – without any indication of what CWC's "updated" analysis determined the fair value of the Senior Loan to be or what methodology it followed in making that determination. (Rolnick Decl. Ex. K at 9; *id.* Ex I at 7.) This is a purely conclusory allegation unsupported by any well-pled facts, which does not

survive Rule 12(c)'s plausibility standard.[13]  At best it is an allegation of what CWC calculated Yield Maintenance Charges to be (although, given its conclusory nature, even that is a stretch), but it nowhere even suggests what CWC determined the Senior Loan's fair value to be.

Because the GSEs have not pled a plausible basis for finding that CWC conducted a fair value determination of the Stuy Town Senior Loan or specifying the results of any such determination, the GSEs have not plausibly alleged a factual predicate for concluding that clause (ii) of Section 3(b) of the Co-Lender Agreement applies for the purpose of determining the Purchase Price in the Gain-on-Sale Proceeds calculation.  As a result, clause (i) applies, and the Gain-on-Sale Proceeds relating to the sale of Stuy Town are to be calculated using the definition of Purchase Price found in the PSA.  Like Penalty Interest, Yield Maintenance Charges are not included within the Purchase Price under that definition, a point the GSEs tacitly concede in their respective Objections.  Accordingly, any amounts that would be classified as Yield Maintenance Charges for Stuy Town are part of the Gain-on-Sale Proceeds that must be used to reimburse Certificateholders' Realized Losses.  Appaloosa is entitled to judgment on the pleadings.

## CONCLUSION

For the foregoing reasons, Appaloosa respectfully requests that this Court grant its motion for judgment on the pleadings in its entirety.

Dated:  June 30, 2017
New York, New York

Respectfully submitted,

By: /s/ Lawrence M. Rolnick
Lawrence M. Rolnick
Thomas E. Redburn (*pro hac vice*)
Michael J. Hampson
**LOWENSTEIN SANDLER LLP**

---

[13] If any party attempts to introduce such a fair value determination in the course of briefing their respective Rule 12(c) motions, that would raise disputed fact issues that could not be resolved without discovery and a full record.  It also bears noting that, if the GSEs' contentions are correct, the Gain-on-Sale Proceeds may be significantly larger than previously believed.

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Fax:  (212) 262-7402
lrolnick@lowenstein.com
tredburn@lowenstein.com
mhampson@lowenstein.com

*Attorneys for Appaloosa Investment L.P. I and
Palomino Master Ltd.*