UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :

In the Matter of the Trusts Established : 
under the Pooling and Servicing Agreements : 
relating to the Wachovia Bank Commercial : 
Mortgage Trust Commercial Mortgage Pass- : 
Through Certificates, Series 2007-C30; : 
COBALT CMBS Commercial Mortgage Trust : 
2007-C2 Commercial Mortgage Pass- : 
Through Certificates, Series 2007-C2; : 
Wachovia Bank Commercial Mortgage Trust : 
Commercial Mortgage Pass-Through : 
Certificates, Series 2007-C31; ML-CFC : 
Commercial Mortgage Trust 2007-5 : 
Commercial Mortgage Pass-Through : 
Certificates, Series 2007-5; and ML-CFC : 
Commercial Mortgage Trust 2007-6 : 
Commercial Mortgage Pass-Through : 
Certificates, Series 2007-6 : 
                                                  :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 9, 2018

17 Civ. 1998 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

This action involves a dispute over the distribution of approximately
$700 million in proceeds from the October 2015 sale of the Peter Cooper Village
and Stuyvesant Town property ("Stuy Town").  As it currently stands,
approximately $560 million of the disputed funds have been allocated to
CWCapital Asset Management LLC ("CWC" or the "Special Servicer") in the form
of Penalty Interest; the remainder has been allocated to Federal Home Loan
Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage
Association ("Fannie Mae," and together with Freddie Mac, the "Government-
Sponsored Enterprises" or "GSEs") in the form of Yield Maintenance Charges.
Appaloosa Investment L.P.I. and Palomino Master Ltd. (collectively,

"Appaloosa") — investors in various trusts that held assets secured by a mortgage on Stuy Town — contest the propriety of those allocations. In Appaloosa's view, the funds should not be paid to CWC and the GSEs; instead, the disputed funds constitute Gain-on-Sale Proceeds that must be deposited directly in a Gain-on-Sale Reserve Account for the benefit of certificateholders.

Before the Court are Appaloosa's, CWC's, and the GSEs' cross-motions for judgment on the pleadings. The moving parties all contend that the governing agreements (and in particular the Pooling and Servicing Agreement (or "PSA")) are unambiguous, though they disagree on their meaning. In Appaloosa's view, the agreements preclude CWC from collecting Penalty Interest and the GSEs from collecting Yield Maintenance Charges, and instead require that the disputed funds be allocated to certificateholders as Gain-on-Sale Proceeds. In CWC's and the GSEs' view, by contrast, the agreements unambiguously establish their entitlement to Penalty Interest and Yield Maintenance Charges.

Despite, or perhaps because of, the excellent briefing by the parties, the Court can discern two reasonable interpretations of the relevant agreements. For this reason, the parties' cross-motions for judgment on the pleadings are denied.

## A.     Factual Background[2]

### 1.     Commercial Mortgage-Backed Securitization

This case involves commercial mortgage-backed securities ("CMBS").  In the type of CMBS transaction at issue, an entity (called the "Depositor") deposits a pool of mortgage loans backed by mortgages on commercial real estate into a trust in exchange for certificates.  (Pet. ¶ 19).  The Depositor then sells the certificates to various purchasers who are entitled to receive cash flows from the trust assets.  Pursuant to a Pooling and Servicing Agreement, a Master Servicer and a Special Servicer are often appointed to service the loans. (*Id.*).  Here, CWC was appointed as Special Servicer, and in that capacity was required, *inter alia*, to collect payments on the mortgage loans and to enforce the terms of the loan.  (*Id.* at ¶¶ 19, 28).

---

[1]     The facts set forth herein are taken from the Notice of Removal and the documents attached thereto or incorporated by reference therein.  (Dkt. #1).

[2]     For ease of reference, the Court refers to the Petition of U.S. Bank National Association, as Trustee, filed in Minnesota state court on December 17, 2015, as "Pet." (Dkt. #1, Ex. A); the Notice of Removal to federal court, filed by Freddie Mac on July 22, 2016, as "Not. Rem." (Dkt. #1); the GSEs' memorandum of law in support of their motion for judgment on the pleadings as "GSE Br." (Dkt. #176); CWC's memorandum of law in support of its motion for judgment on the pleadings as "CWC Br." (Dkt. #173); Appaloosa's memorandum of law in support of its motion for judgment on the pleadings as "Appaloosa Br." (Dkt. #169); CWC's opposition to Appaloosa's motion for judgment on the pleadings as "CWC Opp." (Dkt. #184); Appaloosa's opposition to CWC's and the GSEs' motions for judgment on the pleadings as "Appaloosa Opp." (Dkt. #182); and Appaloosa's reply in further support of its motion for judgment on the pleadings as "Appaloosa Reply" (Dkt. #186).  The Court refers to declarations in support of this briefing and exhibits attached thereto by the name of the declarant and the exhibit designation, e.g., "[ ] Decl., Ex. [ ]."

## 2.  Stuy Town and the C30 Trust

In November 2006, Tishman Speyer Properties ("Tishman") and its partner BlackRock Realty ("BlackRock") purchased Stuy Town, one of New York City's largest residential complexes, for $5.4 billion.  (Pet. ¶ 20).  In connection with that purchase, Tishman and BlackRock borrowed $3 billion under a senior mortgage loan (the "Senior Loan"), which itself was split into six loans.  (*Id.* at ¶¶ 20-23).  The six loans were sold to CMBS trusts ("Trusts," or "Senior Lender"), which in turn issued certificates to investors, including Appaloosa and the GSEs.  (*Id.*).  One such trust (the "C30 Trust") was charged with administering the Senior Loan on behalf of the other Trusts in accordance with the PSA.  (*Id.* at ¶¶ 26-27).  In late 2009, servicing of the loan secured by the mortgage on Stuy Town was transferred to CWC, as Special Servicer for the C30 Trust.  (*Id.* at ¶ 3).

## 3.  The Default and the Subsequent Sale of Stuy Town

On January 8, 2010, Tishman and BlackRock defaulted on their mortgage.  (Pet. ¶¶ 4, 29).  CWC, on behalf of the C30 Trust, provided written notice of the default to the borrowers by letter dated January 8, 2010; when the default was not cured, CWC accelerated the loan by letter dated January 29, 2010.  (*Id.* at ¶ 29).  On February 16, 2010, CWC commenced foreclosure proceedings in this District, and on June 21, 2010, the Court entered a Judgment of Foreclosure and Sale authorizing the Senior Lender to sell the property at a foreclosure sale.  (*Id.* at ¶¶ 30-31).  However, no foreclosure sale took place.  Instead, on June 3, 2014, the Senior Lender

acquired title to the Property via a deed in lieu of foreclosure, at which point Stuy Town became real-estate-owned property ("REO Property") under the terms of the PSA.  (*Id.* at ¶¶ 33-34).

On December 18, 2015, Blackstone Group LP ("Blackstone") and Ivanhoe Cambridge Inc. ("Ivanhoe") purchased Stuy Town for $5.3 billion.  (Pet. ¶ 36; Not. Rem. ¶ 2).  The proceeds were expected to — and did — cover all of the unpaid principal interest due on the Senior Loan at the time of the Foreclosure Judgment ($3,666,734.70) by more than $1 billion.  (*Id.* at ¶ 37).  CWC claimed approximately $560 million of the proceeds in Penalty Interest (*id.* at ¶ 7), and the GSEs claimed Yield Maintenance Charges on the order of $100-$150 million (Rolnick Decl., Ex. J at 4; *id.*, Ex. K at 7).

### 4.    Relevant Provisions of the Pooling and Servicing Agreement

The moving parties' disputes implicate various definitions and provisions within the PSA.  The PSA governs, *inter alia*, the creation of the C30 Trust; the transfer of mortgage loans into the Trust; the issuance of certificates; and the duties, rights, and obligations of the various parties, including the Depositor, Master Servicer, Special Servicer, and Trustee.  (*See generally* PSA).  It also governs the allocation and distribution of proceeds from the sale of REO Properties like Stuy Town.  (*Id.*).  The Court here reviews the provisions most relevant to the pending motions.

### a. Section 1.01: Definitions

### i. Gain-on-Sale Proceeds

The PSA defines Gain-on-Sale Proceeds as "the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses,[3] over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received."  (PSA § 1.01).

### (A) Liquidation Proceeds

The PSA defines Liquidation Proceeds, in relevant part, as:

> All cash amounts ... received by the Master Servicer or the Special Servicer in connection with: ... the liquidation of a Mortgaged Property or other collateral constituting security for a Defaulted Mortgage Loan, through trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage[.]

(PSA § 1.01).

### (B) Purchase Price

The PSA defines Purchase Price, in relevant part, as:

> With respect to any Mortgage Loan or REO Loan to be purchased by a Mortgage Loan Seller pursuant to the applicable Mortgage Loan Purchase Agreement, by the Majority Subordinate Certificateholder, the Companion Holder or the Special Servicer ... or by the Depositor, the Special Servicer, the Majority Subordinate Certificateholder or the Master Servicer ... , a cash price equal to the outstanding principal balance of such Mortgage Loan or REO Loan, as of the date of the purchase, together with [i] all accrued and unpaid interest on such Mortgage Loan or REO Loan at the related Mortgage Rate to but not including the Due Date

---

[3]    The PSA does not define the term Liquidation Expenses.

in the Collection Period of purchase *plus* any accrued interest on [Principal & Interest] Advances made with respect to such Mortgage Loan, [ii] all related and unreimbursed Servicing Advances *plus* any accrued and unpaid interest thereon, [iii] any reasonable costs and expenses, including, but not limited to, the cost of any enforcement action, incurred by the Master Servicer, the Special Servicer or the Trust Fund in connection with any such purchase by a Mortgage Loan Seller ... and [iv] any other Additional Trust Fund Expenses in respect of such Mortgage Loan ... , or in the case of any Loan Pair, the purchase price specified in the Intercreditor Agreement; *provided* that the Purchase Price shall not be reduced by any outstanding [Principal & Interest] Advance.

(PSA § 1.01).

## ii.        Penalty Interest

The PSA defines Penalty Interest as:

> With respect to any Mortgage Loan or Companion Loan (or successor REO Loan), any amounts collected thereon, other than late payment charges, Additional Interest, Prepayment Premiums or Yield Maintenance Charges, that represent penalty interest (arising out of a default) in excess of interest on the Stated Principal Balance of such Mortgage Loan or Companion Loan (or successor REO Loan) accrued at the related Mortgage Rate.

(PSA § 1.01).

## iii.       REO Loan

The PSA defines REO Loan as:

> The Mortgage Loan deemed for purposes hereof to be outstanding with respect to each REO Property to the extent of the Trust Fund's interest therein. ... Collections in respect of each REO Loan ... shall be treated: *first*, as a recovery of Nonrecoverable Advances and Unliquidated Advances ... with respect to such REO Loan ... ; *second*, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate

7

to but not including the Due Date in the Collection
Period of receipt … ; *third*, as a recovery of principal of
such REO Loan to the extent of its entire unpaid
principal balance; and *fourth*, in accordance with the
normal servicing practices of the Master Servicer, as a
recovery of any other amounts due and owing in respect
of such REO Loan, including, without limitation,
(i) Yield Maintenance Charges, Prepayment Premiums
and Penalty Interest and (ii) Additional Interest and
other amounts, in that order.

(PSA § 1.01).  The definition includes a list of priority for the allocation of funds

collected on the REO Loan (the "REO Loan Waterfall").

### iv.     Yield Maintenance Charges

The PSA defines Yield Maintenance Charge, in relevant part, as:

> Payments paid or payable, as the context requires, on a
> Mortgage Loan as the result of a Principal Prepayment
> thereon, not otherwise due thereon in respect of
> principal or interest, which have been calculated … to
> compensate the holder for reinvestment losses based on
> the value of an interest rate index at or near the time of
> prepayment.

(PSA § 1.01).

### b.     Section 3.02:  Collection of Mortgage Loan Payments

The PSA details the Special Servicer's (i.e., CWC's) obligation to collect

payments for various types of mortgages, including Mortgage Loans,

Companion Loans, and REO Loans (of which the Stuy Town mortgage was one).

Section 3.02 includes a detailed waterfall for distribution of funds collected on

Mortgage Loans and Companion Loans.  (PSA § 3.02(b)).  For REO Loans, by

contrast, amounts collected are "deemed to be applied in accordance with the

definition thereof."  (*Id.*).  In other words, for the allocation of funds collected on

an REO Loan, the PSA refers back to the waterfall contained within the REO

Loan definition.

### c.    Section 3.04(e):  Gain-on-Sale Reserve Account

Under Section 3.04(e) of the PSA, the paying agent — Wells Fargo Bank,

N.A. — is required to establish and maintain a Gain-on-Sale Reserve Account

on behalf of the Trustee for the benefit of the certificateholders.  (PSA § 3.04(e)).

The provision further states that, "[u]pon the disposition of any REO Property

in accordance with Section 3.09 or Section 3.18, the Special Servicer will

calculate the Gain-on-Sale Proceeds, if any, realized in connection with such

sale and remit such funds to the Paying Agent for deposit into the Gain-on-Sale

Reserve Account." (*Id.*).

### d.    Section 3.11(d):  Servicing Compensation

Section 3.11 of the PSA provides for several forms of compensation for

CWC.  Subsection (d) reads as follows:

> Additional servicing compensation in the form of:  (i) all late payment charges, Penalty Interest received on or with respect to Specially Serviced Mortgage Loans actually collected that, with respect to late payment charges and penalty charges, accrued during the time that the related Mortgage Loan was a Specially Serviced Mortgage Loan, (ii) one hundred percent (100%) of any assumption application fees and assumption fees with respect to any Specially Serviced Mortgage Loan …, and (iii) modification fees collected on all Mortgage Loans or Companion Loans …, in each case to the extent actually paid by the related Mortgagor, shall be retained by the Special Servicer or promptly paid to the Special Servicer by the Master Servicer and shall not be required to be deposited in the Certificate Account[.]

(PSA § 3.11(d)).

### e. Section 3.18: Resolution of Defaulted Mortgage Loans and REO Properties

Finally, Section 3.18 of the PSA sets forth conditions for the sale or purchase of a Mortgage Loan or an REO Property. It states, in relevant part:

> The amount paid for a Defaulted Mortgage Loan ... or related REO Property ... purchased under this Agreement shall be deposited into the Certificate Account, or if applicable, applied in accordance with the related Intercreditor Agreement (except that portion of any purchase price constituting Gain-on-Sale Proceeds which shall be deposited in the Gain-on-Sale Reserve Account).

(PSA § 3.18(*l*)).

## B. Procedural Background

On December 17, 2015, Petitioner U.S. Bank National Association ("U.S. Bank") filed a Petition for Instructions in the Administration of Certain Trusts in the District Court for the Second Judicial District of Minnesota. (*See generally* Pet.). It sought instructions on the proper construction of the operative agreements at issue here, including the PSA. (*Id.*). It framed the relevant question as:

> whether — in connection with the sale of REO Property — (i) Section 3.11(d) [of the PSA] requires that Penalty Interest be calculated and paid to the Special Servicer before the calculations and actions under Section 3.18(*l*) [of the PSA] are completed (as [CWC] contends); or (ii) Section 3.18(*l*) alone controls the allocation of sale proceeds from REO Property (as Appaloosa contends).

(*Id.* at ¶ 50).

On February 24, 2016, CWC moved to dismiss the Petition on jurisdictional, mootness, and *forum non conveniens* grounds, which motion the

Minnesota state court denied. (Not. Rem. ¶ 7). On July 22, 2016, Freddie Mac removed the case to the United States District Court for the District of Minnesota. (Dkt. #1). Freddie Mac thereafter moved to transfer the case to this Court, which United States District Judge Donovan W. Frank approved in an Opinion and Order dated March 14, 2017. (Dkt. #53, 111).[4]

On June 30, 2017, Appaloosa moved, and CWC and the GSEs cross-moved, for judgment on the pleadings. (Dkt. #169-179). Appaloosa argued that the PSA unambiguously requires that all Gain-on-Sale Proceeds be delivered to certificateholders prior to the payment of any Penalty Interest to CWC or Yield Maintenance Charges to the GSEs. CWC and the GSEs, for their part, claimed that the PSA unambiguously establishes that Penalty Interest and Yield Maintenance Charges must be paid out before the transfer of Gain-on-Sale Proceeds into the Gain-on-Sale Reserve Account. The parties filed their opposition papers on August 4, 2017 (Dkt. #181-184), and their replies on September 1, 2017 (Dkt. #185-188).

---

[4]    In his Opinion, Judge Frank commented in passing on the need *vel non* for witness testimony in this case. He noted that, "[i]n this contract interpretation case, … the Court doubts whether much, if any, witness testimony will be needed to interpret the PSA and provide instruction to the Trustee in response to the Petition." *In the Matter of the Trs. Established Under the Pooling and Servicing Agreements*, 241 F. Supp. 3d 905, 928 (D. Minn. 2017). This Court understands Judge Frank's comment to have been made for the limited purpose of addressing one of the factors — convenience of potential witnesses — relevant to Freddie Mac's motion to transfer venue. For that reason, and because the comment did not contain a specific holding as to the need for discovery in this case, the Court does not consider Judge Frank's comment to be law of the case on that issue.

**DISCUSSION**

**A.    Applicable Law**

Courts apply the same procedure to evaluate motions for judgment on the pleadings under Rule 12(c) as for motions to dismiss under Rule 12(b)(6). *Altman* v. *J.C. Christensen & Assoc's, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *Johnson* v. *Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  This procedure requires courts to "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  The non-movant is entitled to relief if he or she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleadings of specifics, it does require enough facts to nudge [the non-movant's] claims across the line from conceivable to plausible." (internal quotation marks and citation omitted)).

Motions for judgment on the pleadings are "particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) (quoting *VoiceAge Corp.* v. *RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013)).  In interpreting a contract, the Court's primary objective "is to give effect to the intent of the parties as revealed by the

12

language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted).

"When analyzing the meaning of a contractual provision, a threshold question the Court [must] address is whether the contract is ambiguous." *U.S. Bank, N.A.* v. *Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017); *see also Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). If the contract is unambiguous, its meaning is a question of law that the Court may decide on a motion for judgment on the pleadings. *Id.* However, where the contract is ambiguous, "the Court must examine extrinsic evidence of the parties' intent — which means, in this posture, that the Court would have to deny both cross-motions [for judgment on the pleadings] and proceed to discovery." *Neopharm Ltd.* v. *Wyeth-Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016).

Ambiguity exists where a contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in

13

the particular trade or business." *Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  By contrast, a contract "is unambiguous when [the contract language] has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).  "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]"  *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

New York courts emphasize that "[f]orm should not prevail over substance and a sensible meaning of words should be sought."  *Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998) (quoting *Atwater & Co.* v. *Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)).  And under New York law, a contract may not be found to be ambiguous merely because litigants present alternative interpretations. *Maverick Tube Corp.*, 595 F.3d at 467.  Rather, ambiguity requires that "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Goldman Sachs Grp., Inc.* v. *Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal quotation marks and citation omitted); *see also Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).

**B.    Analysis**

**1.    Overview**

It is not undue flattery to note that the parties have articulated the strongest and most cogent arguments for their respective positions, and the Court takes this opportunity to thank all sides for the intellectual rigor evident from their briefing.  That said, as the remainder of this section evidences, even the most well-thought-out arguments in this litigation leave key questions unanswered and obvious elisions in logic.  Each side has canons of construction to cite, and cases to support the general propositions of contract law they seek to advance.  But neither side presents an interpretation of the PSA and related contracts that addresses, much less harmonizes, all of the provisions that are implicated by this case.

Broadly speaking, the parties' arguments respond to the two questions initially presented by the Trustee to the Minnesota state court.  The Court considers first the coextensive arguments of CWC and the GSEs.[5]  The contract analysis is easy, they say, with the key PSA provision being Section 3.02(a)-(b), which addresses the collection of REO Loan proceeds, and Section 1.01, which describes the REO Loan Waterfall.  The occurrence of one or more events of default led Stuy Town to become an REO property, and thus the proceeds of its sale in 2015 must be allocated using the REO Loan Waterfall.  What is more, it is claimed, this history entitles CWC to special servicer compensation in the

---

[5]    The Court generally dispenses with pinpoint cites to the parties' submissions, inasmuch as certain arguments are made repeatedly throughout the supporting and opposing briefs.

form of Penalty Interest pursuant to Section 3.11(d), and entitles the GSEs to

Yield Maintenance Charges pursuant to Section 2.3(b) of the Notes of the Stuy

Town Senior Loan — two items that are explicitly provided for in the fourth

step of the REO Loan Waterfall.

According to CWC and the GSEs, the PSA's Gain-on-Sale Proceeds

provisions are merely a method of calculating fees.  To the extent that

Gain-on-Sale Proceeds result at all from the Stuy Town transaction, they are to

be segregated and distributed as part of the "other amounts" category,

contained at the last clause of the last step of the REO Loan Waterfall.  To

conclude otherwise, CWC and the GSEs argue, would impermissibly read out

multiple provisions of the PSA, while reading in language into REO sale

provisions that simply is not there.  In the same vein, CWC and the GSEs

anticipate, and attempt to rebuff, other purported limitations on their recovery

advanced by Appaloosa, including arguments that Penalty Interest is limited to

funds paid directly by the Borrower; that CWC's entitlement to Penalty Interest

ended with the entry of the Foreclosure Judgment in June 2010; or that Yield

Maintenance Charges can only be realized from funds paid by the Mortgagor.

While the arguments of CWC and the GSEs have the benefit of

harmonizing more (and kneecapping fewer) provisions of the PSA, they are not

fully satisfying.[6]  First, and perhaps foremost, the arguments give too short a

shrift to the PSA's provisions concerning Gain-on-Sale Proceeds.  CWC

---

[6] These arguments also appear to have been more consistent over the length of the parties' litigation efforts.  (*See* CWC Reply 1 (describing manner in which Appaloosa's arguments regarding the import of the REO Loan Waterfall have evolved over time)).

suggests that the definition of Gain-on-Sale Proceeds is simply a "catchall" definition, a method of calculating amounts that are eligible to be deposited in the Gain-on-Sale Reserve Account.  But this tautology does nothing to aid the Court in ascertaining the manner in which Gain-on-Sale Proceeds are calculated, or the timing and priority of these calculations.  And while no one is disputing the inattention of the PSA's drafters in this area — for example, the absence of a Gain-on-Sale Proceeds Waterfall, or the failure to include Gain-on-Sale Proceeds in either of the REO and Mortgage Waterfalls — it strikes the Court as curious that a term defined and referenced in several places in the PSA would be shunted into an undefined category of "other expenses" in the allocation priority.

CWC notes that proceeds remaining after the other categories listed in the Waterfall were paid in full were "*allocated* as Gain-on-Sale Proceeds." (CWC Br. 22 (emphasis added)).  That proves the Court's point:  If the Gain-on-Sale Proceeds provisions specify a method of calculation, that method should have been used to determine the amount of proceeds subject to this definition.  Indeed, neither side can explain satisfactorily the method of calculating Gain-on-Sale Proceeds, largely because of the PSA's failure to define the term "Liquidation Expenses."  The Court says this not to fault the parties, but to explain its hesitation in accepting CWC's catchall-definition argument. Additionally, because CWC has not rebutted at a more granular level Appaloosa's proffered mode of calculating Gain-on-Sale Proceeds, the Court is left to contemplate a situation in which a substantial Gain-on-Sale Proceeds

figure, which in theory is to be placed in a segregated account, will never be segregated and will never be attained.  CWC and the GSEs have suggested that the penalties and fees they seek should be considered part of "Liquidation Expenses."  On this point, too, the Court is skeptical; while inclusion of these figures would go a long way towards reconciling the parties' positions, the Court imagines that such inclusion would have been addressed in the definitions section of the PSA.

The Court next turns to Appaloosa's arguments, which are presented with equal skill and confidence.  Focusing in particular on Section 3.04(e) of the PSA, Appaloosa posits that upon the sale of Stuy Town, CWC was obligated under the PSA to calculate Gain-on-Sale Proceeds[7] — which it estimates to exceed $600 million — segregate the proceeds in a separate account, and then remit them to certificateholders in the C30 Trust to offset past and future losses from other assets held by the Trust.  Importantly for CWC and the GSEs, Gain-on-Sale Proceeds as defined by Appaloosa includes neither Penalty Interest nor Yield Maintenance Charges.  Perhaps more importantly, Appaloosa

---

[7] Appaloosa explains the calculation process as follows:

> Gain-on-Sale Proceeds are defined in Section 1.01 of the PSA as the excess of (i) the "Liquidation Proceeds" net of any "Liquidation Expenses" over (ii) the "Purchase Price." "Liquidation Proceeds" are the proceeds received in connection with the liquidation of a mortgaged property, "Liquidation Expenses" are the actual out-of-pocket expenses incurred by the C30 Trust in liquidating the mortgaged property, and the "Purchase Price" is generally equal to the outstanding principal balance of the mortgage loan, plus any accrued but unpaid interest on the mortgage loan, plus any servicing advances that have been made on the mortgage loan and are still owed to the Master Servicer or Special Servicer.

(Appaloosa Br. 8 (internal citations omitted)).

18

contends that the REO Loan Waterfall either has no application to the Stuy Town sale, or is considered only after the segregation of the Gain-on-Sale Proceeds. (*Compare* Appaloosa Br. 23 (arguing that the REO Loan Waterfall "works differently where funds 'collected' while the loan is being serviced are involved, rather than proceeds of a sale that constitute Gain-on-Sale Proceeds"), *with* Appaloosa Opp. 1-2 ("[CWC's and the GSEs'] strained interpretation of the PSA rests almost entirely on a 'waterfall' contained in the contract's definition of 'REO Loan' that, in actuality, is completely irrelevant. ... [T]he Gain-on-Sale Proceeds are required to be calculated and segregated in a separate account before the balance of sale proceeds passes through the REO Loan waterfall[.]")).

With respect to the individual fees claimed by its adversaries, Appaloosa explains that neither is implicated by the Stuy Town sale. In particular, it contends that CWC is not entitled to Penalty Interest because the language in Section 3.11(d) requiring the proceeds to be "actually collected" means that the proceeds must be paid by the Borrower. As a fallback position, Appaloosa argues that any entitlement by CWC to Penalty Interest ended on June 21, 2010, when a judgment of foreclosure was entered against the Stuy Town Senior Loan. For similar reasons, Appaloosa argues that the GSEs are not entitled to Yield Maintenance Charges, which, as it construes Section 2.3(b) of the Notes of the Stuy Town Senior Loan, can only be assessed on principal payments made by the Mortgagor. (*See, e.g.*, Appaloosa Br. 31 ("Because there was no Principal Prepayment for Stuy Town, there are no Yield Maintenance

Charges.  And, since the Fees claimed by the GSEs are not Yield Maintenance Charges *as that term is defined in the PSA*, the GSEs are not entitled to receive them under the waterfalls in the definition of REO Loan and Section 4.01(b) of the PSA, which means the central basis for their objection falls apart." (emphasis in original))).  At base, claims Appaloosa, "once Gain-on-Sale Proceeds have been calculated in accordance with the PSA, the respective amounts attributable to Penalty Interest, Yield Maintenance Charges and Prepayment Premiums for the particular sale of REO Property at issue will all equal zero."  (Appaloosa Opp. 12).

Appaloosa's contract construction has the advantage of addressing, head-on, the Gain-on-Sale provisions that have caused such consternation to its adversaries.  But in other respects, Appaloosa offers a whack-a-mole interpretation of the PSA that is too disjointed to be useful to the Court.  For starters, accepting Appaloosa's construction of the PSA would severely restrict (and potentially vitiate) multiple provisions, in derogation of canons of construction and New York law.  Appaloosa's construction seemingly overlooks or misinterprets provisions:  Its reading of the REO Loan Waterfall provisions, for example, is refuted by the existence of separate Mortgage Loan waterfall and REO Revenue provisions.  The Court is also struck by certain logical contortions in which Appaloosa engages in order to argue for the invalidation of Penalty Interest and Yield Maintenance Charges in this case.  Finally, the Court is concerned that Appaloosa is ascribing undue significance to

Gain-on-Sale Proceeds — a term that is at best partly defined, and whose actual role in the PSA currently eludes the Court.

And therein lies the problem: No matter how well-presented the parties' arguments, they do not adequately address the Gain-on-Sale provisions. Indeed, to the Court, attempting to understand Gain-on-Sale Proceeds on this record recalls the parable of the blind men and the elephant, in which incomplete perspectives result in incorrect interpretations. *See* MASNAWI OF JALALUDDIN RUMI. The Gain-on-Sale provisions are in the PSA, and presumably serve some function, but their utility (or superfluity) in this setting cannot be resolved on the documents currently before the Court. As set forth in the remainder of this Opinion, both sides have advanced reasonable arguments for their constructions of the PSA. For this reason, the Court cannot grant any party's motion for judgment on the pleadings.

### 2. Relevant Provisions in the PSA Are Ambiguous

As noted, the present dispute revolves around the allocation of proceeds from the sale of an REO Property. The first issue before the Court is whether the PSA clearly and unambiguously establishes, as CWC and the GSEs claim, that Penalty Interest and Yield Maintenance Charges are to be allocated before the Gain-on-Sale Proceeds are distributed to certificateholders; or, as Appaloosa contends, that the Gain-on-Sale Proceeds are allocated to certificateholders prior to and separate from the payment, if any, of Penalty Interest and Yield Maintenance Charges.

The Court finds that the PSA is ambiguous as to the priority of payments upon the sale of an REO Property. *First*, it is unclear whether the definition of Gain-on-Sale Proceeds in Section 1.01 of the PSA allows for Penalty Interest and Yield Maintenance Payments to be deducted as Liquidation Expenses. *Second*, the REO Loan Waterfall does not reference either Gain-on-Sale Proceeds or Liquidation Proceeds, creating ambiguity regarding its application upon the sale of an REO Property. *Third*, the tension between Section 3.18(*l*), which governs the allocation of Gain-on-Sale Proceeds, and the REO Loan Waterfall exacerbates the ambiguity surrounding the allocation of proceeds from the sale of an REO Property.

### a. The PSA's Definition of Gain-on-Sale Proceeds Is Ambiguous

Ambiguity emerges, in the first instance, from the very definition of Gain-on-Sale Proceeds. The PSA defines Gain-on-Sale Proceeds as "the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received." (PSA § 1.01). The PSA separately defines all of the capitalized terms within the Gain-on-Sale Proceeds definition *except* the term Liquidation Expenses. Without that definition, the calculation of Gain-on-Sale Proceeds — which is central to the parties' dispute — is necessarily rendered ambiguous.

Appaloosa argues that "the ordinary meaning of the term 'Liquidation Expenses' is limited to actual out-of-pocket expenses, such as appraisal and attorneys' fees, incurred in connection with 'liquidating' or selling the

property." (Appaloosa Br. 15). In its view, the definition of Gain-on-Sale Proceeds unambiguously excludes Penalty Interest and Yield Maintenance Charges from the relevant calculus. Yet the term Liquidation Expenses itself does not demand such a limited reading, and Appaloosa has failed to persuade the Court — either with reference to other contractual provisions or with evidence of customary use — to adopt such a narrow reading. Instead, the Court is left unable to determine whether the parties intended for Gain-on-Sale Proceeds to be calculated independently of Penalty Interest and Yield Maintenance Charges.

That ambiguity is relevant to the parties' present dispute. If Liquidation Expenses were read to include Penalty Interest and Yield Maintenance Charges, there would be no question that CWC and the GSEs would be entitled to Penalty Interest and Yield Maintenance Charges before any Gain-on-Sale Proceeds would be distributed to certificateholders. If, by contrast, Liquidation Expenses were read more narrowly so as to exclude Penalty Interest and Yield Maintenance Charges, the proper allocation of the disputed funds becomes less clear. If Gain-on-Sale Proceeds may be calculated independently from Penalty Interest and Yield Maintenance Charges, the question becomes one of priority, i.e., whether the PSA unambiguously establishes that payment of Penalty Interest and Yield Maintenance Charges takes precedence over the distribution of Gain-on-Sale Proceeds. The Court now turns its attention to that very question.

### b. The PSA Is Ambiguous as to the Priority, If Any, Accorded to Gain-on-Sale Proceeds

The ambiguity surrounding the distribution of Gain-on-Sale Proceeds extends to the priority, if any, to be accorded to Gain-on-Sale Proceeds. To be sure, the PSA instructs the Paying Agent to place Gain-on-Sale Proceeds into a separate account for the benefit of the certificateholders. Section 3.04(e) states that the Paying Agent "shall establish … [a] Gain-on-Sale Reserve Account … [that] shall be maintained as a segregated account[.]" (PSA § 3.04(e)). Upon the disposition of any REO Property, CWC was required to "calculate the Gain-on-Sale Proceeds, if any, … and remit such funds to the Paying Agent for deposit into the Gain-on-Sale Reserve Account." (*Id.*). And, in Section 3.18(l), the PSA notes that "[t]he amount paid for a … REO Property … shall be deposited into the Certificate Account … (except that portion of any purchase price constituting Gain-on-Sale Proceeds which shall be deposited in the Gain-on-Sale Reserve Account)." (PSA § 3.18(*l*)).

Absent from these provisions is any discussion of the timing of the remittance of Gain-on-Sale Proceeds into the dedicated account, or the priority accorded to Gain-on-Sale Proceeds relative to Penalty Interest and Yield Maintenance Charges. Though the PSA specifies that Gain-on-Sale Proceeds must be segregated from other funds and placed in the Gain-on-Sale Reserve Account, it is unclear whether the parties intended for these provisions to require Gain-on-Sale Proceeds to be calculated and deposited in the dedicated account *before* the payment of Yield Maintenance Charges or Penalty Interest. It is also unclear whether funds that have been deposited into the Gain-on-Sale

Reserve Account could be used to cover Yield Maintenance Charges or Penalty Interest before distribution to certificateholders. For this reason, the Court cannot find as a matter of law — as Appaloosa urges the Court to do — that upon the sale of an REO Property, Gain-on-Sale Proceeds immediately must be deposited into the Gain-on-Sale Reserve Account for the exclusive benefit of certificateholders.

### c. The PSA Is Ambiguous as to Whether the REO Loan Waterfall Applies to Gain-on-Sale Proceeds

Nor can the Court hold as a matter of law — as CWC and the GSEs argue — that Penalty Interest and Yield Maintenance Charges receive priority over Gain-on-Sale Proceeds. To be sure, the PSA contains an REO Loan Waterfall. Yet the PSA's plain language is ambiguous as to whether and how that waterfall was meant to apply in the context of the sale of an REO Property. Section 3.02(b) of the PSA states that "[a]mounts collected on an REO Loan shall be deemed to be applied in accordance with the definition thereof." (PSA § 3.02(b)). The definition of REO Loan, in turn, states that "[c]ollections in respect of each REO Loan" are to be distributed as follows:

> [F]*irst*, as a recovery of Nonrecoverable Advances and Unliquidated Advances … with respect to such REO Loan … ; *second*, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt … ; *third*, as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and *fourth*, in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums

and Penalty Interest and (ii) Additional Interest and
other amounts, in that order.

(*Id.* at § 1.01).

What remains unclear is whether this waterfall applies to REO sales that
result in Gain-on-Sale Proceeds. The waterfall does not specifically mention
Gain-on-Sale Proceeds or Liquidation Proceeds. The absence of reference to
Gain-on-Sale Proceeds is conspicuous in light of the special treatment
elsewhere accorded to Gain-on-Sale Proceeds. (*See* PSA §§ 3.04(e), 3.18(*l*)).
The failure to reference Liquidation Proceeds is equally noteworthy given that,
in another waterfall contained in a different PSA provision, the parties explicitly
reference Liquidation Proceeds. Indeed, in Section 3.02(b), which governs
allocation of funds collected from Mortgage Loans and Companion Loans, the
relevant waterfall covers "[a]ll amounts collected … in the form of payments
from Mortgagors, and/or guaranties, Liquidation Proceeds … or Insurance
Proceeds[.]" (PSA § 3.02(b)). The fact that the REO Loan Waterfall does not
reference Liquidation Proceeds or Gain-on-Sale Proceeds makes its application
to the sale of REO Properties ambiguous.

That ambiguity is exacerbated by the fact that "other amounts" appears
at the end of a list that includes Yield Maintenance Charges, Prepayment
Premiums, Penalty Interest, and Additional Interest. Those payments are
arguably of a different kind than Gain-on-Sale Proceeds, as they accrue in the
absence of Liquidation Proceeds. The incongruity between the items listed in
the fourth step of the waterfall and Gain-on-Sale Proceeds, and the waterfall's
lack of mention of Gain-on-Sale Proceeds or Liquidation Proceeds, precludes

this Court from finding as a matter of law that "other amounts" was intended to cover Gain-on-Sale Proceeds.

### 3. The Parties' Competing Interpretations Are Reasonable

Having found the relevant contractual provisions to be ambiguous, the Court returns to the parties' competing interpretations. The Court's inquiry here is limited: It assesses only the reasonableness of the moving parties' interpretations. That binary analysis ends with a finding (or not) of reasonableness.

#### a. CWC's and the GSEs' Interpretation of the Relevant Provisions Is Reasonable

CWC and the GSEs advance a cogent interpretation of the PSA. They begin by noting that, under Section 3.02(b), "[a]mounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof." (CWC Br. 19 (quoting PSA § 3.02(b)); GSE Br. 11 (quoting same)). They then point to the REO Loan Waterfall that calls for funds to be distributed, *first*, as a recovery of Nonrecoverable Advances and Unliquidated Advances; *second*, as a recovery of accrued and unpaid interest; *third*, as a recovery of principal; and *fourth*, as a recovery of "any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums[,] and Penalty Interest and (ii) Additional Interest and other amounts, in that order." (CWC Br. 20 (quoting PSA § 1.01); GSE Br. 11 (quoting same)). In their view, Section 3.02(b) and the definition of REO Loan in Section 1.01 establish that Yield Maintenance Charges and Penalty Interest receive priority over Gain-on-Sale Proceeds. (CWC Br. 20 ("[U]ntil every

category listed in the REO [Loan] Waterfall gets paid, no gain can be realized and made available for deposit into the Gain-on-Sale Reserve Account."); GSE Br. 11-12 ("Section 3.02(b) of the C30 PSA, coupled with the definition of REO Loan, required that proceeds from the sale [of Stuy Town] be allocated to Yield Maintenance Charges prior to any allocation to Gain-on-Sale.")).

CWC and the GSEs assert that their rights to Penalty Interest and Yield Maintenance Charges are unequivocal under the terms of the PSA. CWC notes that, under Section 3.11(d) of the PSA, CWC is entitled to receive as additional servicing compensation "all late payment charges [and] Penalty Interest received on or with respect to Specially Serviced Mortgage Loans actually collected," and that Penalty Interest "shall be retained by the Special Servicer or promptly paid to the Special Servicer by the Master Servicer and shall not be required to be deposited into the Certificate Account." (CWC 22-23 (quoting PSA § 3.11(d)) (emphasis omitted)). The GSEs, for their part, point to the PSA's definition of Yield Maintenance Charges and to Section 2.3(b) of the Notes, which "provides that, if the borrower defaults and the Senior Note is accelerated and declared due and payable, an additional prepayment fee, called a Yield Maintenance Premium, shall become due and payable in an amount calculated pursuant to a formula described therein." (GSE Br. 9 (citing Notes § 2.3(b))).

CWC's and the GSEs' reading of the contractual provisions is reasonable, and Appaloosa's claims to the contrary do not detract from that conclusion. Appaloosa claims, for example, that CWC's and the GSEs' reliance on the REO

Loan Waterfall renders their interpretation unreasonable. (Appaloosa Opp. 1-2). Yet the REO Loan Waterfall, by its terms, applies to "[c]ollections in respect of each REO Loan." (PSA § 1.01). "Collections in respect of each REO Loan" may quite reasonably be read to encompass proceeds from the sale of an REO Property. Appaloosa next suggests that interpreting the reference to "other amounts" in the REO Loan Waterfall so as to include Gain-on-Sale Proceeds would "fundamentally misread the [text]." (Appaloosa Opp. 8). Not so. Although this Court has found the phrase "other amounts" to be ambiguous, it does not follow that CWC's and the GSEs' interpretation of the REO Loan Waterfall is unreasonable. "Other amounts" may reasonably be read to cover all REO Loan payments other than those specifically mentioned in the REO Loan Waterfall. That includes Gain-on-Sale Proceeds.

Finally, Appaloosa contends that "[t]he interpretation advanced by CWC and the GSEs … creates undoubted contractual surplusage by reading out of the PSA virtually the entire definition of Gain-on-Sale Proceeds that comprehensively governs the calculation of those amounts." (Appaloosa Opp. 2). Appaloosa again misses the mark. CWC's and the GSEs' interpretation does not ignore the definition of Gain-on-Sale Proceeds. It merely places those proceeds below Penalty Interest and Yield Maintenance Charges in the priority schedule. Indeed, CWC and the GSEs concede that Gain-on-Sale Proceeds might be payable to certificateholders upon the sale of an REO Property; they simply note that, under the REO Loan Waterfall, any

such payments may only occur after Penalty Interest and Yield Maintenance Charges have been allocated. (CWC Br. 20; GSE Br. 11-12).

### b. Appaloosa's Interpretation of the Relevant Provisions Is Reasonable

The Court similarly finds Appaloosa's interpretation of the PSA to be reasonable. Appaloosa claims that, under the terms of the PSA, Gain-on-Sale Proceeds are not covered by the REO Loan Waterfall, but instead must be segregated and placed into a Gain-on-Sale Reserve Account, for the benefit of certificateholders, upon the sale of an REO Property. Appaloosa's interpretation finds support in the express terms of the contract.

The Court begins, as does Appaloosa, with the provisions that deal exclusively with Gain-on-Sale Proceeds. Under Section 3.04(e), the Paying Agent is required to segregate Gain-on-Sale Proceeds from all other funds following the sale of an REO Property. (PSA § 3.04(e)). That obligation is reinforced by Section 3.18(*l*), according to which the "portion of any purchase price constituting Gain-on-Sale Proceeds ... shall be deposited in the Gain-on-Sale Reserve Account." (*Id.* at § 3.18(*l*)). Based on these provisions, Appaloosa reasonably claims that "when the Special Servicer sold Stuy Town ... , it was required to determine whether any Gain-on-Sale Proceeds ... were realized from the sale and remit them to the Paying Agent to be deposited into the Trusts' Gain-on-Sale Reserve Accounts." (Appaloosa Br. 14). As Appaloosa notes, that obligation "is express and unconditional." (*Id.* at 15).

Appaloosa then argues that Gain-on-Sale Proceeds are calculated independently from Penalty Interest and Yield Maintenance Payments. It

points to the definition of Gain-on-Sale Proceeds, which states that Gain-on-Sale Proceeds are "the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received." (PSA § 1.01). Appaloosa reasonably claims that, because Liquidation Expenses typically refers only to expenses incurred to effectuate the liquidation of property, it does not refer to Penalty Interest or Yield Maintenance Charges. It follows, in light of Sections 3.04(e) and 3.18(l), that CWC "must segregate, and the Paying Agent must deposit into the … Gain-on-Sale Reserve Accounts, the cash received from the sale of Stuy Town less out-of-pocket expenses incurred … [and] less the 'Purchase Price' of the Senior Loan." (Appaloosa Br. 15). Appaloosa reasonably concludes that, "upon the sale of Stuy Town, the default interest claimed by CWC [and the Yield Maintenance Charges claimed by the GSEs are] not deducted from the Liquidation Proceeds for purposes of calculating the Gain-on-Sale Proceeds." (*Id.* at 19). CWC and the GSEs were therefore "not entitled to divert any portion of those proceeds[.]" (*Id.*). Although the Court need not, in this posture, decide whether Liquidation Expenses should be read to exclude Penalty Interest or Yield Maintenance Charges, the Court does find that such a reading is reasonable, and that Appaloosa's arguments stemming therefrom are similarly reasonable.

Finally, Appaloosa interprets the PSA to require that Gain-on-Sale Proceeds be deposited directly into the Gain-on-Sale Reserve Account, before

any amounts are deducted for other payments under the REO Loan Waterfall. It again points to Sections 3.04(e) and 3.18(*l*). This Court has already explained that these provisions do not unambiguously establish Gain-on-Sale Proceeds' priority over Penalty Interest and Yield Maintenance Charges. But Appaloosa's reading, if not entirely persuasive, is reasonable. That is particularly so given the REO Loan Waterfall's lack of clarity as to whether it applies to Gain-on-Sale Proceeds.

CWC's and the GSEs' arguments to the contrary fall short. They claim that Appaloosa's interpretation of the PSA renders moot Sections 3.04(a) and 3.05(a), which allow the Master Servicer to deposit all Liquidation Proceeds into the Certificate Account and to withdraw Penalty Interest from the Certificate Account following the sale of REO Property. Yet, as Appaloosa notes in its reply brief, under Appaloosa's interpretation of the PSA, "[b]oth provisions still serve important purposes under the contract." (Appaloosa Reply 6). The provisions' application is merely "curtailed by the more specific terms of Sections 3.04(e) and 3.18(*l*) when Gain-on-Sale Proceeds have been realized from the sale of an REO Property." (*Id.*). Appaloosa's interpretation of the PSA limits the application of Sections 3.04(a) and 3.05(a), but it does not render those sections superfluous.

CWC and the GSEs further claim that, under Appaloosa's interpretation, the definition of Gain-on-Sale Proceeds supplants the REO Loan Waterfall. This, they claim, is unreasonable, and the Court must "reject Appaloosa's attempt to replace the operative REO Loan Waterfall with the definition of

Gain-on-Sale Proceeds." (CWC Opp. 7). To support their claim, they point to *Bank of New York Trust* v. *Franklin Advisers, Inc.*, which held that "to construe the Indenture to give a reasonable and effective meaning to all its terms precludes a finding that § 9.1(e) [relied on by the shareholders] constitutes the entire distribution plan for an Optional Redemption." (CWC Opp. 7 (quoting *Franklin Advisors*, 674 F. Supp. 2d 458, 465 (S.D.N.Y. 2009))). But what CWC and the GSEs either fail to appreciate or simply fail to mention is that *Franklin Advisors* was decided on a motion for summary judgment *after* the court found, at the motion to dismiss stage, that at least one of the contract's terms was ambiguous. This Court has already found that the REO Loan Waterfall's application to Gain-on-Sale Proceeds is ambiguous. The Court therefore cannot find that Appaloosa's interpretation of the contract is unreasonable because it reads the REO Loan Waterfall so as not to apply to Gain-on-Sale Proceeds. The REO Loan Waterfall references neither Gain-on-Sale Proceeds nor Liquidation Proceeds. While that does not mean that the Waterfall does not apply to such funds, it does create space for Appaloosa to advance a reasonable interpretation to the contrary.

This Court stated, in an unrelated matter, that "[i]t is a 'cardinal principal of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other.'" *Pig Newton, Inc.* v. *Bds. of Dirs. of Motion Picture Indus. Pension Plan*, 95 F. Supp. 3d 366, 382 (S.D.N.Y. 2015) (quoting *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); citing *Weeks Marine, Inc.* v. *Am. S.S. Owners Mut.*

*Prot. & Indem. Ass'n, Inc.*, 511 F. App'x 78, 80 (2d Cir. 2013) (summary order)).

Though Appaloosa's reading of the PSA limits the reach of the REO Loan

Waterfall and Sections 3.04(a) and 3.05(a), it does not render any of the

provisions entirely superfluous. And the interpretation that it advances — that

Gain-on-Sale Proceeds are dealt with separately from other funds upon the sale

of an REO Property — can be read consistently with the other contractual

provisions. The Court therefore cannot find that Appaloosa's interpretation is

unreasonable as a matter of law.[8]

## CONCLUSION

For the reasons referenced above, the parties' cross-motions for

judgment on the pleadings are DENIED. The Clerk of Court is directed to

terminate Docket Entries 169, 173, and 176. The parties are hereby

ORDERED to file a Case Management Plan on or before **March 30, 2018**.

SO ORDERED.

Dated:     March 9, 2018
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge

---

[8]     In their briefs, the parties address a secondary issue concerning the effect, if any, of the Foreclosure Judgment on the accrual of Penalty Interest. Appaloosa claims that the Foreclosure Judgment "expressly mandated that [Penalty Interest] would stop running as of June 21, 2010, the date judgment was entered, and that post-judgment interest would accrue thereafter at the legal rate." (Appaloosa Br. 25). CWC rejects this claim, arguing that the Foreclosure Judgment had no effect on the calculation of Penalty Interest under the terms of the PSA. (*See* CWC Br. 32-35). Because the Court has found Appaloosa's interpretation of the PSA (under which CWC may not be entitled to any Penalty Interest) to be reasonable, the Court declines at this juncture to reach the secondary issue of the proper calculation of Penalty Interest.