UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Trusts Established under the
Pooling and Servicing Agreements relating to the
Wachovia Bank Commercial Mortgage Trust
Commercial Mortgage Pass-Through Certificates,
Series 2007-C30; COBALT CMBS Commercial
Mortgage Trust 2007-C2 Commercial Mortgage
Pass-Through Certificates, Series 2007-C2;
Wachovia Bank Commercial Mortgage Trust
Commercial Mortgage Pass-Through Certificates,
Series 2007-C31; ML-CFC Commercial Mortgage
Trust 2007-5 Commercial Mortgage Pass-Through
Certificates, Series 2007-5; and ML-CFC
Commercial Mortgage Trust 2007-6 Commercial
Mortgage Pass-Through Certificates, Series 2007-6

17 Civ. 1998 (KPF)

**<u>OPINION AND ORDER</u>**

---

KATHERINE POLK FAILLA, District Judge:

Broadly speaking, this action involves a dispute with CWCapital Asset

Management LLC ("CWC") on one side, and Appaloosa Investment L.P.I. and

Palomino Master Ltd. (collectively, "Appaloosa") on the other, over the

distribution of approximately $700 million in proceeds from the October 2015

sale of the Peter Cooper Village and Stuyvesant Town property ("Stuy Town").

In Appaloosa's view, a portion of the funds that are currently allocated to CWC

should instead be deposited into a Gain-on-Sale Reserve Account for the

benefit of Certificateholders.  In March 2018, this Court denied CWC's and

Appaloosa's cross-motions for judgment on the pleadings, finding that the

governing agreements (and, in particular, the Pooling and Servicing Agreement

("PSA")) are ambiguous.  Shortly thereafter, Appaloosa filed an Amended

Answer, in which it asserted a cross-claim against CWC.  Before the Court is

CWC's motion to dismiss the cross-claim for lack of standing. Here, unlike those provisions discussed in the Court's March 2018 Opinion and Order, the relevant provisions of the PSA are unambiguous. For the reasons stated below, the Court grants CWC's motion.

## BACKGROUND[1]

The Court's Opinion and Order of March 9, 2018, provides a thorough review of the relevant facts of this case. *See In re the Trusts Established under the Pooling & Servicing Agreements*, No. 17 Civ. 1998 (KPF), 2018 WL 1229702, at *1 (S.D.N.Y. Mar. 9, 2018) ("*PSA I*"). As a result, this Court assumes the parties' familiarity with the underlying facts and will only discuss what is necessary to resolve the instant motion.

On April 11, 2018, approximately one month after the Court denied the parties' cross-motions for judgment on the pleadings, the parties appeared before the Court for a conference. (Am. Answer ¶ 205). During that conference, Appaloosa stated its intention to assert a cross-claim against CWC. (*Id.* at ¶ 206). In response, CWC expressed "disbelief that Appaloosa actually had acquired over 25% of the Voting Rights," as required for Certificateholders

---

[1] This Opinion draws its facts from the well-pleaded allegations of Appaloosa's Amended Answer ("Am. Answer" (Dkt. #239)), and from the parties' submissions in relation to the instant motion. For ease of reference, the Court refers to the parties' briefing as follows: CWC's Memorandum of Law in Support of the Motion to Dismiss as "CWC Br." (Dkt. #245); Appaloosa's Memorandum of Law in Opposition to the Motion to Dismiss as "Appaloosa Opp." (Dkt. #257); and CWC's Reply Memorandum of Law in Support of the Motion to Dismiss as "CWC Reply" (Dkt. #261). Certain capitalized terms used in this Opinion have the definitions specified for them in the PSA.

to bring any action under the PSA.  (*Id.* at ¶ 207).  That issue is at the heart of the instant motion.

Generally speaking, only the Trustee is authorized to act on behalf of the Trusts.  However, individual Certificateholders are allowed to assert claims on behalf of the Trusts so long as they comply with the No Action Clause in Section 11.03(c) of the PSA, which requires, among other things, that Certificateholders with at least 25% of the Voting Rights provide the Trustee with a written notice of default and give the Trustee an opportunity to take the action requested to address the default.  (PSA § 11.03).[2]

Several days prior to the conference with the Court, on April 6, 2018, Appaloosa had sent CWC and the Trustee written notice of default.  (Am. Answer ¶ 175).  "Specifically, among other things, Appaloosa informed CWC that its failure to allocate approximately $764 million of the Stuy Town sale proceeds as Gain-on-Sale Proceeds for deposit into the Stuy Town CMBS Trusts' respective Gain-on-Sale Reserve Accounts violated relevant portions … of the PSA[.]" (*Id.* at ¶ 44).  On May 5, 2018, after CWC failed to cure the defaults of which it was notified, Appaloosa sent a written direction to the Trustee that advised the Trustee of what it perceived to be a continuing default and requested that the Trustee bring a direct action on behalf of the C30 Trust against CWC.  (*Id.* at ¶ 230).  In that letter, Appaloosa also offered to provide a reasonable indemnity to the Trustee, as required by the PSA.  (*Id.*).

---

[2]    The PSA governs, *inter alia*, the creation of the C30 Trust; the transfer of mortgage loans into the Trust; the issuance of certificates; and the duties, rights, and obligations of the various parties.  (*See generally* PSA).

On May 10, 2018, the Trustee responded to Appaloosa's letter, indicating that it did not intend to commence suit as directed. (Am. Answer ¶ 235). Accordingly, Appaloosa sought the Court's permission to amend its Answer to assert a cross-claim against CWC. (Dkt. #231). The Court granted Appaloosa's request based "in large part on Appaloosa's representations that [] it holds sufficient voting rights to satisfy the no-action clauses in the pooling and servicing agreements such that it may properly bring the contemplated cross-claim against CWC." (Dkt. #236). As a result, Appaloosa filed its Amended Answer on June 16, 2018. (Dkt. #239).

On August 1, 2018, CWC filed a motion to dismiss Appaloosa's cross-claim. (Dkt. #244-46). Appaloosa filed its opposition on August 22, 2018 (Dkt. #256-58), and the motion was fully briefed with the filing of CWC's reply on June 26, 2014 (Dkt. #261). The Court now considers the motion.

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss under Rule 12(b)(1)

CWC brings the present motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. #244). "As the Second Circuit has explained, however, standing challenges are jurisdictional questions that are properly resolved under Rule 12(b)(1)." *Platinum-Montaur Life Scis. LLC* v. *Navidea Biopharmaceuticals, Inc.*, No. 17 Civ. 9591 (VEC), 2018 WL 5650006, at *2 (S.D.N.Y. Oct. 31, 2018) (citing *All. for Envtl. Renewal, Inc.* v. *Pyramid Crossgates Co.*, 436 F.3d 82, 89 n.6 (2d Cir. 2006) ("Although we

have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), the proper procedural route is a motion under Rule 12(b)(1).")). "Because the Court has an independent obligation to apply the correct legal standard[,]" it will construe CWC's motion to dismiss as one pursuant to Rule 12(b)(1). *Id.*

Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions. *See Carter* v. *HealthPort Technologies, LLC,* 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make that determination, a court must accept as true the complaint's allegations "and draw[ ] all reasonable

inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57. "In opposition to such a motion, [a plaintiff] must 'come forward with evidence of their own to controvert that presented by the defendant,' or may instead 'rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.'" *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

## 2. Interpretation of the PSA

The Court's standing inquiry turns on the interpretation of the PSA, which requires the application of contract principles under New York law. In interpreting the PSA, the Court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."

6

*Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted).

"When analyzing the meaning of a contractual provision, a threshold question the Court [must] address is whether the contract is ambiguous." *U.S. Bank, N.A.* v. *Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017); *see also Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). If the contract is unambiguous, its meaning is a question of law that the Court may decide on a motion to dismiss. *See Platinum-Montaur Life Scis. LLC*, 2018 WL 5650006, at *5. However, where the contract is ambiguous, courts generally find that the potential ambiguity is sufficient to establish standing to proceed with the litigation. *See Diverse Partners, LP* v. *AgriBank, FCB*, No. 16 Civ. 9526 (VEC), 2017 WL 4119649, at *6 (S.D.N.Y. Sept. 14, 2017). While the Second Circuit has not yet had occasion to rule on the issue, the Third and Fifth Circuits have found standing on the basis of ambiguity and allowed the case to proceed to discovery. *See Baldwin* v. *Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 77 (3d Cir. 2011); *see also In re MPF Holdings US LLC*, 701 F.3d 449, 456 (5th Cir. 2012).

Ambiguity exists where a contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y.* v. *Maverick*

*Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  By contrast, a contract "is unambiguous when [the contract language] has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).  "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]"  *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

New York courts emphasize that "[f]orm should not prevail over substance and a sensible meaning of words should be sought."  *Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998) (quoting *Atwater & Co.* v. *Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)).  And under New York law, a contract may not be found to be ambiguous merely because litigants present alternative interpretations. *Maverick Tube Corp.*, 595 F.3d at 467.  Rather, ambiguity requires that "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Goldman Sachs Grp., Inc.* v. *Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal quotation marks and citation omitted); *see also Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).

**B.     Appaloosa Lacks Standing to File Its Cross-Claim**

CWC mounts a facial challenge to Appaloosa's standing to file its cross-claim.  Specifically, CWC argues that Appaloosa has not plausibly alleged standing because it is not in compliance with the PSA's No Action Clause, and, thus, is unable to bring its cross-claim under the PSA.  (CWC Br. 5-13).  CWC's argument hinges on the textual interpretation of several provisions of the No Action Clause, as well as a related section of the PSA specifying how Voting Rights are calculated.  (*Id.*).  Each party argues that all relevant provisions are unambiguous and should be interpreted in its favor.  The Court begins by addressing the No Action Clause Language, and then proceeds to determine the proper method by which to calculate Appaloosa's share of Voting Rights.

**1.     The No Action Clause**

To review, the No Action Clause requires that prior to instituting an action under the PSA, a Certificateholder must fulfill certain conditions.  (PSA § 11.03).  Specifically, the No Action Clause dictates that (i) a Certificateholder must give the Trustee written notice of a continuing default under the PSA; (ii) Certificateholders who own at least 25% of the Voting Rights must direct the Trustee to institute an action and offer the Trustee a reasonable indemnity in connection therewith; and (iii) the Trustee must fail to file suit within 60 days of receiving the direction.  (*Id.*).  Only when those three conditions are met may a Certificateholder initiate an action under the PSA.  In full, the No Action Clause states that:

> No Certificateholder shall have any right by virtue of any
> provision of this Agreement to institute any suit, action

or proceeding in equity or at law upon or under or with respect to this Agreement or any Mortgage Loan, unless, with respect to any suit, action or proceeding upon or under or with respect to this Agreement, such Holder previously shall have given to the Trustee a written notice of default hereunder, and of the continuance thereof, as hereinbefore provided, and unless also (except in the case of a default by the Trustee) the *Holders of Certificates entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee* hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding.

(PSA § 11.03 (emphasis added)).

In brief, CWC asserts that Appaloosa has not satisfied the No Action Clause's conditions, and therefore is barred from bringing its cross-claim. (CWC Br. 2). Appaloosa disagrees for two reasons. (Appaloosa Opp. 8-16). *First*, according to Appaloosa, the No Action Clause does not require Certificateholders to hold 25% of Voting Rights at the time a suit is filed (*id.* at 13-16); and *second*, the Clause does not require every certificateholder who provided written notice to the Trustee to be a named plaintiff in a subsequent action (*id.* at 10-13). The Court agrees with Appaloosa's analysis on both points.

### a. The No Action Clause Does Not Require Holders of Certificates to Hold 25% at the Time a Suit Is Filed

As its first line of argument, CWC asserts that Appaloosa's cross-claim is are barred because it did not have 25% of the Voting Rights on June 18, 2018,

when it filed its amended Order and Answer. (CWC Br. 6). However, the PSA contains no such requirement. Instead, the No Action Clause states that the Certificateholders must hold at least 25% of the Voting Rights when directing the Trustee to initiate the action under its own name. (PSA § 11.03). At no point does the No Action Clause indicate, as CWC claims, that the Certificateholders must continue to hold at least 25% of the Voting Rights at the time of filing.

New York law is clear that, when interpreting a PSA, courts should be "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *See ACE Sec. Corp.* v. *DB Structured Prod., Inc.*, 25 N.Y.3d 581, 597 (2015) (internal citations and quotations omitted). If these sophisticated parties, represented by counsel, intended to make the bringing of a Certificateholder action conditioned upon holding 25% of the Voting Rights at the time of filing, they easily could have included a provision to that effect. *See Fundamental Long Term Care Holdings, LLC* v. *Cammeby's Funding LLC*, 20 N.Y.3d 438, 439 (2013). This Court cannot, under the guise of interpretation, read in an additional term that distorts the PSA's meaning.

In its counterargument, CWC bypasses the language of the No Action Clause, insisting instead that "New York courts interpreting identical no-action clause language consistently require compliance with the no-action clause as of the filing date and dismiss claims as a matter of law where certificate holders have not so complied." (CWC Br. 7). This argument is both distracting and

11

incorrect. *First*, neither party disputes that Appaloosa must be in compliance with the No Action Clause as of the date of filing. What is in dispute is what conditions a Certificateholder must satisfy in order to be in compliance.

*Second*, neither of the two cases cited by CWC stands for the proposition that a party would have to maintain a certain percentage of the Voting Rights at the time of filing. (CWC Br. 7). In *Greene* v. *New York United Hotels*, the First Department dismissed the action because Plaintiff, a bondholder who held his securities subject to the conditions of an underlying trust agreement, did not include in his complaint any "allegations showing compliance with these provisions of the trust agreement." 260 N.Y.S. 405, 407 (1st Dep't 1932), *aff'd*, 261 N.Y. 698 (1933). Similarly, in *Greenwich Financial Services Distressed Mortgage Fund 3, LLC* v. *Countrywide Financial Corp.*, the plaintiffs argued that they were not bound by the procedural requirements of the No Action Clause in its entirety. *See* Index No. 650474/08, 2010 WL 9525799, at *2-4 (N.Y. Sup. Ct. Oct. 7, 2010). The court disagreed and dismissed the complaint. *See id.* at *4. Neither case discusses whether parties must maintain the requisite Voting Rights percentage at the time of filing, and, thus, neither case is applicable to the issue at hand.

### b. The No-Action Clause Does Not Require Azteca to Be a Party to the Cross-Claim

Next, CWC argues that a separate entity, Azteca Partners LLC ("Azteca") must be a named plaintiff in the instant action in order for Appaloosa to be in compliance with the No Action Clause and for the cross-claim to move forward.

(CWC Br. 5).  Additional background is needed to fully understand CWC's argument.

As previously discussed, on May 7, 2018, Appaloosa — in coordination with another investment fund, Azteca — issued a direction to the Trustee to initiate litigation on behalf of the C30 Trust against CWC.  (Am. Answer ¶ 230; Appaloosa Opp., Ex. A).[3]  Per the No Action Clause, the written direction to the Trustee must be made by Certificateholders who have at least 25% of the Voting Rights.  (PSA § 11.03).  Appaloosa alleges that as of May 7, 2018, the combined Voting Rights of Appaloosa and Azteca exceeded 25 percent.  (Am. Answer ¶¶ 178 n.1, 233-34).

CWC's argument, which is based on a misinterpretation of the No Action Clause, is simple:  All Certificateholders constituting part of the 25% Voting Rights block who provide written direction to the Trustee must be named plaintiffs in the subsequent suit.  (CWC Br. 5-6).  Therefore, CWC asserts, because Azteca is not named as a plaintiff and because Appaloosa does not independently own 25% of the Voting Rights, the cross-claim must be dismissed.  (*Id*.).

Once again, CWC reads into the No Action Clause a requirement that is not there.  There is no requirement in the No Action Clause that a suit must be instituted by all of the Certificateholders who made up the 25% Voting Rights block.  Instead, the language in the No Action Clause specifically moves from

---

[3]     The May 2, 2018 letter was signed by the investment advisor for Appaloosa Investment L.P.I., Palomino Master Ltd., and Azteca Partners LLC.  (Appaloosa Opp., Ex. A).

the singular to the plural: "No *Certificateholder* shall have any right ... to institute any suit," unless, "such *Holder* previously shall have given the Trustee a written notice of default hereunder, ... and unless also ... the *Holders of Certificates* entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to initiate such action." (PSA § 11.03 (emphases added)). If the drafters of the PSA had intended to include a requirement that all members of the 25% Voting Rights block be named as plaintiffs, they would not have included the distinction between those *Holders of Certificates*, plural, who must make the written request upon the Trustee, and any *Certificateholder*, singular, who may initiate the approved, follow-on suit.

Furthermore, the plain reading of the PSA is not incongruous with the general purpose of No Action Clauses: to make it more difficult for individual investors to bring suits that are either frivolous or otherwise not in the interest of their fellow investors. *See Quadrant Structured Prod. Co.* v. *Vertin*, 23 N.Y.3d 549, 565 (2014). Allowing Certificateholders, who may individually have less than 25% of the Voting Rights, to bring an action would not open the floodgates to large numbers of frivolous claims. That is because individual Certificateholders would still need to muster a similarly-minded group that, in the aggregate, holds at least 25% of the Voting Rights to initiate the process through written notification to the Trustee. Then, those individual investors are only authorized to bring "such action, suit or proceeding" that was initiated by the larger group. (PSA § 11.03). For that reason, in addition to the plain

14

language of the PSA, Azteca does not need to be a named plaintiff to this action.

### 2. The PSA's Language Regarding the Method of Calculation for Voting Rights Is Unambiguous

Having determined that the language of the No Action Clause is unambiguous, the Court turns to the methodology by which Voting Rights are calculated under the PSA.  To review, according to the plain reading of the No Action Clause, if Appaloosa and Azteca had a combined 25% of the Voting Rights as of May 7, 2018, Appaloosa will have sufficiently alleged standing to bring its cross-claim.

Voting Rights are defined in the PSA as "[t]he portion of the voting rights of all of the Certificates which is allocated to any Certificate."  (PSA § 1.01). Pursuant to that definition, Voting Rights are calculated as a fraction:

> the numerator of which is equal to the aggregate Certificate Balance of the related Class of Certificates *(adjusted as provided in the immediately succeeding provisos)* and the denominator of which is equal to the aggregate Certificate Balances of all Classes of Certificates referenced above, determined as of the Distribution Date immediately preceding such time); *provided that solely for the purpose of determining the Voting Rights of the Classes of Sequential Pay Certificates, the aggregate Appraisal Reduction Amount (determined as set forth herein) shall be treated as Realized Losses with respect to the calculation of the Certificate Principal Balances thereof*; provided, further, however, the aggregate Appraisal Reduction Amount shall not reduce the Class Principal Balance of any Class for purposes of determining the Controlling Class, the Controlling Class Representative or the Majority Subordinate Certificateholder.

(*Id.* (emphases added)).

CWC and Appaloosa dispute whether both the numerator and the denominator in the Voting Rights fraction should be adjusted by the Appraisal Reduction Amount ("ARA"). The ARA itself "reflects a comparison of the appraisal value to the overall loan exposure (including not only the unpaid principal balance, but also unpaid interest, unpaid fees and expenses, advances, and other amounts)." (CWC Br. 11 (citing PSA § 1.01)). CWC argues the ARA should be applied only to the numerator; Appaloosa believes it should adjust both the numerator and denominator.

Determining whether the ARA should be applied to the denominator, in addition to the numerator, again requires application of familiar contract principles. To review, under New York law, "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms" because "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Ellington* v. *EMI Music, Inc.*, 24 N.Y.3d 239, 244-45 (2014). Here, the language of the PSA unambiguously indicates that the ARA should only be applied to the numerator.

In the PSA's definition of Voting Rights, the word "numerator" — but not "denominator" — is followed by the following parenthetical: "(adjusted as provided in the immediately succeeding provisos)." (PSA § 1.01). The proviso itself reads, "solely for the purpose of determining the Voting Rights of the Classes of Sequential Pay Certificates, the aggregate Appraisal Reduction Amount … shall be treated as Realized Losses with respect to the calculation of

16

the Certificate Principal Balances thereof." (*Id.*). CWC argues, and the Court agrees, that "[t]his is a clear reference to the numerator, which represents the Voting Rights allocated to a certain Class; whereas the denominator represents the aggregate principal balance of *all* Classes." (CWC Br. 9).

In addition, the unambiguous language in the PSA is reinforced by the Prospectus Supplement. The Second Circuit held in *Wells Fargo Bank, N.A.* v. *Financial Security Assurance Inc.*, that this Court may — and in fact, should — consider the Prospectus Supplement during the course of a plain reading interpretation of the PSA:

> As an initial matter, we reject [the defendant's] argument that the district court erred in considering, in interpreting the PSA, the Prospectus Supplement and other transaction documents related to the PSA. Under New York law, which governs the PSA, the district court properly considered all writings forming part of a single transaction, *see This Is Me, Inc.* v. *Taylor*, 157 F.3d 139, 143 (2d Cir. 1998), as [the defendant] itself asked the district court to do below.

504 F. App'x 38, 40 (2d Cir. 2012) (summary order).

In this case, the language in the Prospectus Supplement directly tracks the language of the PSA, and affirms the Court's plain reading of the agreement:

> a fraction, the numerator of which is equal to the aggregate Certificate Balance of such Class of Certificates *(as adjusted by treating any Appraisal Reduction Amount as a Realized Loss solely for the purposes of adjusting Voting Rights)* and the denominator of which is equal to the aggregate Certificate Balances of all Classes of Sequential Pay Certificates, determined as of the Distribution Date immediately preceding such time[]

(Prospectus Supplement S-230 (emphasis added)).  The Prospectus Supplement is equally clear: the numerator of the Voting Rights fraction, but not the denominator, shall be adjusted by the ARA.

The omission of the parenthetical after "denominator" in both the PSA and Prospectus Supplement was deliberate.  *See Quadrant Structured Prod. Co.*, 23 N.Y.3d at 560 ("Even where there is ambiguity, if parties to a contract omit terms … the inescapable conclusion is that the parties intended the omission.").  The Second Circuit has held that "the presence of a phrase applicable to one factor makes clear that the phrase's omission elsewhere was deliberate."  *United States* v. *Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018), *cert. denied*, 2019 WL 887697 (Feb. 25, 2019) (internal quotations and citations omitted).  Here, these experienced and sophisticated entities, represented by counsel, included the parenthetical to modify "numerator," but deliberately omitted the same parenthetical following "denominator."  The Court cannot find, given the plain language of the PSA, that they intended otherwise.

Appaloosa encourages the Court to depart from the plain reading of the PSA by arguing that applying the ARA only to the numerator is untenable because it "results in entire provisions of the PSA being rendered meaningless." (Appaloosa Opp. 19).  CWC's interpretation, Appaloosa asserts, creates the possibility that if enough ARA were recognized by the Trust, then no investor could obtain 25% of Voting Rights, which in turn would result in Certificateholders being unable to exercise numerous rights.  (*Id.* at 20).  Those rights that require Certificateholders to own a certain minimum percentage of

Voting Rights include the rights to remove the Trustee and amend the PSA. (*Id.* at 19).

Of course, when construing a contract, surplusage is a result to be avoided. *See Westview Assocs.* v. *Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 339 (2000). However, Appaloosa cannot avoid the provision's plain meaning by "attempting to create an irrational conflict between two provisions[.]" *See G & B Photography, Inc.* v. *Greenberg*, 619 N.Y.S.2d 294, 296 (2d Dep't 1994). In response to Appaloosa's argument, CWC notes that the ARA has never been this high, even during the last decade's real estate crisis. (CWC Br. 9). Furthermore, as CWC explains, even if the ARA were that high, appraisal reduction is a dynamic process, and the scenario proffered by Appaloosa, in addition to being unrealistic, "is simply not sustainable." (*Id.*).

Each side argues that its interpretation of the PSA, as CWC puts it, "makes perfect commercial sense." (CWC Br. 10). But the Court is not allowed to deviate from the plain meaning of the PSA. Even accepting Appaloosa's argument that extreme circumstances can be imagined in which the plain language of the PDA renders some clauses meaningless, the Court must recognize that "the canon against surplusage is not absolute." *Marx* v. *Gen. Revenue Corp.*, 568 U.S. 371, 372 (2013). "[T]he canon assists only where a competing interpretation give effect to every clause and word" of the statute. *Id.* Here, in order to accept Appaloosa's reading, the Court would have to divest the entire parenthetical of meaning, or write in a second parenthetical. However, under New York law, courts may not excise terms under the guise of

interpreting the writing. *See Vt. Teddy Bear Co.* v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004).

In addition, "adopting the plain meaning of statutory language with the result that some language is superfluous is preferable to adopting an ambiguous meaning where there is no surplusage." *All. for Open Soc'y Int'l, Inc.* v. *U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 246-47 (S.D.N.Y. 2006) (citing *Lamie* v. *U.S. Tr.*, 540 U.S. 526, 536 (2004)), *aff'd*, 651 F.3d 218 (2d Cir. 2011). The Court cannot ignore or alter the plain language of the PSA, which language unambiguously provides a method to calculate Voting Rights.

### 3. Appaloosa Did Not Have 25% of the Voting Rights on May 7, 2018

Calculating the relevant Voting Rights shares as prescribed above, the Court finds that Appaloosa's and Azteca's combined holdings did not reach 25% as of May 7, 2018, the date on which Appaloosa sent a written direction to the Trustee to initiate the action. In point of fact, Appaloosa and Azteca owned 14.96% of Voting Rights in the C30 Trust as of May 7, 2018. (CWC Br. 7 n.4). However, Appaloosa makes one last-ditch effort to obtain standing and asks the Court to calculate its Voting Rights share using the March — as opposed to the April — ARA. (*See* Appaloosa Opp. 15). According to Appaloosa, in April 2018, just six days after Appaloosa announced its intention to assert a direct claim against CWC, the ARA for the C30 trust was suspiciously raised by 54 percent. (*Id.*). For its part, CWC rejects Appaloosa's insinuation that it had any part in manipulating the ARA as "simply made up." (CWC Br. 11-12). Regardless, the Court need not decide the issue at this juncture. Even if the

Court were to disregard the April ARA and use the March ARA in its calculations, Appaloosa and Azteca would still only have 23.1% of Voting Rights. (*Id.* at 13).[4] For that reason, Appaloosa does not have standing to bring its cross-claim.[5]

## CONCLUSION

For the reasons detailed above, CWC's motion to dismiss the cross-claim filed by Appaloosa is GRANTED. The Clerk of Court is directed to terminate Docket Entry 244. The next pretrial conference in this matter will take place on April 9, 2019, at 4:00 p.m. in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York 10007.

SO ORDERED.

Dated:      March 25, 2019
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[4]  Appaloosa disputes this calculation only to the extent that it believes the ARA should be applied to both the numerator and denominator of the Voting Rights fraction. (*See* Appaloosa Opp. 16 n.4). As previously discussed, applying a different methodology would cut against the plain language of the PSA.

[5]  The Court declines to address the remaining two issues mentioned in CWC's motion to dismiss as moot. *First*, Appaloosa argues that it is entitled to damages on behalf of the other four Trusts, other than the C30 Trust. (Am. Answer ¶ 253). In support of its argument, Appaloosa contends that it only needs to hold 25% of Voting Rights in the C30 Trust to recover amounts allegedly owed to all five Trusts under the Co-Lender Agreement. (*Id.* at ¶¶ 188-90). Because this Court finds that Appaloosa did not hold a 25% Voting Rights share as of May 7, 2018 — and Appaloosa does not argue that it satisfied the preconditions on Certificateholder actions contained in the PSAs governing the other four Trusts — the issue is moot. *Second*, CWC asks the Court to strike Appaloosa's demand for a jury trial on its cross-claim. (CWC Br. 15-18). Because Appaloosa's request for a jury trial is limited to its cross-claim, no issues remain for jury determination.