# EXHIBIT 45

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass- Through Certificates, Series 2007-C30; COBALT CMBS Commercial Mortgage Trust 2007-C2 Commercial Mortgage Pass- Through Certificates, Series 2007-C2; Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C31; ML-CFC Commercial Mortgage Trust 2007-5 Commercial Mortgage Pass-Through Certificates, Series 2007-5; and ML-CFC Commercial Mortgage Trust 2007-6 Commercial Mortgage Pass-Through Certificates, Series 2007-6 | Case No.: 17-cv-01998 (KPF)<br><br>HON. KATHERINE POLK FAILLA |

**EXPERT REPORT OF BRIAN OLASOV**

# **TABLE OF CONTENTS**

**Page**

**I.    Summary** ........................................................................................................... 2

   A.    Engagement and Scope of Service ........................................................... 2

   B.    Summary of Opinions ............................................................................... 3

**II.   Qualifications** ................................................................................................... 4

**III.  Background** ...................................................................................................... 7

   A.    Commercial Lending and Prepayment Risk ............................................. 7

   B.    History of CMBS ...................................................................................... 9

   C.    The Structure of CMBS Securitizations ................................................ 10

   D.    The REO Loan Concept .......................................................................... 13

   E.    The Stuy Town Senior Loan and the Five CMBS Trusts ...................... 14

**IV.   Opinions** ......................................................................................................... 18

   A.    CMBS Transactions Generally Prioritize Creditor Rights Such as Yield Maintenance Over Equity Concepts Like Gain on Sale ............................................... 18

   B.    Prepayment Protections Like Yield Maintenance Are Key Creditor Rights Throughout Commercial Mortgage Lending and CMBS Markets Because They Mitigate the Risk of Losses to Investors Caused by Prepayments, Both Voluntary and Involuntary. ............................ 21

   C.    Gain on Sale is an Uncapped, Residual Concept that is Subordinate to the Satisfaction of Debt Obligations to Creditors ................................................................. 24

   D.    CMBS Transactions Generally Protect and Preserve the Priority of Creditor Rights in the REO Context Through the REO Loan Concept .................................... 25

   E.    The Stuy Town Securitization and Loan Documents Are Consistent with the Foregoing Principles ................................................................................................. 27

**V.    Conclusion** ..................................................................................................... 33

**EXHIBIT 1**: MATERIALS RELIED UPON

**EXHIBIT 2**: GLOSSARY

**EXHIBIT 3**: CURRICULUM VITAE

# I.       Summary

## A.       Engagement and Scope of Service

Holwell Shuster & Goldberg LLP and McKool Smith, P.C. (the "Firms") have retained me on behalf of their clients, the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae" and, together with Freddie Mac, the "GSEs").  The Firms have asked me to discuss general industry custom and practice in commercial-mortgage-backed securities ("CMBS") lending and servicing and to develop specific opinions with respect to the Peter Cooper Village and Stuyvesant Town Loan (the "Stuy Town Senior Loan"), the Trusts that held the Stuy Town Senior Loan, and whether the allocation to the GSEs of Yield Maintenance from the sale of Peter Cooper Village and Stuyvesant Town ("Stuy Town") comported with industry custom and practice.

My opinions are based on my experience and knowledge of the CMBS market, and the information and documents set forth in Exhibit 1.

My firm, Carlton Fields Jorden Burt LLP ("Carlton Fields"), is being compensated at the rate of $700 hourly.  This compensation is in no way contingent on the outcome of this litigation.

2

B.    Summary of Opinions

1.    CMBS transactions are generally structured to prioritize creditor rights such as yield maintenance over equity concepts including gain on sale.

2.    Prepayment protections like yield maintenance are important creditor rights recognized throughout the commercial mortgage lending market, because they mitigate the risk of losses to investors caused by prepayments, both voluntary and involuntary.

3.    Gain on sale is an uncapped, residual concept equivalent to equity.  In contrast, creditor obligations like yield maintenance and default interest are calculable and closed-ended, permitting gain on sale to be paid subsequent to their satisfaction.

4.    CMBS transactions protect and preserve the priority of creditor rights in the "real estate owned" ("REO") context through the "REO loan concept." Collections from an REO loan are, inherently, not sourced from the borrower on the predecessor mortgage loan, particularly in non-recourse lending, but they are applied as if they were.

5.    The documents governing the Stuy Town transaction are consistent with these general principles.  Certificateholder rights to Yield Maintenance survive the foreclosure process and extend through the Trusts' ownership of the REO Property in the form of an REO Loan.[1]

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Pooling and Servicing Agreement, dated as of March 1, 2007, relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30 (CWCAM0050925–51236) ("C30 PSA").  The definition of "Yield Maintenance Charge" in the C30 PSA refers to the underlying Mortgage Loan, here, the Stuy Town Senior Loan, where the corresponding deal term is defined as "Yield Maintenance Premium."  C30 PSA § 1.01, Definition of Yield Maintenance Charge.  For the sake of clarity, I refer to the term generally as "Yield Maintenance" except when making specific references to the terms in the corresponding agreement.  For ease of reference, a Glossary compiling relevant excerpted C30 PSA definitions is attached hereto as Exhibit 2.

## II.      Qualifications

I am an Executive Director of Financial Services at Carlton Fields.  I received a Bachelor of Arts degree in International Relations from Yale College in 1981 and a Master of Arts degree in Business Administration from Emory University in 1990.  I have worked in and around commercial mortgage lending and real estate finance in various capacities for over thirty years.  I began managing a mortgage credit administration department at a regional bank that included resolving defaulted credits, after which I became a commercial mortgage loan officer.  I then became a Vice President at Bear Stearns, where I analyzed and valued mortgage loans for trading and structured mortgage-backed securities ("MBS").   While attending graduate school, I also worked as a Capital Markets Specialist for the Federal Home Loan Bank of Atlanta, where my responsibilities included analyzing financial institutions and writing research on the mortgage industry.  While at the Federal Home Loan Bank, I also developed methodologies for valuing commercial and residential mortgage assets, allowing my co-authors and me to conduct and publish research on the empirical causes of the thrift industry collapse.  These valuation models incorporated aspects of market, credit and prepayment risks. Although not a lawyer, beginning in 1990 and through June 2015, I worked at the law firm of McKenna Long & Aldridge LLP (formerly known as Long Aldridge & Norman), where I worked with the firm's clients and attorneys in evaluating, acquiring and resolving problem commercial mortgage loans and assisted in securitizing these corrected mortgage loans. Carlton Fields recruited me as an Executive Director of Financial Services Consulting, beginning in July 2015.

I am frequently retained to provide expert witness testimony and consulting in structured finance and mortgage securities disputes involving mortgage loan underwriting, valuation and servicing.  In addition to other engagements, I have been retained to analyze

4

pooling and servicing agreement ("PSA") compliance by master and special servicers in CMBS, I have worked extensively on breach claims arising under residential and commercial mortgage loan purchase agreements and PSAs, and I have worked with bankruptcy counsel on reviewing and opining on various mortgage portfolios.  My *curriculum vitae* is attached hereto as Exhibit 3.

I have been qualified to testify as an expert on various MBS issues in several matters, including in *Chase Manhattan Mortgage Corp. v. Advanta Corp.*, No. 01-507 (D. Del.), and *Wells Fargo Bank, N.A. as Trustee for the Certificateholders of First Union-Lehman Brothers-Bank of America Commercial Mortgage Pass-Through Certificate, Series 1998-C2 v. Wachovia Bank, N.A.*, No. 3-02CV1945-M (N.D. Tex.).  I have also been qualified to testify as an expert witness in Cook County Circuit Court in the matter of *Wells Fargo Bank Minnesota, N.A. as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Pass-through Certificates, Series 2002-C3 v. 318 West Adams LLC, et. al.*, No. 04-CH-3099.  A complete list of the matters in which I have testified at trial or by deposition in the last four years is included in my *curriculum vitae*.

I have authored many articles on commercial mortgage loans and mortgage servicing practices, including the chapter on mortgage loan servicing in *Mortgage and Asset-Backed Securities Litigation Handbook*, (Thomson West), Volumes 2008 through 2015, as well as contributing a chapter on regulatory oversight affecting bank lenders and CMBS lenders in the 2012 book *Real Estate Finance*.[2]  I am on the editorial board of *CREF World*, a quarterly publication devoted to commercial real estate finance issues.  Beginning in 2019, I will serve

---

[2] Brian Olasov, (2012).  Regulatory Considerations in US Real Estate Finance.  In *Real Estate Finance*.  PEI.

as an adjunct professor of real estate capital markets at New York University Schack Institute of Real Estate.

I have also been active in both the Commercial Real Estate Finance Council ("CREFC") and the Mortgage Bankers Association, particularly with respect to mortgage lending, investor reporting, mortgage servicing and standards-setting committees.  CREFC is the preeminent commercial mortgage trade association, covering all sources of commercial real estate lending and servicing, including commercial bank and CMBS lending.  CREFC is the successor to the Commercial Mortgage Securities Association, or "CMSA."  The standards-setting importance of CMSA/CREFC is recognized throughout the C30 PSA, where CMSA definitions run for almost three pages in the definitions section[3] and the term "CMSA" is applied 128 times throughout the document.  I currently serve on CREFC's Board of Governors and Audit Committee, and I just completed a six-year term on CREFC's Executive Committee.  I also recently finished my third term as the chair of the National Policy Committee, which is charged with representing the interests of commercial real estate lenders from all sectors before regulators from the Federal Deposit Insurance Corporation ("FDIC"), the Office of Comptroller of the Currency ("OCC"), the Federal Reserve Board, the Securities and Exchange Commission ("SEC")  and Congress.

In addition, I am a frequent speaker on the state of commercial mortgage markets, MBS litigation, comparing structural differences between bank lending and CMBS, and structured finance products, including twice serving as a Visiting Scholar Speaker for the national bank regulator, the OCC, where I discussed commercial real estate markets, CMBS practices and

---

[3] *See generally* C30 PSA at § 1.01.

credit quality issues among other topics.  The OCC recently invited me back to discuss liquidity and default risks across different CMBS lending sectors.

My published and presented research includes analyzing the accuracy and reliability of appraisals in CMBS, which was profiled in a *New York Times* article.  I have also guest-lectured on CMBS, bank lending and real estate finance at the graduate schools of Georgia State University, Emory University, Columbia University, New York University, Georgetown University and Wharton School of Business at the University of Pennsylvania.  I have testified before the Congressional Oversight Panel to the Troubled Asset Relief Program on the state of various commercial real estate mortgage markets that compared the state of bank lending and CMBS markets as well as having recently briefed the U.S. Senate Banking Committee staff on the effects of regulation on the pricing and availability of commercial mortgage credit generally and CMBS in particular.  I have also worked with counsel investigating and defending officers and directors in failed banks as to whether or not they prudently and reasonably originated and serviced commercial mortgage loans.  A complete list of all publications I have authored is included in my *curriculum vitae*.

## III.    Background

### A.    Commercial Lending and Prepayment Risk

Commercial lending is similar to residential lending, in that both present default risk and prepayment risk.  Default risk is the risk that the borrower will not make timely payments as required under the loan documents.  Like residential mortgage notes, commercial mortgage notes typically set forth events of default, which, if they occur, may permit the lender to accelerate all amounts due and payable on the loan and charge additional interest.  If satisfactory arrangements cannot be made to cure the default, the lender may then pursue

foreclosure.  Typically, this results in the lender's ownership of the real property.  Many lenders refer to this ownership as REO.[4]

Prepayment risk is the risk that the loan will be paid off prior to its stated maturity date, thereby depriving the lender of the yield anticipated on the stream of debt payments.  The vulnerability that lenders face with a prepaid loan is similar to that of a prematurely terminated lease.  If a tenant decides to vacate its leased premises three years into a five-year lease, the tenant cannot simply walk into the landlord's office and hand over its keys to a broom-clean space.  Subject to reasonable mitigation efforts on the part of the landlord, the tenant can be held to its contracted rent obligations through the end of the lease term.  Likewise, a lender "rents" money for the borrower's use under contracted terms.  Receiving its money back prematurely exposes a lender to reinvestment risk just as receiving the keys to an office space prematurely exposes a landlord to the risks and costs of re-leasing the property.

In residential lending, borrowers typically have the right to prepayment.  Commercial lenders, however, generally protect against prepayment risk through a variety of well-known devices.  Today, structural prepayment risk protections on fixed-rate commercial mortgage loans range from outright prohibitions on prepayment (*i.e.*, "lockouts"), various forms of prepayment fees (such as the 3-2-1 percentage described below), yield maintenance (which seeks to make the lender whole on a present value basis), and defeasance (which bars the borrower from prepaying, but permits the borrower to obtain a release of the collateral early by substituting government obligations for the real property collateral backing the loan).

In my experience, every fixed rate commercial real estate loan offers some form of prepayment protection, and many offer more than one.  If commercial lenders could not protect

---

[4] Banks account for this property acquired through foreclosure as OREO (Other Real Estate Owned) to distinguish these properties from the bank's other owned properties such as branches and headquarters.

against prepayment risk, commercial lenders would demand a higher rate of interest to compensate them for this prepayment risk. Accordingly, prepayment protections help keep commercial interest rates down.

B.      History of CMBS

Mortgage securitization traces its roots back to at least the residential mortgage-backed securities ("RMBS") of the early 1970s. These first deals involved "conforming" single family residential mortgage loans that were underwritten to comply with the requirements of government-sponsored enterprises such as Fannie Mae, Freddie Mac, or the Government National Mortgage Association.

"One-off" CMBS deals extended back to the 1980s, but the real foundation for the modern CMBS product began with the Resolution Trust Corporation ("RTC"). Authorized by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the RTC arose in response to widespread failures in the savings and loan industry. As described in *Managing the Crisis*, the official FDIC history of the RTC, its mission was threefold: "(1) to maximize the net present value return from the disposition of failed thrifts and their assets, (2) to minimize the effects of such transactions on local real estate and financial markets, and (3) to maximize the availability and affordability of residential real property for low- and moderate-income individuals."[5]

The scale of the problem – the RTC had to resolve or liquidate $402.6 billion in assets – forced the agency to explore financial innovations. Among these innovations was the application of securitization to the RTC's mortgage portfolio. "Although the RTC

---

[5] *Federal Deposit Insurance Corporation, Managing the Crisis: The FDIC and RTC Experience 1980–1994* (Washington, D.C., FDIC, 1998), 8.

securitization program initially included residential mortgage loans, it was expanded to include other types of loans that previously had not been securitized, such as commercial mortgages, multi-family properties, and consumer loans."[6]  At the final tally in 1995, the RTC issued 27 CMBS transactions with a face value of $17 billion in CMBS bonds.  "The successful performance of the RTC securities was a significant factor in the further development and standardization of this [CMBS] market."[7]

One of the issues that the RTC faced was providing certificateholders protection against prepayment risk and reinvestment risk.  Many of the early RTC-era CMBS employed crude 3-2-1 prepayment fees to dissuade borrowers from prepaying their loans when interest rates fell.[8]  Over time, while the desire for prepayment protections has remained constant, the types of prepayment protections have evolved as the CMBS market expanded.  These protections keep senior investors' required rates of return low and rate quotes to borrowers competitive against other mortgage lenders.

C.    The Structure of CMBS Securitizations

CMBS are asset-backed securities that are secured by a pool of commercial mortgage loans.  The commercial loans are originated or acquired by "sponsors" of the securitization and then sold into trusts.  The trusts issue securities (in the form of "certificates") to investors (called "certificateholders"), and the trusts (and the trustees on behalf of the certificateholders) hold those mortgage loans for the benefit of the certificateholders.  The aggregate value of the CMBS certificates is based on the bundle of rights in the underlying commercial mortgage

---

[6] *Id.*

[7] *Id.* at 420.

[8] This prepayment protection applied a flat, declining percentage of unpaid principal balance without regard to prevailing interest rates.  Therefore, the fees are not tied to the reinvestment risks faced by lenders and bond investors.

loans deposited into the trust, such as the reliability of collecting interest and principal payment as they come due and the commercial loans' protections against various risks, including default and prepayment risks. Stated otherwise, the coupon rates, the sales prices, and the ultimate investment return on the CMBS certificates derive from the rights, characteristics and quality of the underlying mortgage loans. Because the CMBS certificates must derive their value from the underlying mortgage pool, CMBS trusts are structured to pass through to the trust and to the various certificateholders the original commercial lender's rights (as set forth in the underlying loan documents).

Aside from the credit quality of the underlying mortgage pool, sponsors of CMBS make CMBS certificates more attractive to a broader range of investors by issuing certificates with differing interests in the mortgage pool. The certificates are divided into layers, called tranches, that have certain payment priorities based upon the "seniority" of the tranche. This structure, in which different classes of certificates have different priority rights to the payments generated by the underlying mortgage loans, is referred to as "senior/subordination." The most senior certificates have a first claim on interest and principal cash flows and are the last certificates to which mortgage default losses are applied. These senior certificates are the most highly rated and generally earn the lowest return. Using a "waterfall," payments flow first to the senior certificates and only after senior certificates have received the full payment due in a given period does payment flow to more junior certificates. Within the more junior certificates there is a similar arrangement, in that one class is senior to more junior certificates, another is senior to the remaining certificates, and so on until the most junior of the junior certificates. The junior-most certificates are often called "first loss certificates" and are subordinate to all

other bonds.  Throughout the waterfall, payments cascade from the senior certificates to the junior certificates in a fixed order set forth in the governing agreements.

Because of the relatively higher risk nature of the junior-most bonds, these bonds also contain protections and governance rights not afforded more senior certificates, in addition to a higher yield.  The logic is that investors who, at the margin, are at the most immediate risk of loss should have consultation and consent rights with respect to administering the loans when it comes to major decisions.  These consent rights, however, are always conditioned by the servicer's requirements to disregard any such advice or direction that, in the reasonable judgment of the servicer, would be adverse to the interests of all the certificateholders or otherwise violate its obligations under the governing PSA, including complying with the servicing standard.[9]

Generally speaking, a CMBS collects payments required by the underlying mortgage loans and then applies those payments for the benefit of the trust certificateholders.  In a multi-loan conduit CMBS, assuming that all mortgagors are paying as agreed, all certificateholders should also receive all amounts due.  Even in default situations, where a master servicer has determined that payment defaults are temporary in nature or that the certificateholders are protected from ample value as the mortgage loan is protected by underlying collateral value, a special servicer may direct that liquidity advances be made, such that payments to all certificateholders will not be disrupted.

When loans default, provisions in the loan documents kick in and losses are allocated from the bottom up in the CMBS pool.  Due to the subordination structure in the CMBS market,

---

[9] In the case of the C30 PSA, see § 6.11(a).

the most senior certificates are generally immune from default risk in all but the most severe outcomes.

D.     The REO Loan Concept

Just as CMBS transactions are structured to pass through to certificateholders the trusts' rights to payments under the mortgage notes, CMBS transactions are also structured to pass through to certificateholders the notes' protections against prepayment risk.  Indeed, as stated in the C30 PSA, "the Depositor . . . does hereby assign, sell, transfer, set over and otherwise convey to Trustee . . . for the benefit of the Certificateholders . . . all the right, title and interest of the Depositor, in, to and under . . . the Mortgage Loans."[10]  The Trust acquires these rights "in, to and under" the Mortgage Loans, including rights to prepayment protection, on behalf of its certificateholders.  If senior certificates were exposed to and unprotected from prepayment risks, it would be impossible to sell those senior certificates at the values necessary to sustain the CMBS market.

One of the principal ways that CMBS trusts protect against prepayment risk and seek to assure steady payments to certificateholders is through the concept of the "REO loan," which, based upon my experience reviewing hundreds of PSAs, is a foundational concept. Mortgage securitizers developed the REO loan concept to balance a special servicer's ability to enforce a lender's rights against the borrower, including through foreclosure proceedings and/or taking title to the mortgaged property on behalf of the trust as "REO property," without disturbing investors' rights while assuring steady loan payments as if the loan was intact.  The concept instructs the transaction parties to treat the mortgage loan associated with a property taken into REO as if it were still outstanding, notwithstanding the trust's exercise of default

---

[10] C30 PSA at § 2.01(a).

remedies.  The special servicer's decision to acquire the property on behalf of the related trust therefore does not upend the investors' expectations with respect to amounts due according to the terms of the underlying mortgage loan.  Thus, in those instances where the trust comes to own the underlying collateral as REO property through foreclosure or deed-in-lieu-of-foreclosure, the mortgage loan becomes an REO loan and is deemed to be outstanding for purposes of ongoing creditor calculations.  Through this REO loan concept, the securitization parties protect and retain creditor rights throughout the lifetime of a CMBS trust's investment in a mortgage loan or its real property collateral.  As such, all scheduled payments of principal and interest, as well as all other amounts due and owing on the REO loan – including any prepayment protections such as yield maintenance – continue to be "deemed" due and owing, as if the default and REO acquisition never occurred and the mortgage loan still exists.  The servicer[11] is required to advance these payments subject to a recoverability analysis.

     E.     The Stuy Town Senior Loan and the Five CMBS trusts

The Stuy Town Senior Loan here, as securitized into five different trusts, reflects all of these concepts discussed above.  The Stuy Town Senior Loan was originated by Wachovia Bank, National Association ("Wachovia") on November 17, 2006 to the borrower PCV ST Owner LP, and was secured by a mortgage on the Stuy Town apartment complexes of 56 buildings and 11,227 units.  The Stuy Town Senior Loan was split among six Notes aggregating $3 billion.  An additional $1.4 billion in mezzanine debt and sponsor equity of $1.89 billion brought the entire capital stack on the purchase to $6.29 billion.  Under the Amended and Restated Co-Lender Agreement, Wachovia was the "Lead Lender" and its A-1 Note was intended to be sold to Wachovia Commercial Mortgage Securities, Inc., which, in

---

[11] In the case of the C30 Trust, the Master Servicer.

turn, intended to transfer and assign the Note to a trustee pursuant to a PSA.[12]  Likewise, the intention of Noteholders A-2 through A-6 was to have their Notes securitized.

The Stuy Town CMBS exemplifies the economics underlying securitization.  Investors in multi-loan conduit deals benefit from diversification (the Wachovia Bank Commercial Trust 2007-C30 transaction contained interests in 263 mortgage loans scattered geographically and representing all major property types)[13] and a range of investor risks and rewards (32 classes of certificates were offered of which 14 senior classes were offered by the Prospectus Supplement).  Further subdivision occurred between Loan Group I (212 loans secured by major property types with the exception of multifamily) and Loan Group 2 (51 loans backed exclusively by multifamily properties).[14]  This diverse selection of certificates permitted investors to tailor their investment preferences to those bonds that suited their risk preferences (senior bonds for risk averse; junior bonds for risk accepting), duration needs (among the offered certificates, weighted average lives modeled between 2.79 years and 9.88 years) and, as here, property type preferences.  Indeed, the designated multifamily loan groups were often structured specifically to permit the GSEs to invest in the bonds.

In the GSEs' case, their investment choice of Class A-1A Certificates selected (a) the senior-most bonds in terms of being first in priority to receive principal and interest distributions from Loan Group 2 (the loans supporting multifamily housing)[15] and receiving

---

[12] Amended and Restated Co-Lender Agreement, dated as of March 12, 2007, CWCAM0071918–35 (the "Co-Lender Agreement"), at Recitals.
[13] Prospectus Supplement dated March 14, 2007, relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, CWCAM0001776–2368 ("Prospectus Supplement"), at S-38, S-40, S-41.
[14] *Id.* at S-71.
[15] *Id.* at S-16.

the top ratings from all three of the rating agencies that rated the transaction,[16] (b) bonds of longer duration, with an assumed final distribution date of January 15, 2017[17] and (c) bonds backed solely by multifamily mortgage loans.  As is typical of senior certificates, the levels of subordination largely insulated the GSEs' investments from default risk, but "the yield on the Class A-1A certificates [was] particularly sensitive to prepayments on mortgage loans in loan group 2."[18]  The Stuy Town Senior Loan comprised 65.5% of the balance in Loan Group 2, such that any prepayment of the Stuy Town Senior Loan would have had an outsized effect on the GSEs' reinvestment risk and intended yield.

Notably, the Amended and Restated Promissory Notes contain many of the prepayment protections that I previously described.  From the Notes' inception through the Lockout Expiration Date (three months prior to maturity), the borrower was prohibited from voluntarily prepaying the loans, but rather had to defease the loan (substitute Treasury bonds) to obtain a release of the underlying collateral.[19]  In addition to defeasance, in the event that the borrower defaulted, a Yield Maintenance Premium became "immediately due and payable" upon the Note's acceleration.[20]  Such Yield Maintenance Premium was payable "whether such prepayment is voluntary or involuntary," including resulting from the Lender's exercise of its rights.[21]

The Co-Lender Agreement memorialized that all six Notes were to be serviced as if there was one loan and subject to the terms of the Pooling Agreement into which the A-1 Note

---

[16] *Id.* at S-37.
[17] *Id.* at S-229.
[18] *Id.* at S-54.
[19] Amended and Restated Promissory Note A-1, dated as of February 16, 2007, CWCAM0500458–82 (the "Note"), § 2.3(a).
[20] *Id.* at § 2.3(b).  *See supra* Section III.A, Commercial Lending and Prepayment Risk.
[21] Note at § 2.3(c)

would be deposited (*i.e.*, the C30 PSA).  *Inter alia*, the Co-Lender Agreement revised the amount due under the six Notes, although the $3 billion aggregate was unchanged.

According to comments by Special Servicer CWCapital Asset Management LLC ("CWC"), the Stuy Town Senior Loan transferred to the Special Servicer in November 2009 due to imminent default.[22]  On January 8, 2010, counsel for the Special Servicer notified the Borrower that its non-payment has resulted in "the occurrence of an 'Event of Default' under Section 13.01(b) of the Loan Agreement."[23]  Following this January 8, 2010 Event of Default notice, on January 29, 2010, counsel to the Special Servicer cited the Lenders' "rights and remedies upon the occurrence and during the continuance of any Event of Default" as the basis for the Special Servicer's "declaring all of the unpaid Debt outstanding under the Notes to be immediately due and payable."[24]  A deed-in-lieu-of-foreclosure then resulted in the collateral property becoming REO Property and the Mortgage Loan becoming an REO Loan of the Trust on June 3, 2014.  The REO Property was sold on December 18, 2015, which generated Liquidation Proceeds available for distribution.  Upon the sale of the REO Property, the Stuy Town Senior Loan prepaid just short of one year of its December 8, 2016 maturity date.

The two letters from Special Servicer's counsel – the January 8, 2010 letter declaring "the occurrence of an 'Event of Default'" and the January 29, 2010 letter citing "the occurrence and continuance of any Event of Default" and "declaring all of the unpaid Debt outstanding under the Notes to be immediately due and payable" – mirror the language under the Note,

---

[22] REO Liquidation Report for Peter Cooper Village/Stuyvesant Town, dated as of December 23, 2015, CWCAM0071532–35.

[23] Letters from Gregory A. Cross, Venable LLP, to PCV St Owner LP, ST Owner LP, Blackrock Financial Management, et. al. Re Notice of Event of Default (Jan. 8 and 29, 2010), CWCAM0515164–74, at -CWCAM 0515166.

[24] *Id.* at CWCAM0515171.

which triggers Yield Maintenance Premium to "also then be immediately due and payable . . . based on the Debt then outstanding on the date of such acceleration."[25]   Although the actual Yield Maintenance Premium calculation is set to occur "on any day during the fifteen (15) day period preceding the date of such prepayment," the claim to the Yield Maintenance Premium is "immediately due and payable" simultaneous with the Note having been "declared due and payable by Lender" on January 29, 2010.

## IV.   Opinions

### A.   CMBS Transactions Generally Prioritize Creditor Rights Such as Yield Maintenance Over Equity Concepts Like Gain on Sale

When teaching finance, one of the core principles that I convey is that lenders can only hope to get their money returned under the terms of the loan contract.  If a property is purchased for $10 million through a combination of $7 million debt and $3 million equity and the property value increases to $15 million, the sale of the property generates enough to satisfy the debt, followed by $8 million for equity.   The debtholder receives only the return of $7 million principal, together with contracted-for interest and fees.  In contrast, if the sale of the property returns only $8 million, equity loses $2 million and receives only $1 million after paying off the $7 million debt (plus earned interest and fees along the way).

As these examples illustrate, equity is always subordinate to debt and therefore assumes more risk, but it holds the prospect of greater, uncapped rewards.  Debt, conversely, is capped at amounts due under the note.  This principle guides finance generally, and that certainly includes real estate finance (as is familiar to any homeowner who is required to satisfy her mortgage out of the proceeds from the sale of her home before registering a gain).  It also

---

[25] Note at § 2.3(b).

guides the absolute priority rule of bankruptcy, where senior-secured claims are fully paid before junior debtors are paid.  At the end of that row of senior to junior debt claims, and only after all such debt claims are satisfied, equity gets the residual, if any.

By way of further illustration, this residual concept exists at the core of the basic accounting principle "TA–TL=NW," *i.e.* "total assets" (economic stores of value) minus "total liabilities" (claims against assets) leaves the residual of "net worth," or equity.  Equity is commonly defined as the residual interest in the assets of an entity that remains after deducting its liabilities.  In my experience, these concepts apply with equal force in the CMBS industry. Generally, CMBS structures prioritize and protect creditor rights; equity returns are subordinate.

In my experience, loans that generate a "gain on sale" – *i.e.*, a residual amount payable to equity after all outstanding debt has been satisfied – occur in secondary loan markets, but they are highly unusual in defaulted loan situations.[26]  The reason is simple: if the underlying collateral value was greater than the debt, it should be generating sufficient cash to meet debt service payments and not default on its obligations in the first instance.[27]  In the case of the Stuy Town Senior Loan, however, following the borrower's 2010 declared default and 2014 deed-in-lieu-of-foreclosure, the Special Servicer managed it as an REO Property until its December 2015 sale.  During that time, not only did the general economy improve, but, as a result of operating and capital improvements at the property and cap rate compression resulting in higher real estate values, the 2015 sale generated proceeds that exceeded outstanding debt,

---

[26] In CMBS liquidations, the average loss severity measured as a percentage of unpaid principal balance exceeds 40%.  *See CMBS – US: Loss severities – Q2 2018 update*, Moody's Investors Service, (Sept. 5, 2018) at Exhibit 1.  Among the 2,554 loans liquidated from 2007 vintage CMBS, weighted average loss severity equaled 43.0%. *Id.*

[27] *See generally* Iannarone Dep. Tr. 38:24–39:16 (testifying that "it is rare to have a gain.  Most of the time [the special servicer acquires the] real estate only when the real estate is not worth the debt.").

including Default Interest and Yield Maintenance.  In such contexts, ensuring that all debt amounts due and payable (*e.g.*, yield maintenance and default interest) are satisfied before applying equity concepts (*e.g.*, gain on sale) is consistent with the priority of debt claims over equity claims.[28]

In my experience, I have never seen a commercial mortgage loan where proceeds from the sale of REO property are paid out as gain on sale to the exclusion of amounts expressly due and payable under the note, such as yield maintenance and default interest.  Based on my review of the factual record of this case, my industry understanding and industry experience is consistent with the experience of the fact witnesses.  For example, CWC witness David Iannarone, President of CWCapital Asset Management, testified that gain-on-sale or excess liquidation proceeds provisions serve to "captur[e] the dollars" that remain "after paying everything due under the note."[29]  Former CWC officer Kathleen Olin, who has served as CREFC's Investor Reporting Package Committee Chair, agreed, testifying that all amounts "due on the loan" must be paid "before there is any excess."[30]  Reflecting on her career in CMBS, Ms. Olin testified that she could not think of a single PSA that allocates proceeds differently.[31]  The testimony from Leslie Hayton, the corporate representative of Master Servicer Wells Fargo Bank, N.A. ("Wells Fargo"), was in accord.  Ms. Hayton, who has also

---

[28] CWC witness Michiko Shimizu testified "[t]he PSA identifies the possibility of [a] transaction that result[s] in[,] what I call[,] full recovery."  Shimizu Dep. Tr. 157:1–3.  A full recovery, according to Ms. Shimizu, requires paying "everything [] owed under the loan, including default interest and yield maintenance."  *Id.* at 157:4–8.  *See also* Olin Dep. Tr. 53:2–24 (testifying that it is a "widely accepted principle" that "generally speaking when you have an asset that is sold for an excess, which in this case would be REO, that you would pay everything that is due on the loan including yield maintenance and late fees and default interest first, before we can even talk about whether there is an excess"); Iannarone Dep. Tr. 40:3–13, 42:7–14 (testifying that gain-on-sale provisions capture the dollars that remain after paying the note).

[29] Iannarone Dep. Tr. 39:4–13; 42:7–9.

[30] Olin Dep. Tr. 53:2–24.

[31] *Id.*

20

served as CREFC's Investor Reporting Package Committee Chair, testified that she has never seen a PSA direct proceeds for deposit into the gain-on-sale account before first allocating amounts due and owing on the loan, including default interest and yield maintenance.[32] Likewise, Appaloosa's corporate representative, James Bolin, testified that he is also unaware of any deal allocating liquidation proceeds as gain on sale to the exclusion of amounts expressly due and payable under the note.[33]

> B.    Prepayment Protections Like Yield Maintenance Are Key Creditor Rights Throughout Commercial Mortgage Lending and CMBS Markets Because They Mitigate the Risk of Losses to Investors Caused by Prepayments, Both Voluntary and Involuntary.

As discussed above, when fixed rate mortgages prepay (voluntarily or involuntarily), the lender is denied the benefit of the agreed-to interest payments, and thus the full yield, that it was set to receive under the note.  In voluntary prepayment situations, the borrower's motivation is frequently dictated by a decline in available financing costs.  On a $100 million fixed rate mortgage loan that amortizes over a 25-year period, reducing a coupon from 6% to 5% would result in annual payment savings in excess of $700,000.[34]  The corollary to this borrower savings is an equal loss to the mortgage lender (or bond investor).  In an involuntary prepayment context (*i.e.*, following a default), the investor may receive the proceeds from an involuntary disposition, such as a foreclosure or REO sale, in a declining interest rate environment.

For many institutional investors who "match fund" their investment assets with the liabilities that finance CMBS bond purchases, this prepayment risk jeopardizes their need to

---

[32] Hayton Dep. Tr. 109:22–110:20.
[33] Bolin Dep. Tr. 216:9–14.
[34] Monthly payments on a $100,000,000 loan balance, amortizing over 25 years at a 6% coupon are $644,301.40 versus $584,590.04 on a 5% coupon.  Payment difference of $59,711.36 multiplied by twelve months equals $716,536.32.

maintain a positive spread against their fixed rate liabilities.  To use an example, life insurance companies are active investors in high credit, low risk (*i.e.*, AA or AAA credit), long-duration CMBS.  Through actuarial tables, they have developed a certain level of precision with respect to predicting the payout on their liabilities through death benefits.  In order to meet these future funding obligations, they must have a similar level of confidence in the timing pattern of their earning assets, such as CMBS bonds.  Swings in the amount and timing of cash receipts from their bond holdings would jeopardize their ability to meet their claims-paying obligations.

While the term used is generally "prepayment risk,"[35] it is more accurately called "reinvestment risk."[36]  Using the examples above, if the life insurance company had invested in that $100 million mortgage loan with a 6% coupon and then faced prepayment when the borrower could achieve a 5% refinancing cost without facing a prepayment restriction of some sort, the life insurance company would receive its money back, but be left with the unattractive choice of reinvesting the prepaid proceeds at 5% in a similar risk-profile obligation.[37]  In normal interest rate environments with a positive-sloping yield curve (short-term debt has a lower associated interest rate than longer-term debt), the reinvestment damage would be greater.  Going back to our example, if the life insurance company received a prepayment in

---

[35] A frequently used real estate finance textbook describes "Prepayment Risk" as follows.

> Some mortgage loans allow borrowers to prepay loans before the maturity date without a penalty. This, in effect, gives borrowers the *option* to prepay the loan, refinance, or pay off the loan balance if a property is sold.  If loans are prepaid when interest rates fall, lenders must forgo the opportunity to earn interest income that would have been earned at the original contract rate.  As funds from the prepaid loans are reinvested by lenders, a lower rate of interest will be earned.  When interest rates increase, however, the loan is not as likely to be prepaid.  The risk that the loan will be prepaid when interest rates fall below the loan contract rate is referred to as prepayment risk.

William Brueggeman & Jeffrey Fisher, Real Estate Finance & Investments 80 (14th ed. 2010).
[36] *See* Errigo Dep. Tr. 39:2–9 (testifying that yield maintenance is generally "a vehicle whereby an investor will be made whole, in the case of principal being returned to them, earlier than they had anticipated in the face of lower interest rates, [or] reinvestment risk").
[37] Of course, the life insurance company could also seek to mirror the lost 6% coupon through incurring additional duration or credit risk, but it could not find an alternative, risk neutral investment.

the ninth year of a ten-year obligation, in order to match fund the remaining year term left on its liabilities, it would be forced to buy a one-year debt instrument that matured in a similar time frame to that of the original mortgage loan.   As mentioned, in normal interest rate environments, being forced to "roll down" the yield curve results in additional yield concessions.   For these reasons, prepayment protections, such as yield maintenance or defeasance, are key creditor rights elements of every fixed rate commercial real estate transaction of which I am aware, both at the mortgage lending and securitization stages.

It is important to note that the reason for a prepayment is immaterial to the harm experienced by the investor.   Whether the borrower voluntarily prepays in order to take advantage of lower prevailing interest rates or principal is prepaid as a result of a sale of the underlying property following a foreclosure or deed-in-lieu-of-foreclosure, the lender or investor in both cases is left with proceeds in a different interest rate environment.   In the case of the ten-year Stuy Town Senior Loan, the ten-year Treasury note ("T-note") rates were 4.61% on the November 17, 2006 origination date.[38]   On the December 18, 2015 liquidation date, T-note rates had declined to 2.54%.[39]   Of more relevance to this Yield Maintenance calculation, Treasury bill ("T-bill") rates maturing in close proximity to the Stuy Town Senior Loan's original December 8, 2016 maturity date yielded 0.713%.[40]   Against the Stuy Town Senior Loan's coupon of 6.434%, this amount represented a loss of approximately 5.75%.[41]   The

---

[38] U.S. Treasury Quotes, Treasury Notes & Bonds, Wall Street Journal, (http://www.wsj.com/mdc/public/page/2_3020-treasury.html).

[39] *Id.*

[40] As determined by Wells Fargo pursuant to C30 PSA Section 3.01(a).  *See* E-mail and attachment from Michael D. Littleton, Wells Fargo, to Michiko Shimizu, CWC Capital, (Dec. 17, 2015) (CWCAM0494816) and (CWCAM0494817–44) at -CWCAM04948 (attaching preliminary calculation for PCVST Owner LP Loan.)

[41] The Stuy Town Senior Loan coupon of 6.434% minus similar maturity T-bill yield of 0.713% equals a 5.721% yield give-up.  Applying this 5.721% yield give-up on an annual basis to the $3 billion principal balance equals $171,630,000.  The actual yield maintenance premium is more complicated than this simple math because it must be calculated for the eleven missed monthly payments and then present-valued back to the actual prepayment date.

investor would be harmed by this lost yield regardless of whether the prepayment was voluntary or involuntary.

C.    Gain on Sale is an Uncapped, Residual Concept that is Subordinate to the Satisfaction of Debt Obligations to Creditors

In contrast to yield maintenance, gain on sale is a residual concept and therefore open-ended.  Allocating all amounts due above trust reimbursements, unpaid principal balance and accrued, unpaid interest to a gain-on-sale reserve account forecloses any opportunity for amounts due and owing to creditors like yield maintenance and default interest to be paid under any circumstances.  Accordingly, it affords no opportunity to satisfy all of the creditor rights associated with the loan, which contravenes the basic principle that debt obligations must be satisfied before recognizing gains.  By contrast, satisfying creditor obligations due under the note, such as yield maintenance and default interest, prior to gain-on-sale payments permits the distribution of gains on sale after those capped, determinable amounts are allocated.  Consistent with this principle, after amounts due and payable under the Note had been satisfied here, there was a Gain on Sale distributed in the amount of approximately $49 million.[42]  If Gain-on-Sale Proceeds were calculated prior to Yield Maintenance, no Yield Maintenance would ever have been paid, whether the property sold for $5.5 billion or $550 billion.

It is my opinion that, unless the deal documents specifically and clearly directed otherwise, industry participants would rightfully seek to satisfy all amounts due and owing under the note before calculating gain on sale.  As set forth below, the deal documents do not contain such a directive and are in fact consistent with industry practices.  Unsurprisingly, the loan documents contain no language pertaining to gain on sale but provide explicitly for the

---

[42] Realized Loss Form, Peter Cooper Village & Stuyvesant Town, dated as of January 11, 2016, WF00001954.

24

payment of the yield maintenance and default interest.  My opinion in this regard is based on my experience in commercial real estate finance and CMBS lending.  This opinion is also consistent with the views of senior industry participants, with whom I am familiar, as reflected in the factual record of this case.[43]

> D.      CMBS Transactions Generally Protect and Preserve the Priority of Creditor Rights in the REO Context Through the REO Loan Concept

In order to preserve creditor rights during the CMBS trust's holdings of mortgage loans, most CMBS transactions with which I am familiar include the concept (if not the identical PSA term) of REO loan.  The concept harmonizes the CMBS industry's goal of passing through to investors a fixed stream of predictable, agreed-to payments with the related special servicer's ability to service and recover on behalf of the trust for non-performing loans while the trust advances payments as if the loan was intact.[44]

Although there may be exceptions among the thousands of MBS issued over the decades, based upon my experience, the vast majority, including this issuance, preserve and maintain the amounts due and payable on the mortgage loan associated with the REO property "otherwise to have the same terms and conditions as its predecessor Mortgage Loan (such terms and conditions to be applied without regard to the default on such predecessor Mortgage

---

[43] *See* E-mail from Leslie Hayton, Wells Fargo, to Lindsey Wright, C-III Asset Management, Grace Bodemuller-Holst, Strategic Asset Services, and Kathleen Olin, CWC Capital (June 23, 2015), CWCAM0828699–701.  This e-mail reflects a discussion among senior members of the CMBS special servicing community, including Leslie Hayton; Kathleen Olin; Lindsey Wright of C-III Asset Management; and John Mayfield, Grace Bodemuller-Holst, and Michael O'Hanlon of Strategic Asset Services LLC.  Ms. Hayton served as CREFC's Investor Reporting Package Committee Chair at this time, Hayton Dep. Tr. 26:14–25, and several other of these participants have held senior positions in CREFC's Servicers' Forum, a forum which routinely discusses servicing customs and practices.  The correspondence appears to conclude that generally in an REO disposition yield maintenance is paid out of excess proceeds "as if the borrower never went away" and that "[i]t has always been pretty clear that you apply the funds as far as they will go on the loan." CWCAM0828699.

[44] These advances are always subject to a nonrecoverability decision.

Loan and the acquisition of the related REO Property as part of the Trust Fund)."[45]  This language from the C30 PSA is functionally equivalent to language found in most CMBS transactions.  More specifically, the other sfour PSAs into which Companion Loans of the Stuy Town Senior Loan had been deposited contain functionally equivalent language preserving noteholder rights through foreclosure.  This "deemed outstanding" concept is nearly universal in the CMBS industry.   It is applied liberally throughout the C30 PSA and utilized in calculating advances, servicing fees, discount rate, due date (for payments under the Note), mortgage rate (". . . determined as if the predecessor Mortgage Loan had remained outstanding") and default interest, among many other applications.  Based on my experience, this is fully consistent with industry standards and investor expectations.

The bond investors' objective is clear: when bonds are bought in an MBS, the intention is to hold predictable interest-bearing debt instruments, not real property.  Although a special servicer may from time to time have to foreclose and then own a property as REO on behalf of a trust, certificateholders' preference is to continue accruing interest and other fees as if payments due under the mortgage note continued.  Subject to a determination made by the master servicer that such advance would be a nonrecoverable advance, the master servicer is required to continue making scheduled payments on the REO loan as if the note was active, and other amounts due and owing under the terms of the predecessor note continue to accrue notwithstanding the special servicer's collection actions.   In my experience, the industry extends this "deemed outstanding" concept to the preservation of investor rights, including prepayment protections such as yield maintenance.  That is, in the event that collections on an REO property (including liquidation proceeds from the sale of an REO property) are received

---

[45] C30 PSA at § 1.01, Definition of REO Loan.

in advance of the predecessor mortgage loan's maturity date, the REO loan concept dictates that those collections must be treated as borrower prepayments, as if the mortgage loan were still extant.  Yield maintenance must be calculated as an amount due and owing on the loan, as provided for in the underlying mortgage note.

In order to give full credence to the REO loan concept, collections on an REO loan, either through income streams from the REO property or through a disposition, must be applied without regard to the source of the funds.  The definition of REO Loan here and generally across CMBS PSAs is agnostic as to the source of such funds.  Absent collections from a deficiency judgment, once the mortgage loan becomes an REO loan, there is no borrower extant.[46]  As a result, requiring that a principal prepayment in a REO loan context result from a borrower payment would make no sense.  Indeed, as CWC witness Michiko Shimizu testified, the definition of REO Loan expressly allocates Yield Maintenance upon the sale of an REO Property.[47]  Moreover, CMBS lending is non-recourse to the borrower subject to limited carveouts.  Requiring yield maintenance solely from the borrower in a REO loan would render these charges uncollectible.

E.     The Stuy Town Securitization and Loan Documents Are Consistent with the Foregoing Principles.

The securitization and loan documents here are consistent with the industry practices I have described above.  Specifically, the underlying loan documents contain no language pertaining to gain on sale, but do provide explicitly for the payment of the yield maintenance and default interest, as discussed below.

---

[46] There may be other borrower parties, such as guarantors and indemnitors.
[47] Shimizu Dep. Tr. 36:20–37:20.  Similarly, Ms. Hayton of Wells Fargo testified that for purposes of the Master Servicer's calculation, the REO sale date is the "prepayment date" notwithstanding that the REO sale did not result in a payment by the borrower.  Hayton Dep. Tr. 131:5–12 (referring to CWCAM0828699–701).

As with any set of contracting parties, parties to a CMBS transaction are free to establish whatever terms they choose, subject to any governing laws and regulations, and, in the case of MBS, the terms of the underlying mortgage loans.  That said, the general principles and opinions that I have set forth are, based on my experience in the industry, consistent with the understanding and expectations of CMBS industry participants, including sponsors, servicers and investors.  Absent inconsistent or ambiguous directives in the documents governing a transaction, I (and the industry participants with whom I am familiar) expect the principles and opinions to apply with full force.  Furthermore, I view the deal documents through the lens of these industry customs and practices, and, with respect to the C30 PSA and the underlying Note, I believe that the Master Servicer's accounting (at the direction of the Special Servicer) for Yield Maintenance out of the proceeds from the sale of Stuy Town was fully consistent with industry custom and practice.  Moreover, I find nothing unconventional or inconsistent with these views in any of the loan documents or the C30 PSA.

As a starting point, the C30 PSA could not be more explicit regarding its intent to pass along to its certificateholders the Trusts' rights in the underlying Stuy Town Senior Loan.  The C30 PSA adopts the accepted REO loan concept in its definitions, requiring the transaction parties to treat Stuy Town in REO as having "the same terms and conditions as [the Stuy Town Senior Loan]," with "amounts due and owing, or deemed to be due and owing, with respect to [the Stuy Town Senior Loan] as of the date of the related REO Acquisition . . . deemed to continue to be due and owing in respect of any REO Loan."  It is worth quoting the definition of REO Loan in its entirety:

> The Mortgage Loan deemed for purposes hereof to be outstanding with respect to each REO Property to the extent of the Trust Fund's interest therein.  Each REO Loan shall be deemed to be outstanding for so long as the related REO Property remains part of REMIC I and deemed to provide for Periodic

Payments of principal and/or interest equal to its Assumed Scheduled Payment and otherwise to have the same terms and conditions as its predecessor Mortgage Loan (such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan and the acquisition of the related REO Property as part of the Trust Fund). Each REO Loan shall be deemed to have an initial unpaid principal balance and Stated Principal Balance equal to the unpaid principal balance and Stated Principal Balance, respectively, of its predecessor Mortgage Loan (or, if applicable, Companion Loan) as of the date of the related REO Acquisition. All Scheduled Payments (other than a Balloon Payment), Assumed Scheduled Payments (in the case of a Balloon Mortgage Loan delinquent in respect of its Balloon Payment) and other amounts due and owing, or deemed to be due and owing, in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, shall be deemed to continue to be due and owing in respect of an REO Loan. In addition, Nonrecoverable Advances and Unliquidated Advances (including interest on such Nonrecoverable Advances or Unliquidated Advances) with respect to such REO Loan that were paid from collections on the Mortgage Loans and resulted in principal distributed to the Certificateholders being reduced pursuant to Section 3.05(a) hereof, shall be deemed outstanding until recovered or until a Final Recovery Determination is made. Collections in respect of each REO Loan (after provision for amounts to be applied to the payment of, or to be reimbursed to the Master Servicer, the Special Servicer or the Trustee for the payment of, the costs of operating, managing, selling, leasing and maintaining the related REO Property or for the reimbursement of the Master Servicer, the Special Servicer or the Trustee for Advances as provided in this Agreement) shall be treated: *first*, as a recovery of Nonrecoverable Advances and Unliquidated Advances (including interest on such Nonrecoverable Advances and Unliquidated Advances) with respect to such REO Loan, in each case that relate to Advances that were paid from collections on the Mortgage Loans and resulted in principal distributed to the Certificateholders being reduced pursuant to Section 3.05(a) hereof; *second*, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt (exclusive of any portion thereof that constitutes Additional Interest); *third*, as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and *fourth*, in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums and Penalty Interest and (ii) Additional Interest and other amounts, in that order. Notwithstanding the foregoing, all amounts payable or reimbursable to the Master Servicer, the Special Servicer or the Trustee in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, including, without limitation, any unpaid Servicing Fees and any unreimbursed Servicing Advances and P&I Advances, together with any interest accrued and payable to the Master Servicer, the Special Servicer or the Trustee in respect of such Servicing Advances and P&I Advances in accordance

with Sections 3.03(d) and 4.03(d), shall continue to be payable or reimbursable to the Master Servicer, the Special Servicer or the Trustee, as the case may be, in respect of an REO Loan pursuant to Section 3.05(a).

I have discussed this language at various prior points, but a handful of observations merit repeating: (1) REO Loans perpetuate the economic aspects of the predecessor Mortgage Loan (which includes the Mortgage Loan's prepayment protections); (2) whatever amounts were due and owing under the predecessor Mortgage Loan as of the acquisition date of the REO Property continue to be due and owing as an REO Loan (including amounts that have become due and owing as a result of a default and acceleration); (3) the economic terms of the predecessor Mortgage Loan survive until the REO Property is no longer owned by the Trust (*i.e.*, through an REO sale by the Trust) and (4) REO Loans specifically contemplate the payment of Yield Maintenance out of collections from the REO Property.

As discussed above, prepayment protections are key creditor elements of any fixed-rate commercial loan obligation, and the Stuy Town Senior Loan is no different in that respect. The language in the Note itself is clear or "express" as to the circumstances, timing and calculation of Yield Maintenance. Pursuant to the terms of the Note, prepayments of any sort are not permitted prior to the Lockout Expiration Date, which is defined as three payment dates immediately prior to the maturity date, or September 8, 2016. Section 2.3(b) of the Note states the conditions under which Yield Maintenance Premium becomes due and payable:

> If, prior to the Lockout Expiration Date, the indebtedness evidenced by this Note shall have been declared due and payable by Lender pursuant to Article 3 hereof of the provisions of any other Loan Document due to the occurrence and continuance of an Event of Default by Borrower, then, in addition to the indebtedness evidenced by this Note being immediately due and payable, there shall also then be immediately due and payable a prepayment fee in an amount equal to the Yield Maintenance Premium (as hereinafter defined) based on the debt outstanding on the date of such acceleration.

In other words, under the Note, the only circumstances that give rise to Yield Maintenance becoming due and payable is when the Lender declares the indebtedness due under the Note to be due and payable after the occurrence of an Event of Default.  When the Lender through its Special Servicer accelerated all amounts due under the Note in a January 29, 2010 letter to the borrower, Yield Maintenance Premium became "immediately due and payable" through automatic operation.

Thus, pursuant to the terms of the Note, Yield Maintenance became due and owing at the time of the original 2010 acceleration of the Stuy Town Senior Loan, and, pursuant to the REO loan concept embodied in the C30 PSA, remained due and owing subsequent to the acquisition of Stuy Town as REO Property.[48]  The REO Loan waterfall incorporated into the C30 PSA's definition of REO Loan then provides for collections on REO Loans to be applied to "Yield Maintenance Charges, Prepayment Premiums and Penalty Interest" when "in accordance with the normal servicing practices of the Master Servicer."

Based on my understanding of CMBS servicing practices, as well as the deposition testimony of representatives from the Master and Special Servicers, allocation of Yield Maintenance from the Liquidation Proceeds of an REO Disposition are fully in accordance with normal servicing practices.[49]  The Note – deemed outstanding through the REO Loan concept – then provided the basis for the Master Servicer's calculation of Yield Maintenance Premium:  "the Master Servicer shall be required to follow the terms and provisions contained

---

[48] "All Scheduled Payments (other than a Balloon Payment), Assumed Scheduled Payments (in the case of a Balloon Mortgage Loan delinquent in respect of its Balloon Payment) and other amounts due and owing, or deemed to be due and owing, in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, shall be deemed to continue to be due and owing in respect of an REO Loan."  C30 PSA at § 1.01, Definition of REO Loan.

[49] *See* Hayton Dep. Tr. 103:21–25; Olin Dep. Tr. 53:2–13; Iannarone Dep. Tr. 42:7–13.

in the applicable Mortgage Note."[50]  Through these standard CMBS provisions, the C30 Trust passes onto its certificateholders unimpaired the Trust's rights to Yield Maintenance under the Mortgage Loans the Trust purchased.

Prioritizing Yield Maintenance over any Gain-on-Sale Proceeds in the Stuy Town Senior Loan is thus consistent with general principles in finance, and more specifically, with industry custom and practice in the commercial mortgage sector.  It is impossible to fulfill the C30 PSA's directive to "deem" all amounts due and owing on an REO Loan as outstanding if Gain-on-Sale Proceeds are given priority; by contrast, equity's risk/reward proposition is reflected when Gain on Sale is treated as a residual, subordinate to the claims of the lender, that gets paid out to the extent it exists after payment of yield maintenance and default interest.

---

[50] C30 PSA at § 1.01, Definition of Yield Maintenance Charge.

## V.      Conclusion

Based on my experience in CMBS lending and servicing as well as my experience in real estate finance generally, in addition to my review of pertinent documents in this loan and CMBS transaction, I hold these opinions as of the report date. I reserve the right to modify these opinions if additional information is presented to  me.


Dated: January 18, 2019
New York, New York

Brian Olasov

## EXHIBIT 1: MATERIALS RELIED UPON

**COURT DOCUMENTS**

1. Memorandum of Law in Support of Appaloosa Investment L.P. I and Palomino Master Ltd's Motion for Judgment on the Pleadings, June 30, 2017 (ECF 170)
2. Memorandum of Law in Support of CWCapital Asset Management LLC's Motion for Judgment on the Pleadings, June 30, 2017 (ECF 175)
3. Memorandum of Law in Support of the Federal Home Loan Mortgage Corporation's and the Federal National Mortgage Association's Joint Motion for Judgment on the Pleadings, June 30, 2017 (ECF 177)
4. The Federal Home Loan Mortgage Corporation's and the Federal National Mortgage Association's Memorandum of Law in Opposition to Appaloosa's Motion for Judgment on the Pleadings, August 4, 2017 (ECF 181)
5. Appaloosa Investment L.P. I and Palomino Master Ltd's Memorandum of Law in Opposition to the Federal Home Loan Mortgage Corporation's, the Federal National Mortgage Association's, and CWCapital Asset Management LLC's Motions for Judgment on the Pleadings, August 4, 2017 (ECF 182)
6. CWCapital Asset Management LLC's Memorandum of Law in Opposition to Appaloosa's Motion for Judgment on the Pleadings, August 4, 2017 (ECF 184)
7. Reply Memorandum of Law in Support of the Federal Home Loan Mortgage Corporation's and the Federal National Mortgage Association's Joint Motion for Judgment on the Pleadings, September 1, 2017 (ECF 185)
8. Reply Memorandum of Law in Support of Appaloosa Investment L.P. I and Palomino Master Ltd's Motion for Judgment on the Pleadings, September 1, 2017 (ECF 186)
9. Reply Memorandum of Law in Support of CWCapital Asset Management LLC's Motion for Judgment on the Pleadings, September 1, 2017 (ECF 188)
10. Opinion and Order, March 9, 2018 (ECF 195)

**DEPOSITION TRANSCRIPTS AND EXHIBITS**

1. 30(b)(6) Deposition of James Bolin, December 10, 2018
2. 30(b)(6) Deposition of Daniel T. Dresser, December 13, 2018
3. 30(b)(6) Deposition of Glenn Errigo, December 13, 2018
4. 30(b)(6) Deposition of Leslie Hayton, November 30, 2018
5. 30(b)(6) Deposition of David B. Iannarone, December 5, 2018
6. 30(b)(6) Deposition of Edwin Janis, December 6, 2018
7. 30(b)(6) Deposition of Kathleen C. Olin, December 14, 2018
8. 30(b)(6) Deposition of David Potier, November 30, 2018
9. Deposition of Ross Romano, November 29, 2018
10. 30(b)(6) Deposition of Michiko Shimizu, December 12, 2018

1

**BATES-STAMPED DOCUMENTS**

1. Prospectus Supplement dated March 14, 2007, relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30 (CWCAM0001776–2368)
2. Pooling and Servicing Agreement, dated as of April 1, 2007, relating to the Cobalt Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C2 (CWCAM0017298–17618)
3. Pooling and Servicing Agreement, dated as of March 1, 2007, relating to the ML-CFC Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-5 (CWCAM0039543–40202)
4. Pooling and Servicing Agreement, dated as of April 1, 2007, relating to the ML-CFC Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-6 (CWCAM0040203–40531)
5. December 17, 2015 E-mail from Michael D. Littleton to Michiko Shimizu attaching Preliminary Calculation for PCVST Owner LP Loan, dated as of December 17, 2015 (CWCAM0494816–44)
6. Amended and Restated Promissory Note A-1, dated as of February 16, 2007 (CWCAM0500458–82)
7. Pooling and Servicing Agreement, dated as of March 1, 2007, relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30 (CWCAM0050925–51236)
8. REO Liquidation Report for Peter Cooper Village/Stuyvesant Town, dated as of December 23, 2015 (CWCAM0071532–35)
9. Amended and Restated Co-Lender Agreement, dated as of March 12, 2007 (CWCAM0071918–35)
10. December 18, 2015 E-mail from Michael D. Littleton to Michiko Shimizu attaching Preliminary Calculation for PCVST Owner LP Loan, dated as of December 18, 2015 (CWCAM0828308–10)
11. Pooling and Servicing Agreement, dated as of May 1, 2007, relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C31 (CWCAM0089671–89971)
12. January 8, 2010 Letter from Gregory A. Cross to PCV St Owner LP, ST Owner LP, and Blackrock Financial Management Re Notice of Event of Default (CWCAM0515164–74)
13. Realized Loss Form, Peter Cooper Village & Stuyvesant Town, dated as of January 11, 2016 (WF00001954)

**OTHER SOURCES**

1. U.S. Treasury Quotes, Treasury Notes & Bonds, Wall Street Journal, (http://www.wsj.com/mdc/public/page/2_3020-treasury.html)
2. *CMBS – US: Loss severities – Q2 2018 update*, Moody's Investors Service, (Sept. 5, 2018)

# EXHIBIT 2: GLOSSARY

| | **Wachovia Commercial Mortgage Securities, Inc.**<br>**Series 2007-C30 PSA** | |
|---|---|---|
| **Depositor** | Wachovia Commercial Mortgage Securities, Inc. | Cover |
| **Master Servicer** | Wachovia Bank, National Association | Cover |
| **Special Servicer** | CWCapital Asset Management LLC | Cover |
| **Trustee** | Wells Fargo Bank, N. A. | Cover |
| **Final Recovery Determination** | A determination by the Special Servicer with respect to any Defaulted Mortgage Loan (and, if applicable, any defaulted Companion Loan) or REO Property (other than a Mortgage Loan or REO Property, as the case may be, that was purchased by either Mortgage Loan Seller pursuant to the applicable Mortgage Loan Purchase Agreement or by the Majority Subordinate Certificateholder, the applicable Companion Holder or the Special Servicer pursuant to Section 3.18(c), 3.18(d), 3.18(e) or 3.18(h), or by the Master Servicer, the Special Servicer or the Majority Subordinate Certificateholder pursuant to Section 9.01) that there has been a recovery of all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries that the Special Servicer has determined, in accordance with the Servicing Standard, will be ultimately recoverable (or, in the case of the LB-UBS 2007-C1 Serviced Mortgage Loan, a "Final Recovery Determination" as defined in the LB-UBS 2007-C1 Pooling and Servicing Agreement with respect to such Mortgage Loan). | 1.01 |
| **Gain-on-Sale Proceeds** | With respect to any Mortgage Loan, the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received. | 1.01 |
| **Liquidation Event** | With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made with respect to such Mortgage Loan; (iii) such Mortgage Loan is repurchased by a Mortgage Loan Seller pursuant to the applicable Mortgage Loan Purchase Agreement; or (iv) such Mortgage Loan is purchased by the Majority Subordinate Certificateholder, the Companion Holders, the mezzanine lenders or the Special Servicer pursuant to Section 3.18(c), 3.18(d), 3.18(e) or 3.18(m), or by the Master Servicer, the Special Servicer or the Majority Subordinate Certificateholder pursuant to Section 9.01. With respect to any REO Property (and the related REO Loan), any of the following events: (i) a Final Recovery Determination is made with respect to such REO Property; (ii) such REO Property is purchased by the Master Servicer, the Special Servicer or the Majority Subordinate Certificateholder pursuant to Section 9.01; or (iii) such REO Property is purchased by the Companion Holder as described in Section 3.18(d). | 1.01 |
| **Mortgage Loan** | Each of the mortgage loans transferred and assigned to the Trust Fund pursuant to Section 2.01 and listed on the Mortgage Loan Schedule and from time to time held in the Trust Fund. As used herein, the term "Mortgage Loan" includes the related Mortgage Note, Mortgage, and other security documents contained in the related Mortgage File. Unless otherwise indicated, as used in this Agreement, the term "Mortgage Loan" does not include any Companion Loan. | 1.01 |
| **Peter Cooper Village & Stuyvesant Town Loan** | That certain Mortgage Loan which is included in the Trust Fund (identified as loan number 1 on the Mortgage Loan Schedule). | 1.01 |
| **Realized Loss** | With respect to: (1) each Defaulted Mortgage Loan as to which a Final Recovery Determination has been made, or with respect to any successor REO Loan as to which a Final Recovery Determination has been made as to the related REO Property, an amount (not less than zero) equal to (a) the unpaid principal balance of such Mortgage Loan or REO Loan, as the case may be, as of the commencement of the Collection Period in which the Final Recovery Determination was made, plus (b) without taking into account the amount described in subclause (1)(d) of this definition, all accrued but unpaid interest on such Mortgage Loan or such REO Loan, as the case may be, at the related Mortgage Rate to but not including the Due Date in the Collection Period in which the Final Recovery Determination was made (exclusive of any portion thereof that constitutes default interest in excess of the Mortgage Rate, Additional Interest, Prepayment Premiums or Yield Maintenance Charges), plus (c) any related unreimbursed Servicing Advances and any unreimbursed interest on any Advances as of the commencement of the Collection Period in which the Final Recovery Determination was made, together with any new related Servicing Advances | 1.01 |

1

| | | |
|---|---|---|
| | made during such Collection Period, *minus* (d) all payments and proceeds, if any, received in respect of such Mortgage Loan or the REO Property that relates to such REO Loan, as the case may be, during the Collection Period in which such Final Recovery Determination was made; (2) each defaulted Mortgage Loan as to which any portion of the principal or previously accrued interest (other than Additional Interest and Penalty Interest) payable thereunder was canceled in connection with a bankruptcy or similar proceeding involving the related Mortgagor or a modification, waiver or amendment of such Mortgage Loan granted or agreed to by the Special Servicer pursuant to Section 3.20, the amount of such principal and/or interest so canceled; (3) each Mortgage Loan as to which the Mortgage Rate thereon has been permanently reduced and not recaptured for any period in connection with a bankruptcy or similar proceeding involving the related Mortgagor or a modification, waiver or amendment of such Mortgage Loan granted or agreed to by the Special Servicer pursuant to Section 3.20, the amount of the consequent reduction in the interest portion of each successive Periodic Payment due thereon (each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Periodic Payment); and (4) each Mortgage Loan for which a Final Recovery Determination has been made, to the extent not included in clause (1) above, Nonrecoverable Advances (including interest on such Nonrecoverable Advance) to the extent amounts have been paid from the Principal Distribution Amount pursuant to Section 3.05(a) hereof. | |
| **REO Disposition** | The sale or other disposition of any REO Property pursuant to Section 3.18(h). | 1.01 |
| **REO Loan** | The Mortgage Loan deemed for purposes hereof to be outstanding with respect to each REO Property to the extent of the Trust Fund's interest therein. Each REO Loan shall be deemed to be outstanding for so long as the related REO Property remains part of REMIC I and deemed to provide for Periodic Payments of principal and/or interest equal to its Assumed Scheduled Payment and otherwise to have the same terms and conditions as its predecessor Mortgage Loan (such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan and the acquisition of the related REO Property as part of the Trust Fund). Each REO Loan shall be deemed to have an initial unpaid principal balance and Stated Principal Balance equal to the unpaid principal balance and Stated Principal Balance, respectively, of its predecessor Mortgage Loan (or, if applicable, Companion Loan) as of the date of the related REO Acquisition. All Scheduled Payments (other than a Balloon Payment), Assumed Scheduled Payments (in the case of a Balloon Mortgage Loan delinquent in respect of its Balloon Payment) and other amounts due and owing, or deemed to be due and owing, in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, shall be deemed to continue to be due and owing in respect of an REO Loan. In addition, Nonrecoverable Advances and Unliquidated Advances (including interest on such Nonrecoverable Advances or Unliquidated Advances) with respect to such REO Loan that were paid from collections on the Mortgage Loans and resulted in principal distributed to the Certificateholders being reduced pursuant to Section 3.05(a) hereof, shall be deemed outstanding until recovered or until a Final Recovery Determination is made. Collections in respect of each REO Loan (after provision for amounts to be applied to the payment of, or to be remitted to the Master Servicer, the Special Servicer or the Trustee for the payment of, the costs of operating, managing, selling, leasing and maintaining the related REO Property or for the reimbursement of the Master Servicer, the Special Servicer or the Trustee for Advances as provided in this Agreement) shall be treated: *first*, as a recovery of Nonrecoverable Advances and Unliquidated Advances (including interest on such Nonrecoverable Advances and Unliquidated Advances) with respect to such REO Loan, in each case that relate to Advances that were paid from collections on the Mortgage Loans and resulted in principal distributed to the Certificateholders being reduced pursuant to Section 3.05(a) hereof; *second*, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt (exclusive of any portion thereof that constitutes Additional Interest); *third*, as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and *fourth*, in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums and Penalty Interest and (ii) Additional Interest and other amounts, in that order. Notwithstanding the foregoing, all amounts payable or reimbursable to the Master Servicer, the Special Servicer or the Trustee in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, including, without limitation, any unpaid Servicing Fees and any unreimbursed Servicing Advances and P&I Advances, together with any interest accrued and payable to the Master Servicer, the Special Servicer or the Trustee in respect of such Servicing Advances and P&I Advances in accordance with Sections 3.03(d) and 4.03(d), shall continue to be payable or reimbursable to the Master Servicer, the Special Servicer or the Trustee, as the case may be, in respect of an REO Loan pursuant to Section 3.05(a). | 1.01 |
| **REO Property** | A Mortgaged Property acquired on behalf and in the name of the Trustee (or, in the case of the LB-UBS 2007-C1 Serviced Mortgage Loan, the Trust Fund's proportionate beneficial interest in the Mortgaged Property acquired by the LB-UBS 2007-C1 Trustee pursuant to the LB-UBS 2007-C1 Pooling and Servicing Agreement) for the benefit of the Certificateholders (subject to the related Intercreditor Agreement with respect to a Mortgaged Property securing a Loan Pair) through foreclosure, acceptance of a deed-in-lieu of foreclosure or otherwise in accordance with applicable law in connection with the default or imminent default of a Mortgage Loan. | 1.01 |
| **Yield Maintenance Charge** | Payments paid or payable, as the context requires, on a Mortgage Loan as the result of a Principal Prepayment thereon, not otherwise due thereon in respect of principal or interest, which have been calculated (based on Scheduled Payments on such Mortgage Loan) to compensate the holder for reinvestment losses based on the value of an interest rate index at or near the time of prepayment. Any other prepayment premiums, penalties and fees not so calculated will not be considered "Yield Maintenance Charges." In the event that a Yield Maintenance Charge shall become due for any particular Mortgage Loan, the Master Servicer shall be required to follow the terms and provisions contained | 1.01 |

in the applicable Mortgage Note; *provided*, *however*, in the event the particular Mortgage Note shall not specify the U.S. Treasuries which shall be used in determining the discount rate or the reinvestment yield to be applied in such calculation, the Master Servicer shall be required to use those U.S. Treasuries having maturity dates most closely approximating the maturity of such Mortgage Loan. Accordingly if either no U.S. Treasury issue, or more than one U.S. Treasury issue, shall coincide with the term over which the Yield Maintenance Charge shall be calculated (which depending on the applicable Mortgage Note is based on the remaining average life of the Mortgage Loan or the actual term remaining through the Maturity Date), the Master Servicer shall use the U.S. Treasury whose reinvestment yield is the lowest, with such yield being based on the bid price for such issue as published in *The Wall Street Journal* on the date that is fourteen (14) days prior to the date that the Yield Maintenance Charge shall become due and payable (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield. The monthly compounded nominal yield ("MEY") is derived from the reinvestment yield or discount rate and shall be defined as MEY = (12X {(1+"BEY"/2)^1/6}-1) where BEY is defined as the U.S. Treasury Reinvestment Yield which is in decimal form and not in percentage, and 1/6 is the exponential power to which a portion of the equation is raised. For example, using a BEY of 5.50%, the MEY = (12 X {(1+ 0.055/2)^0.16667}-1) where 0.055 is the decimal version of the percentage 5.50% and 0.16667 is the decimal version of the exponential power. The MEY in the above calculation is 5.44%.

3

**EXHIBIT 3: CURRICULUM VITAE**

# BRIAN OLASOV

405 Lexington Avenue
New York, NY 10174
(212) 380-9637
bolasov@carltonfields.com

**EXPERIENCE**

**Adjunct Professor**.  NEW YORK UNIVERSITY, SCHACK INSTITUTE OF REAL ESTATE.  Teaching responsibilities include real estate finance, valuation and real estate capital markets.  2019 – Present.

**Executive Director – Financial Services Consulting.**  CARLTON FIELDS JORDEN BURT.  Atlanta and New York.  Employed from July 2015 – Present.

**Managing Director.**  McKENNA LONG & ALDRIDGE. Atlanta and London. Provide financial due diligence on distressed mortgage loans, portfolios and institutions including credit restructuring, valuation, bulk sales and securitization options for Financial Restructurings Group.  Determine highest net present value recovery strategies for mortgages using various workout and capital market structures and in compliance with Pooling and Servicing Agreements.  Active member of Bank Solutions practice analyzing capital needs, accounting and regulatory solutions and loan portfolio condition of bank clients and corporate client financing needs.  Analyze state of banking industries, overleveraged property markets, feasibility of mortgage securitization across Europe. Analyze Pooling and Servicing Agreement compliance by Master and Special Servicers in residential and commercial mortgage-backed securities.   Provide litigation support and construction of damage calculations and financial implications of defense theories including rescission and repurchase claims in various asset classes of structured finance bonds, particularly mortgage-backed securities.  Extensive bond modeling for government affairs practice involving real estate development financing. Support corporate department in merger and acquisition transactions.

Provide expert witness testimony and consulting in structured finance and mortgage securities disputes involving loan underwriting and mortgage loan servicing, valuation disputes in civil and regulatory matters and damage calculations.  Extensive work on breach claims arising under residential and commercial mortgage loan purchase agreements and Pooling and Servicing Agreements as well as rescission claims in various structured finance investments.  Advise bankruptcy examiner and counsel in the investigation and preparation of examination reports on failed financial institutions.   Financial advisory work on bankruptcy examination reports including Refco, Washington Mutual and Petra CDO on various topics involving insolvency and liquidity testing, mortgage and securities accounting treatment and valuation analyses approaching bankruptcy filing.  Work with bankruptcy counsel on valuation issues, mortgage bond modeling and claims analysis including leading equity analysis and mortgage servicing transfer for equity committee of United Companies. Employed from June 1990 – June 2015.

Past and current activities and associations include testifying witness on mortgage-backed securities and banks' impact on real estate markets before the TARP Congressional Oversight Panel, policy briefing to Senate Banking Committee staff on effect of regulations on CMBS and commercial mortgage lending activities, Visiting Scholar Speaker for OCC on securitization's impact on commercial banking industry and state of real estate lending on national banks, guest lecturer on  mortgage-backed securities and real estate finance at Georgia State University, Emory Goizueta, Columbia University, New York University, Georgetown University and Wharton School of Business, Vice-Chairman of Real Estate

Capital Resources Association Mortgage Securitization Committee, Board of Governors of Commercial Mortgage Securitization Association (CMSA) and Commercial Real Estate Finance Council (CREFC), Executive Committee of CREFC, Audit Committee member of CREFC, Chair of Policy Committee of CREFC, Chair of Risk Retention Implementation Task Force, Co-Chair, CMSA International Committee and CMSA European Chapter founder.  Active participant in various CMSA, CREFC and Mortgage Bankers Association mortgage loan servicing, investor reporting and standards settings committees including drafting model representations and warranties to support reemerging securitization market. Board member, Real Estate Investment Advisors Council and *Commercial Real Estate Finance World* editorial board.  Frequent national and international speaker on state of residential and commercial mortgage markets, MBS litigation, structured finance products, appraisal and valuation issues, banking and lending regulations and legislation.

**Adjunct Professor**.    EMORY  LAW  SCHOOL.    Curriculum  design  and  teaching responsibilities for transactional certificate program comprising accounting fundamentals, valuation,  financial  statement  analysis  and  financial  concepts  in  context  of  corporate contracts and financial structures.  2008 – 2010.

**Capital Markets Specialist.**  FEDERAL HOME LOAN BANK OF ATLANTA. Co-designed market valuation model for savings and loans to determine causes of industry insolvency focusing on value, volatility and default probability of mortgage loan and MBS portfolios, public policy implications and institutional behavior of banks. Published research on valuation methodology and thrift behavior presented at NBER and Brookings Institute. Authored  reports  for  top  management  on  FHLB's  strategic  options,  securitization participation and impact of FIRREA. Advised on regulatory reporting changes, thrift policy initiatives and mortgage servicing audits.  Employed from June 1989 - May 1990.

**Institutional Fixed Income Sales and Analysis/Structuring.**  BEAR, STEARNS & CO., INC.  New York and Atlanta. Responsible for developing, modeling, presenting and implementing Asset/Liability strategies and structured mortgage financings for financial institutions and valuing residential mortgage loan portfolios in order to determine market value of portfolio equity (MVPE) for banks and savings and loans. Concentrated effort in community and regional banks and savings and loan industry with accounting and regulatory specialization. Author and programmer of Situation Analysis Program - a comprehensive review of financial institution's condition, stress testing bank capital value at risk with focus on mortgage loan portfolio, default and loss risk exposure and asset/liability management systems and strategic options.  Presentations to senior bank auditors on mortgage loan performance and MBS accounting.  Developed computer modeling and structuring for various Mortgage-Backed Securities investment and financing proposals, balance sheet and capital adequacy testing. Responsibility for southeastern Financial Services Group effort. Series 7 and 63 (lapsed).  Employed from December 1984 - September 1988.

**Commercial Loan Portfolio Manager/Commercial Loan Officer.** SOUTH CAROLINA NATIONAL BANK. Columbia and Charleston, SC. Senior Credit officer with supervisory duties, responsible for underwriting $120 million CLD portfolio with mortgage concentration leading to lowest delinquency and loss experience in system. Later, as Commercial Loan officer, filled annual production quota in six months.  Employed from August 1981 - September 1984.

| | |
|---|---|
| **EDUCATION** | **MBA,** EMORY UNIVERSITY, Atlanta, GA, Class of 1990. |

                         < Emory MBA Fellowship

                         < Executive MBA Teaching Assistantship in International Finance

                         < Chairman, Faculty Awards Committee

**BA, International Relations,** YALE COLLEGE, New Haven, CT, Class of 1981.

                         < George C. Haas Leadership Scholar

2

< U.S. Senate internship, Sen. Ernest Hollings (D-SC)
< Owner/Manager of Yale Audio through undergraduate term

**PUBLICATIONS**

< With Mauldin, Ruff, "Fourth District Use of Derivative Securities" *Financial Analysts' Journal*, May 1990.
< With Benston, Carhill, "The Failure and Survival of Thrifts: Evidence from the Southeast", *Financial Markets and Financial Crises*, University of Chicago Press, 1991.
< With Benston, Carhill, "Market-Value vs. Historical Cost Accounting", *The Reform of Federal Deposit Insurance*, Harper Business Press, 1992.
< With Donaldson, Lufkin & Jenrette, "Evaluating Mortgage Servicing", *Mortgage Product Spotlight*, June 1990.
< "The Healthiest Banks Have Little to Fear In Regulators' Push for Market Accounting", *American Banker*, March 15, 1991.
< "Cure for Commercial Realty", *American Banker*, February 14, 1992.
< "Conservatorships Do More Harm Than Good", *American Banker*, May 20, 1992.
< "Selling Problem Assets Can Strengthen Your Bank", *American Banker*, April 14, 1993.
< Contributing author, *Report to Congress on the Federal Home Loan Bank System*, Office of Policy Development and Research, Department of Housing and Urban Development, 1994.
< "Commercial Mortgage Finance: Capital Markets Fill a Void", *Real Estate Review*, Summer 1994.
< "The Maturing of the Commercial Mortgage-Backed Securities Market", *Real Estate Review*, Summer 1995.
< "Property Developments", *Balance Sheet*, (Risk Publications) Summer 1995.
< "When the Levee Breaks: A Cautionary Tale for the CMBS Industry", *Real Estate Review*, Winter 2000.
< "The Evolving Servicer Landscape: Protecting Against Losses and Lawsuits", *CMBS World*, Summer 2003.
< Contributing author, *Mortgage and Asset-Backed Securities Litigation*, chapter on MBS industry structure and loan servicing, Thomson West, volumes 2008 through 2015.
< "We're Living in the Post 9-15 World", *Atlanta Business Chronicle*, September 11, 2009.
< "Small Businesses Feel Banks' Pain", *Atlanta Journal Constitution*, December 16, 2009.
< "Help Salvageable Banks", *American Banker*, May 25, 2010.
< "Time for Banks to Sell Nonperforming Loans", *National Real Estate Investor*, November 2010.
< "Nostalgic for the RTC?", *National Real Estate Investor* online, May 2011.
< "Faulty Appraisals Kill Banks", *American Banker*, December 29, 2011.
< "The Honest Truth about Appraisals: Evidence from CMBS", *Commercial Real Estate Finance World*, January 2012.
< Contributing author, *Real Estate Finance*, "Regulatory Considerations in US Real Estate Finance", PEI, 2012.
< "Living with a Three Percent Treasury", *MBANewslink*, August 21, 2013.
< "The Legacy of Lehman, Five Years Later", *Atlanta Business Chronicle*, September 13, 2013.

**EXPERT WITNESS WORK AND TESTIMONY**

_In re Martin W. Taplin & Associates, Plaintiff v. Mellon Mortgage Company, Defendant, in the Circuit Court of the Eleventh Judicial Circuit, Florida General Jurisdiction Division, Case No. 96-0818_. Retained in fall of 1998 by Plaintiff's counsel, Katherine Ezell of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A.  Dispute centered on determination of customary and reasonable servicer performance and equitable compensation between master and special servicer in resolving a distressed commercial mortgage loan portfolio based on review of servicing agreements and portfolio results.  Provided expert report and defended same at deposition leading to favorable out-of-court settlement.

_In re United Companies Financial Corporation, US Bankruptcy Court for the District of Delaware, Case No. 99-00451_.  In case where firm represented the equity committee of Debtor, supervised and constructed residuals and servicing valuation and sensitivity work in connection with dispute with other constituencies and orchestrated mortgage servicer interviews and analyses and attempted transfer of servicing rights to permit Debtor restructuring.  Subpoenaed in 2001 as fact witness by counsel for creditors' committee.  Provided deposition testimony on determination of various valuation and operational issues of loan servicing platform and credit loss performance of subprime mortgage-backed securities residual portfolio.

_In re Kansas City Southern Corp. v. Alan Atterbury et al_.  Retained by Larry Joye of Stinson Morrison Hecker in November 1999 as Defendant's counsel to act as consulting witness in case involving previous partner dispute regarding sale and valuation of large commercial mortgage servicer to commercial bank.

_In re Stanford Hotels Corp., Plaintiff, v. Potomac Creek Associates, L.P., et al, Defendants, Superior Court of the District of Columbia Civil Division, Civil Action No. 99ca001413-RP_.  Retained spring of 2001 by Dennis Black of Williams & Connolly as Plaintiff's counsel in suit for seller to perform under sale agreement.  Provided calculations, affidavits and deposition testimony regarding ability and process for borrower to conduct partial defeasance and release under loan documents for $150 million _pari passu_

4

mortgage debt and servicer requirements under applicable pooling and servicing agreements.

In the case of LQ Holdings, LLC v. Wells Fargo Bank Minnesota, NA, as Trustee for the registered holders of the GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2000-C2.  US Bankruptcy Court Eastern District of Virginia Alexandria Division, Case No. 02-81385. Retained March 2003 by Sam Alberts of Akin Gump Strauss Hauer & Feld to prepare rebuttal expert report and defend CMBS trust and its servicers against charges of lender liability and violation of servicing standard and to calculate and support prepayment premium enforceability in commercial mortgage loan.

In the case of Calstar, LLC, Plaintiff, v. First Union National Bank; Lennar Partners et al.  US District Court Central District of California, Case No. CV 00-08980 R.  Retained May 2003 by Anne Edwards of Akin Gump Strauss Hauer & Feld to consult with and provide rebuttal expert report defending commercial mortgage servicers against allegations of lender liability and violations of servicing standard in CMBS trust. Judgment entered in favor of Defendants and against Plaintiff.

In the case of Union Central Mortgage Funding, Inc. v. Island Lakesz Business Center, Inc. U.S. District Court Middle District of Florida, Orlando Division, Case No. 6:03-CV-1105.  Retained January 2004 by Stephen Gillman of Gallwey Gillman as lender's counsel to act as consulting witness,  run calculations and review loan documents on prepayment dispute on commercial mortgage loan leading to favorable out-of-court settlement.

In the case of Chase Manhattan Mortgage Corporation and Chase Home Mortgage Company of the Southeast v. Advanta Corp. et al U.S. District Court for the District of Delaware, Case No. 01-507.  Retained June 2003 by John Goodchild of Morgan Lewis Bockius as Plaintiff's counsel in purchase dispute involving 30 subprime mortgage residuals collateralized by $6 billion in mortgage collateral, $1 billion in whole loans and value of servicing platform.  Provided expert, supplemental and rebuttal reports, defended same during depositions, qualified to testify at trial in various valuation, investor reporting and servicing issues including defending damage calculations.  Recalled as rebuttal witness in matters involving purchaser due diligence,

5

reliance on available materials, interpretation of relevant transaction and servicing documents including pooling and servicing agreements and prospectus supplements and residual and whole loan damage calculations based on projected credit losses.  Judge entered award in favor of Plaintiff.

In the case of Wells Fargo Bank, N.A. as Trustee for the Certificateholders of First Union-Lehman Brothers-Bank of America Commercial Mortgage Pass-Through Certificate, Series 1998-C2 and ORIX Capital Markets, L.L.C., v. Lehman Brothers Holdings, Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings, Inc., in the District Court – 191ST Judicial District Dallas County, Texas Cause No. 03-10799.  Retained June 2004 by Peter Flynn of Locke Liddell & Sapp, as Defendant's counsel in breach claim brought against seller of $1.7 billion in commercial mortgage loans.  Prepared rebuttal report responding to damage calculations and breach claim under mortgage loan purchase agreement.  Settlement reached prior to deposition.

In the case of Wells Fargo Bank, National Association as Trustee for the Certificateholders of Salomon Brothers Commercial Mortgage Trust 2000-C2 and ORIX Capital Markets, L.L.C., v. Salomon Brothers Realty Corp., et al, in the District Court - 44th Judicial District Dallas County, Texas Cause No. 02-11524.  Retained July 2004 by Peter Flynn of Locke Liddell & Sapp, as Defendant's counsel in breach claim brought against seller of $298 million in commercial mortgage loans.  Prepared rebuttal report responding to damage calculations and claim under mortgage loan purchase agreement.  Settlement reached prior to deposition.

In the case of Wells Fargo Bank, N.A. as Trustee for the Certificateholders of First Union-Lehman Brothers-Bank of America Commercial Mortgage Pass-Through Certificate, Series 1998-C2 and ORIX Capital Markets, L.L.C., v. Wachovia Bank, National Association f/k/a First Union National Bank, in the United States District Court Northern District of Texas Dallas Division Civil Action No. 3-02CV1945-M .  Retained July 2004 by Thomas Quigley of Winston & Strawn as Defendant's counsel in breach claim brought against seller of $1.3 billion in commercial mortgage loans.  Prepared rebuttal response to damage calculations and causation, defended same in deposition and testified at trial.  Qualified by court as expert in

6

matters involving pooling and servicing agreements, mortgage underwriting standards and customary loan administration, default rates and loss severities and impact on mortgage loan valuation.  Court awarded no damages to Plaintiff.

In the case of LaSalle Bank National Association, as Trustee for the Certificateholders of Commercial Mortgage Pass-Through Certificate, Series 2002-MW1, by and through GMAC Commercial Mortgage Corporation as Special Servicer, v. Merrill Lynch Mortgage Lending, Inc., in the United States District Court for the Southern District of New York Civil Action No. 04 Civ. 5452 (PKL).
Retained May 2005 by Talcott Franklin of Patton Boggs as Plaintiff's counsel in breach claim brought against seller of $10 million commercial mortgage loan.  Prepared expert and rebuttal reports to demonstrate materiality of breaches under mortgage loan purchase agreement and Pooling and Servicing Agreement, defended same in deposition, prepared purchase price calculation and submitted affidavit in support of Motion for Summary Judgment.

In the case of Thor Chestnut Hill, L.P. and Thor Chestnut Hill II, L.P., Plaintiffs, against Wells Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2003-C5, Defendant in the United States District Court Easter District of Pennsylvania Case 2:05-cv-02765-LDD.  Retained March 2006 by Brent Brougher of Kilpatrick Stockton LLP in assumption dispute concerning purchase and assumption of $10 million retail property in Philadelphia.  Prepared expert report to demonstrate reasoning behind conditional approval and master servicer's compliance with servicing standard under the Pooling and Servicing Agreement.  Suit dropped by Plaintiff.

In the case of Silver Creek LLC, Plaintiff, v. Blackrock Realty Advisors, Inc., Defendant and related Cross-Complaint in the Superior Court of the State of California County of San Diego, Central Division No. GIC 851670.  Retained April 2006 by John Gibson of Paul, Hastings, Janofsky & Walker, LLP in assumption dispute concerning property seller's unwillingness to proceed under Purchase and Sale Agreements for sale of securitized office buildings and retention of earnest money.   Provided expert reports opining as to

reasonableness of assumption process by master servicer under loan documents and pooling and service agreement requirements contrasted with seller's actions.  Defended reports at depositions and provided testimony at trial.


In the matter of 3685 San Fernando Lenders, LLC, a Nevada limited liability company, et al., Plaintiffs, v. Compass USA SPE, LLC, a Delaware limited liability company, et al., Defendants. United States District Court, District of Nevada, CASE NO.:  3:07-CV-00241-RCJ-VPC.  Retained December 2007 by Mark Weibel of Fulbright & Jaworski LLP in commercial mortgage servicing dispute involving the improper servicing and cash flow allocation arising from a commercial mortgage portfolio with an original principal balance of $962 million.  Provided declaration concerning customary servicing practices and consulted with attorneys.

In related case, United States District Court, District of Nevada. Case No. 2:07-cv-00892-RCJ-GWF Bankr. Case No. 06-10725-LBR, retained August 2009 by Robert Millimet of Bickel & Brewer submitted expert opinion concerning commercial mortgage servicing conventions, responsibilities and fees in nonperforming situations and consultation with attorneys.


In various FINRA arbitrations involving funds' investments in structured finance products, retained May 2009 to consult with several law firms in defending against plaintiffs' allegations.  These allegations involve misrepresented quality in structured finance products, NAV discrepancies, role of credit rating agencies in marketplace, deficiencies in mortgage underwriting, derivation of credit losses in residential mortgage-backed securities, allocation of losses in complex mortgage derivatives and general state of mortgage and structured finance markets at time of fund managers' investment decisions.


In the case of Wells Fargo Bank Minnesota, NA as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Pass-through Certificates, Series 2002-C3, Plaintiff, v. 318 West Adams LLC, Steven Byers, Craig J. Walker, and CIBC Inc. Defendants, Circuit Court of Cook County, Illinois, Case No. 04-CH-3099, retained December 2009 by Catherine Bernard, Mayer Brown LLP in asserted breach claim brought against mortgage loan seller into a CMBS trust and reliance on indemnitor.  Drafted expert reports

8

and defended same in depositions, testified at trial describing mechanics of CMBS, role of participants, importance of enforcing non-recourse carve-out provisions, compliance with underwriting guidelines and breach claim procedures under mortgage loan purchase agreement and Pooling and Servicing Agreement.

In the case of Greenwich Financial Services Distressed Mortgage Fund 3, LLC, and QED LLC, Plaintiffs against Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP, Defendants, Supreme Court State of New York, retained June 2010 by Brian Boyle of O'Melveny & Myers to research and investigate various issues including mortgage loan impairment, rights of investors under PSAs and loan performance comparisons for similar subprime and Alt-A issuers and originators involving two hundred MBS trusts.  Case dismissed.

Retained to lead team researching and cataloguing  representation and warranty conventions and customary remedy enforcement across subprime, Alt-A and HEL industry through the selection and review of representative cross-sample of approximately one hundred MBS private-label Pooling and Servicing Agreements, Mortgage Loan Purchase Agreements and Prospectus Supplements from 2005-2007.  Designed review template for review team and  supervised investigation.  Research reached general conclusions as to similarities and dissimilarities among various deal structures, vintage, issuers and loan originators with respect to claim notification requirements, breach claim procedures, remedies and timelines, typical and atypical representations and warranties among MLPAs and relationship between MLPA-conveyed representations and warranties and those conveyed to the trust.  Retained March 2012.

In the matter of IMPAC SAC Mortgage Pass-Through Trust Series 2006-3 *et al*.  Superior Court of the State of California for the County of Orange, Complex Justice Center.  Case Nos.:30-2010-00411604-PR-TR-CXC, 30-2010-00411617-PR-TR-CXC and 30-2010-00411625-PR-TR-CXC.  Retained June 2012 by Cliff Frieden of Rutan Tucker in residential mortgage-backed securities dispute concerning discrepancies between Prospectus Supplement and Pooling and Servicing Agreement affecting cashflow distributions to certificateholders.  Developed various opinions concerning the role of various transaction documents, the impact of differing language on certificateholder distributions, the role of transaction participants and the

9

role of rating agencies in the issuance and potential amendment of transaction documents.  Defended opinions at deposition.

In the case of LendingTree, LLC v. Zillow *et al*. United State District Court for the Western District of North Carolina Charlotte Division. Civil Action No. 3:10-cv-439.  Retained April 2013 by George Kanabe of Sheppard Mullin Richter & Hampton LLP in patent infringement case involving on-line mortgage origination and prior art in mortgage lending.  Drafted original and rebuttal reports and defended same at deposition.  Drafted declaration in response to Motion for Summary Judgment.  Qualified as expert in mortgage loan origination and residential mortgage industry and testified at jury trial involving mortgage origination process, residential mortgage lending industry, practices and regulations and patents at issue.

In the case of U.S. Bank National Association as Trustee, for the holders of Merrill Lynch Mortgage Trust, Commercial Mortgage Pass-through Certificates, Series 2002-MW, Plaintiff, v. JSM @ College Pointe, LTD, L.L.P., *et al*.  Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida, Case No. 11-CA-053210.  Retained October 2013 by Rick Gross of Carlton Fields in CMBS borrower dispute involving allegations of improper loan transfer to the trust, lack of personal recourse obligation and loan servicing violations.  Drafted expert report rebutting allegations based on industry practices, loan servicing file review and compliance with Pooling and Servicing Agreement and loan documents.

In the case of 4220 VK, LLC, a California limited liability company, Plaintiff, v. U.S. Bank, National Association, as trustee for the registered holders of ML-CFC Commercial Mortgage Trust 2007-7 *et al.*  Superior Court of the State of California for the County of Orange, Case No. 30-2013-00671488.  Retained March 2014 by Mark Mersel of Bryan Cave LLP in CMBS assumption dispute.  Reviewed loan servicing file including assumption memoranda and drafted declaration describing industry practices and servicer compliance with loan documents and Pooling and Servicing Agreement.  Suit dropped by borrower.

In various litigation matters, retained as a consultant on behalf of a major RMBS sponsor and issuer to review breach claim assertions and breach notice requirements under various RMBS trusts and to analyze

mortgage loan servicing compliance with PSA obligations and obligations of parties to the PSA.  Retained February 2013.

In various litigation matters, retained as a consultant on behalf of a major, national residential lender to review RMBS servicing practices and compliance under pertinent Pooling and Servicing Agreements, nature and extent of loan-level representations and warranties conveyed to the trusts under Mortgage Loan Purchase Agreements, analysis of causes of trust-level mortgage defaults and losses and examination of elements of repurchase price.  Retained December 2013.

In the case of The Bank of New York Mellon, solely as Trustee for GE-WMC Mortgage Securities Trust 2006-1, Plaintiff, v. WMC Mortgage, LLC and G.E. Mortgage Holding, L.L.C., Defendant.  US District Court SDNY, Civ. Action No. 12-cv-07096 (DLC).  Retained December 2013 by Michael Brody, Jenner & Block, to analyze transactional agreements, study mortgage loan performance, review the impact of servicing practices on loss severities, investigate breach claim procedural compliance, determine impact when prompt notice of breach claims are not provided and explore cause and effect of post-securitization reasons for defaults on mortgage pool performance as supported by independent academic studies.  Filed Expert Reports and Declarations and defended same in deposition. Case settled.

In the case of Law Debenture Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2, Plaintiff, v. WMC Mortgage LLC, Defendant. US District Court District of Connecticut, Civ. Action No.: 12-cv-1538-CSH.  Retained December 2013 by Michael Brody, Jenner & Block, to review pool performance, deal documents including Pooling and Servicing Agreement and Prospectus Supplement and servicing records to analyze role of mortgage loan servicing and borrower communications to determine post-securitization causes of mortgage loan delinquencies and realized losses.  Also analyzed academic studies exploring links between borrower life events and mortgage loan defaults.  Filed Expert Report and defended same in deposition; testified at trial.

11

In the case of The Bank of New York Mellon, solely as Securities Administrator for J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Plaintiff, v. WMC Mortgage, LLC; J. P. Morgan Mortgage Acquisition Corporation; and J. P. Morgan Chase Bank, N.A., Defendants. Supreme Court of the State of New York, County of New York, Index No. 654464/2012.   Retained December 2013 by Michael Brody, Jenner & Block, and later, Sullivan & Cromwell, to review servicing records, mortgage loan performance and academic studies explaining mortgage loan defaults resulting from borrower life events in order to analyze impact of post-securitization borrower events on delinquencies, defaults and realized losses.   Filed Expert Report and defended same in deposition.

Retained by national bank to develop framework to measure the effects of mortgage loan servicer behavior on multi-billion portfolio of whole loan (unsecuritized) residential mortgage loans.   Retained December 2014.

In the case of LTC Global, Inc. and NGFS Acquisition Group LLC, Plaintiffs v. Sun West Mortgage Company, Inc., Defendant. US District Court Central District of California, Case No.: 2:14-cv-04903-PSG-AS. Retained March 2015 by Jeff Rosenfeld, DLA Piper, to analyze impact of servicer actions and reporting irregularities on servicing fee income with respect to a pool of Fannie Mae HECM reverse mortgage loans with the objective of investigating governance and payment compliance under subservicing agreement.   Filed Expert Report and defended same at deposition.   Case settled.

In related matters CSMC 2006-C5 Office 4545, LLC, Plaintiff, v. Vinod K. Gupta, Defendant. US District Court Central District of California, Case No.: 2:14-cv-04796-DSF-CW and CSMC 2006-C5 Office 4545, LLC, an Oklahoma limited liability company, Plaintiff, v. Lincoln Plaza Office Building, LLC, an Oklahoma limited liability company, Defendant.   District Court in and for Oklahoma County, State of Oklahoma, Case No. CJ-2013-1492.   Retained June 2015 by Meagen Leary, Duane Morris, to review mortgage loan documents, insurance policies, servicing records, deposition testimony and Pooling and Servicing Agreement in dispute involving application of property casualty proceeds, events of default under mortgage loan documents and breaches under Indemnification and Guaranty Agreement and investigate

12

whether such breaches triggered partial or full recourse. Filed Expert Report and defended same at deposition. Case settled.

In the case of Five Mile Capital Westin North Shore SPE LLC, Plaintiff v. Berkadia Commercial Mortgage, LLC, Defendant. Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 12 CH 10805. Retained December 2015 by Rick Darke on behalf of a commercial mortgage-backed securities special servicer to investigate and opine as to whether the sale of a hotel property was commercially reasonable and compliant with servicing standards under its pooling and servicing agreement and participation agreement obligations. Submitted expert and rebuttal reports defending same at deposition. Testified at trial with favorable court ruling.

Retained January 2016 by Anne Edwards of Rodi Pollock on behalf of a commercial mortgage-backed securities servicer to analyze and opine as to whether a borrower triggered a fully recourse obligation under an Indemnification and Guaranty Agreement on the basis of unauthorized transfers of subject property. Filed declaration in mediation and matter settled.

Retained as a consultant on behalf of a residential mortgage loan seller to investigate the existence of improper servicer actions and review of servicing records with respect to two subprime residential mortgage-backed securities and the effect, if any, of such violations of the servicing standard and borrower reasons for default on loan default and loss severity performance. Also reviewed PSA compliance with repurchase provisions. Retained February 2016.

Retained as a consultant on behalf of a global financial firm to investigate the existence of improper servicer actions with respect to approximately 20,000 residential mortgage loans deposited into six residential mortgage-backed securities and the effect, if any, of such violations of the servicing standard on loan default and loss severity performance. Reviewed and abstracted PSAs. Also studied servicing comments and borrower correspondence that included borrower-provided reasons for default and mortgage loan performance along with macroeconomic studies linking borrower life events with loan defaults. Retained

13

April 2016.

In the case of Residential Funding Company, LLC, Plaintiff, v. Provident Funding Associates, L.P., Defendant. US District Court, District of Minnesota, Court File No. 13-cv-03485.  Retained May 2016 by Bill Robinson of Simpson Thatcher & Bartlett LLP, to review servicing comments and mortgage loan performance in order to analyze impact of servicer actions and borrower life events on delinquencies, defaults and realized losses.  Also reviewed pertinent financial research that explored links between borrower life events, financial crisis and mortgage loan defaults.  Filed Rebuttal Report and matter settled.

Retained as a consultant on behalf of a mortgage-backed securities trustee to review business obligations and protections under dozens of PSAs.  Abstracted PSAs highlighting material differences and drafted conclusions and various trustee and servicer obligations with respect to mortgage loan default management, limitations on servicer oversight and remedy enforcement duties upon discovery of breach claims.

In the case of Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of JPMBB Commercial Mortgage Pass-through Certificates, Series 2014-C21, Plaintiff, against MC-Five Mile Commercial Mortgage Finance LLC, Defendant, Supreme Court of the State of New York, Index No. 653546/2016.  Retained September 2017 by Eric Fisher of Binder & Schwartz LLP to review repurchase claim against mortgage loan seller involving lockbox arrangement.  Filed Affidavit.

14