UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Trusts Established under the
Pooling and Servicing Agreements relating to the
Wachovia Bank Commercial Mortgage Trust
Commercial Mortgage Pass-Through Certificates,
Series 2007-C30; COBALT CMBS Commercial
Mortgage Trust 2007-C2 Commercial Mortgage
Pass-Through Certificates, Series 2007-C2;
Wachovia Bank Commercial Mortgage Trust
Commercial Mortgage Pass-Through Certificates,
Series 2007-C31; ML-CFC Commercial Mortgage
Trust 2007-5 Commercial Mortgage Pass-Through
Certificates, Series 2007-5; and ML-CFC
Commercial Mortgage Trust 2007-6 Commercial
Mortgage Pass-Through Certificates, Series 2007-6

17 Civ. 1998 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

When the owners of Peter Cooper Village and Stuyvesant Town
(collectively, "Stuy Town") defaulted on their financing obligations in 2010, few
could have expected that the property would ultimately be sold at a substantial
profit just a few years later. This lack of clairvoyance is what the Court
presumed when it found ambiguities in the relevant agreements concerning the
treatment of sale proceeds, and these ambiguities in turn informed the Court's
decision to deny the parties' cross-motions for judgment on the pleadings. *See*
*Matter of Pooling & Servicing Agreements*, No. 17 Civ. 1998 (KPF), 2018 WL
1229702 (S.D.N.Y. Mar. 9, 2018) ("*PSA I*"). But now, after exhaustive discovery,
the evidence is in, and it points conclusively in one direction.

As it currently stands, approximately $614 million in disputed funds
have been allocated to CWCapital Asset Management LLC ("CWC"), which
served as the Special Servicer for the Stuy Town property, in the form of

Penalty Interest; and an additional $53 million has been allocated to the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae," and together with Freddie Mac, the "Government-Sponsored Enterprises" or "GSEs") in the form of Yield Maintenance. Appaloosa Investment L.P.I. and Palomino Master Ltd. (collectively, "Appaloosa"), investors in various trusts that held assets secured by a mortgage on Stuy Town, contest those allocations. In Appaloosa's view, the disputed funds constitute Gain-on-Sale Proceeds that must be directly deposited in a Gain-on-Sale Reserve Account for the benefit of certificateholders like it.

The evidence disclosed after more than a year of discovery makes clear that the funds in dispute are Penalty Interest and Yield Maintenance, and not Gain-on-Sale Proceeds. This evidence includes analogous documents from other transactions in the same shelf registration, the contemporaneous understanding of those involved in the Stuy Town sale and related transactions, the course of performance between and among the parties to the relevant agreements, the custom and practice in the collateralized mortgage-backed securities ("CMBS") industry, and related industry publications. And while Appaloosa has done a commendable job in attempting to generate a genuine dispute of fact for trial, its efforts have come up short. Its many arguments are belied by the record and, at times, undercut by Appaloosa's own positions in this litigation. Accordingly, and for the many reasons detailed in this Opinion, CWC's and the GSEs' motions for summary judgment are

granted; Appaloosa's motion for partial summary judgment is denied;

Appaloosa's motion to exclude CWC's and the GSE's expert testimony is denied

in part on the merits and denied in part as moot; and CWC's and the GSEs'

motions to exclude Appaloosa's expert testimony are denied as moot.

**BACKGROUND**[1]

**A.     Factual Background**

**1.     The 2006 Purchase of the Stuy Town Property**

In November 2006, Tishman Speyer Properties and BlackRock Realty,

through affiliates (together, the "Borrower"), purchased Stuy Town, one of New

York's largest residential complexes, for $5.4 billion.  (CWC 56.1 C1).  The

purchase of the property was financed by a senior mortgage loan in the

---

[1]     This Opinion draws on facts from CWC's Responses and Counterstatements to Appaloosa's Statement of Additional Material Facts ("CWC 56.1" (Dkt. #388); the GSEs' Reply to Appaloosa's Response to the GSEs' Local Rule 56.1 Statement and Appaloosa's Statement of Additional Material Facts ("GSE 56.1" (Dkt. #369)); CWC's and the GSEs' Counterstatements to Appaloosa's Rule 56.1 Statement of Undisputed Material Facts in Support of Appaloosa's Motion for Partial Summary Judgment ("Appaloosa 56.1" (Dkt. #385)); Appaloosa's Response to Responses and Counterstatements of CWC and the GSEs to Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Appaloosa Response 56.1" (Dkt. #405)); the exhibits attached to the Declaration of Neil R. Lieberman in Support of the GSEs' Motion for Summary Judgment ("Lieberman Decl., Ex. []" (Dkt. #321)); the exhibits attached to the Declaration of Colleen Mallon Casse in Support of CWC's Motion for Summary Judgment ("Casse Decl., Ex. []" (Dkt. #302-310, 312, 373-378)); and the exhibits attached to the Declaration of Michael J. Hampson in Opposition to CWC's Motion for Summary Judgment ("Hampson Decl., Ex. []" (Dkt. #340, 396)).

For ease of reference, the Court refers to CWC's memorandum of law in support of its motion for summary judgment as "CWC SJ Br." (Dkt. #315, 381); the GSEs' memorandum of law in support of their motion for summary judgment as "GSE SJ Br." (Dkt. #318, 365); Appaloosa's memorandum of law in support of its partial motion for summary judgment as "Appaloosa SJ Br." (Dkt. #326, 389); Appaloosa's opposition to CWC's motion for summary judgment as "Appaloosa CWC SJ Opp." (Dkt. #338, 394); Appaloosa's opposition to the GSEs' motion for summary judgment as "Appaloosa GSE SJ Opp." (Dkt. #342, 398); CWC's and the GSEs' joint opposition to Appaloosa's motion for partial summary judgment as "CWC/GSE SJ Opp." (Dkt. #334, 384); Appaloosa's memorandum of law in support of its motion to exclude as "Appaloosa MIL Br." (Dkt. #328, 392); and CWC's and the GSEs' memorandum of law in opposition to Appaloosa's motion to exclude as "CWC/GSE MIL Opp." (Dkt #337, 386).

principal amount of $3 billion (the "PCV Loan"), and eleven tiers of mezzanine loans in the aggregate principal amount of $1.4 billion. (*Id.* at C2). The PCV Loan was evidenced by, among other things, an Amended and Restated Loan and Security Agreement dated as of February 16, 2007 (the "Loan Agreement"), and six promissory notes (collectively, the "Notes"), and was secured by, among other things, a mortgage on Stuy Town. (*Id.* at C3).[2]

The six Notes were sold to five CMBS trusts: (i) Note A-1 was securitized into the Wachovia Bank Commercial Mortgage Trust Series 2007-C30 (the "C30 Trust"); (ii) Note A-2 was securitized into the COBALT CMBS Commercial Mortgage Trust 2007-C2 (the "COBALT 2007-C2 Trust"); (iii) Notes A-3 and A-4 were securitized into the Wachovia Bank Commercial Mortgage Trust Series 2007-C31 (the "WBCMT C31 Trust"); (iv) Note A-5 was securitized into the ML-CFC Commercial Mortgage Trust 2007-5 (the "ML-CFC 2007-5 Trust"); and (v) Note A-6 was securitized into the ML-CFC Commercial Mortgage Trust 2007-6 (the "ML-CFC 2007-6 Trust," and collectively with the C30 Trust, the COBALT 2007-C2 Trust, the WBCMT C31 Trust, and the ML-CFC 2007-5

---

[2]     The PCV Loan was originally evidenced by six promissory notes each dated as of November 17, 2006, and identified as Note A-1 from PCV Borrower to Wachovia Bank, National Association ("Wachovia") in the principal amount of $500,000,000.00; Note A-2 from PCV Borrower to Wachovia in the principal amount of $500,000,000.00; Note A-3 from PCV Borrower to Wachovia in the principal amount of $500,000,000.00; Note A-4 from PCV Borrower to Wachovia in the principal amount of $500,000,000.00; Note A-5 from PCV Borrower to Merrill Lynch Mortgage Lending, Inc. ("Merrill") in the principal amount of $500,000,000.00; and Note A-6 from PCV Borrower to Merrill in the principal amount of $500,000,000.00 (collectively, the "Original Notes"). (GSE 56.1 G2). The Original Notes were then amended and restated into six promissory notes, each dated as of February 16, 2007, with Note A-1 being amended and restated into Amended Note A-1, and so forth. (GSE 56.1 G4).

Trust, the "PCV Trusts").  (CWC 56.1 C4; GSE 56.1 G6).[3]  The PCV Trusts were securitization vehicles created to sell investment interests to finance the acquisition of a pool of commercial mortgage loans held by each of them. (Appaloosa 56.1 A4).  Each of the PCV Trusts had its own pooling and servicing agreement (or "PSA"), which governed the creation of the trust and laid out the rights and obligations of the depositor, master servicer, special servicer, and trustee over the pools of securitized mortgage loans in the trust.

### 2.    The Co-Lender Agreement

Although each of the PCV Trusts had its own PSA, the PCV Trusts also entered into a Co-Lender Agreement to govern their rights and obligations solely with respect to Stuy Town.  (*See* Hampson Decl., Ex. E; CWC 56.1 A77). The Co-Lender Agreement deemed the C30 Trust the "Lead Lender" on the PCV Loan and granted it authority and responsibility to service and administer all of the Notes.  (CWC 56.1 C7; GSE 56.1 G7).  In addition, the Master Servicer and Special Servicer of the C30 Trust were granted the authority and responsibility to administer all of the Notes consistent with terms of the Co-Lender Agreement and C30 Trust's PSA (the "C30 PSA").  (GSE 56.1 G8; *see* CWC 56.1 C7).[4]

---

[3]    CMBS trusts are pooled investment vehicles comprised of numerous mortgage loans. (CWC 56.1 A36).

[4]    A copy of the C30 PSA is attached to the Casse Declaration as Exhibit 28.  (Casse Decl., Ex. 28).

### 3. The WBCMT Trusts and Their Documentation

The C30 Trust was itself part of a shelf of 33 CMBS trusts (the "WBCMT Trusts" or "WBCMT Shelf"), which were sequentially numbered C1 through C34 (with no C13), reflecting the chronological order of their formation by Wachovia Bank Commercial Mortgage Securities, Inc. between 2002 and 2007. (CWC 56.1 C132). Each of the 33 WBCMT Trusts was governed by its own PSA. (*Id.* at C143). However, each WBCMT Trust used the prior WBCMT Trust's PSA as a starting point. (*Id.*). For this reason, the PSAs governing the WBCMT Trusts (the "WBCMT PSAs") contain many largely verbatim provisions. (*Id.* at C158). In particular, many of the provisions of the C30 PSA at issue in this case — including the definitions of REO ("Real Estate Owned") Property, REO Loan, Penalty Interest,[5] Purchase Price, Liquidation Proceeds, Yield Maintenance Charges,[6] and Principal Prepayment, as well as the payment-collection and compensation provisions of § 3.02(b) and § 3.11 — appear largely verbatim in the PSAs of the other 32 WBCMT Trusts. (*Id.* at C158; *see* Casse Decl., Ex. 73-104). These provisions are implicated by the parties' cross-motions, and they are discussed in the remainder of this section.[7]

---

[5]    Penalty Interest includes default interest. (CWC 56.1 C33). The Court refers to both as Penalty Interest.

[6]    Although certain of the relevant documents refer to Yield Maintenance as "Yield Maintenance Payments" or "Yield Maintenance Charges," the Court refers to the term simply as Yield Maintenance.

[7]    The Court cites to the C30 PSA in the following quotations. However, the Court has reviewed all of the relevant provisions of the WBCMT PSAs to ensure that they are materially identical. (*See* Casse Decl., Ex. 73-104).

The Court recognizes that the extended block quotations in this section can be tedious for the reader, particularly a reader with only passing familiarity with the CMBS

### a. Section 1.01: Definitions

#### i. Liquidation Proceeds

The WBCMT PSAs define Liquidation Proceeds, in relevant part, as:

> All cash amounts … received by the Master Servicer or the Special Servicer in connection with: … the liquidation of a Mortgaged Property or other collateral constituting security for a Defaulted Mortgage Loan, through trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage[.]

(C30 PSA § 1.01).

#### ii. Purchase Price

The WBCMT PSAs define Purchase Price, in relevant part, as:

> With respect to any Mortgage Loan or REO Loan to be purchased by a Mortgage Loan Seller pursuant to the applicable Mortgage Loan Purchase Agreement, by the Majority Subordinate Certificateholder, the Companion Holder or the Special Servicer as described in Section 3.18(c), 3.18(d) or 3.18(e), or by the Depositor, the Special Servicer, the Majority Subordinate Certificateholder or the Master Servicer pursuant to Section 9.01, a cash price equal to the outstanding principal balance of such Mortgage Loan or REO Loan, as of the date of purchase, together with [i] all accrued and unpaid interest on such Mortgage Loan or REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of purchase *plus* any accrued interest on [Principal & Interest] Advances made with respect to such Mortgage Loan, [ii] all related and unreimbursed Servicing Advances *plus* any accrued and unpaid interest thereon, [iii] any reasonable costs and expenses, including, but not limited to, the cost of any enforcement action, incurred by the Master Servicer, the Special Servicer or the Trust

---

industry. The Court includes them in this Opinion because of their criticality to the issues in dispute, and asks in advance for the reader's indulgence.

Fund in connection with any such purchase by a Mortgage Loan Seller … and [iv] any other Additional Trust Fund Expenses in respect of such Mortgage Loan … , or in the case of any Loan Pair, the purchase price specified in the related Intercreditor Agreement; *provided* that the Purchase Price shall not be reduced by any outstanding [Principal & Interest] Advance.

(C30 PSA § 1.01).

### iii.    Penalty Interest

The WBCMT PSAs define Penalty Interest as:

With respect to any Mortgage Loan or Companion Loan (or successor REO Loan), any amounts collected thereon, other than late payment charges, Additional Interest, Prepayment Premiums or Yield Maintenance Charges, that represent penalty interest (arising out of a default) in excess of interest on the Stated Principal Balance of such Mortgage Loan or Companion Loan (or successor REO Loan) accrued at the related Mortgage Rate.

(C30 PSA § 1.01).[8]

### iv.    REO Property

The WBCMT PSAs define REO Property as:

A Mortgaged Property acquired on behalf and in the nature of the Trustee … for the benefit of the Certificateholders (subject to the related Intercreditor Agreement with respect to a Mortgaged Property securing a Loan Pair) through foreclosure, acceptance of a deed-in-lieu of foreclosure or otherwise in accordance with applicable law in connection with the default or imminent default of a Mortgage Loan.

(C30 PSA § 1.01).

---

[8]    Where the Court is referring to Penalty Interest as it is defined in the WBCMT PSAs, it capitalizes the term.  When the Court is referring generally to the concept of penalty interest in the CMBS industry, it uses lowercase.  The same is true for yield maintenance, gain-on-sale proceeds, special servicer, and master servicer.

### v. REO Loan

The WBCMT PSAs define REO Loan as:

> The Mortgage Loan deemed for purposes hereof to be outstanding with respect to each REO Property to the extent of the Trust Fund's interest therein. ... Collections in respect of each REO Loan ... shall be treated: *first*, as a recovery of Nonrecoverable Advances and Unliquidated Advances ... with respect to such REO Loan ... ; *second*, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt ... ; *third*, as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and *fourth*, in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) Yield Maintenance Charges, Prepayment Premiums and Penalty Interest and (ii) Additional Interest and other amounts, in that order.

(C30 PSA § 1.01). The definition includes a list prioritizing the allocation of funds collected in respect of an REO Loan, which list is sometimes referred to as an "REO Loan Waterfall."

### vi. Yield Maintenance

The WBCMT PSAs define Yield Maintenance, in relevant part, as:

> Payments paid or payable, as the context requires, on a Mortgage Loan as the result of a Principal Prepayment thereon, not otherwise due thereon in respect of principal or interest, which have been calculated ... to compensate the holder for reinvestment losses based on the value of an interest rate index at or near the time of prepayment.

(C30 PSA § 1.01).

### vii. Principal Prepayment

The WBCMT PSAs define Principal Prepayment, in relevant part, as:

Any payment of principal made by the Mortgagor on a Mortgage Loan or Companion Loan that is received in advance of its scheduled Due Date; provided that it shall not include a payment of principal that is accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

(C30 PSA § 1.01).

### b. Section 3.02: Collection of Mortgage Loan Payments

The WBCMT PSAs also detail each Special Servicer's obligation to collect payments for various types of mortgages, including Mortgage Loans, Companion Loans, and REO Loans (of which the Stuy Town mortgage became one). On this point, Section 3.02(b) of the WBCMT PSAs states as follows:

All amounts collected in respect of any Mortgage Loan or Companion Loan (other than the Non-Serviced Companion Loan) in the form of payments from Mortgagors, and/or guaranties, Liquidation Proceeds (insofar as such Liquidation Proceeds are of the nature described in clauses (i) through (iii) of the definition thereof) or Insurance Proceeds shall be applied to either amounts due and owing under the related Mortgage Note and Mortgage (including, without limitation, for principal and accrued and unpaid interest) in accordance with the express provisions of the related Mortgage Note and Mortgage (and, with respect to a Loan Pair, the related Intercreditor Agreement) or, if required pursuant to the express provisions of the related Mortgage, or as determined by the Master Servicer or Special Servicer in accordance with the Servicing Standard, to the repair or restoration of the related Mortgaged Property, and, in the absence of such express provisions, shall be applied for purposes of this Agreement: *first,* as a recovery of any related and unreimbursed Advances *plus* unreimbursed interest accrued thereon; *second,* as a recovery of Nonrecoverable Advances, Unliquidated Advances and Workout Delayed Reimbursement Amounts (including

interest on such Nonrecoverable Advances), that were paid from collections on the Mortgage Loans (allocable to principal) and resulted in principal from the Mortgage Pool distributed to the Certificateholders being reduced pursuant to Section 3.05(a) hereof; *third*, as a recovery of accrued and unpaid interest at the related Mortgage Rate on such Mortgage Loan, to the extent such amounts have not been previously advanced, and exclusive of any portion thereof that constitutes Additional Interest; *fourth*, as a recovery of principal of such Mortgage Loan then due and owing, to the extent such amounts have not been previously advanced, including, without limitation, by reason of acceleration of the Mortgage Loan following a default thereunder; *fifth*, in accordance with the normal servicing practices of the Master Servicer or the Special Servicer, as a recovery of any other amounts then due and owing under such Mortgage Loan (other than Additional Interest), including, without limitation, Prepayment Premiums, Yield Maintenance Charges and Penalty Interest; *sixth*, as a recovery of any remaining principal of such Mortgage Loan to the extent of its entire remaining unpaid principal balance; and *seventh*, with respect to any ARD Loan after its Anticipated Repayment Date, as a recovery of any unpaid Additional Interest. All amounts collected on any Mortgage Loan in the form of Liquidation Proceeds of the nature described in clauses (iv) through (vi) of the definition thereof shall be deemed to be applied: *first*, as a recovery of any related and unreimbursed Advances *plus* interest accrued thereon; *second*, as a recovery of accrued and unpaid interest at the related Mortgage Rate on such Mortgage Loan to but not including the Due Date in the Collection Period of receipt, to the extent such amounts have not been previously advanced, and exclusive of any portion thereof that constitutes Additional Interest; *third*, as a recovery of principal, to the extent such amounts have not been previously advanced, of such Mortgage Loan to the extent of its entire unpaid principal balance; and *fourth*, with respect to any ARD Loan after its Anticipated Repayment Date, as a recovery of any unpaid Additional Interest. No such amounts shall be applied to the items constituting additional servicing compensation as described in the first sentence of either Section 3.11(b) or 3.11(d) unless

and until all principal and interest then due and payable on such Mortgage Loan has been collected. Amounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof. The provisions of this paragraph with respect to the application of amounts collected on any Mortgage Loan shall not alter in any way the right of the Master Servicer, the Special Servicer or any other Person to receive payments from the Certificate Account as set forth in clauses (ii) through (xvi) of Section 3.05(a) from amounts so applied.

(C30 PSA § 3.02(b)). For convenience, and in accordance with the terminology used by CWC's and the GSEs' witnesses, the Court refers to the first payment priority structure laid out in § 3.02(b) as a "waterfall."

### c.     Section 3.11: Servicing Compensation

Finally, the WBCMT PSAs specify certain forms of servicing compensation due to the Special Servicer. Section 3.11(c) states, in part, as follows:

> As compensation for its activities hereunder, the Special Servicer shall be entitled to receive the Special Servicing Fee with respect to each Specially Serviced Mortgage Loan and each REO Loan .... As further compensation for its activities hereunder, the Special Servicer shall be entitled to receive the Workout Fee with respect to each Corrected Mortgage Loan, so long as such loan remains a Corrected Mortgage Loan .... In addition, with respect to each Specially Serviced Mortgage Loan and REO Loan ... the Special Servicer shall be entitled to the Liquidation Fee ....

(C30 PSA § 3.11(c)). Section 3.11(d) states, in part, as follows:

> Additional servicing compensation in the form of: (i) all late payment charges, Penalty Interest received on or with respect to Specially Serviced Mortgage Loans actually collected that, with respect to late payment charges and penalty charges, accrued during the time that the related Mortgage Loan was a Specially Serviced

12

Mortgage Loan, (ii) one hundred percent (100%) of any assumption application fees and assumption fees with respect to any Specially Serviced Mortgage Loan ..., and (iii) modification fees collected on all Mortgage Loans or Companion Loans ..., in each case to the extent actually paid by the related Mortgagor, shall be retained by the Special Servicer or promptly paid to the Special Servicer by the Master Servicer and shall not be required to be deposited in the Certificate Account[.]

(C30 PSA § 3.11(d)).

### d.    The 2003 Introduction of "Gain-on-Sale" Provisions to the WBCMT Shelf

Certain definitions and provisions regarding the concept of "gain-on-sale" were introduced into the WBCMT PSAs beginning with the C4 PSA in 2003. (CWC 56.1 C157; *see generally* Casse Decl., Ex. 105 (C3 PSA/C4 PSA blackline)). For starters, these later PSAs defined "Gain-on-Sale Proceeds" as follows:

With respect to any Mortgage Loan, the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received.

(C30 PSA § 1.01). A "Gain-on-Sale Reserve Account" was also introduced to the WBCMT PSAs, defined as:

A segregated custodial account or accounts or subaccount of the Distribution Account created and maintained by the Paying Agent pursuant to Section 3.04(e) on behalf of the Trustee in trust for the Certificateholders, which shall be entitled "Wells Fargo Bank, N.A., as Trustee, in trust for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C30." Any such account shall be an Eligible Account or a subaccount of an Eligible Account.

13

(*Id.*).

And § 3.04(e) was added to require the Paying Agent — in this case, Wells Fargo Bank, N.A. — to establish and maintain a Gain-on-Sale Reserve Account on behalf of the Trustee for the benefit of certificateholders:

> The Paying Agent, on behalf of the Trustee for the benefit of the Certificateholders, shall establish (upon notice from Special Servicer of an event occurring that generates Gain-on-Sale Proceeds) and maintain the Gain-on-Sale Reserve Account in the name of the Paying Agent on behalf of the Trustee for the benefit of the Certificateholders. The Gain-on-Sale Reserve Account shall be maintained as a segregated account, separate and apart from trust funds for mortgage pass-through certificates of other series administered by the Paying Agent and other accounts of the Paying Agent. Upon the disposition of any REO Property in accordance with Section 3.09 or Section 3.18, the Special Servicer will calculate the Gain-on-Sale Proceeds, if any, realized in connection with such sale and remit such funds to the Paying Agent for deposit into the Gain-on-Sale Reserve Account.

(C30 PSA § 3.04(e)).[9]

These additions were included in the C30 PSA, which was signed by Wachovia Commercial Mortgage Securities, Inc., as Depositor; Wachovia Bank, N.A., as Master Servicer; Wells Fargo Bank, N.A. ("Wells Fargo"), as Trustee; and CWC, as Special Servicer. (CWC 56.1 C12). In December 2008, Wells Fargo acquired the Wachovia entities and succeeded to its role as Master

---

[9]     *See also* C30 PSA § 3.18(*l*):

> The amount paid for ... REO Property ... purchased under this Agreement shall be deposited into the Certificate Account ... (except that portion of any purchase price constituting Gain-on-Sale Proceeds which shall be deposited in the Gain-on-Sale Reserve Account).

Servicer for the C30 Trust. (*Id.* at C13). As a result of the Wachovia acquisition, Wells Fargo was required to resign as Trustee. (*Id.* at C14). Pursuant to a Trust Administration Agreement dated March 31, 2009 (the "Trust Administration Agreement"), Bank of America, N.A. ("BofA") was appointed Trustee for the C30 Trust. (*Id.* at C15). Pursuant to the Trust Administration Agreement, BofA appointed Wells Fargo as Paying Agent and Trustee Agent, among other things. (*Id.* at C16). In December 2010, U.S. Bank National Association ("U.S. Bank") acquired BofA's trust administration business and succeeded to BofA's role as Trustee for the C30 Trust. (*Id.* at C18).

Wells Fargo, as Master Servicer for the C30 Trust, and CWC, as Special Servicer for the C30 Trust, were responsible for administering Stuy Town on behalf of all of the PCV Trusts. (CWC 56.1 C20). CWC was also delegated as the Special Servicer in 7 of the 33 WBCMT PSAs, inclusive of the C30 PSA. (*Id.* at C135). As such, CWC was a signatory to 7 of the 33 WBCMT PSAs.

### 4. Securities Issued by the PCV Trusts

Each of the PCV Trusts issued securities, called certificates, for sale to investors. (GSE 56.1 G12). More specifically, the PCV Trusts issued various classes of certificates associated with varying levels of risk. (CWC 56.1 C5).

Significantly, certificateholders were not and are not parties to the PSAs.[10] Rather, they are third-party beneficiaries, who invest on a take-it-or-

---

[10] A New York State court has so found in the specific context of the C30 Trust. *See CWCapital Cobalt VR Ltd.* v. *CWCapital Investments LLC*, Index No. 653277/2018 (N.Y. Sup. Ct. Aug. 20, 2019), Dkt. No. 182 at 2 n.1, 12, 16 (concluding that CWCapital

leave-it basis. The certificates issued by the C30 Trust make clear that the parties to the C30 PSA are Wachovia as Depositor, Wachovia Bank (now Wells Fargo) as Master Servicer, CWC as Special Servicer, and Wells Fargo (now U.S. Bank) as Trustee. (Hampson Decl., Ex. B at A-13-1-3).[11] These certificates recite that they are "issued under and [are] subject to the terms, provisions and conditions of the [PSA], to which [PSA] the Holder of [each] Certificate by virtue of the acceptance hereof assents and by which such Holder is bound." (*Id.*).

Appaloosa did not purchase certificates in the PCV Trusts at the time of issuance in 2007. (*See* CWC 56.1 C60). Rather, it purchased certificates of several different classes in the C30 Trust in the secondary market. (*See id.*; Dkt. #239 at ¶ 17).

The GSEs are also certificateholders, though of a different class of securities. The GSEs purchased Class A-1A Certificates, the most senior rated

---

Cobalt VR Ltd., an alleged certificateholder in the C30 Trust, "is not a party to [the C30] PSA"). Numerous other court decisions have confirmed that certificateholders are not parties to the governing PSA, but rather are third-party beneficiaries. *See, e.g.*, *MBIA* v. *Nationstar Mortg.*, No. 18 Civ. 938 (VB), 2019 WL 357932, at *5 (S.D.N.Y. Jan. 29, 2019); *Nat'l Credit* v. *U.S. Bank*, No. 14 Civ. 9928 (KBF), 2015 WL 2359295, at *5 (S.D.N.Y. May 18, 2015); *BNP Paribas* v. *Bank of N.Y.*, No. 11 Civ. 350 (PGG), 2012 WL 13059498 (S.D.N.Y. Mar. 28, 2012); *Greenwich Fin. Servs.* v. *Countrywide*, 654 F. Supp. 2d 192, 197 (S.D.N.Y. 2009); *PIMCO* v. *Wells Fargo*, No. 654743/2017 (N.Y. Sup. Ct. Dec. 5, 2017), Dkt. No. 65 at 19; *LNR Partners* v. *C-III Asset Mgmt.*, No. 8472 (VCP), 2014 WL 1312033, at *12 (Del. Ch. Mar. 31, 2014); *Walnut Place* v. *Countrywide*, 35 Misc.3d 1207(A), at *1 n.2 (N.Y. Sup. Ct. Mar. 28, 2012), *aff'd*, 948 N.Y.S.2d 580 (1st Dep't 2012); *Bankers* v. *Countrywide*, No. 8:11 Civ. 1630-T-17, 2012 WL 2594341, at *2 (M.D. Fla. July 5, 2012); *Sterling* v. *Countrywide*, No. 11 Civ. 2012 (AJS), 2012 WL 2368821, at *3 (N.D. Ill. June 21, 2012).

[11]  The C30 Prospectus Supplement, described *infra*, similarly states that "[t]he trust fund will be created on or about the closing date pursuant to a pooling and servicing agreement, dated as of March 1, 2007, by and among the depositor, the master servicer, the special servicer and the trustee." (Casse Decl., Ex. 29 ("C30 Pro Supp") at S-8). Certificateholders like Appaloosa were not involved in negotiating or drafting the C30 PSA or the C30 Pro Supp. (CWC 56.1 C11).

certificates of the C30 Trust, at par value when they were first issued. (GSE 56.1 G15; CWC 56.1 C59). The Class A-1A Certificates were backed by "loan group 2," which included the Notes. (GSE 56.1 G16).

Among other things, each of the Notes prohibits the Borrower from voluntarily prepaying the Notes from their inception date through the Lockout Expiration Date (defined as the date three months prior to maturity, here, September 8, 2016). (GSE 56.1 G18). For the Borrower to obtain the release of collateral underlying the loan prior to the Lockout Expiration Date, it would have to defease the loan by substituting direct non-callable, fixed-rate obligations of the United States of America or other non-callable fixed-rate "government securities." (*Id.* at G18). In such a circumstance, Section 2.3(b) of the Notes would come into play:

> If, prior to the Lockout Expiration Date, the indebtedness evidenced by this Note shall have been declared due and payable by Lender ... due to the occurrence and continuance of an Event of Default by Borrower, then, in addition to the indebtedness evidenced by this Note being immediately due and payable, *there shall also then be immediately due and payable a prepayment fee in an amount equal to the Yield Maintenance Premium* (as hereinafter defined) based on the Debt then outstanding on the date of such acceleration.

(Lieberman Decl., Ex. 2 at § 2.3(b) (emphasis added)). In other words, the Borrower was prohibited under the Notes from voluntarily prepaying them at any time prior to the three months before the Maturity Date, on pain of Yield Maintenance that would become immediately due and payable. (GSE 56.1 G20).

## 5. The C30 Pro Supp

In conjunction with the sale of the certificates in the C30 Trust,

Wachovia published a prospectus supplement (the "C30 Pro Supp") on

March 14, 2007, that provided investors with additional information about the

offering. (Casse Decl., Ex. 29). The C30 Pro Supp disclosed that CWC was the

special servicer for the C30 Trust. (*See* C30 Pro Supp S-9). It explained to

investors that:

> With respect to the Peter Cooper Village & Stuyvesant
> Town Loan, the Master Servicer[, Wells Fargo,] and the
> Special Servicer[, CWC,] will administer the Peter
> Cooper Village & Stuyvesant Town Loan and the Peter
> Cooper Village & Stuyvesant Town Pari Passu
> Companion Loans pursuant to the Pooling and
> Servicing Agreement and the Peter Cooper Village &
> Stuyvesant Town Intercreditor Agreement for so long as
> the Peter Cooper Village & Stuyvesant Town Loan is part
> of the Trust Fund.

(*Id.* at S-104–S-05).

In a section titled "Fees and Expenses," the C30 Pro Supp explained

certain fees to which the Special Servicer was entitled:

> Certain fees and expenses are payable from amounts
> received on the mortgage loans in the trust fund and are
> generally distributed prior to any amounts being paid to
> the holders of offered certificates.
>
> The special servicer is entitled to the special servicing
> fee [the "Special Servicing Fee"] which is payable
> monthly on each mortgage loan that is a specially
> serviced mortgage loan and each REO mortgage loan
> from general collections on the mortgage loans. The
> special servicing fee accrues at a rate equal to 0.25%
> *per annum* and is computed on the basis of the same
> principal amount respecting which any related interest
> payment due on such specially serviced mortgage loan
> or REO mortgage loan, as the case may be, is paid.

18

The special servicer is also entitled to a liquidation fee [the "Liquidation Fee"] with respect to each specially serviced mortgage loan that is generally an amount equal to 1.00% of any whole or partial cash payments of liquidation proceeds received in respect thereof or, with respect to the Peter Cooper Village & Stuyvesant Town mortgage loan, the lesser of (i) 0.50% of any whole or partial cash payments of liquidation proceeds received in respect thereof and (ii) $15,000,000; *provided, however*, in no event will the liquidation fee be payable to the extent a workout fee is payable concerning the related cash payments.

The special servicer is also entitled to a workout fee [the "Workout Fee"] with respect to each mortgage loan that is no longer a specially serviced mortgage loan that is generally equal to 1.00% of all payments of interest and principal received on such mortgage loan for so long as it remains a corrected mortgage loan or, with respect to the Peter Cooper Village & Stuyvesant Town mortgage loan, the lesser of (i) 0.50% of all payments of interest and principal received on such mortgage loan for so long as it remains a corrected mortgage loan, and (ii) $15,000,000....

The master servicer, special servicer, and trustee are entitled to certain other additional fees and reimbursement expenses. All fees and expenses will generally be payable prior to distribution on the certificates.

(C30 Pro Supp S-28–S-29). And in a later section, titled "Compensation and Payment of Expenses," the C30 Pro Supp adds:

The Master Servicer, the Special Servicer and the Trustee will be entitled to payment of certain fees as compensation for its services performed under the Pooling and Servicing Agreement. Certain additional fees and costs payable by the related Mortgagors are allocable to the Master Servicer, the Special Servicer, and the Trustee, but such amounts are not payable from amounts that the Trust Fund is entitled to receive.

(*Id.* at S-171).[12]

The C30 Pro Supp describes the Special Servicing Fee, Liquidation Fee, and Workout Fee as the "principal compensation" to be paid to the Special Servicer in respect of its special servicing activities.  (C30 Pro Supp S-177). But a few pages later, the C30 Pro Supp clarifies that:

> As additional servicing compensation, the Master Servicer and/or the Special Servicer is entitled to retain all modification fees, assumption fees, defeasance fees, assumption and other application fees, late payment charges and default interest …. In addition, to the extent the master servicer special servicer receives late payment charges or default interest on a Mortgage Loan for which interest on Advances or Additional Trust Fund Expenses (other than Special Servicing Fees, Workout Fees and/or Liquidation Fees) related to such Mortgage Loan has been paid and not previously reimbursed to the Trust Fund, such payment charges or default interest will be used to reimburse the Trust Fund for such payment of interest or Additional Trust Fund Expenses.

(*Id.* at S-179).

On the specific topic of Yield Maintenance, the C30 Pro Supp provides:

---

[12]    In a chart that follows, the C30 Pro Supp indicates that the special servicer may be entitled to "Additional Special Servicing Compensation" in the form of:

> Late payment charges and default interest actually collected with respect to any Mortgage Loan, but only to the extent such late payment charges and default interest (a) accrued with respect to that Mortgage Loan while it was specially serviced or after the related mortgaged property became an REO Property; and (b) are not otherwise allocable to pay the following items with respect to the related Mortgage Loan or REO Property; (i) interest on advance, or (ii) Additional Trust Fund Expenses (exclusive of special servicing fees, liquidation fees and workout fees) currently payable or previously paid with respect to the related Mortgage Loan, Mortgaged Property or REO Property from collections on the mortgage pool and not previously reimbursed.

(C30 Pro Supp S-174–S-75).

> On each distribution date, any prepayment premium or yield maintenance charge actually collected during the related collection period on a mortgage loan included in the trust fund will be distributed to the holders of each class of offered certificates ….

(C30 Pro Supp S-30).  A later section similarly defines Yield Maintenance as:

> fees paid or payable, as the context requires, as a result of a prepayment of principal on a Mortgage Loan, which fees have been calculated (based on Scheduled Payments on such Mortgage Loan) to compensate the holder of the Mortgage for reinvestment losses based on the value of a discount rate at or near the time of prepayment ….

(*Id.* at S-215).

The C30 Pro Supp does not define "Gain-on-Sale" or "Gain-on-Sale Proceeds," though it does define a "Gain-on-Sale Reserve Account":

> The Trustee will establish and will maintain a "<u>Gain-on-Sale Reserve Account</u>" in the name of the Trustee for the benefit of the Certificateholders.  To the extent that gains realized on sales of Mortgaged Properties, if any, are not used to offset Realized Losses previously allocated to the Certificates, such gains will be held and applied to offset future Realized Losses, if any.

(C30 Pro Supp S-204).

### 6.     The Servicers and Their Respective Obligations

Under the C30 PSA and the Co-Lender Agreement, the Master Servicer and Special Servicer are responsible for servicing and administering the PCV Loan.  (CWC 56.1 C19).  Generally speaking, the Master Servicer, Wells Fargo, services performing loans held by the C30 Trust, while the Special Servicer, CWC, services non-performing loans.  (*Id.* at C20).  As explained above, Wells

Fargo and CWC are parties to the C30 PSA, along with the Depositor (also now Wells Fargo) and Trustee (U.S. Bank).  (*Id.* at C12-C18).

In addition to servicing non-performing loans, CWC is responsible for allocating post-closing proceeds from the sale of an REO Property in accordance with the terms of the C30 PSA, which includes responsibility for calculating Gain-on-Sale Proceeds.  (CWC 56.1 C21-C22).  Following the sale of REO property, CWC completes a realized loss report ("RLR") to allocate REO sale proceeds and then sends the RLR to the Master Servicer for review.  (CWC 56.1 C23-C25).  Wells Fargo, as Master Servicer, is then responsible for forwarding the RLR to the Paying Agent and Trustee.  (CWC 56.1 C27).

As explained above, § 3.11(c) of the C30 PSA provides for several forms of Special Servicer compensation, including a Special Servicing Fee, a Workout Fee, and a Liquidation Fee, while § 3.11(d) provides that:

> Additional servicing compensation in the form of: (i) all late payment charges, Penalty Interest received on or with respect to Specially Serviced Mortgage Loans actually collected that, with respect to late payment charges and penalty charges, accrued during the time that the related Mortgage Loan was a Specially Serviced Mortgage Loan, (ii) one hundred percent (100%) of any assumption application fees and assumption fees with respect to any Specially Serviced Mortgage Loan …, and (iii) modification fees collected on all Mortgage Loans or Companion Loans …, in each case to the extent actually paid by the related Mortgagor, shall be retained by the Special Servicer or promptly paid to the Special Servicer by the Master Servicer and shall not be required to be deposited in the Certificate Account[.]

(C30 PSA § 3.11(d)).

**7.     The Transfer of the PCV Loan to Special Servicing**

Three years after the Stuy Town purchase, on November 6, 2009, the PCV Loan was transferred to CWC for special servicing because of the risk of imminent default.  (CWC 56.1 C42; GSE 56.1 G21).  Upon transfer to special servicing, the PCV Loan became a "Specially Serviced Mortgage Loan" as defined in the C30 PSA.  (CWC 56.1 C43).

On January 8, 2010, the Borrower defaulted on the PCV Loan; CWC, on behalf of the Senior Lender, provided written notice of the default.  (CWC 56.1 C44).  By letter dated January 29, 2010, CWC, on behalf of the Senior Lender, accelerated the PCV Loan when the default was not cured.  (*Id.* at C45).  Pursuant to the Notes, Yield Maintenance became due and payable when the Borrower defaulted and the indebtedness on the Notes was declared due and payable.  (GSE 56.1 G24).

On February 16, 2010, CWC, on behalf of the Senior Lender, filed a complaint in the United States District Court for the Southern District of New York asserting a single count for foreclosure of Stuy Town.  (CWC 56.1 C46; Appaloosa 56.1 A9; *see also Bank of Am., N.A.* v. *PCV St. Owner L.P.*, No. 10 Civ. 1178 (AKH) (S.D.N.Y.) (the "2010 Action"), Dkt. #1).  On February 23, 2010, Appaloosa filed a motion to intervene.  (2010 Action, Dkt. #16).  The court denied the motion on April 30, 2010.  (*Id.*, Dkt. #89).  On June 21, 2010, the court entered a Judgment of Foreclosure and Sale (the "Foreclosure Judgment"), which, *inter alia*, authorized the foreclosure sale of Stuy Town, appointed a referee to conduct the sale of the property, and calculated amounts

23

owed on the PCV Loan. (*Id.*, Dkt. #92; *see also* CWC 56.1 C49; GSE 56.1 A178).

In the Foreclosure Judgment, the court computed that $3,666,734,464.70 was owed on the Senior Loan, representing: (i) the unpaid principal balance of $3 billion; (ii) interest of $48,225,000 through April 7, 2010; (iii) Penalty Interest of $22,500,000 through April 7, 2010; (iv) Penalty Interest on unpaid interest of $220,423.67 through April 7, 2010; (v) per diem interest on principal and unpaid interest of $11,916,443.70 between April 7, 2010, and April 22, 2010; (vi) Yield Maintenance of $622,110,023.31; and (vii) other charges incurred under the loan documents of $956,427.96; from which was subtracted (viii) $39,223,853.94 in cash flow from operations, escrow balances, and interest reserves. (2010 Action, Dkt. #92). The court further found that additional interest on the outstanding principal balance and unpaid interest amounts would continue to run at a rate of 6.434%, and that Penalty Interest on the outstanding principal balance and unpaid interest amounts would continue to run at a rate of 3%, through the date of the Foreclosure Judgment. (*Id.*). Thereafter, post-judgment interest would be calculated at the federal rate, pursuant to 28 U.S.C. § 1961(a). (*Id.*).

Despite the entry of the Foreclosure Judgment, no foreclosure sale ever took place. (CWC 56.1 C50). CWC effectively operated Stuy Town for the next four years until, on June 3, 2014, the PCV Trusts took title to Stuy Town via a deed in lieu of foreclosure. (CWC 56.1 C53; GSE 56.1 G31). The Deed In Lieu of Foreclosure Agreement recites:

As this Deed is being executed and delivered in lieu of foreclosure of the Mortgage (as defined below), the Grantor hereby makes the following representations and warranties: This Deed is an absolute conveyance of the title to the above described property, in effect as well as in form, and is not intended as a mortgage, conveyance in trust or as a hypothecation of any kind or character; that the conveyance herein is freely and fairly made and not as a result of duress, force, undue influence or threats of any kind; that the conveyance is a bona fide and not given to hinder, delay or defraud the rights of creditors or contravene the bankruptcy laws of the United States or any other applicable laws; Grantor further acknowledges that there is nothing unconscionable in this transaction; Grantor considers this transaction to be fair and equitable based on Grantor's determination of the value and financial condition of the Property; that the Grantor has no option to purchase or any other right, title or interest in or to the Property; and that the Property is encumbered by that certain Mortgage, Security Agreement, Assignment of Rents and Fixture Filing, dated as of November 17, 2006, by PCV Borrower to Wachovia Bank, National Association and Merrill Lynch Mortgage Lender, Inc., and recorded in the Office of the City Register of the City of New York on November 20, 2006 as CRFN 2006000643688 (as amended and assigned to date, the "Mortgage"), the current mortgagee thereunder being an affiliate of the Grantee.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT THE PARTIES HEREIN DO NOT INTEND THAT ACCEPTANCE OF THIS DEED IN LIEU OF FORECLOSURE BE DEEMED TO CONSTITUTE A MERGER OF THE MORTGAGE REFERRED TO IN THE PRECEDING PARAGRAPH WITH THE FEE CONVEYED HEREBY BUT THAT THE MORTGAGE SHALL REMAIN AS A GOOD AND VALID MORTGAGE SEPARATE AND APART FROM ANY OTHER INTEREST OF GRANTEE IN FEE. FURTHER, THE TRANSFER CONTEMPLATED BY THIS DEED SHALL NOT CONSTITUTE A FULL OR PARTIAL SATISFACTION, WAIVER OR RELEASE OF THE INDEBTEDNESS EVIDENCED BY ANY INSTRUMENT SECURED BY OR MADE IN CONJUNCTION WITH THE MORTGAGE.

(Casse Decl., Ex. 39 at 2 (capitalization in original)).  Further, the Agreement explicitly states that the "indebtedness under the Notes and the lien of the Mortgage shall not be extinguished as a result of the delivery of the Transfer Documents."  (Casse Decl., Ex. 41 at 5).  As a result of the deed in lieu of foreclosure, Stuy Town became "REO Property," and the PCV Loan became an "REO Loan," under the C30 PSA.  (CWC 56.1 C54-C55).

### 8. The Stuy Town Liquidation

On October 20, 2015, it was publicly announced that Blackstone LP ("Blackstone") and Ivanhoe Cambridge Inc. ("Ivanhoe") had agreed to purchase Stuy Town from the PCV Trusts for $5.4 billion.  (Appaloosa 56.1 A16).  On December 18, 2015, the Property was sold to affiliates of Blackstone and Ivanhoe for $5,309,381,250.  (CWC 56.1 C58; Appaloosa 56.1 A17).  The sale of Stuy Town was treated as an REO Disposition by both Wells Fargo, as Master Servicer, and CWC, as Special Servicer.  (CWC 56.1 C69).[13]

The Stuy Town sale was an REO Disposition that generated "Liquidation Proceeds" within the meaning of C30 PSA.  (CWC 56.1 C68-C69; GSE 56.1 G48).  As Special Servicer, CWC was responsible for distributing those proceeds in accordance with the C30 PSA.  (CWC 56.1 C21).  CWC distributed the proceeds in accordance with the "waterfall" of payment priorities detailed in § 3.02(b) of the C30 PSA, *see supra* at 10-11, including allocating Yield

---

[13] The C30 PSA defines "REO Disposition" as "The sale or other disposition of any REO Property pursuant to Section 3.18(h)."  (C30 PSA § 1.01).

Maintenance and Penalty Interest per the fifth step of the waterfall.  (CWC 56.1 C67-C70; GSE 56.1 G49).

As is typical in the case of REO Dispositions, CWC completed an RLR (the "Stuy Town RLR"), which reflected the allocation of the Stuy Town sale proceeds as CWC believed they should be distributed under the PSA.  (CWC 56.1 C24).  The Stuy Town RLR reflects that CWC first calculated $4,869,183,977.85 of "Net Proceeds Received on Liquidation" (or Liquidation Proceeds), comprising $5,309,381,250.00 of sale proceeds, $84,898,759.76 of amounts held in property-level suspense accounts, and a seller credit of $24,694,052.26, less the costs associated with the sale (including broker fees of $16,674,809.00 and litigation settlement costs of $533,115,654.07).  (*Id.* at C75).  CWC then ran the Liquidation Proceeds through the payment priorities waterfall set forth in § 3.02(b), with the cash applied sequentially to each step until exhausted, resulting in $614,424,027.57 of Penalty Interest and $156,797,854.44 of Yield Maintenance.  (*Id.* at C77).[14]  At the last step of the waterfall, CWC calculated Gain-on-Sale Proceeds in the amount of $49,672,388.15.  (CWC 56.1 C78).

CWC's calculations were ultimately approved by Wells Fargo, as Master Servicer, and sent by Wells Fargo to the Paying Agent and Trustee, U.S. Bank.

---

[14]    From CWC's calculation of $156,797,854.55 of Yield Maintenance generally due, the Stuy Town RLR allocated $52,384,737.73 to the MLCFC 2007-5 Trust and the MLCFC 2007-6 Trust.  (GSE 56.1 G57).  The remaining Yield Maintenance figure of $104,413,116.71 reflected charges due to the C30 Trust, the C31 Trust, and the COBALT 2007-C2 Trust, and has been held in escrow pending the outcome of this litigation.  (GSE 56.1 G59; CWC 56.1 C80).

(CWC 56.1 C25, C27).  Certificateholders, including Appaloosa and the GSEs, had no involvement in allocating the proceeds resulting from the Stuy Town sale.  (*Id.* at C23).

**B.     Procedural Background**

**1.     The Petition, Its Removal, and Its Transfer to the SDNY**

On December 17, 2015, U.S. Bank, as Trustee of the C30 Trust, filed a Petition for Instructions in the Administration of Certain Trusts in the District Court for the Second Judicial District of Minnesota.  (*See* Dkt. #1, Ex. A (the "Petition")).  The Petition sought instructions on the proper construction of the operative agreements at issue here, including the C30 PSA.  (*Id.*).  It framed the first relevant question as:

> whether — in connection with the sale of REO Property — (i) Section 3.11(d) [of the C30 PSA] requires that Penalty Interest be calculated and paid to the Special Servicer before the calculations and actions under Section 3.18(*l*) [of the C30 PSA] are completed (as [CWC] contends); or (ii) Section 3.18(*l*) alone controls the allocation of sale proceeds from REO Property (as Appaloosa contends).

(*Id.* at ¶ 50).  It also listed a second issue relevant to the correct allocation of the disputed funds, namely, the amount of Penalty Interest that had accrued on the REO Loan.  (*Id.* at ¶ 51).

On February 24, 2016, CWC moved to dismiss the Petition on jurisdictional, mootness, and *forum non conveniens* grounds, which motion the Minnesota state court denied.  (Dkt. #1 ¶ 7).  On July 22, 2016, Freddie Mac removed the case to the United States District Court for the District of Minnesota.  (Dkt. #1).  Freddie Mac thereafter moved to transfer the case to

28

this Court, which United States District Judge Donovan W. Frank approved in an Opinion and Order dated March 14, 2017. (Dkt. #53, 111). This case was then assigned to this Court.[15]

## 2. The Cross-Motions for Judgment on the Pleadings

On June 30, 2017, shortly after the case was transferred, Appaloosa moved, and CWC and the GSEs cross-moved, for judgment on the pleadings. (*See* Dkt. #169-179). The parties offered competing interpretations of how the proceeds from the Stuy Town liquidation of should be distributed under the C30 PSA, and these interpretations are summarized here for completeness.

### a. CWC's and GSEs' Interpretation of the C30 PSA

To a large extent, CWC's and the GSEs' arguments regarding the interpretation of the C30 PSA were coextensive. They pointed to subsections (a) and (b) of § 3.02, which address the collection of REO Loan proceeds, and argued specifically that the portion of § 3.02(b) that states that "[a]mounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof" required CWC to run the Stuy Town sale proceeds through the payment priorities waterfall contained in the definition of an REO Loan:

---

[15]    At the time of the transfer, Interested Party Inessoft, LLC ("Inessoft"), moved to intervene. (Dkt. #104-110). The motion was transferred to this Court, and Inessoft filed an amended motion shortly thereafter. (Dkt. #126-127). The motion was denied without prejudice during a telephonic conference held on May 31, 2017. (Dkt. #158). Nearly a year later, in March 2018, Interested Party CWCapital Cobalt Vr Ltd. ("Cobalt") moved to intervene. (Dkt. #196-199). The motion was denied on May 23, 2018 (*see* Dkt. #237 (transcript), 252 (order)), and the denial was subsequently upheld by the Second Circuit, *see CWCapital Cobalt Vr Ltd.* v. *U.S. Bank Nat'l Ass'n*, 790 F. App'x 260 (2d Cir. 2019) (summary order).

> *first,* as a recovery of Nonrecoverable Advances and Unliquidated Advances … with respect to such REO Loan … ; *second,* as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt … ; *third,* as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and *fourth,* in accordance with the normal servicing practices of the Master Servicer, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, (i) **Yield Maintenance Charges**, Prepayment Premiums and **Penalty Interest** and (ii) Additional Interest and **other amounts**, in that order.

(C30 PSA § 1.01 (emphases added)).  What is more, CWC and the GSEs reasoned that the fourth step of the waterfall, by its terms, entitled CWC to retain $600 million in Penalty Interest (pursuant to § 3.11(d)), and entitled the GSEs to $157 million in Yield Maintenance (pursuant to § 2.3(b) of the Notes of the Stuy Town Senior Loan).

CWC and the GSEs argued that the Gain-on-Sale Proceeds definition in the C30 PSA, and the related references to gain-on-sale in the relevant documents, did *not* affect the payment priorities for the liquidation of an REO Loan.  They explained that "gain-on-sale" was merely a catchall provision for calculating fees after liquidation proceeds had been distributed in accordance with the REO Loan Waterfall.  According to CWC and the GSEs, to the extent that Gain-on-Sale Proceeds resulted at all from the Stuy Town sale, they were to be segregated and distributed as part of the "other amounts" category, contained in the last clause of the last step of the REO Loan Waterfall.  Relatedly, CWC and the GSEs argued that the REO Loan Waterfall provision

could be harmonized with the definition of Gain-on-Sale Proceeds because Penalty Interest and Yield Maintenance were both part of the "Liquidation Expenses" that were subtracted from the Purchase Price before any Gain-on-Sale Proceeds could be calculated.

### b. Appaloosa's Interpretation of the C30 PSA

Unsurprisingly, Appaloosa held a different view. To it, the starting point for distribution of the Stuy Town liquidation proceeds was § 3.04(e) of the C30 PSA, which it interpreted to obligate CWC to calculate Gain-on-Sale Proceeds, segregate those proceeds in a separate account, and then remit them to certificateholders in the C30 Trust to offset past and future losses from other assets held by the Trust. In Appaloosa's estimation, the REO Loan Waterfall either had no application to the Stuy Town sale or should have been considered only after the segregation of Gain-on-Sale Proceeds.

More broadly, Appaloosa contended that CWC was entitled to no Penalty Interest, and the GSEs were entitled to no Yield Maintenance, because such items were never recoverable in an REO Disposition. That contention rested on two theories: (i) Penalty Interest and Yield Maintenance must be paid by the borrower, and there is no borrower in an REO Loan setting; and (ii) the definition of Gain-on-Sale Proceeds trumps the payment waterfalls set forth in § 3.02(b) and the definition of REO Loan. Because there was no carve-out for Penalty Interest or Yield Maintenance in the Gain-on-Sale Proceeds definition (i.e., neither the undefined term Liquidation Expenses nor the term Purchase Price included Penalty Interest and Yield Maintenance), Appaloosa reasoned

31

that Penalty Interest and Yield Maintenance were simply not recoverable in this setting.

### c. The Court's Opinion

On March 9, 2018, this Court issued an order denying the cross-motions for judgment on the pleadings. *See PSA I*, 2018 WL 1229702. It concluded principally that the C30 PSA did not clearly and unambiguously establish either: (i) that Penalty Interest and Yield Maintenance were allocated before Gain-on-Sale Proceeds were distributed to certificateholders, as CWC and the GSEs claimed; or (ii) that Gain-on-Sale Proceeds were allocated to certificateholders prior to and separate from the payment, if any, of Penalty Interest and Yield Maintenance, as Appaloosa claimed. *Id.* at *9.

The Court found the C30 PSA to be ambiguous as to the priority of payments upon the sale of an REO Property for several reasons. *PSA I*, 2018 WL 1229702, at *9. *First*, the Court found it unclear whether the definition of Gain-on-Sale Proceeds in § 1.01 of the C30 PSA allowed for Penalty Interest and Yield Maintenance to be deducted as Liquidation Expenses. *Id.* *Second*, the REO Loan Waterfall did not reference either Gain-on-Sale Proceeds or Liquidation Proceeds, creating ambiguity regarding its application upon the sale of an REO Property. *Id.* *Third*, the Court found that the tension between § 3.18(*l*), which governed the allocation of Gain-on-Sale Proceeds, and the REO

Loan Waterfall exacerbated the ambiguity surrounding the allocation of proceeds from the sale of an REO Property. *Id.*

The Court concluded that both sides presented reasonable arguments for their construction of the C30 PSA, but that neither side had adequately explained or harmonized the different provisions of the C30 PSA to permit the Court to decide the issue as a matter of law. *PSA I*, 2018 WL 1229702, at *11-14. Accordingly, the Court denied the motions. *See id.* at *14.[16]

### 3. Discovery and the Motion to Dismiss Appaloosa's Cross-Claim

Following the denial of the cross-motions for judgment on the pleadings, the Court held a conference on April 11, 2018, to discuss next steps in the litigation. (Dkt. #220 (transcript)). At that conference, Appaloosa notified the Court of its intention to submit an amended pleading asserting a crossclaim against CWC. (*Id.* at 48). The Court also set a discovery schedule. (*Id.*). In the following months, the Court resolved several discovery issues raised by the parties. (*See* Dkt. #262, 275).

On June 4, 2018, the Court granted Appaloosa's request to submit an amended pleading (Dkt. #236), and on June 18, 2018, Appaloosa filed an amended pleading asserting a cross-claim against CWC (Dkt. #239). CWC then moved to dismiss the cross-claim, arguing that Appaloosa did not have standing to bring the cross-claim, because it had not complied with the No Action Clause in § 11.03(c) of the C30 PSA, which requires, *inter alia,* that

---

[16] The Court did not reach the second question raised by the Petition, regarding the proper calculation of penalty interest. *See PSA I*, 2018 WL 1229702, at *14 n.8 (S.D.N.Y. Mar. 9, 2018).

certificateholders with at least 25% of the voting rights provide the Trustee with a written notice of default and give the Trustee an opportunity to take the action requested to address the default. (Dkt. #244). On March 25, 2019, the Court granted CWC's motion and dismissed the cross-claim, concluding that Appaloosa lacked sufficient voting rights to bring the suit. *See In re the Trusts Established Under the Pooling and Servicing Agreements*, 375 F. Supp. 3d 441 (S.D.N.Y. 2019) ("*PSA II*").

### 4. The Instant Motions

On April 9, 2019, after about a year of discovery, the Court held a conference to determine whether the parties intended to file summary judgment motions or sought to proceed directly to a bench trial. (Dkt. #296 (transcript)). At that time, CWC and the GSEs indicated their intent to file summary judgment motions; Appaloosa indicated its intent to file a motion for partial summary judgment; and all three parties indicated their intent to file motions to exclude the expert witnesses of the opposing side. At present, the Court has before it the following motions:

- CWC's motion for summary judgment (*see* Dkt. #301-310, 312, 315-316, 338-341, 357-359, 373-378, 381-383, 387-388, 394-397);

- The GSEs' motion for summary judgment (*see* Dkt. #317-321, 342-344, 353-355, 365-370, 398-400);

- Appaloosa's motion for partial summary judgment (*see* Dkt. #322-323, 325-326, 334-335, 360-362, 384-385, 389-391, 404-406);

- CWC's motion to exclude the expert testimony of Ann Hambly, Michael Hartzmark, Ph.D., and Andrew

Berman (*see* Dkt. #324, 329-330, 345, 356, 379-380, 401);

- The GSEs' motion to exclude the expert testimony of Ann Hambly, Michael Hartzmark, Ph.D., and Andrew Berman (*see* Dkt. #311, 313-314, 346-347, 352, 371-372, 402-403); and

- Appaloosa's motion to exclude the expert testimony of Ronald F. Greenspan, Thomas F. Nealon III, and Brian Olasov (*see* Dkt. #327-328, 331, 336-337, 350-351, 386, 392-393, 407-408).

For ease of analysis, the Court addresses the parties' summary judgment motions, several arguments of which implicate the expert witness opinions proffered by the parties, before specifically addressing the motions to exclude. For the reasons explained below, the Court grants CWC's and the GSEs' motions for summary judgment, denies Appaloosa's motion for partial summary judgment, denies Appaloosa's motion to exclude in part on the merits and in part as moot, and denies as moot CWC's and the GSEs' motions to exclude.

## DISCUSSION

**A.  The Court Grants CWC's and the GSEs' Motions for Summary Judgment and Denies Appaloosa's Motion for Partial Summary Judgment**

### 1.  Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[17]  A

fact is "material" if it "might affect the outcome of the suit under the governing

law," and is genuinely in dispute "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d

549, 553 (2d Cir. 2005).  "The district court's task on a summary judgment

motion — even in a nonjury case — is to determine whether genuine issues of

material fact exist for trial, not to make findings of fact."  *O'Hara* v. *Nat'l Union*

*Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).

The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The movant may

discharge its burden by showing that the nonmoving party has "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253,

256 (2d Cir. 2013) (finding summary judgment appropriate where the non-

moving party failed to "come forth with evidence sufficient to permit a

---

[17]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.'  'Dispute better reflects the focus of a summary-judgment
determination.").  This Court uses the post-amendment standard, but continues to be
guided by pre-amendment Supreme Court and Second Circuit precedent that refers to
"genuine issues of material fact."

reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

"When interpreting a contract under New York law, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'"  *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113-14 (2d Cir. 2014) (internal citations omitted).  Where, as here, a court finds a contract ambiguous with respect to the question disputed by the parties, the factfinder must "examine extrinsic evidence to determine the contract's effect."  *Luitpold Pharm., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87-88 (2d Cir. 2015); *accord In re Motors Liquidation Co.*, 943 F.3d 125, 131 (2d Cir. 2019) ("If an ambiguity is found, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" (quoting *Int'l Multifoods Corp.* v. *Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002))).  This examination requires considering all "surrounding facts and circumstances" to ascertain the intent of the contracting parties, *U.S. Naval Inst.* v. *Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989), including any relevant course of performance, usage of trade, "as well as a party's own admissions, the party's actions or statements from which knowledge or reason to know may be inferred, and the usages and meanings of third persons with which the party probably was familiar."  *JA Apparel Corp.* v. *Abboud*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010).  The factfinder should also consider "the natural and ordinary usage" of the words of the governing documents, *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000), in light of "the customs,

practices, usages and terminology as generally understood in the particular trade or business," *International Multifoods Corp.*, 309 F.3d at 83.

Summary judgment should be granted if "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary or if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Luitpold Pharm., Inc.*, 784 F.3d at 88 (citations and internal quotation marks omitted); *see also Compagnie Financiere de CIC et de L'Union Europeenne*, 232 F.3d at 158, 161 (granting summary judgment on an ambiguous contract where the extrinsic evidence was one-sided in favor of the appealing party); *Blum* v. *Spaha Cap. Mgmt., LLC*, 44 F. Supp. 3d 482, 498 (S.D.N.Y. 2014) (same); *Faulkner* v. *Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 377, 382 (S.D.N.Y. 2006) (same). "Similarly, summary judgment may be granted despite any ambiguities in the contract 'where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case.'" *N.Y. Marine & Gen'l Ins. Co.* v. *Lafarge North Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (quoting *Topps Co.* v. *Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). The linchpin of a summary judgment determination is the existence *vel non* of genuine disputes of material fact. *See id.; AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999).

### 2. The Summary Judgment Motions Before the Court

To review, the Court has before it the parties' competing summary judgment motions; a voluminous summary judgment record; CWC's and the

GSEs' respective motions to exclude Appaloosa's experts; and Appaloosa's motion to exclude CWC's and the GSEs' experts. The Court also has before it the parties' respective *Daubert* motions, which ask the Court to exclude certain expert evidence from consideration at this stage. Therefore, where the Court considers expert testimony in its analysis of the summary judgment motions, it has made the antecedent determination that such evidence satisfies Federal Rule of Evidence 702, as described *infra*.[18] Because the Court relies on CWC's experts, Greenspan and Nealon, in granting CWC's and the GSEs' summary judgment motions, the Court provides a more robust *Daubert* analysis of their opinions *infra*.

While it is true (as Appaloosa never ceases to mention) that the Court previously found that certain conflicting provisions within the C30 PSA rendered it ambiguous regarding the allocation of REO liquidation proceeds, the Court now has before it a surfeit of extrinsic evidence regarding those provisions. This evidence, which the Court will proceed to outline and analyze, overwhelmingly favors CWC's and the GSEs' interpretation of the C30 PSA — that Penalty Interest and Yield Maintenance are paid prior to Gain-on-Sale

---

[18] At the summary judgment stage, it is appropriate for district courts to decide questions regarding the admissibility of evidence. *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). An expert's opinions that are without factual basis and are based on speculation or conjecture are inappropriate material for consideration on a motion for summary judgment. *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). In deciding whether certain expert opinions can be considered, the Court is mindful of the fact that the *Daubert* "dynamic is slightly altered in a bench trial." *Joseph S.* v. *Hogan*, No. 06 Civ. 1042 (BMC) (SMG), 2011 WL 2848330, at *2-3 (E.D.N.Y. July 15, 2011); *Victoria's Secret Stores Brand Mgmt., Inc.* v. *Sexy Hair Concepts, LLC*, No. 07 Civ. 5804 (GEL), 2009 WL 959775, at *6 n. 3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence[.]").

Proceeds.  The Court has considered Appaloosa's multifarious challenges to CWC's and the GSEs' extrinsic evidence; it has also considered Appaloosa's extrinsic evidence offered in support of its arguments.  Ultimately, however, the Court concludes that Appaloosa's challenges to CWC's and the GSEs' extrinsic evidence are either immaterial or not germane to the issues before the Court, and the limited extrinsic evidence Appaloosa offers is insufficient to defeat CWC's and the GSEs' motions for summary judgment.  *See Eastman Kodak Co. v. Asia Optical Co.*, 518 F. App'x 23, 24 (2d Cir. 2013) (summary order) (rejecting the competing contractual interpretation because it was "at odds with the record").  Because the evidence is "so one-sided that no reasonable person could decide the contrary," and because Appaloosa "fails to point to any relevant extrinsic evidence supporting [its] interpretation of the language," *Luitpold Pharmaceuticals, Inc.*, 784 F.3d at 88, CWC and the GSEs are entitled to summary judgment and Appaloosa is not entitled to partial summary judgment.

### 3.    The Parties' Competing Views of the C30 PSA

A year of discovery has only succeeded in further entrenching the parties' positions.  CWC and the GSEs contend that the payment priorities contained in § 3.02(b) of the C30 PSA control the allocation of proceeds collected from the sale of Stuy Town as an REO Property.  (CWC 56.1 C66-C67).[19]  According to

---

[19]    In its earlier motion for judgment on the pleadings, CWC argued primarily that § 3.02(b) directed it to the definition of REO Loan, which contained the relevant waterfall provision for the Stuy Town liquidation.  (*See* Dkt. #175).  Discovery revealed that employees of CWC had actually utilized the waterfall provision of § 3.02(b), rather than the REO Loan definition, and CWC now argues that the § 3.02(b) waterfall is the one that is applicable.  (*See generally* CWC SJ Br.).  Because CWC argued in favor of

them, upon the disposition of Stuy Town, CWC worked collaboratively with
Wells Fargo to apply the cash proceeds from the sale in the order specified in
the § 3.02(b) waterfall.  After satisfying each step in § 3.02(b), which included
the principal and interest due to the PCV Trusts on the Stuy Town Loan, $157
million in Yield Maintenance, and $614 million in Penalty Interest, CWC
calculated approximately $50 million that remained as Gain-on-Sale Proceeds
to be distributed to certificateholders.

CWC and the GSEs argue that the distribution of proceeds in this
manner is consistent with the text of the C30 PSA and the intent of its parties.
In broad strokes, CWC and the GSEs contend that the definition of "Gain-on-
Sale Proceeds" and its related provisions were added to the C4 PSA in the
WBCMT shelf as a "catchall" provision designed to allocate, to the relevant
trust, the money that remained after all else had been paid.  By way of
historical background, CWC explains that the definition of Gain-on-Sale
Proceeds and its related references in the WBCMT PSAs emerged in the late

---

applying the REO Loan definition in its motion for judgment on the pleadings,
Appaloosa argues that CWC's change in position is prohibited under the law of the case
doctrine.  (*See* Appaloosa CWC SJ Opp. 24-25).  The Court will not preclude CWC from
making an argument, at the summary judgment stage, that is consistent with the
evidence that has been produced during discovery.  Further, CWC's motion for
judgment on the pleadings explicitly stated that

> Although CWC[] followed the specific direction in Section 3.02(b) to
> apply the amounts in accordance with the REO Waterfall set forth
> in the definition of REO Loan, the result is the same under the
> more general waterfall applicable to Liquidation Proceeds that is
> set forth in Section 3.02(b).  Both provisions required the payment
> of Penalty Interest to the Special Servicer after all Advances (i.e.,
> Trust fund expense), principal and interest are recovered.

(Dkt. #175 at 20).  Accordingly, the Court considers CWC's argument that the § 3.02(b)
waterfall applies to the Stuy Town liquidation proceeds.

1990s/early 2000s, so that certificateholders, and not the residual holder, would benefit from those few occasions in which an REO liquidation yielded excess funds. When the gain-on-sale provisions were introduced into the WBCMT PSAs with the C4 PSA in 2003, the parties did not intend to disrupt the REO waterfall payment system and priority already established under existing PSAs and accepted servicing practice.

CWC and the GSEs offer both fact and expert witness testimony to this effect. With respect to the former, both course of performance and industry custom and practice evidence support their construction of § 3.02(b) and Gain-on-Sale Proceeds. For example, CWC and the GSEs point to dozens of other REO liquidations in the WBCMT Shelf that contain substantively identical provisions to the C30 PSA, where the proceeds were distributed in the manner that CWC and the GSEs argue should prevail here, with the gain-on-sale provisions coming into play after only after the proceeds were run through the § 3.02(b) waterfall.

For its part, Appaloosa reiterates its Rule 12(c) position that following the Stuy Town liquidation, the certificateholders' entitlement to Gain-on-Sale Proceeds took precedence over CWC's entitlement to Penalty Interest and the GSEs' entitlement to Yield Maintenance. Appaloosa contends this is so because § 3.04(e) of the C30 PSA and the definition of Gain-on-Sale Proceeds takes precedence over the waterfall provisions of § 3.02(b). Accordingly, Appaloosa contends that following the sale of REO Property, CWC was obligated to calculate Gain-on-Sale Proceeds, segregate the proceeds in a

43

separate account, and then remit them to certificateholders in the PCV Trusts to offset past and future losses from other assets held by the PCV Trusts.

As a counter-history, Appaloosa posits that the gain-on-sale concept was developed to help certificateholders, who are the parties with money at risk, offset losses in one part of the CMBS pool with gains realized on other assets in the pool, thereby giving concrete effect to the diversification of the pool. Appaloosa contends that the gain-on-sale provisions of the C30 PSA impose an "unflinching obligation" on the Special Servicer, following the sale of REO Property, to calculate Gain-on-Sale Proceeds in accordance with that definition and remit them to the Paying Agent for deposit in the Gain-on-Sale Reserve Account for reimbursement of Realized Losses incurred by certificateholders. And it argues that the gain-on-sale provisions that were added to WBCMT PSAs beginning in 2003 altered the application of other provisions of the WBCMT PSAs (such as the REO Loan definition), even though the language of those other provisions was left unchanged.

Separately, Appaloosa argues that CWC is entitled to no Penalty Interest and the GSEs are entitled to no Yield Maintenance because the term "Liquidation Proceeds" in the definition of Gain-on-Sale Proceeds — defined as the excess of (i) Liquidation Proceeds of the Mortgage Loan or related REO Property net of any related Liquidation Expenses, over (ii) the Purchase Price for such Mortgage Loan on the date on which such Liquidation Proceeds were received — includes neither Penalty Interest nor Yield Maintenance as a permitted Liquidation Expense. Taking this argument to its logical conclusion,

Appaloosa reasons that under the C30 PSA, Penalty Interest and Yield Maintenance could never be paid from the sale of REO property. (CWC 56.1 C101; CWC 56.1 A161).

At the Rule 12(c) stage, the Court noted that neither side's attempt to harmonize the terms of the C30 PSA was fully satisfying. Even now, at the close of discovery, the Court acknowledges that the extrinsic evidence offered by the parties concerning the meaning of the C30 PSA and the intent of its drafters, does not answer every possible question about the relationship among the various provisions. That said, what is pellucidly clear to the Court is that the § 3.02(b) waterfall provision — which entitles CWC to Penalty Interest and the GSEs to Yield Maintenance — takes precedence over the Gain-on-Sale Proceeds provisions of the C30 PSA; that CWC is entitled to the full amount of Penalty Interest that it retained; that the GSEs are entitled to the amount of Yield Maintenance that has been put aside for them in escrow; and that the Court can therefore answer the questions raised by the Petition.

### 4. Extrinsic Evidence Overwhelmingly Supports CWC's and the GSEs' View that Penalty Interest and Yield Maintenance Are Paid Prior to Gain-on-Sale Proceeds

To begin, CWC contends that "all of the extrinsic evidence illuminating the parties' intended meaning of the contract" — including course of performance, testimony of the parties to the C30 PSA, disclosures in the C30 Pro Supp, custom and practice, industry publications, the evolution of the gain-on-sale concept, and the drafting history of the C30 PSA — conclusively resolves any ambiguities in the C30 PSA in favor of CWC's interpretation. (*See*

CWC SJ Br. 9). The GSEs echo this sentiment and add that other evidence —

including the testimony of the parties to the transaction, industry participants

and experts, and various documents — conclusively supports their entitlement

to Yield Maintenance. The Court has conducted is own review of the evidence,

and in large part agrees with CWC and the GSEs, as detailed herein.

> ### a. The Parties' Course of Performance Under the C30 PSA and Other WBCMT PSAs Supports CWC's and the GSEs' Interpretation of the C30 PSA

Course of performance, sometimes referred to as "practical construction,"

is the best indication of what the parties intended a contract to mean. *See*

*Lafarge*, 599 F.3d at 119 (holding that under New York law, the conduct of

parties provides an important source for deriving their intent as to the meaning

of the contracts at issue).[20] Under New York law, "the practical interpretation

of a contract by the parties to it for any considerable period of time before it

comes to be the subject of controversy is deemed of great, if not controlling,

influence." *Federal Ins. Co.* v. *Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (1st

Dep't 1999) (course of performance is the "most persuasive evidence of the

agreed intention of the parties" (internal quotation marks and citation

omitted)). The record evidence on the parties' course of performance under the

C30 PSA, and under other WBCMT PSAs with identical provisions, indisputably

supports CWC's and the GSEs' view that Penalty Interest and Yield

Maintenance are paid before Gain-on-Sale Proceeds.

---

[20] The C30 PSA is governed by New York law. (*See* C30 PSA § 11.04).

As detailed in the Background section, between 2002 and 2007, Wachovia formed 33 CMBS trusts (designated as C1-C34, with no C13), that were numbered sequentially in the order in which they were formed. (CWC 56.1 C132). Each of the WBCMT Trusts was administered by a PSA signed by the relevant Master Servicer, Special Servicer, Depositor, and Trustee. Moreover, each of the WBCMT Trusts used the prior WBCMT Trust's PSA as a template starting point. (*Id.* at C143). Accordingly, many of the material provisions at issue in this case — including the definitions of REO Loan, REO Property, Penalty Interest, Purchase Price, Liquidation Proceeds, Yield Maintenance, and Principal Prepayment, as well as the collection and compensation provisions in § 3.02(b) and § 3.11 — did not substantively change from one WBCMT PSA to the next. (*Id.* at C158). However, while the PSAs for WBCMT C1 through C3 do not contain any references to gain-on-sale, the PSAs for WBCMT C4 through C34 contain a definition of Gain-on-Sale Proceeds and related references.

CWC offers extrinsic evidence of custom and practice under the C30 PSA — and under the WBCMT Shelf more generally — through the expert testimony of Ronald Greenspan, the global co-leader of the Real Estate and Structured Finance Consulting Practice at FTI Consulting, Inc. (Casse Decl., Ex. 15 ("Greenspan Report")). Greenspan reviewed all of the REO liquidations from the WBCMT Shelf. (*See* Greenspan Report 20-22). His analysis revealed, and discovery in this case confirms, four occasions (including Stuy Town) where an REO Property held by the C30 Trust was sold for an amount

47

sufficient to pay Penalty Interest and/or Gain-on-Sale Proceeds after all other amounts owing had been paid. (*Id.* at 20; CWC 56.1 C167). In the three other occasions, *viz.*, the liquidations of Entrata di Paradiso Apartments, the Peachtree Dunwoody GSA Building, and the Lakeridge East Apartment Complex, Penalty Interest was paid prior to, or to the exclusion of, any Gain-on-Sale Proceeds. (Casse Decl., Ex. 107-110).

CWC also served as Special Servicer for 12 of the other 32 WBCMT Shelf Trusts. (Greenspan Report 21).[21] These 12 trusts yielded 20 loans with REO liquidation proceeds in excess of outstanding principal, non-penalty interest, fees, and costs. (*Id.* at 21). For 16 of those 20 transactions, only Penalty Interest was paid. (*Id.*).[22] For the other four, Penalty Interest and Gain-on-

---

[21]    At the time the WBCMT PSAs came into existence, CWC was a signatory and party to 7 of them. (*See* CWC 56.1 C135). At some point after the WBCMT PSAs came into existence, CWC became special servicer for an additional 5 trusts. (Greenspan Report 21).

[22]    *See* Casse Decl., Ex. 111 (CWC RLR for Lewisville Estates property from WBCMT C34 indicating a payment of $1.6 million in default interest); Ex. 112 (CWC RLR for Microtel Inn property from WBCMT C23 indicating a payment of $300,000 in default interest); Ex. 113 (CWC RLR for Perry Hills Estates Portfolio property from WBCMT C14 indicating a payment $167,000 in default interest); Ex. 115 (CWC RLR for Sterling University Canyon property from WBCMT C20 indicating a payment of $371,000 in default interest); Ex. 116 (CWC RLR for Summit Trails Apartment property from WBCMT C32 indicating a payment of $2.3 million in default interest); Ex. 117 (CWC RLR for The Landing property from WBCMT C23 indicating a payment of $927,000 in default interest); Ex. 118 (CWC RLR for Villa Medici Apartments property from WBCMT C23 indicating a payment of $108,000 in default interest); Ex. 119 (CWC RLR for Wesley Paces Apartment Homes property from WBCMT C34 indicating a payment of $3 million in default interest and $900,000 in yield maintenance); Ex. 120 (CWC RLR for 990 Spring Garden Street property from WBCMT C23 indicating a payment of $380,000 in default interest); Ex. 121 (CWC RLR for Candleglow Apartments property from WBCMT C20 indicating a payment of $183,000 in default interest); Ex. 122 (CWC RLR for 808 South Olive Street property from WBCMT C25 indicating a payment of $751,000 in default interest and $601,000 in gain-on-sale proceeds); Ex. 123 (CWC RLR for Chatham Wood Apartment Complex property from WBCMT C26 indicating a payment of $862,000 in default interest and $644 in gain-on-sale proceeds); Ex. 124 (CWC RLR for Cornerstone Business Center property from WBCMT C28 indicating a payment of $162,000 in default interest); Ex. 125 (CWC RLR for Essex Place Apartments property from WBCMT C11 indicating a payment of $1.7 million in default

Sale Proceeds were paid. (*Id.*). As with the C30 Trust, there were multiple occasions in which Wells Fargo as the Master Servicer for the WBCMT Trusts shared in the Penalty Interest that was collected, including Summit Trails Apartments (C32), 990 Spring Garden Street (C23), Microtel Inn (C23), The Landing (C23), Villa Medici Apartments (C23), Charter Pointe Apartments (C22), 808 South Olive Street and 801-807 South Hill Street (C25), Essex Place Apartments (C11), Chatham Wood Apartment Complex (C26), Kedron Village (C34), and Candleglow Apartments (C20)). (CWC 56.1 C171; *see* Casse Decl., Ex. 112, 116, 117, 118, 120, 122, 123, 125, 127, 128). Not once in any of these WBCMT Shelf transactions was Gain-on-Sale Proceeds paid without a corresponding payment of Penalty Interest.

LNR Partners, Inc. ("LNR"), Torchlight Loan Services, LLC ("Torchlight"), and Situs Holdings LLC ("Situs") were the Special Servicers for many of the other trusts in the WBCMT Shelf. Indeed, LNR is one of the largest special servicers in the industry. (CWC 56.1 C137). LNR, Torchlight, and Situs distributed Penalty Interest in the context of REO liquidations in WBCMT Shelf transactions in the precise manner that CWC espouses here. (Greenspan Report 21-22). There were nine occasions where LNR, as Special Servicer, sold

---

interest); Ex. 126 (CWC RLR for Fountain Village Apartments property from WBCMT C16 indicating a payment of $206,000 in default interest); Ex. 127 (CWC RLR for Kedron Village – Phase II property from WBCMT C34 indicating a payment of $4 million in default interest); Ex. 128 (CWC RLR for Charter Pointe Apartments property from WBCMT C22 indicating a payment of $4 million in default interest); Ex. 129 (CWC RLR for Lake Sweetwater Apartments property from WBCMT C22 indicating a payment of $2 million in default interest); Ex. 130 (CWC RLR for Brookside West property from WBCMT C25 indicating a payment of $726,000 in default interest).

an REO Property held by a WBCMT Trust for an amount sufficient to pay Penalty Interest and/or Gain-on-Sale Proceeds after all other amounts owing had been paid. (*Id.* at 22). On all nine occasions, Penalty Interest was paid prior to, or to the exclusion of, Gain-on-Sale Proceeds. (*Id.*).[23] There were three occasions where Torchlight, a Special Servicer, sold an REO Property held by a WBCMT Trust for an amount sufficient to pay Penalty Interest and/or Gain-on-Sale Proceeds after all other amounts owing had been paid. (*Id.*). On all three occasions, Penalty Interest was paid prior to, or to the exclusion of, any Gain-on-Sale Proceeds. (*Id.*).[24] There was one occasion where Situs, as Special Servicer, sold an REO Property held by a WBCMT Trust for an amount sufficient to pay Penalty Interest and/or Gain-on-Sale Proceeds after all other amounts owing had been paid. (*Id.*). On that occasion, Situs paid Penalty

---

[23]  *See* Casse Decl., Ex. 131 (LNR RLR for "Various" property from WBCMT C29 indicating a payment of $146,000 in default interest); Ex. 132 (LNR RLR for Grandeville on Saxon property from WBCMT C24 indicating a payment of $207,000 in default interest and $240,000 in yield maintenance); Ex. 133 (LNR RLR for 200 South Tryon property from WBCMT C31 indicating a payment of $3.4 million in default interest and $573,000 in gain-on-sale proceeds); Ex. 134 (LNR RLR for Eastern Marketplace Office property from WBCMT C1 indicating a payment of $233,000 in default interest); Ex. 135 (LNR RLR for Maple Village Apartments property from WBCMT C31 indicating a payment of $3.6 million in default interest and $210,000 in yield maintenance); Ex. 136 (LNR RLR for Parkway 400 property from WBCMT C31 indicating a payment of $1.8 million in default interest); Ex. 137 (LNR RLR for Pocalla Springs Apartments property from WBCMT C3 indicating a payment of $1.1 million in default interest); Ex. 138 (LNR RLR for South Shades Crest Station property from WBCMT C9 indicating a payment of $321,000 in default interest); Ex. 139 (LNR RLR for Stonehue Retail Center property from WBCMT C27 indicating a payment of $12,000 in default interest).

[24]  *See* Casse Decl., Ex. 140 (Torchlight RLR for Century Hills Apartment property from WBCMT C33 indicating a payment of $1.3 million in default interest and $1.3 million in yield maintenance); Ex. 141 (Torchlight RLR for Public Retail Store property from WBCMT C33 indicating a payment of $86,000 in default interest); Ex. 142 (Torchlight RLR for Shiloh Square Shopping Center property from WBCMT C8 indicating a payment of $398,000 in default interest).

Interest to the exclusion of any Gain-on-Sale proceeds. (*Id*.).[25] In none of these REO sales arising from the WBCMT Shelf was Gain-on-Sale Proceeds paid to the exclusion of Penalty Interest, as Appaloosa contends it should be.

Besides being Special Servicer for 15 of the 33 WBCMT Trusts, LNR was also a party to the C3 and C5 PSAs, which were executed months apart on either side of the C4 PSA. (CWC 56.1 C139). Significantly, LNR distributed proceeds from the sale of REO Properties in the same manner before *and* after the Gain-on-Sale Proceeds definition was introduced into the WBCMT Trusts in the C4 PSA. (Greenspan Report 22).[26] In other words, the inclusion of the Gain-on-Sale Proceeds definition had no impact on the manner in which LNR ascertained Penalty Interest in REO liquidations. (*See id*.).

The RLRs for these REO liquidations also support the GSEs' view that Yield Maintenance is due and owing to them under the C30 PSA. In five REO dispositions from the WBCMT Shelf that occurred prior to the maturity date of the relevant promissory note and generated sufficient proceeds, three different Special Servicers — CWC, Torchlight, and LNR — paid Yield Maintenance. (GSE 56.1 G87).[27]

---

[25] *See* Casse Decl., Ex. 143 (Situs RLR for The Fairways Apartments 1 property from WBCMT Trust C29 indicating a payment of $2.8 million in default interest).

[26] *Compare* Casse Decl., Ex. 134 (LNR REO liquidation from the C1 Trust), *and* Ex. 137 (LNR REO liquidation from the C3 Trust), *with* Ex. 131 (LNR REO liquidation from the C29 Trust), Ex. 132 (LNR REO liquidation from the C24 Trust), Ex. 133 (LNR REO liquidation from the C31 Trust); Ex. 135 (LNR REO liquidation from the C31 Trust), Ex. 136 (LNR REO liquidation from the C31 Trust), Ex. 138 (LNR REO liquidation from the C9 Trust), *and* Ex. 139 (LNR REO liquidation from the C27 Trust).

[27] *See* Casse Decl., Ex. 119 (CWC REO liquidation from C34 Trust indicating $900,000 in yield maintenance); Ex. 125 (CWC REO liquidation from C26 Trust indicating $263,000 prepayment penalty); Ex. 132 (LNR REO liquidation from C24 Trust indicating $240,000 in yield maintenance); Ex. 135 (LNR REO liquidation from C31 Trust

This data demonstrates a uniform pattern on the part of the parties to the WBCMT PSAs of distributing REO proceeds in a manner consistent with CWC's and the GSEs' proposed distribution of the Stuy Town liquidation proceeds. CWC's distribution of Penalty Interest prior to Gain-on-Sale Proceeds is consistent with how CWC has performed in distributing REO liquidation proceeds under the WBCMT Shelf. Further, CWC's distribution is consistent with how other special servicers in the industry have allocated proceeds from the sale of REO Properties in the WBCMT Shelf.

Appaloosa contends that CWC's course of performance evidence fails on several fronts. *First*, Appaloosa explains that "[i]n order to establish a course of performance, 'there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with knowledge thereof and acquiescence therein, express or implied, by the other.'" (Appaloosa CWC SJ Opp. 15 (quoting *Continental Cas. Co.* v. *Rapid-Am. Corp.*, 80 N.Y.2d 640, 651 (1993))). Put somewhat differently, according to Appaloosa, CWC has not actually introduced evidence of a course of performance because it has "failed to establish as a matter of law that Certificateholders knew about or acquiesced to the transactions on which CWC is relying to constitute the supposed course of performance." (*Id.*). Perhaps more troublingly, Appaloosa

---

indicating $210,000 in yield maintenance); Ex. 140 (Torchlight REO liquidation from C33 Trust indicating $1.3 million in yield maintenance).

accuses CWC and the other special servicers of surreptitiously skimming money from the sale of REO properties for their own benefit. (*Id.* at 16).[28]

As the Court explained above, Appaloosa and other certificateholders in the C30 PSA were not parties to the C30 PSA or involved in its negotiation. And, as is obvious, the point of proffering course of performance evidence is to reveal the intent of the parties to the contract. *See, e.g., Fed. Ins. Co.*, 691 N.Y.S.2d at 512 ("[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'").[29] The relevance of this evidence is that each of the parties to each of the WBCMT PSAs — Servicer, Depositor, and Trustee — repeatedly and consistently acted in accordance with CWC's proffered interpretation of the C30 PSA.

---

[28] Appaloosa's repeated suggestions of coordinated nefarious activity by special servicers, including references to them as a "cabal," are unsubstantiated by the record, and disregarded by the Court.

[29] *See also In re Prudential Lines Inc.*, 158 F.3d 65, 79 (2d Cir. 1998) ("[A]lthough the [non-party] Claimants attempt to introduce their interpretation as one plausible reading of the policy, this cannot be said to be the expectation or intention of the contract parties.... [A]lthough the contract language is less than clear, it has been illumined by conduct on the part of the signatories that reflects an understanding incompatible with the position urged in this case by the Claimants, who are strangers to the contract."); *Royal Park* v. *Deutsche Bank*, No. 14 Civ. 4394 (AJN) (BCM), 2016 WL 4613390, at *12 n.11 (S.D.N.Y. Aug. 31, 2016) ("The historical opinion of a non-party to a contract (even if the non-party becomes a third party beneficiary) can neither alter the contractual terms nor assist the Court in interpreting them."); *MBL Contracting* v. *King World*, 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000) (observing that where two contracting parties have a common understanding of what is meant by an agreement, the understanding of a third-party beneficiary to that agreement does not control its meaning); *AQ Asset Mgmt.* v. *Levine*, 974 N.Y.S.2d 332, 340 (1st Dep't 2013) (granting summary judgment: "At bottom, [plaintiffs] seek to enforce their own interpretation of an agreement to which they were not parties .... To permit the unraveling of the transaction would be to ignore the plain language of the SPA and also the notion that parties are free to contract as they wish and that courts should enforce those contracts as written").

Thus, while the Court takes Appaloosa's point — that to the extent Appaloosa did not know how Special Servicers were interpreting the WBCMT PSAs, they could not have explicitly or implicitly consented to CWC's interpretation of the C30 PSA — the point does not devalue CWC's evidence. To the extent CWC's evidence shows that numerous Special Servicers were all interpreting the same WBCMT PSA language in the same way — to distribute Penalty Interest and Yield Maintenance prior to Gain-on-Sale Proceeds — these data points are highly relevant to the instant cross-motions.

*Second*, Appaloosa claims that there were too few transactions to constitute a course of performance under the law. Appaloosa points to the fact that of the four liquidations in the C30 Trust, one of them was the Stuy Town transaction itself and two post-dated the Stuy Town sale. Appaloosa argues that only prior transactions can be considered in evaluating a course of performance. (*See* Appaloosa CWC SJ Opp. 17 (citing *Nat'l Liability & Fire Ins. Co.* v. *Mediterranean Shipping Co., S.A.,* No. 09 Civ. 6516 (WHP), 2011 WL 723604, at *3 (S.D.N.Y. Feb. 22, 2011))). Accordingly, Appaloosa argues that the one transaction between the time the C30 Trust went into effect in 2007 and the sale of Stuy Town in 2015 is insufficient to constitute a course of performance.

Appaloosa is of course correct that one transaction does not a course of performance make. However, there have been a total of 36 REO liquidations from the WBCMT Shelf that generated proceeds in excess of outstanding principal, non-penalty interest, fees, and costs. The proceeds from every one of

those liquidations (16 serviced by CWC and 20 by other Special Servicers) have been distributed in accordance with CWC's and the GSEs' interpretation of the C30 PSA.

Appaloosa's remaining response to this evidence is that these other transactions cannot qualify as evidence of a course of performance because some of the WBCMT PSAs do not contain any gain-on-sale provisions whatsoever. But that is *exactly* CWC's and the GSEs' point: The introduction of the gain-on-sale references beginning with the C4 PSA had no impact on how the WBCMT Special Servicers — including LNR, which serviced REO properties that were liquidated from the WBCMT C1 and C3 Trusts as well as subsequent WBCMT Trusts — distributed liquidation proceeds. In sum, CWC's course of performance evidence puts the lie to Appaloosa's assertion that the gain-on-sale additions to the C4 PSA "imposed an unflinching obligation on the Special Servicer, following the sale of a REO Property, to calculate Gain-on-Sale Proceeds in accordance with that definition and remit them to the Paying Agent for deposit in the Gain-on-Sale Reserve Account." (Appaloosa CWC SJ Opp. 24).

### b.   CMBS Industry Custom and Practice Supports CWC's and the GSEs' Interpretation of the C30 PSA

Also under New York law, where a contract is ambiguous, industry custom and practice may be considered as an interpretive aid. *See Stolt-Nielsen SA* v. *AnimalFeeds Intern. Corp.*, 548 F.3d 85, 99 (2d Cir. 2008) (noting that New York state law follows a "custom and practice" canon of construction where the terms of a contract are ambiguous); *accord Evans* v. *Famous Music*

*Corp.*, 1 N.Y.3d 452 (2004). That said, courts must approach such evidence with care. "Under New York law, custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." *British Intern. Ins. Co. Ltd.* v. *Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003) (citation omitted). Here, that high bar has been met: CWC and the GSEs have established, through record evidence, that it is a fixed and invariable custom and practice in the CMBS industry to pay penalty interest and yield maintenance prior to gain-on-sale proceeds.

CWC again provides support through expert witness Ronald Greenspan, who surveyed the universe of 116,649 CMBS loans that originated between 1990 and 2009, and that are colloquially referred to as "CMBS 1.0." (Greenspan Report 16-17). Of those 116,639 CMBS loans, Greenspan found 249 instances of REO liquidations in which sufficient funds were recovered to pay penalty interest and/or gain-on-sale proceeds. (*Id.*). He found that in 99.2% of such REO liquidations (247 of 249), penalty interest was paid prior to, or to the exclusion of, any gain-on-sale proceeds. (*Id.*). These 249 loans represented a cross-section of the CMBS industry; they were issued by 35 different issuers and serviced by 7 different special servicers, including LNR, C-III Asset Management, LLC ("C-III"), Torchlight, Berkadia Commercial Mortgage, Midland Loan Services, Situs, and CWC. (*Id.* at 17).

With respect to the GSEs' related claim for Yield Maintenance, the RLRs and promissory notes produced in this litigation indicate that, in at least 45 REO dispositions that occurred prior to the maturity date of the relevant

promissory note and that generated sufficient proceeds, the special servicer paid yield maintenance. (GSE 56.1 G84).[30] This data provides compelling evidence of a custom and practice in the CMBS industry for special servicers to make distributions of penalty interest and yield maintenance prior to the payment of gain-on-sale proceeds.[31]

This empirical data is further supported by the expert opinions of Thomas F. Nealon III, another expert witness proffered by CWC, who was Vice Chairman and Director of Legal Affairs at LNR for over 25 years. (CWC 56.1 C136). While at LNR, Nealon reviewed and negotiated PSAs on behalf of LNR in its capacities as a special servicer and as an investor. (*Id.* at C138). Nealon has also been significantly involved in the Commercial Real Estate Finance Council ("CREFC"), the independent standard-setting governing body for the CMBS industry, serving as Chair of the Servicers Forum and as a member of the CREFC Board of Governors and Policy Committee. (Casse Decl., Ex. 14 ("Nealon Report") 2-3).

Importantly, during his lengthy tenure at LNR, Nealon reviewed and approved the allocation of REO liquidation proceeds on numerous occasions. (Nealon Report 11). Based on his experience in allocating proceeds collected

---

[30]   *See* Casse Decl., Ex. 119, 123, 132, 135, 140, 148, 160, 163, 164, 173, 178, 185, 216, 219, 222, 233, 234, 237, 239, 240, 243, 250, 253, 257, 260, 261, 264, 269, 270, 271, 272, 283, 285, 289, 290, 298, 300, 305, 307, 344, 346, 349, 351, 355, 356.

[31]   Greenspan found only two occasions where gain-on-sale proceeds were paid prior, or to the exclusion of, penalty interest.  (*See* Greenspan Report 17 n.22).  Neither asset was liquidated out of a WBCMT PSA.  Both were specially serviced by C-III.  (*See id.*). In 39 other instances, however, C-III distributed proceeds in the manner CWCAM seeks to do here, and the other special servicers have done so consistently.  (*See id.*).

from an REO property sale and his understanding of how other special servicers allocated such proceeds, Nealon opines that it is the custom and practice in the CMBS industry to require that amounts collected from the sale of an REO property in excess of outstanding principal, contract interest, and costs be paid to the special servicer as penalty interest before any gain-on-sale proceeds or excess liquidation proceeds are realized.  (*Id.* at 11-12).  Indeed, Nealon never, in his 25-year career at LNR, witnessed REO proceeds being allocated in the manner Appaloosa contends.  (*Id.* at 10-13, 15-21).[32]  Instead, CWC's distribution of Penalty Interest on the Stuy Town Loan is, in Nealon's experience, consistent with normal servicing practices and industry custom and practice.  (*Id.* at 18-19).[33]

Appaloosa attempts to contest CWC's and the GSEs' evidence of industry custom and practice through the competing expert opinions of Ann Hambly. Hambly has 35 years of experience in commercial real estate servicing and has been the CEO of many large servicing organizations in the industry.  (*See* Hampson Decl., Ex. N ("Hambly Report") 3).  She has also served on the boards of many commercial real estate trade associations, including the just-

---

[32]    As explained *infra*, Appaloosa is not meaningfully able to dispute Nealon's opinions. *See Jobim* v. *Songs of Universal*, 732 F. Supp. 2d 407, 417 (S.D.N.Y. 2010) (granting summary judgment, construing ambiguous contract based in part on unrebutted expert testimony of industry custom); *Toto* v. *Sony Music Entm't*, 60 F. Supp. 3d 407, 416-17 (S.D.N.Y. 2014) (granting summary judgment based on unrebutted testimony of executive as to the industry custom and usage of disputed contract term).

[33]    Nealon offered an example:  In December 2013, LNR distributed proceeds collected from the sale of an REO property called Astor Crowne Plaza.  (Nealon Report 12).  There, LNR paid all amounts due and owing as set forth in the relevant PSA waterfall and collected roughly $18 million in penalty interest on a loan with an unpaid balance of roughly $73 million before passing along roughly $10 million as gain-on-sale proceeds.  (*Id.*).

mentioned CREFC. (*Id.*). Between the mid-1980s and 2005, Hambly was responsible for the commercial real estate servicing groups of numerous banks and institutions, including Bank of America, GE Capital, Bank of New York, Nomura Capital, and Prudential. (*Id.*). In her roles as the head of various CMBS servicing shops, during the years 1995 to 2005, she negotiated and executed approximately 50 PSAs and over 100 servicing agreements. (*Id.* at 4). In 2005, Hambly created 1st Service Solutions, Inc. ("1SS") to assist borrowers in negotiating and resolving CMBS-related issues. (*Id.*). Since 2005, 1SS has assisted borrowers in connection with over 1,000 non-performing CMBS loans, totaling over $10 billion in principal, including by negotiating loan restructures with special servicers. (*Id.*).

Hambly does not so much seek to contest CWC's expert witness evidence as to downplay it. In particular, Hambly contends that because the information necessary to uncover that special servicers were paying penalty interest and yield maintenance before gain-on-sale proceeds was neither publicly available nor discernable from the information distributed to investors, no industry custom and practice existed. Her contention dovetails with Appaloosa's earlier arguments concerning CWC's course of performance evidence, arguing here that an industry custom and practice cannot exist if the certificateholders are unable to discern its existence. But for similar reasons, this argument fails.

To establish an industry custom and practice, the proponent must demonstrate a "general, uniform and unvarying" practice. *Law Debenture Trust Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). Further,

> [a] custom, in order to become a part of a contract, must be so far established and so far known *to the parties*, that it must be supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual, uniform and not varying, general and not personal, and known *to the parties*.

*Id.* (emphases added). CWC has demonstrated as much. Further, joining the chorus of courts on the issue, the Court finds that the certificateholders were not parties to the C30 PSA. *See, e.g.*, *CWCapital Cobalt Vr* v. *CWCapital Invs.*, Index No. 653277/2018 (N.Y. Sup.), Dkt. No. 182 at 2 n.1, 12, 16. In consequence, whether the certificateholders were aware that special servicers collected penalty interest from REO sales is irrelevant, because any such awareness would reveal nothing about the intent of the parties to the C30 PSA. Appaloosa is thus incorrect in claiming that its own lack of knowledge, or investors' general lack of knowledge, precludes the existence of a custom and practice in the CMBS industry.

When CWC's custom and practice evidence is properly contextualized, Appaloosa has no response. Appaloosa does not dispute that in 247 instances — over 99% of the time — when the sale of an REO property from any CMBS 1.0 trust governed by any PSA resulted in proceeds sufficient to pay penalty interest and/or gain-on-sale proceeds, penalty interest was paid prior to, or to the exclusion of, gain-on-sale proceeds. It does not contest the factual

accuracy of Greenspan's data, and Hambly does not present competing data. Accordingly, despite Appaloosa's contention, there are no "competing expert opinions" to be resolved at trial: Hambly acknowledged the accuracy of Greenspan's empirical analysis at her deposition, and conceded that in reviewing the RLRs she had come to the same conclusion (i.e., that they reflect the payment of penalty interest ahead of gain-on-sale proceeds). (Hambly Dep. 46-48, 70-71, 61, 157, 180-81). In other words, Hambly agrees with Greenspan's findings, but considers them to be irrelevant. (CWC 56.1 C189). This misperception on her part does not create a genuine dispute of fact. *See Tiffany & Co.* v. *Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 250-51 (S.D.N.Y. 2015) (finding that defendant's "proffer [was] insufficient to raise an issue of material fact," where its expert's assertions "consist[ed] only of his own competing beliefs as to what would make for an appropriate survey" and did not rebut the findings of plaintiff's expert).

### c. Nealon's Testimony Supports CWC's and the GSEs' View of the Addition of "Gain-on-Sale" Language to the PSAs

Thomas Nealon also provides helpful firsthand corroboration for CWC's and the GSEs' "catchall" theory of gain-on-sale. He explains that in the early 2000s, a few liquidations occurred that generated excess liquidation proceeds; under the applicable terms of the PSAs in effect at the time, any such amounts were a windfall distributed to the residual holder for that trust — typically, the depositor or an affiliate of the depositor. (Nealon Report 13). As it happened, however, the residual holder was usually limited in role to making tax and regulatory filings necessitated by the structure of CMBS transactions. (*Id.* at

14). Residual holders were not intended to be economic participants in the CMBS pools. (*Id.*). According to Nealon, this discovery — and the related concern that funds derived from a trust asset were going to a party not actively involved with the operation of the trust — precipitated the inclusion of gain-on-sale provisions. (*Id.*).

Nealon explains that the gain-on-sale or excess liquidation proceeds concept was engrafted onto existing PSA templates years after the initial versions of these templates had been drafted. (Nealon Report 14). In most cases, these PSAs had gone through multiple versions and revisions by the time that these concepts were added. (*Id.*). Since the likelihood of obtaining a gain-on-sale seemed minimal at best, little time was devoted to the drafting and incorporation of these new concepts into existing PSA forms. (*Id.*). Indeed, the concepts were added without due attention to the provisions and definitions already in use in existing PSAs. (*Id.*). In short, the challenge of drafting appropriate terminology associated with this new (and concededly rare) concept resulted in a lack of precision in its incorporation. (*Id.*).

Of note, Nealon confirms that the concept of a gain on an REO disposition was not designed to disrupt the payment system and priority already established under existing PSAs and accepted servicing practice. (Nealon Report 15). And as discussed above, this concept was added to the standard PSAs many years after the CMBS industry was launched. (*Id.*). Its sole purpose was to serve as a net to capture any amounts that might be produced in the case of a disposition of a specially serviced mortgage loan or

REO property that was in excess of all sums that were due and owing under the PSAs to the trust and due and owing to trust representatives, in those rare cases when such a situation might occur. (*Id.*).

### d. The Testimony of the Deal Parties Supports CWC's and the GSEs' Interpretation of the C30 PSA

During discovery, the parties obtained testimony from representatives of CWC, Wells Fargo, and Appaloosa, including current and former employees of parties to the C30 PSA. This testimony is of a piece with the evidence just outlined, and it further corroborates the interpretations of the C30 PSA proffered by CWC and the GSEs.[34]

### i. The CWC Witnesses

Kathleen Olin, a former employee of CWC, is the Managing Director of Industry Initiatives for CREFC. (GSE 56.1 G39, G62). CREFC's membership touts over 300 companies, including over 10,000 individuals affiliated with those member companies. (*Id.* at G39). Members include representatives from CMBS master servicers, special servicers, and investors, among others. (*Id.*). From approximately 2006 through 2012, Olin served as Chair of CREFC's Investor Reporting Package ("IRP") Committee, which she described as a representative group of investors, servicers, trustees, certificate administrators, underwriters, and rating agencies that serves to promote best practices in

---

[34] Appaloosa accuses CWC of grossly mischaracterizing the deposition testimony on which it relies. (*See* Appaloosa CWC SJ Opp. 18-20). The Court does not blindly accept CWC's (or any party's) summaries of the relevant testimony. The Court has reviewed the depositions of each fact witness in this case and relies on its own reading of the testimony in this Opinion.

CMBS reporting.  (*Id.* at G63, G68-G70).  Olin has also served as a Governor on CREFC's Board of Directors, Chair of CREFC's Servicers' Forum, and Secretary on CREFC's Executive Committee.  (*Id.* at G63).

Olin, who testified as a former employee of CWC, worked in special servicing from 1996 until 2018, at which time she left CWC to work for CREFC as the Managing Director for Industry Initiatives.  (CWC 56.1 C160).  At CWC, Olin was responsible for, among other things, investor reporting and industry relations.  (*Id.* at C161).  Olin's role at CWC included reviewing PSAs when CWC was appointed special servicer.  (CWC 56.1 C162; Casse Decl., Ex. 4 ("Olin Dep.") 35:24-36:10).  At times, Olin signed PSAs on behalf of CWC, including the WBCMT C28 PSA.  (CWC 56.1 C163).

Olin was not involved in drafting the C30 PSA.  (Olin Dep. 41:3-10). However, Olin reviewed those portions of the C30 PSA that addressed special servicing fees when CWC was appointed Special Servicer for the C30 Trust.  (*Id.* at 42:21-44:2).  At her deposition, Olin testified about emails she exchanged in July 2008 with colleagues at CWC regarding the WBCMT C34 PSA.  (*See id.* at 50:17-53:24).  On July 9, 2008, Olin received an email in which she was asked, "[i]n this PSA, do either of you know what would happen[] to the sale of REO that creates an excess over the loan exposure?  Who would be the beneficiary?" (Casse Decl., Ex. 457).  Olin responded, "Are you also saying there would be an excess over and above the [yield maintenance] that would have been due on the loan?  And all former late fees and default interest?  That's usually the first

stop." (*Id.*).  When Olin was asked what she meant by her response, she explained:

> I meant that generally speaking when you have an asset that is sold for an excess, which in this case would be REO, that you would pay everything that is due on the loan including yield maintenance and late fees and default interest first, before we can even talk about whether there is an excess.

(Olin Dep. 53:2-8).  When asked whether she had ever seen a PSA that provided to the contrary, she responded, "I can't think of a single PSA I have read where it is written differently."  (*Id.* at 53:19-24).

David Iannarone, CWC's corporate designee, negotiated and signed the C30 PSA on CWC's behalf.  (CWC 56.1 C133; Casse Decl., Ex. 2 ("Iannarone Dep.") 24:9-25:16).  Iannarone has worked in special servicing since the inception of CMBS in the early 1990s, and currently serves as CWC's CEO.  (CWC 56.1 C134).  CWC was a party to 7 of the 33 WBCMT PSAs, including the C30 PSA, and Iannarone signed 6 of them on behalf of CWC.  (*Id.* at C135).

Iannarone explained that each PSA was not "negotiated" in the true sense of the word, but rather evolved from the prior PSA in that shelf.  (Iannarone Dep. 25:1-26:18).  If any substantive changes were made to the C29 PSA template when the parties were drafting the C30 PSA, those changes would have been highlighted and brought to the parties' attention.  (*Id.* at 27:14-23).  For example, Iannarone recalled that the $15 million cap on the liquidation fee for Stuy Town was a material change that was brought to his attention.  (*Id.* at 27:24-29:4).  He recalled no other substantive changes being made to the C30 PSA.  (*Id.* at 33:5-12).

65

Iannarone also testified that CWC does not have a policy addressing the circumstances in which penalty interest gets paid from the sale proceeds of REO properties, because the distribution of proceeds is done according to the particular loan documents and PSA. (Iannarone Dep. 143:3-10). His understanding of "gain-on-sale" is that the provision is a "catchall" designed to capture excess proceeds after everything that was due and owing on a loan had been paid. (*Id.* at 38:15-40:13). Conversely, Iannarone stated that gain-on-sale provisions were not designed to change the waterfall provisions of PSAs. (*Id.* at 41:20-42:13).

According to Iannarone, it was common knowledge when the C30 PSA was negotiated that the Special Servicer was entitled to Penalty Interest. (Iannarone Dep. 58:2-8). He sourced this knowledge to: (i) the fact that special servicers in the industry were in fact collecting penalty interest; (ii) his conversations with special servicers; (iii) contemporaneous publications indicating that special servicers collected penalty interest; and (iv) the fact that special servicers sometimes shared penalty interest with the controlling class of certificateholders. (*Id.* at 58:9-18).

Michiko Shimizu was the third CWC witness with firsthand knowledge of relevant events. Shimizu was and remains the individual at CWC responsible for calculating realized losses/gains sustained by trusts serviced by CWC, completing RLRs, and applying proceeds recovered from, *inter alia*, REO sales. (CWC 56.1 C63; GSE 56.1 G46). She has worked in special servicing for her entire career, since 2000, and the allocation of sale proceeds and concomitant

preparation of RLRs have been part of her role since 2006 or 2007.  (CWC 65.1 C64).  At her deposition in December 2018, Shimizu testified that she was finalizing RLRs for 50 assets in that month alone.  (*Id.* at C65).

Shimizu prepared the RLR for the Stuy Town sale.  (Casse Decl., Ex. 3 ("Shimizu Dep.") 21:14-22:8).  She explained that CWC applied the proceeds of the Stuy Town sale using the waterfall provision in § 3.02(b), and that it was only after the proceeds from the sale had run through that waterfall that remaining proceeds would be designated Gain-on-Sale Proceeds:

> The 3.02(b) clearly includes [yield] maintenance as payable on the liquidation proceeds.  And also the same goes to [penalty] interest, too.
>
> And in an REO collection, there is a definition under REO loan what the waterfall will be.
>
> If you narrow it down to collection of REO — collections made on REO, then you go through the waterfall.
>
> It is very clear that yield maintenance is something that would be payable.  The same for [penalty] interest.  [Penalty] interest is included in the waterfall.

(Shimizu Dep. 162:24-163:16; *see also id.* at 46:6-47:25, 36:20-38:5, 51:8-52:1, 99:8-100:6).

### ii.    The Wells Fargo Witnesses

Similar sentiments were expressed by the Wells Fargo witnesses.  Leslie Hayton testified as the corporate designee for Wells Fargo in its capacities as Master Servicer and Paying Agent of the C30 Trust.  (CWC 56.1 C96).  Hayton is currently a Managing Director at Wells Fargo and has worked there (or its predecessor Wachovia) for 15 years.  (*Id.*).  She is responsible for, among other

things, investor reporting and account reconciliations. (*Id.*). Like Olin, Hayton also served as CREFC's IRP Committee Chair. (GSE 56.1 G40). Hayton testified that, with respect to the calculation of Penalty Interest, Wells Fargo, as Master Servicer, took direction from CWC, as Special Servicer; as such, Wells Fargo did not independently verify CWC's claimed entitlement to Penalty Interest. (*See* Casse Decl., Ex. 5 ("Hayton Dep.") 24:23-25:17, 38:2-8, 48:13-49:9, 61:19-24).[35] However, Hayton testified that Wells Fargo did calculate the Yield Maintenance due to the GSEs in accordance with the C30 PSA and the loan documents. (Hayton Dep. 118:6-129:2, 132:25-133:6).

Looking back at her (and Wells Fargo's) experiences in the CMBS industry, Hayton responded to questioning by CWC's counsel as follows:

> BY MR. CROSS:
>
> Q. Appaloosa's taken the position that whenever liquidation proceeds are sufficient to recoup all amounts listed within the definition of purchase price, that all other amounts available for distribution are required to be deposited into the gain-on-sale account so that there can never be a recovery of default interest or yield maintenance. Has Wells ever seen this application applied to a liquidation — to liquidation proceeds received on account of any loans in the C30 trust?
>
> ...
>
> A. No, I'm thinking. No, we have never seen that.
>
> Q. Have you seen it with any other trust?

---

[35]   This testimony was corroborated by that of Ross Romano, who is responsible for investor reporting, including for the C30 Trust, at Wells Fargo. (*See* Casse Decl., Ex. 7 ("Romano Dep.") 15:7-16:17, 119:19-120:5, 130:5-132:14).

A. Not that I'm aware of.

Q. Do you believe that Wells Fargo complied with all of its obligations under the C30 PSA in connection with the distribution of liquidation proceeds from the Stuyvesant Town sale?

A. Yes.

Q. How long have you been at Wells Fargo?

A. 15 years.

Q. Is there anything unusual in your experience about a special servicer collecting default interest in the proceeds in an REO disposition?

...

A. In general, if there are proceeds available to pay default interest on a specially serviced loan, we will see the special servicer collect those.

(Hayton Dep. 109:21-111:7).

Ross Romano, who is responsible for investor reporting at Wells Fargo, also testified to having "seen many cases where the special [servicer] has collected [penalty] interest" from the proceeds of an REO disposition. (Romano Dep. 196:23-197:7).

### iii.    Appaloosa's Witness

Appaloosa was not a party to any WBCMT PSA negotiation. However, when its designee requested information from parties who were, he received materials that supported CWC's and the GSEs' claims.

James Bolin, the portfolio manager for credit products and CMBS at Appaloosa, testified as its corporate representative. (Casse Decl., Ex. 1 ("Bolin Dep.") 14:20-17:4). Around the time of the Stuy Town sale, in October or

November 2015, Bolin had a conversation with George Carleton, a senior executive at C-III, regarding how the § 3.02(b) waterfall provision allocated Gain-on-Sale Proceeds to certificateholders. (Bolin Dep. 42:21-45:5). As an outgrowth of that conversation, Carleton sent Bolin an email in which he (Carleton) stated:

> Jim, attached are a couple Realized Loss spreadsheet example[s] *where there were excess proceeds which went to the trust through the waterfall.* I can go over these with you are your convenience.

(Bolin Dep. 42:3-43:23 (emphasis added); Casse Decl., Ex. 453).

Carleton also forwarded an email he had received from Michael J. Lylle at C-III Capital Partners that stated:

> George — Please see attached for 2 examples of REO sales that resulted in "Gain on REO Sale Proceeds" within Trusts Wells Fargo was the Trustee.

(Casse Decl., Ex. 453). Two RLRs were attached to the email, both of which showed gain-on-sale proceeds being distributed after penalty interest. The first RLR concerned the Courtyard Norwich REO sale, and reflected over $200,000 in penalty interest being paid to C-III. (*Id.*; *see also* Bolin Dep. 46:19-49:13). The second RLR concerned the Flextronics REO sale, and reflected $565,000 in penalty interest being paid to C-III. (*Id.*; *see also* Bolin Dep. 49:24-50:22).

Bolin made other key concessions at his deposition. He explained that Appaloosa did not participate in the drafting of the C30 PSA, and that it had no knowledge of the meaning and intent of the C30 PSA beyond the words on the page. (Bolin Dep. 68:9-69:13, 162:25-163:21). Bolin also conceded that Appaloosa was relying solely on the words of the C30 PSA and the C30 Pro

Supp, and not any "collateral facts or information," to support its belief that a special servicer could not recover penalty interest from the sale of REO property. (*Id.* at 162:25-163:21). Bolin acknowledged that he could not point to a single industry publication that agreed with Appaloosa's position on the C30 PSA, nor could he point to any examples of REO loan dispositions in which the proceeds had been distributed in accordance with the methodology now advanced by Appaloosa. (*Id.* at 205:16-23, 215:12-216:14). And when asked whether "Appaloosa [was] in possession of any industry documents showing a calculation of a determination that's consistent with the position that it's advancing in this case," Bolin responded that he was "not aware of any such document." (*Id.* at 53:16-54:2).

### e. Industry Publications Support CWC's and the GSEs' Interpretation of the C30 PSA

Finally, in the weeks preceding the sale of the Stuy Town, analysts in the CMBS industry consistently reported that Penalty Interest and Yield Maintenance would be paid out when the sale proceeds flowed through the waterfall. (CWC 56.1 C190). *See Axiom Inv. Advisors* v. *Deutsche Bank*, No. 15 Civ. 9945 (LGS), 2018 WL 4253152, at *7 (S.D.N.Y. Sept. 6, 2018) (citing industry publications as extrinsic evidence of custom and practice).

For example, Barclays reported in an October 20, 2015 article that:

> The payoff should be enough to repay all advances, ASER, and principal on the outstanding $3bn loan in WBCMT 2007-C30 ($1.5bn), MLCFC 2007-5 ($800mn), CWCI 2007-C2 ($250mn), WBCMT 2007-C31 ($248mn) and MLCFC 2007-6 ($202mn). After this, the loan is likely to pay a yield maintenance penalty due on the loan, which is applied since the loan can no longer be

defeased and was first mentioned in foreclosure proceedings on the loan. After this, the proceeds should repay delinquent interest to CWCapital as an incentive, which has been accruing at 3% since the loan first became delinquent. Next, the proceeds should repay all special servicing fees paid on the loan and potential reimbursing some other small fees. Finally, the proceeds are then applied to the REO gain-on-sale provisions in CMBS, which dictate that the proceeds are used to recoup losses previously taken on the trusts.

(Casse Decl., Ex. 436; CWC 56.1 C192).

That same day, an affiliate of the Master Servicer for the C30 Trust, Wells Fargo Securities, offered an identical understanding of the contemplated disposition of the sale proceeds:

CWCapital is preparing to sell Stuyvesant Town and Peter Cooper Village to Blackstone and Ivanhoe Cambridge for $5.3 billion according to media reports. The sale would include an agreement with the city to preserve 5,000 units under rent control for twenty years, while rent deregulation will be slowed on another 1,400 units, according to reports. Official announcements are expected this morning. As part of the deal, New York City is expected to provide Blackstone with $144 million in financing and waive the $75 million in recording tax.

CMBS investors in the deals will be watching for terms of a settlement with Centerbridge Partners LP, which would reduce available distributions to the trusts. As of this morning the next hearing in that case is scheduled for November 16. Default interest under the loan documents will likely also reduce proceeds available to the trusts. Under the CMBS pooling and servicing agreement, the special servicer is generally entitled to "penalty interest". In WBCMT 2007-C30, for example, the discussion on Servicing Compensation under §3.11(d) specifies that, for specially serviced loans, penalty interest — the interest in excess of the mortgage rate that accrues due to default — is payable to the special servicer. After these considerations, and a potential yield maintenance penalty, the gain-on-sale

mechanism may come into play as we outlined in the Sept. 22 *CMBS Brief*. The gain-on-sale reserve is a deal feature that traps excess liquidation proceeds for reimbursement of prior realized losses.

(Casse Decl., Ex. 437).[36]

---

[36] Appaloosa claims that industry reports regarding the Stuy Town sale did not uniformly forecast that penalty interest and yield maintenance would be paid before gain-on-sale proceeds, citing a September 22, 2015 Wells Fargo Securities report, written by the same analysts as the October 20, 2015 report quoted in the text.  (*See* CWC 56.1 C190). The earlier report reads in relevant part:

    Stuytown: The Excess Proceeds Question

    What happens when an REO property generates sales proceeds above the loan balance?  With a potential settlement and sale on the horizon for the Peter Cooper Village & Stuyvesant Town loan, an uncommon deal feature comes into play.  In broad strokes, here are our thoughts on how sale proceeds would flow through the deals: First, as is typical, liquidation proceeds, after expenses and the special servicer's fee, will go to reimburse outstanding servicer advances, interest on advances, and then ASERs.  These items amount to more than $850mm (Exhibit 1). Second, liquidation proceeds would go to pay principal up to the original loan balance—directly benefiting the A1A classes, but also translating to a substantial build in credit enhancement for other classes in the deals.

    Sales proceeds remaining after this are labeled "gain-on-sale proceeds" under the relevant pooling and servicing agreements and are to be deposited into a gain-on-sale reserve account. (The Cobalt deal uses the terms "excess liquidation proceeds" and "excess liquidation proceeds account.")  Funds in this reserve account are used to reimburse prior realized losses and remaining interest shortfalls (See, WBCMT 2007-C30 PSA §4.01(l)).  To be clear, distributions from the gain-on-sale reserve account do not go to amortize class principal balances and instead only reimburse prior losses and interest shortfalls. Any proceeds remaining after prior realized losses and outstanding interest shortfalls have been paid back would be held in reserve to offset future losses and shortfalls.

    As a practical matter, the property would need to sell for well more than $3.9 billion before the gain-on-sale reserve comes into play, given the outstanding advances, advance interest, ASERs, 1% special servicing fee, and future expenses.  Additionally, the terms of any settlement with Centerbridge may come into play.  Then again, in 2014 Bloomberg reported that Fortress Investment Group LLC was soliciting financing for a $4.7 billion offer for the property, a price at which the treatment of excess sales proceeds is not an esoteric question.

(Casse Decl., Ex. 446).  A review of the substance of the two articles makes clear, however, that the later article clarified the opinions of the earlier one.  In particular, in the October 20, 2015 article, the authors explained that the Gain-on-Sale provisions

An October 21, 2015 Morgan Stanley Research report entitled

"Stuyvesant Town Deal Ushers New Era of Core-Plus Real Estate," applied

those concepts to the contemplated Stuy Town sale proceeds:

> We think the $3b of CMBS backing the property will receive full payoffs. We also expect significant reimbursement of outstanding interest shortfalls on bonds, payment of yield maintenance, and payment of default interest to the special servicer that has been accruing since 2010 and gain on sale payments to junior bonds that had previously realized losses.

(Lieberman Decl., Ex. 38, 39).

Finally, analysts at Credit Suisse reported that:

> before the remaining proceeds [of the Stuy Town sale] are used to reimburse tranches for previously realized losses, there can be both prepayment penalties and, very importantly in this case, default interest .... While it is fairly uncommon to see payments of prepayment penalties and default interest, as most liquidated loans do not generate enough sales proceeds to cover these, they are far from unheard of. In fact, we have even seen an example just this month, where a $16.0 million loan generated over $4.0 million in default interest.

(Casse Decl., Ex. 442).

It is also notable that a December 19, 2013 Morgan Stanley Research

Report, which was issued well before the Stuy Town sale, advised its readers

that:

> Investors are discovering the nuances of CMBS cash flow waterfalls written into pooling and servicing agreements ("PSAs"). We review the application of loan

---

discussed in the September 22, 2015 article might come into play, if at all, only after Penalty Interest was paid to the special servicer. (Casse Decl., Ex. 437). As noted, Appaloosa's corporate representative Bolin could not "point [] to a single industry publication that has agreed with Appaloosa's position." And among Appaloosa's expert witnesses, neither Ann Hambly (*see* Hambly Dep. 196:12-17) nor Andrew Berman (*see* Berman Dep. 198:4-13) could identify any such publication.

liquidation proceeds with a specific focus on five provisions that may not be well understood, including providing specific loan examples for each ....

## Yield Maintenance

### Definition and Mechanics

This is an uncommon payment that typically occurs when an REO asset is liquidated for more than the original loan balance. *If there are excess proceeds after payment of the loan balance in full, then yield maintenance is still owed on the loan after it becomes REO.* Such payments typically flow through to senior bond holders. We note that the special servicer may have the right to waive yield maintenance, but in our experience they typically do not given their fiduciary responsibility to maximize value to the trust ....

## Default Interest & Late Charges

### Definition and Mechanics

*If excess proceeds remain after the payment of yield maintenance, then there is a pro-rata payment of default interest and late charges to the special servicer.*

Late charges are just what they sound like — charges that accrue for the loan being delinquent.

Defaulted interest is far more interesting, in our opinion. This is a fee owed from when a loan first becomes delinquent and when the loan becomes REO. One could think of this as incentive for the special servicer to maximize the value of an REO property. Defaulted interest is only disclosed in each individual loan document (which are private documents and therefore not available to most investors), but it is our understanding that the fee is typically 3-5% of the loan balance per annum. This fee is in addition to the 25 bps special servicing fee and the 1% REO liquidation fee ....

## Gain on Sale

### Definition and Mechanics

> *Finally, at the very bottom of the waterfall is a concept known as gain on sale. If there are any excess liquidation proceeds after the payment of all of the line items outlined above, it is used to reimburse prior write-downs.* Again, the bond would receive a cash payment equal to the amount of the write-down reimbursement.
>
> Note that there are nuances across PSAs where gain on sale proceeds are applied similar to ASER reimbursements, whereby the payment is made to bonds in order of seniority to 1) current interest, 2) cumulative interest shortfalls and 3) only then to write-down reimbursement amounts.

(Lieberman Decl., Ex. 37 (emphases added)).

### 5. Appaloosa's Extrinsic Evidence Is Insufficient to Generate a Genuine Dispute of Material Fact Concerning the Proper Interpretation of the C30 PSA

The extrinsic evidence just outlined by the Court is powerful, if not conclusive. Appaloosa contends, however, that it also has extrinsic evidence supporting its interpretation of the C30 PSA, that Gain-on-Sale Proceeds take precedence over the waterfall provisions of § 3.02(b). As detailed in this section, a review of Appaloosa's extrinsic evidence reveals that it is either irrelevant to the issues before the Court or insufficient to create a genuine dispute of material fact.

#### a. Appaloosa Errs in Claiming That Penalty Interest Is Not a Liquidation Expense

Appaloosa's first category of extrinsic evidence regards the definition of Gain-on-Sale Proceeds in the C30 PSA. Picking up on an ambiguity in that definition that the Court noted at the Rule 12(c) stage, Appaloosa contends that the term "Liquidation Expenses" in the definition of Gain-on-Sale Proceeds does not include Penalty Interest or Yield Maintenance. (Appaloosa CWC SJ

Opp. 7-9).  To review, the term "Liquidation Expenses," while capitalized in the C30 PSA, is not a defined term.  Neither side has provided any explanation, other than oversight, for why such term was left undefined.  But in support of its view that "Liquidation Expenses" excludes Penalty Interest and Yield Maintenance, Appaloosa proffers expert opinions from Ann Hambly.

Hambly reasons, based both on her own industry experience and upon her review of 94 PSAs drafted by the same law firm that drafted the C30 PSA (Cadwalader Wickersham & Taft), that the term "Liquidation Expenses" means the "customary, reasonable, out-of-pocket costs associated with the liquidation of the property," such as brokerage commissions, legal fees, and conveyance taxes.  (Hambly Report 15).  According to Hambly, the out-of-pocket costs incurred in liquidating a property do *not* include accrued and unpaid penalty interest; as such, the definition of Liquidation Expenses in the C30 PSA does not include Penalty Interest.  (*Id.*).  Citing Hambly's experience in the CMBS industry, Appaloosa argues that it is reasonable to conclude that the parties to the C30 PSA intended Liquidation Expenses to have the meaning Hambly ascribes to it.  (Appaloosa CWC SJ Opp. 8).

Not so.  Quite to the contrary, Hambly's opinion on the definition of "Liquidation Expenses" does not even generate a genuine dispute of material fact, because the Court's decision here has focused on the interplay and relative priorities of provisions in the C30 PSA, and not merely on the definition of Gain-on-Sale-Proceeds.  *First*, taken as true, Hambly's opinion does not help the Court decide, in the first instance, whether CWC is obligated to apply the

waterfall provision of § 3.02(b) or the Gain-on-Sale provision of § 3.04(e) to the proceeds of the Stuy Town sale. That is, Hambly's opinion would only be helpful if Appaloosa had established the antecedent proposition that the gain-on-sale provision of the C30 PSA takes precedence over the § 3.02(b) waterfall provision. But while Hambly provides opinions on the meaning of "Liquidation Expenses" and the existence (or not) of a custom and practice in the industry, she offers no opinion on the Gain-on-Sale, Penalty Interest, and Yield Maintenance provisions in the C30 PSA. More fundamentally, Appaloosa has provided the Court with no other evidence sufficient to generate a triable issue on the question before the Court regarding the relative priorities of Gain-on-Sale Proceeds, Penalty Interest, and Yield Maintenance.

*Second*, to the extent Hambly contends that Penalty Interest and Yield Maintenance must be specifically included within the definition of Liquidation Expenses in order for those amounts to be paid on the sale of an REO property, her contention is disproved by abundant empirical evidence. Hambly supports her opinion with a review of 94 sample PSAs from the same time frame and the same law firm as the C30 PSA. (Hambly Report 20, Ex. D). She observes that the definition of "Liquidation Expenses" consistently included "customary, reasonable, out-of-pocket costs associated with the liquidation of the property." (*Id.* at 20). From this, she reasons that there must have been a "scriveners' error in the drafting of the [C30] PSA by not including [such] definition of Liquidation Expenses." (*Id.*).

But Ronald Greenspan reviewed the same 94 PSAs, and the operation of those PSAs stands in stark contrast to Hambly's musings. (*See* Casse Decl., Ex. 20 ("Greenspan Rebuttal") 6). Greenspan identified 88 REO liquidations arising out of loans in those 94 trusts. (*Id.*). Of those 88 REO liquidations, none paid gain-on-sale or excess liquidation proceeds to the exclusion of penalty interest; 40 paid penalty interest only (no gain-on-sale or excess liquidation proceeds were paid); 16 paid penalty interest and gain-on-sale; and for the remaining 32, either an RLR was not available from the special servicer or neither penalty interest nor gain-on-sale was distributed. (*Id.*).[37]

*Third*, Hambly's opinion on Liquidation Expenses is also refuted by Greenspan's industry-wide empirical analysis. The 249 instances where REO liquidations proceeds were greater than outstanding principal, non-penalty interest, costs, and fees came from 158 different trusts. (Greenspan Rebuttal 5). Greenspan reviewed the PSAs for those 158 trusts and found that 104 of the 158 PSAs included a definition of "Liquidation Expenses." (*Id.*). Significantly, in every one of those 104 PSAs, the Liquidation Expenses definition was silent as to whether penalty interest was included as a liquidation expense. (*Id.*). Yet in every single one of these 104 trusts, penalty

---

[37]    Hambly also ignored the fact that many participants in the CMBS industry, including Wells Fargo and U.S. Bank, include penalty interest as a liquidation expense on their RLRs. (*See* CWC 56.1 C129, C122 (Wells Fargo reporting penalty interest as part of "Fees, Advances, and Expenses" column of its distribution date statements, including for the PCV Loan), C123 (U.S. Bank reporting penalty interest in the "Liquidation Expenses" column of its distribution date statements, including for the PCV Loan)). Indeed, Hambly herself admitted that penalty interest "is most often lumped into liquidation expenses" in distribution date statements. (Hambly Dep. 62; CWC 56.1 C124).

interest was distributed to the special servicer when REO proceeds were generated in excess of principal, interest, fees, and costs. (*Id.*). So while both Hambly and Greenspan have proffered expert opinions that speak to the construction of "Liquidation Expenses," it is Greenspan's that have the record support.

### b.    Appaloosa Misreads the Co-Lender Agreement

Appaloosa's second source of extrinsic evidence is the Co-Lender Agreement, which was entered into by each of the five PCV Trusts to facilitate the administration of the Stuy Town loan. As noted, the Co-Lender Agreement recognizes that the Master Servicer and Special Servicer for the C30 Trust are responsible for servicing the PCV Loan.

Section 2(d) of the Co-Lender Agreement states, in relevant part:

> In addition, in the event that the related Loan becomes a Specially Serviced Mortgage Loan, the related Co-Lender shall pay to the Special Servicer under the Pooling Agreement a fee to be paid in accordance with this Agreement and the Pooling Agreement (the "Special Servicing Fee") equal to the product of 0.25% per annum and the related Note principal balance on which interest accrues. If the Loan becomes a Specially Serviced Mortgage Loan and the Special Servicer obtains a full or partial payment of any liquidation proceeds, the Special Servicer shall be entitled to a fee (the "Liquidation Fee") set forth in the Pooling Agreement, such Liquidation Fee not to exceed the lesser of (i) the product of 0.50% per annum and the related liquidation proceeds or payments, and (ii) $15,000,000. If the Loan becomes a "Corrected Mortgage Loan" (as defined in the Pooling Agreement), the Special Servicer shall be entitled to a fee (the "Workout Fee") set forth in the Pooling Agreement, such Workout Fee not to exceed the lesser of (i) 0.50% of all payments of interest and principal received on such Mortgage Loan for so long as it remains a Corrected

> Mortgage Loan and (ii) $15,000,000. The Servicing Fee
> and the Special Servicing Fee shall accrue on the same
> basis as the related interest payment on such Note is
> computed. All of the Loans shall be considered a
> Specially Serviced Mortgage Loan if Loan A-1 is
> determined to be a Specially Serviced Mortgage Loan
> under the Pooling Agreement. Lead Lender agrees to
> cause all of the Loans to be specially serviced and the
> Special Servicer agrees to specially service all of the
> Loans for the benefit of each Co-Lender in accordance
> with the terms and provisions set forth in the Pooling
> Agreement whenever Loan A-1 is a Specially Serviced
> Mortgage Loan. Whenever Loan A-1 becomes a
> Specially Serviced Mortgage Loan, any "Workout Fee" or
> "Liquidation Fee" (each as defined in the Pooling
> Agreement) payable to the Special Servicer under the
> Pooling Agreement shall be allocated pro rata between
> the proceeds of Loan A-1, Loan A-2, Loan A-3, Loan A-
> 4, Loan A-5 and Loan A-6 payable to the holders of Note
> A-1, Note A-2, Note A-3, Note A-4, Note A-5, and Note
> A-6, respectively.

(Hampson Decl., Ex. E ("Co-Lender Agreement") § 2(d)).

Appaloosa contends that this section of the Co-Lender Agreement limits

CWC's compensation to Stuy Town to: (i) a Special Servicing Fee based on a

percentage of the loan amount; (ii) if Stuy Town is liquidated, a Liquidation Fee

capped at $15 million; and (iii) if CWC turns the Stuy Town loan into a

performing loan again, a Workout Fee capped at $15 million. (Appaloosa CWC

SJ Opp. 9). More to the present point, Appaloosa argues that the

> Co-Lender Agreement's specific incorporation of some
> parts of the C30 PSA's Special Servicer compensation
> scheme, but its omission of other parts of that
> compensation scheme (such as penalty interest), as well
> as the cap it placed on the Liquidation Fee and Workout
> Fee, indicates a clear intent to limit CWC's
> compensation in connection with its administration of
> Stuy Town.

(*Id.*).  Appaloosa argues additionally from § 3.01(a) of the C30 PSA that in the event of a conflict between the PSA and the Co-Lender Agreement, the Co-Lender Agreement controls.  Since the Co-Lender Agreement discusses three types of Special Servicer compensation (none of which is Penalty Interest), and since the Co-Lender Agreement controls over the C30 PSA, Appaloosa concludes that CWC cannot rely on § 3.11(d) of the C30 PSA to retain any Penalty Interest in connection with Stuy Town.

The Court discerns no conflict between the C30 PSA and the Co-Lender Agreement.  Section 2(d) of the Co-Lender Agreement explicates that the three different types of special servicer fees — the Special Servicing Fee, Liquidation Fee, and Workout Fee payable under § 3.11(c) of the C30 PSA — are to be split *pro rata* amongst the lenders.  With respect to those forms of special servicer compensation, the Co-Lender Agreement contains the same percentages and caps as the C30 PSA.  The Co-Lender Agreement does not discuss, let alone prohibit, additional servicing compensation payable under § 3.11(d) of the C30 PSA, such as Penalty Interest, late fees, assumption fees, and/or modification fees.  As it happens, the Co-Lender Agreement also does not address Gain-on-Sale Proceeds, but that does not mean that it conflicts with the C30 PSA or forecloses the payment of Gain-on-Sale Proceeds, as Appaloosa's argument would suggest.

As but one more nail in the coffin of the Co-Lender Agreement evidence, Appaloosa's contention that it limits Special Servicer compensation to the Special Servicer Fee, Liquidation Fee, and Workout Fee is entirely inconsistent

with Appaloosa's concession that under some circumstances, CWC would be entitled to Penalty Interest under the C30 PSA.  Appaloosa's attempt to leverage the Co-Lender Agreement proves too much, and does not generate a triable dispute of fact.

**c.**    **The Expert Opinions of Dr. Hartzmark Do Not Generate a Genuine Dispute of Material Fact Regarding the Interpretation of the C30 PSA**

Appaloosa's third source of extrinsic evidence is the expert testimony of Dr. Michael L. Hartzmark, the President of Hartzmark Economics Litigation Practice LLC, a consulting firm that specializes in the application of economics and finance to legal, commercial and regulatory issues.  (Hampson Decl., Ex. H ("Hartzmark Report") 6).  Hartzmark holds a Ph.D. in economics from the University of Chicago and has taught economics and financial economics at both Chicago and the University of Michigan.  (*Id.* at 7).  He also has practical experience in the securities industry from serving as a Financial Advisor at Fahnestock & Co., Inc., and has held Series 7 and 63 registered representative licenses.  (*Id.*).

Hartzmark was tasked by Appaloosa with determining "whether fundamental economic principles and data analyses can be applied in this matter to assist the Court in its interpretation of the Governing Agreements concerning the distribution of proceeds from the liquidation of the Stuy Town Property."  (Hartzmark Report 1).  He answers in the affirmative, concluding that "the application of economic principles to the investor-special servicer relationship demonstrates that it would be highly unlikely that the intent of the

parties to a CMBS transaction would be to offer extraordinary payouts to special servicers at the expense of investors, especially when those investors have realized losses." (*Id.* at 52).

While Hartzmark's expertise in the field of economics cannot be gainsaid, the opinions he proffers do not aid the Court in resolving the present dispute. Hartzmark uses economic principles to superimpose a normative theory onto the C30 PSA in an attempt to explain many of its provisions. His exercise is that of an economist attempting to design the most economically efficient PSA possible. But Hartzmark's *post hoc* analyses as to what would make a hypothetical contract economically efficient would not be helpful to the trier of fact, both because his factual premises are faulty and because his overarching analytical framework is legally irrelevant.

Proceeding in reverse order, the Court concludes that Hartzmark's opinions are legally irrelevant because he offers only abstract theoretical opinions that are untethered to the actual evidence in this case. Hartzmark ignores the actual terms of the C30 PSA and instead postulates what he believes would have been a more efficient structure. He couches his commentary in terms of the "intention" of the parties, but he has no actual knowledge of their intent. *See Lippe* v. *Bairnco Corp.*, 288 B.R. 678, 692 (S.D.N.Y. 2003) (excluding expert's opinion because it failed to account for or consider the real world market realities of a business and therefore "amount[ed] to no more than theoretical speculation"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (summary order); *Buckley* v. *Deloitte*, 888 F. Supp. 2d 404, 414

(2002) (excluding opinion because it was not based on actual facts or data: "there is simply too great an analytical gap between the data and the opinion proffered").[38]

The Court's role here is to ascertain whether the record permits it to determine, as a matter of law, the intent of the parties to the C30 PSA, and not to determine what outcome is most economically efficient. *See Reach Music Publ'g, Inc.* v. *Warner Chappell Music, Inc.,* 988 F. Supp. 2d 395, 401 (S.D.N.Y. 2013) (cautioning that expert opinion must "have a valid connection to the pertinent inquiry"); *see also Fleisher* v. *Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 474 (S.D.N.Y. 2014) (rejecting argument that contract should be construed based on "what makes more economic sense," because the "case does not raise issues of sound economics, but of contract construction"); *Glob.*

---

[38] Hartzmark has no specialized knowledge or expertise in the CMBS industry writ large. Specifically, he has no experience in, and has never analyzed, the CMBS industry outside of serving as an expert witness in this case, and as an academic. He has never worked for a financial institution with any involvement in the CMBS industry. (*See* Hartzmark Report, App'x B). He has never invested in CMBS. (*See* Casse Decl., Ex. 12 ("Hartzmark Dep.") 15-16). He did not survey any CMBS market participants as part of his analysis; indeed, the only CMBS investor to which Hartzmark spoke was Appaloosa. (See *id.* at 96-97). And he did not review the deposition transcripts of any of the parties to the C30 PSA or any other witnesses deposed in this case. (*See id.* at 11:15-24; Hartzmark Report, App'x A).

Further deficiencies were identified during Hartzmark's deposition:

- Prior to this case, Hartzmark had never seen a realized loss form for a CMBS. (Hartzmark Dep. 25:14-19).

- He could not recall reviewing a CMBS pooling and servicing agreement prior to this case. (*Id.* at 27:10-20).

- He had no familiarity with the CMBS compensation system for special servicers prior to this case. (*Id.* at 28:1-5).

- He had no familiarity with the terms "gain-on-sale" and "liquidation expenses" as used in CMBS PSAs. (*Id.* at 28:10-22).

*Reinsurance Corp. of Am.* v. *Century Indem. Co.*, 30 N.Y.3d 508, 519 (2017)

(rejecting court's use of "notions of economic efficiency" to interpret the

meaning of a contract); *see generally MASTR Adjustable Rate Mortgs. Tr. 2006-*

*OA2* v. *UBS*, No. 12 Civ. 7322 (PKC), 2015 WL 797972, at *4 (S.D.N.Y. Feb. 25,

2015) (noting that court does not have the prerogative to override the

contracting parties' intent "in order to provide an efficient and economical

remedy," and, "[w]hen it comes to ... contracts among sophisticated parties,

predictable outcomes in accordance with the expressed intentions of the

contracting parties is justice and fairness").[39]

---

[39]  In *LaSalle Bank* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 n.9 (2d Cir. 2005), the Second Circuit rejected the argument that a contract should be interpreted based on what arrangement was most ideal for CMBS investors.  *See also IBM* v. *United Microelectronics*, 764 F. App'x 9, 13 (2d Cir. 2019) (summary order) ("UMC contends that we should nevertheless imply a condition precedent because the contract would otherwise render what UMC calls the 'absurd result' of giving IBM a 'windfall' of millions of dollars for licenses UMC never received....  But, by the plain language of the Amended Agreement, UMC took on the risk that it would be unable (or unwilling) to establish a subsidiary and named facility by December 31, 2015.  To infer a condition that shifts that risk, absent explicit language would be to impermissibly rewrite the parties' bargain."); *Wastemasters, Inc.* v. *Diversified Inv'rs Servs.*, 159 F.3d 76, 79 (2d Cir. 1998); *Blackrock Core Bond Portfolio* v. *U.S. Bank*, 165 F. Supp. 3d 80, 97 (S.D.N.Y. 2016).

Other jurisdictions have concluded similarly.  *See, e.g.*, *Interstate Fire & Cas. Co.* v. *Dickerson*, No. 11 Civ. 7130 (RSL), 2012 WL 3865122, at *2 n.3 (W.D. Wash. Aug. 31, 2012) ("The Court's task is to ... discern the intent of the parties if an ambiguity exists, not to figure out what interpretation makes economic sense ...."); *Laplace* v. *Laplace*, No. 03 Civ. 4291 (JAG), 2006 WL 83110, at *6 (D.N.J. Jan. 12, 2006) (observing that when interpreting a contract, "the Court may not delete contractual provisions" or interpose "a strained construction," even if the result would be "economically more efficient"); *Blue Cross & Blue Shield* v. *Am. Exp.*, No. 99 Civ. 6679 (MFK), 2005 WL 2171192, at *5 (N.D. Ill. Sept. 6, 2005) (rejecting economic professor's application of economic theory to construe contract because opinion improperly focused on the future economic consequences of a contract, which is irrelevant to the parties' intent), *vacated on other grounds*, 467 F.3d 634 (7th Cir. 2006); *Sae Biang Optical* v. *Kenmark Optical*, No. 3:05 Civ. 168 (JDM), 2008 WL 170069, at *6 (W.D. Ky. Jan. 17, 2008) ("commercial entities ... are entitled to bargain for any rational result, even if that result may not be the most ... economically efficient for the average contracting party"); 11 WILLISTON ON CONTRACTS § 31:5 (4th ed.) ("the question whether a bargain is ... economically efficient ... is not ordinarily a legitimate subject of judicial inquiry").

But even if the Court were inclined to consider the economic principles underlying the C30 PSA, the factual premises underlying Hartzmark's opinions are flawed. His theories "about the economic result that rational economic actors would reach in [PSA] negotiations" (Appaloosa MIL Br. 13) proceed from the premise of all actors being at the negotiating table to represent their own interests. However, Hartzmark did not know whether the certificateholders were parties to the PSA (Hartzmark Dep. 130:22-131:9), nor did he "have an understanding of whether the investors were at the [PSA negotiating] table or not" (*id.* at 131:13-19). Hartzmark has no evidentiary support for the idea that certificateholders had any negotiating power with respect to the C30 PSA, or any PSA. (*Cf. id.* at 133:18-136:6 (acknowledging that authority on whom he relies stated that the "investor is the only party who is not a party to the PSA").[40] To the contrary, Ann Hambly testified explicitly that investors do not negotiate PSAs (*see* Hambly Dep. 278:2-14), and Appaloosa acknowledges as much (*see* CWC 56.1 C11). Because certificateholders have no role in negotiating PSAs, Hartzmark's opinions about the "result" they would achieve in a negotiation is irrelevant to how the C30 PSA should be interpreted. Moreover, as CWC observed (*see* CWC MIL Br. 6), Hartzmark's theory presupposes that all certificateholders have the same interests, which the

---

[40]     And the Court is not at all persuaded by Appaloosa's explanation that "Dr. Hartzmark's theory depends on Certificateholders being principals in a CMBS trust as economists understand that term, not on whether they are parties to the PSA as a legal matter." (Appaloosa CWC MIL Opp. 13).

alignment of parties in the instant case would seem to refute. For all of these reasons, Hartzmark's opinions do not create a genuine dispute of material fact.

### d. C-III's Allocation Practice Accords with CWC's and the GSEs' Interpretation of the C30 PSA

Appaloosa contends that, despite CWC's "bravado" that all special servicers interpret "gain-on-sale" identically, that is not true. However, it is only able to point to a single example that supports its view that Gain-on-Sale proceeds takes priority over Penalty Interest. (*See* Appaloosa CWC SJ Opp. 13-14). Appaloosa has identified one instance in which C-III allocated $78,725 as gain-on-sale and did not retain penalty interest. (*See id.*).[41] CWC rejoins that this was a mistake on the part of C-III, and an immaterial one at that, inasmuch as a C-III affiliate held the Class G certificates that received the $78,725. (CWC SJ Br. 19-20).

Extensive record evidence demonstrates that this single transaction was an aberration from C-III's practice. In 39 other REO sales, C-III distributed penalty interest prior to or to the exclusion of gain-on-sale. (*See* Greenspan Report 17 n.22). Two of those sales were out of trusts within the same series as the JPM 2005-LDP3 trust (which held the REO sale to which Appaloosa points) and thus had essentially verbatim PSA provisions. (Casse Decl., Ex. 209, 214; CWC 56.1 A138).

---

[41] As noted *supra* at n.31, Greenspan disclosed two occasions in which gain-on-sale proceeds were paid prior to, or to the exclusion of, penalty interest. (*See* Greenspan Report 17 n.22). Neither asset was liquidated out of a WBCMT PSA. (*See id.*). Both were specially serviced by C-III. (*See id.*).

Further, and as noted above, prior to the Stuy Town sale, Appaloosa's James Bolin reached out to a senior executive at C-III, George Carleton, for examples of instances in which there had been sufficient funds to pay the trust in full. Bolin received two RLRs, both of which evidenced C-III collecting penalty interest ahead of gain-on-sale.[42] Thus, a single instance of paying gain-on-sale before penalty interest is not enough to generate a genuine dispute of material fact as to the uniformity of industry custom and practice. *See Nora Beverages* v. *Perrier Grp. of Am.*, 269 F.3d 114, 124 (2d Cir. 2001) (holding, in a trademark infringement action, that district court did not err in finding that "two anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues"); *In re Optical Disk,* 2017 WL 6451711, at *4 (granting summary judgment, despite expert identifying one contrary example, finding "this lone example is insufficient to raise a genuine issue of material fact").

---

[42] Discovery also showed that C-III entered into fee-sharing agreements with other servicers that expressly provided for the allocation of penalty interest anticipated from REO sales — something Appaloosa contends could never occur. (*See* Casse Decl., Ex. 423-428; 430; CWC 56.1 C101). Appaloosa's own expert, Andrew Berman, who worked for a (non-servicer) affiliate of C-III, (i) testified that C-III collected (and collects) penalty interest as fees; (ii) entered into fee-sharing agreements that allocated penalty interest; and (iii) when shown C-III's RLRs reflecting the collection of penalty on REO sales, refused to say that C-III had acted improperly. (Casse Decl., Ex. 13 at 37, 38-39, 131-59).

Separately, Appaloosa claims that after it filed its papers in this case, Carleton told Appaloosa that C-III agreed with Appaloosa's interpretation of the C30 PSA because it was consistent with C-III's understanding and practice. (Appaloosa CWC SJ Opp. 14). The only evidence Appaloosa cites in support of such a statement is Bolin's deposition testimony regarding a phone call he allegedly had with Carleton. (CWC 56.1 A145). This is inadmissible hearsay. *See* Fed. R. Evid. 801(c). Appaloosa provides no admissible evidence on this point, despite abundant opportunities to do so.

### e. The C30 Pro Supp Is Neutral

Somewhat curiously, both Appaloosa and CWC source their divergent contract interpretations to the C30 Pro Supp. *See Wells Fargo* v. *ESM Fund I, LP*, 785 F. Supp. 2d 188, 195 (S.D.N.Y. 2011) (recognizing that the Prospectus Supplement, filed with the SEC, is "important" and "persuasive evidence" of the intent of the PSA), *aff'd sub nom. Wells Fargo* v. *Fin. Sec. Assur. Inc.*, 504 F. App'x 38 (2d Cir. 2012) (summary order). The C30 Pro Supp states that "[t]he principal compensation to be paid to the Special Servicer in respect of its special servicing activities is the Special Servicing Fee (together with the Master Servicing Fee, the 'Servicing Fees') and, under the circumstances described in this prospectus supplement, Liquidation Fees and Workout fees." (C30 Pro Supp S-177). It goes on to explain that "[a]s additional servicing compensation, the Master Servicer and/or the Special Servicer is entitled to retain all modification fees, assumption fees, defeasance fees, assumption and other application fees, late payment charges and [penalty] interest … and Prepayment Interest Excesses collected from borrowers on Mortgage Loans." (*Id.* at S-179).

In a theme that is echoed in several of its arguments, Appaloosa contends that it would be an absurd result for CWC to retain $614 million in Penalty Interest because that is more than 10 times the $60 million it was entitled to receive as its "principal compensation." (Appaloosa CWC SJ Opp. 20). CWC contends, conversely, that the Pro Supp's disclosure regarding Penalty Interest is consistent with § 3.11(d), which provides that the Special

90

Servicer is entitled to receive as additional compensation "all late payment charges [and] Penalty Interest received on or with respect to Specially Serviced Mortgage Loans actually collected that, with respect to late payment charges, accrued during the time that the Mortgage Loan was a Specially Serviced Mortgage Loan." (C30 PSA § 3.11(d); *see* CWC SJ Br. 14).

The Court concludes that the language of the C30 Pro Supp, and any disclosures it provided to investors in the C30 Trust, do not move the needle in favor of either side's interpretation of the C30 PSA. That the C30 Pro Supp describes certain forms of servicing compensation as the "principal" compensation does not mean that the Special Servicer would never be entitled to Penalty Interest. Indeed, every specially-serviced loan will yield a Special Servicing Fee, Liquidation Fee, and Workout Fee (assuming any of those events occur), whereas in the history of CMBS 1.0, only 247 REO loans have resulted in penalty interest being paid to the special servicer. Clearly, then, for the overwhelming majority of specially-serviced loans, the "principal compensation" for the special servicer will be these other fees. That being said, the fact that the C30 Pro Supp discloses that in certain instances the Special Servicer may be entitled to Penalty Interest does not, in and of itself, mean that CWC is clearly entitled to such compensation here. The C30 Pro Supp evidence is neutral.

The Court has reviewed Appaloosa's extrinsic evidence with care, and in its most favorable light. However, like Appaloosa's challenges to CWC's and the GSEs' extrinsic evidence, Appaloosa's evidence is plainly insufficient to create a

genuine dispute of material fact concerning the proper interpretation of the C30 PSA.

### 6. The Court Rejects Appaloosa's Argument That Yield Maintenance Is Not Owed to the GSEs Because the Borrower Did Not Make a Principal Prepayment

Both in its opposition to the GSEs' motion for summary judgment, and in its own motion for partial summary judgment, Appaloosa argues that regardless of whether a yield maintenance premium was due to the Trust under the Stuy Town Notes, no Yield Maintenance is payable to certificateholders under the C30 PSA because the borrower never made a Principal Prepayment. In this regard, Appaloosa posits that under the C30 PSA, "Yield Maintenance" is defined as amounts "paid or payable, as the context requires, on a Mortgage Loan as the result of a Principal Prepayment thereon[,]" while "Principal Prepayment" is limited to the "payment of principal made *by the Mortgagor* on a Mortgage Loan or Companion Loan that is received in advance of its scheduled Due Date." (C30 PSA § 1.01 (emphasis added)). Here, because the liquidation proceeds from the Stuy Town sale came from a third party — rather than "the Mortgagor" (i.e., the Borrower) — the PSA does not recognize any Yield Maintenance. Appaloosa's argument distills to the following syllogism: The C30 PSA requires that Yield Maintenance can only be recovered when the Borrower makes a Principal Prepayment; in an REO

liquidation, the Trust sells the REO property to a third party; therefore, in an REO liquidation there will never be Yield Maintenance.[43]

Appaloosa made this same argument at the Rule 12(c) stage.  At that time, the Court concluded that the "made by the Mortgagor" clause was ambiguous because it conflicted with other clauses in the C30 PSA — like § 3.02(b)'s waterfall provision and the REO Loan Waterfall — that clearly contemplate payment of Yield Maintenance from REO dispositions, where the payment never comes from "the Mortgagor."  *See PSA I*, 2018 WL 1229702, at *9.  The GSEs argue that the Court's ruling established the law of the case, and that Appaloosa cannot now, at the summary judgment stage, rely on language the Court already found ambiguous at the Rule 12(c) stage.  While the Court does not preclude consideration of Appaloosa's argument as law of the case, it finds the "made by the Mortgagor" language to be ambiguous for the same reasons as before.

---

[43]    Appaloosa suggests that there are circumstances under which there could be a Principal Prepayment "made by the Mortgagor" on an REO Loan.  For example, if a borrower defaults on the loan, resulting in an acceleration of the outstanding principal and accrual of Yield Maintenance, and the trust forecloses and conducts a sheriff's sale, the property may be located in a state that gives the mortgagor the right to redeem the property after such a sale.  In this situation, Appaloosa explains, the redemption results in a Principal Prepayment paid by the borrower, which gives rise to Yield Maintenance.  However, Appaloosa fails to explain where in this line of reasoning the property at issue becomes REO Property or the loan becomes an REO Loan.  As such, this hypothetical scenario does not aid the Court in harmonizing the provisions of the C30 PSA regarding payment of Yield Maintenance on an REO Loan.  Further, Appaloosa has, in other places, conceded that its position in this litigation would preclude the payment of Yield Maintenance from the sale of an REO property in all circumstances.  (*See* GSE 56.1 G88 (responding "Undisputed" to the statement "Appaloosa's position in this litigation would preclude the payment of Yield Maintenance from the sale of an REO property in all circumstances.")).

That tangential bit of ambiguity, however, does not create an issue for trial. With discovery now concluded, the Court has a wealth of extrinsic evidence that supports the GSEs' argument. *See generally Luitpold Pharm., Inc.*, 784 F.3d at 87-88. Among other things, the GSEs identified five transactions (handled by three different special servicers) from the same shelf (and using the same language) as the C30 PSA, including the "made by the Mortgagor" language that Appaloosa argues is controlling, all of which produced the same yield maintenance payments the GSEs seek here. Appaloosa does not contest this fact. In addition to those five, the GSEs point to twelve other properties, governed by agreements with materially identical terms to those on which Appaloosa relies in the C30 PSA, all of which generated yield maintenance charges as a result of an REO disposition. (Lieberman Decl. ¶¶ 3-10 & Ex. 46-52).

The GSEs also point to Karen Olin's testimony that yield maintenance is payable from an REO Loan (*see* GSE 56.1 G64), and Leslie Hayton's testimony that for purposes of a yield maintenance calculation in the context of an REO disposition, Wells Fargo uses the sale date as the "prepayment date" (*see* Hayton Dep. 131:5-132:12). Indeed, Appaloosa's own corporate representative testified that proceeds collected from a foreclosure sale that are used to satisfy the judgment amount would constitute a "payment made by the borrower." (GSE 56.1 G26 (citing Bolin Dep. 274:4-75:19)). Appaloosa is unable to contest this evidence with any substantive fact evidence supporting its interpretation of the C30 PSA, much less evidence sufficient to create a triable issue of fact.

### 7. The Court Finds No Genuine Dispute of Fact over the Amount of Penalty Interest to Which CWC Is Entitled

Having resolved the question of whether CWC is entitled to Penalty Interest, the Court proceeds to consider how much Penalty Interest CWC is entitled to retain. In its moving papers, CWC claims that it is entitled to the full amount of Penalty Interest that it collected, $614,424,027.57, which it calculated as interest accrued on the PCV Loan at the rate of 3% from the date of the Borrower's default on January 8, 2010, until Stuy Town was liquidated on December 18, 2015. (*See* CWC SJ Br. 22). Appaloosa disputes that amount, arguing that: (i) the Foreclosure Judgment cut off the accrual of Penalty Interest; (ii) Penalty Interest does not accrue on an REO Loan; and (iii) Penalty Interest must be used to offset interest on advances. (*See* Appaloosa CWC SJ Opp. 26-27; *see generally* Appaloosa SJ Br.). The Court addresses, and rejects, these arguments in the remainder of this section.

### a. The Foreclosure Judgment Did Not Cut Off the Accrual of Penalty Interest

Appaloosa focuses first on the Foreclosure Judgment, which specified that Penalty Interest would stop running as of June 21, 2010, the date judgment was entered, and that post-judgment interest would accrue thereafter at the federal rate. (Appaloosa CWC SJ Opp. 26).[44] It contends that CWC ignored the Foreclosure Judgment when allocating the Stuy Town sale

---

[44] The Foreclosure Judgment indicated that CWC was entitled to approximately $38.2 million in Penalty Interest as of the date of entry. (*See* 2010 Action, Dkt. #92 at 3-4 ¶ 6).

proceeds, because it calculated Penalty Interest past the date of the

Foreclosure Judgment and in contravention of its terms. (*Id.*).

Appaloosa is wrong. The Foreclosure Judgment merely set forth the

terms of how a foreclosure sale could occur and calculated the amounts due

and owing from the Borrower at the time it was entered, on June 21, 2010.

(*See* 2010 Action, Dkt. #92 at 3-4 ¶ 6). It is undisputed that no foreclosure

sale took place. (CWC 56.1 C49-50).

In this setting, § 18.20 of the Loan Agreement comes into play:

> In case Lender shall have proceeded to enforce any right
> under this Loan Agreement or the Mortgage by
> foreclosure sale, entry or otherwise, and such
> proceedings shall have been *discontinued* or *abandoned*
> for any reason or shall have been determined adversely,
> then, in every such case, Borrower and Lender shall be
> restored to their former positions and rights hereunder
> with respect to the Property subject to the lien hereof
> and the lien of the Mortgage.

(Loan Agreement § 18.20 (emphasis added)). Pursuant to the plain language of

the Loan Agreement, if a foreclosure sale is discontinued or abandoned, the

parties are restored to their prior positions. Appaloosa protests that the

foreclosure sale was not "abandoned," but rather "adjourned *sine die*," and that

the Foreclosure Judgment was thus never vacated. This argument is too clever

by half; the foreclosure sale was plainly "discontinued or abandoned" when the

Lender took title to the property via a deed in lieu of foreclosure.[45]

---

[45] Discovery confirmed that the Foreclosure Judgment had no impact on how the C30
Trust calculated interest that was owing on the PCV Loan or distributions to
certificateholders. (CWC 56.1 C206). Even James Bolin acknowledged that interest
payments on Appaloosa's certificates were not impacted by the Foreclosure Judgment.
(*See* Bolin Dep. 89-95; CWC 56.1 C208). This confirms that the Foreclosure Judgment

The Court also recalls the testimony of Michiko Shimizu that at no point in her career did the terms of a foreclosure judgment affect the accrual of penalty interest on an REO disposition. (Shimizu Dep. 201:24-202:5). Thomas Nealon similarly explained that when he was at LNR, he personally oversaw hundreds of judicial foreclosures, none of which changed the determination of the trust's accrual of interest and amounts payable to certificateholders and trust parties. (Nealon Report 25). Finally, Ronald Greenspan reviewed 26 transactions in which CWC utilized the contract and penalty interest rates set forth in the loan agreements in the face of a foreclosure judgment that imposed a different statutory interest rate after entry. (Greenspan Report 30). Given this evidence, the Court easily concludes as a matter of law that the Foreclosure Judgment did not cut off the accrual of penalty interest.

### b. Penalty Interest Continues to Accrue on an REO Loan

Appaloosa next argues that once the C30 Trust took the title to the property through a deed in lieu of foreclosure, and the PCV Loan became an REO Loan, Penalty Interest stopped accruing because the C30 PSA does not permit the accrual of Penalty Interest on an REO Loan. (Appaloosa CWC SJ Opp. 26-27). Again, the Court concludes otherwise.

The C30 PSA defines an REO Loan as "[t]he Mortgage Loan deemed for purposes hereof to be outstanding," which is further

---

was discontinued or abandoned. It also renders inapposite Appaloosa's citation to *SDF9 COBK LLC* v. *AF & NR LLC*, No. 12 Civ. 3078 (ENV) (RML), 2014 EL 4244296 (E.D.N.Y. Aug. 26, 2014), where the court held that penalty interest accrued at the statutory interest rate following the entry of a foreclosure judgment. *Id.* at *2.

deemed to provide for Periodic Payments of principal and/or interest equal to its Assumed Scheduled Payment and otherwise to have the same terms and conditions as its predecessor Mortgage Loan (such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan and the acquisition of the related REO Property as part of the Trust Fund).

(C30 PSA § 1.01). With little explanation and even less evidentiary support, Appaloosa claims that the language in the definition of REO Loan stating that "(such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan ... )" indicates that Penalty Interest does not accrue on an REO Loan. (*See* Appaloosa CWC SJ Opp. 26-27). In point of fact, this language does not indicate that Penalty Interest stops accruing in an REO Loan. Rather, it merely indicates that, with respect to an REO Loan, the Trusts should continue to receive payments of principal and interest under the same terms and conditions as under the predecessor Mortgage Loan.

Other provisions of the C30 PSA confirm the Court's reading of this provision. *First*, both the definition of REO Loan and § 3.02(b) explicitly anticipate that REO liquidation proceeds will be used to pay Penalty Interest. *Second*, the definition of Penalty Interest itself includes interest that accrues on an REO Loan. In fact, Penalty Interest is explicitly defined with respect to REO Loans. (*See* C30 PSA § 1.01). *Third*, the C30 PSA is clear where it intends to cap or stop from accruing a form of servicing compensation. For example, § 3.11(c) provides that the Workout Fee "will cease to be payable ... if the related Mortgaged Property becomes an REO Property." (C30 PSA § 3.11(c); *see*

*also* C30 PSA § 3.11(c)-(d) (providing explicit cap on Workout Fee and Liquidation Fee payable on the PCV Loan, with no corresponding cap on penalty interest)).  The absence of a similar provision precluding the accrual of Penalty Interest on an REO Loan is thus telling.  And the C30 Pro Supp specifically provides that the Special Servicer is entitled to additional servicing compensation in the form of Penalty Interest that accrues "after the related mortgaged property became an REO Property."  (C30 Pro Supp S-175).

Still further confirmation can be found in the parties' course of performance evidence.  Ronald Greenspan analyzed 24 REO Loans serviced by CWC that were liquidated out of the WBCMT Trusts, all of which contain virtually identical language concerning the accrual of Penalty Interest. (Greenspan Report 28).  Of these 24 WBCMT loans, 23 (96%) either accrued Penalty Interest past the REO title acquisition date or stopped accruing Penalty Interest prior to the REO title acquisition date solely because the trust had insufficient funds to pay Penalty Interest in full.  (*Id.*).  Separately, LNR and Torchlight liquidated a combined 12 REO properties out of WBCMT Trusts that accrued Penalty Interest.  (*Id.*).  Out of LNR's 9 REO loans, 8 (89%) accrued Penalty Interest beyond the REO title acquisition date, while all 3 of the Torchlight loans (100%) accrued Penalty Interest beyond the REO title acquisition date.  (*Id.*).

**c.**      **Penalty Interest Need Not Be Used to Offset Interest on Advances or Additional Trust Fund Expenses**

Appaloosa further claims that, under the C30 PSA, CWC was required to apply Penalty Interest to reimburse the PCV Trusts for $67 million in Interest

on Advances ("IOA") and certain Additional Trust Fund Expenses ("ATFE").

Specifically, Appaloosa claims that CWC breached § 3.05(a)(ix) and § 3.11(d) of

the C30 PSA. Section 3.05, titled "Permitted Withdrawals from the Certificate

Account, Distribution Account, Interest Reserve Account, Additional Interest

Account, Gain-on-Sale Reserve Account, Companion Distribution Account,

Floating Rate Account and Interest Shortfall Account," states, in relevant part:

> (a) The Master Servicer may, from time to time, make withdrawals from the Certificate Account for any of the following purposes ... : ...
>
> (ix) at such time as it reimburses the Trustee, itself, the Special Servicer ... for any unreimbursed Advance (including any Advance that constitutes a Workout-Delayed Reimbursement Amount) pursuant to clause (ii), (vii) or (viii) above, to pay the Trustee, itself, the Special Servicer ... any interest accrued and payable thereon in accordance with Section 3.03(d) or 4.03(d) ... *provided* that the Trustee's, the Master Servicer's, [and] the Special Servicer's, rights to payment pursuant to this clause (ix) with respect to interest on any Advance shall be satisfied (A) subject to and in accordance with the terms of the Intercreditor Agreement with respect to the related Loan Pair, first out of late payment charges and Penalty Interest collected on or in respect of the related Mortgage Loan (and if the Advance was made with respect to a Co-Lender Loan, out of such amounts collected on or in respect of the related Companion Loan(s)) and REO Loan, during the Collection Period in which such Advance is reimbursed (the use of such late payment charges and Penalty Interest to be allocated between the Master Servicer and the Special Servicer on a *pro rata* basis based on the amount of late payment charges and Penalty Interest that the Master Servicer and the Special Servicer have received as additional servicing compensation during such period), and (B) to the extent that the late payment charges and Penalty Interest described in the immediately preceding clause (A) are insufficient, but only at the same time or after such Advance has been reimbursed, out of general collections on the Mortgage Loans, Companion Loans

and any REO Properties on deposit in the Certificate
Account;

(C30 PSA § 3.05(a)(ix)). Appaloosa claims that § 3.05(a)(ix) sets forth a clear

and unambiguous rule as to the source of funds that may be used for the

reimbursement of IOA: IOA is to be paid first out of any Penalty Interest

received during the Collection Period in which the Advance is reimbursed, and

other funds may be used to reimburse interest on advances *only if* the Penalty

Interest received during the relevant Collection Period is insufficient to cover

the outstanding obligation.

Appaloosa finds support for this interpretation in § 3.11(d), which states,

in relevant part, that:

> To the extent the Master Servicer or the Special Servicer
> receives late payment charges or Penalty Interest on a
> Mortgage Loan for which interest on Advances or
> Additional Trust Fund Expenses (other than Special
> Servicing Fees, Workout Fees and/or Liquidation Fees)
> related to such Mortgage Loan and not previously
> reimbursed to the Trust Fund, the Special Servicer shall
> transfer to the Master Servicer for deposit in the
> Certificate Account … an amount equal to the lesser of
> (i) the amount of late payment charges or Penalty
> Interest received on such Mortgage Loan or (ii) the sum
> of the amount of interest paid to the Master Servicer on
> Advances related to such Mortgage Loan incurred since
> the Closing Date for which the Trust Fund has not been
> previously reimbursed and the amount of Additional
> Trust Fund Expenses (other than Special Servicing
> Fees, Workout Fees and/or Liquidation Fees) related to
> such Mortgage Loan incurred since the Closing Date
> and not previously reimbursed to the Trust Fund. To
> the extent that the Special Servicer is not entitled to late
> payment charges or Penalty Interest pursuant to the
> immediately preceding sentence, the Special Servicer
> shall promptly transfer such late payment charges and
> Penalty Interest to the Master Servicer who shall deposit

such late payment charges and Penalty Interest in the
Certificate Account.

(C30 PSA § 3.11(d)).  Appaloosa argues that, collectively, these provisions

(i) required CWC to reimburse IOA and ATFE (other than its Special Servicing,

Workout, and Liquidation Fees) out of any Penalty Interest received on the Stuy

Town Senior Loan, and (ii) precluded what CWC did here, which was to keep all

of the Penalty Interest while using other portions of the Stuy Town sale

proceeds to pay IOA and ATFE.

CWC counters that the plain language of the C30 PSA provides that, if

there are sufficient funds to repay IOA and ATFE in full, then no deductions

are made to Penalty Interest.  Because (i) there were sufficient proceeds to

reimburse IOA and ATFE from amounts that were held in Stuy Town property-

level suspense and cash management accounts at the time of the sale, and

(ii) CWC in fact reimbursed the PCV Trusts for such amounts, it was not

required to deposit any Penalty Interest in the Certificate Account.  CWC

sources its interpretation to § 3.11(d), which states that "[t]o the extent" IOA

and/or ATFE have "not been previously reimbursed," "the Special Servicer shall

promptly transfer such ... Penalty Interest to the Master Servicer who shall

deposit such ... Penalty Interest into the Certificate Account."  (C30 PSA

§ 3.11(d)).  Otherwise, Penalty Interest is "retained by the Special Servicer ...

and shall not be required to be deposited into the Certificate Account."  (*Id.*).

CWC also points to § 3.04(a), which requires the Master Servicer to

establish and maintain a Certificate Account held on behalf of the Trustee for

the benefit of the certificateholders.  Section 3.04(a) states that

"[n]otwithstanding the foregoing, ... amounts that the Master Servicer and Special Servicer are entitled to retain as additional servicing compensation pursuant to Sections 3.11(b) and 3.11(d), need not be deposited by the Master Servicer in the Certificate Account." (C30 PSA § 3.04(a)).

At base, CWC argues that § 3.05(a)(ix) is irrelevant to the question before the Court. The Court agrees. Appaloosa's argument that CWC must use Penalty Interest to pay IOA and ATFE relies on the assumption that all of the Stuy Town proceeds were deposited into the Certificate Account, and that the Master Servicer would be withdrawing proceeds from the Certificate Account to pay IOA and ATFE. But, as CWC notes, § 3.11(d) and § 3.04(a) expressly provide that Penalty Interest need not be deposited into the Certificate Account, but rather may be retained by the Special Servicer. Funds otherwise payable to the Special Servicer as Penalty Interest are only deposited into the Certificate Account to the extent that they are needed to pay IOA and ATFE when a shortfall exists. Because IOA and ATFE were satisfied before CWC retained Penalty Interest, the Master Servicer did not need to make a permitted withdrawal pursuant to § 3.05(a)(ix) in order to reimburse the Trust for such expenses. More to the present motions, CWC was not required to reimburse IOA and ATFE expenses from the Penalty Interest it retained from the sale of Stuy Town.

In sum, the Court recognizes the stringent standards of Rule 56, particularly in the area of the interpretation of ambiguous contract provisions. The fact remains, however, that "the extrinsic evidence is so one-sided that no

reasonable factfinder could decide contrary to [the] interpretation" offered by CWC and the GSEs. *SCS Commc'ns Inc.* v. *Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (quotation marks omitted). Summary judgment in their favor is thus warranted. Further, given this resolution, the Court denies the motion for partial summary judgment filed by Appaloosa. Appaloosa's arguments in that motion, regarding CWC's purported failure to reimburse IOA and ATFE expenses and the GSEs' purported disentitlement to Yield Maintenance, have been addressed and rejected in the context of resolving CWC's and the GSEs' motions.

**B.  The Court Denies Appaloosa's Motion to Exclude CWC's and the GSEs' Expert Testimony**

As evidenced by the preceding disquisition, the Court has evaluated all of the expert testimony presented to it for consideration. It has made implicitly (and will now make explicitly) certain findings about the reliability and helpfulness of this testimony under the Federal Rules of Evidence. While the Court in this section addresses Appaloosa's motion to exclude the expert witnesses proffered by CWC and the GSEs, it begins with a broader point that applies to the resolution of each of the motions to exclude: Because these motions arise in the context of an anticipated bench trial, the Court has erred on the side of inclusion, considering certain of Appaloosa's expert reports despite arguable issues regarding their evidentiary or doctrinal foundations. *See Joseph S.* v. *Hogan*, No. 06 Civ. 1042 (BMC) (SMG), 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) ("It follows then that in a bench trial, the risk is with exclusion of expert testimony rather than with its admission — it is

exclusion that has the potential for an indelible impact on the record; if the appellate court disagrees that the expert's testimony was unreliable, a review for harmless error will be thwarted.").  That said, and as the remainder of this Opinion explains, consideration is not the same as agreement, and non-preclusion is not the same as adoption.

1. **Applicable Law**

    a. **The Court's Role as Gatekeeper**

The Supreme Court has tasked district courts with a "gatekeeping" role with respect to expert opinion testimony.  *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993) (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand").  This "gatekeeping" function applies whether the expert testimony is based on scientific, or on technical or "other specialized" knowledge.  *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999).  "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]"  *Boucher* v. *United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted).

Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court's inquiry thus focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact. *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

### i.      Qualifications of Expert Witnesses

Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education. *See* Fed. R. Evid. 702. In keeping with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony," *Daubert*, 509 U.S. at 588-89, the standard for qualifying expert witnesses is liberal. Assertions that the witness lacks particular educational or other experiential background, "go to the weight, not the admissibility, of [the] testimony." *McCullock* v. *H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that

the witness lacks expertise in the specialized areas that are directly pertinent. *See, e.g., Stagl* v. *Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (expert witness qualified when experience, knowledge, or training related to general area, not to specific question before trier of fact).

### ii.     Reliability of Expert Testimony

Once a court has determined that a witness is qualified as an expert, it must ensure that the expert's testimony both "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[46] In order to be admissible, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel* v. *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008).

Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (finding that "[s]ubjective methodology, as well as

---

[46]     In *Daubert* v. *Merrell Dow Pharmaceuticals*, the Supreme Court identified factors that may bear upon the reliability of proposed scientific testimony, including: (i) whether the theory or technique can be, and has been, tested; (ii) whether it has been subjected to peer review and publication; (iii) the known or potential error rate of the technique; (iv) the existence and maintenance of standards controlling the technique's operation; and (v) whether the technique or theory has gained widespread acceptance in the relevant scientific community.  509 U.S. 579, 593-94 (1993) (noting that these factors do not constitute "a definitive checklist or test").  In *Kumho Tire Co. Ltd.* v. *Carmichael*, the Supreme Court held that a court may apply the *Daubert* factors, as appropriate, in cases dealing with technical or "other specialized," but non-scientific, testimony.  526 U.S. 137, 141 (1999).

testimony that is insufficiently connected to the facts of the case," can serve as "grounds for rejection of expert testimony").  "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp.* v. *Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation and quotation marks omitted).  "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (alteration in original) (citation omitted).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation and quotation marks omitted).  This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

While a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function." *Williams*, 506 F.3d at 160-61 (citation omitted).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (citation omitted).  Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

### iii.    Helpfulness or Relevance of Testimony

Given the comparatively low bars for qualification and reliability, and the absence of concerns of jury confusion, the Court finds here that the expert witnesses proffered by each of the parties are qualified, and that their methodologies are reliable.  The issue on which the Court focuses is whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  This inquiry looks primarily to whether the testimony is relevant.  *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 283.  Under the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

A court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States* v. *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States* v. *Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also*

*Atlantic Specialty Ins.* v. *AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert").

Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### 2. Application of the Federal Rules of Evidence to Greenspan's and Nealon's Expert Opinions

Appaloosa seeks to exclude the entirety of Greenspan's, Nealon's, and Olasov's opinions. The Court addresses this motion, however, only insofar as it pertains to expert opinions on which CWC and the GSEs actually relied in their summary judgment motions, and that the Court actually considered in granting them. In particular, the Court relied on limited portions of Greenspan's and Nealon's opinions, and did not rely on Olasov's opinions at all, in deciding the motions for summary judgment.[47] In so doing, it found

---

[47] The GSEs expressly disclaim reliance on Olasov's opinions in moving for summary judgment. (*See* GSEs SJ Br. 20 n.6). Accordingly, the Court does not consider the Olasov-focused opposition arguments offered by the GSEs or CWC to Appaloosa's motion to exclude.

those opinions to be helpful on the issues for which they were offered.  The

Court accepted those opinions over Appaloosa's objections, and it now explains

why.[48]

### a.    Greenspan's Empirical Study

Appaloosa begins by attacking the methodology of Greenspan's empirical

study, which it claims is fundamentally unreliable because Greenspan: (i) used

a database, Intex Solutions, Inc. ("Intex"), that contains incomplete data;

(ii) used non-public sources, such as RLRs, to supplement the information he

obtained from Intex; (iii) relied on information provided to him from CWC;

(iv) selectively chose to remove certain data from his dataset; and (v) inflated

his dataset by including Stuy Town.  (*See* Appaloosa MIL Br. 8-13).  Appaloosa

also observes that while Greenspan claimed to have considered only loans that

resulted in proceeds sufficient to repay outstanding principal, non-penalty

interest, fees, and costs, his dataset includes several loans in which penalty

interest was paid, but the relevant trust realized a loss.  (*See id.* at 14-15).

The Court has closely reviewed Greenspan's expert report and the

methodology described therein.  Greenspan used Intex, he explained, because

it maintains a comprehensive database of CMBS issuances and related activity

from the earliest days of the CMBS industry, January 1990, to the present.

---

[48]    For avoidance of doubt, the Court has examined the expert witness materials on which it has not relied, which materials include portions of Greenspan's and Nealon's reports and deposition testimony and the entirety of Olasov's report and deposition testimony, in order to determine whether these materials generate a genuine dispute of fact sufficient to preclude summary judgment in favor of CWC and the GSEs.  It found no such dispute.

(Greenspan Report 34 & n.47).[49]  Greenspan sorted this database to identify the CMBS loans that eventuated in REO property and whether the disposition of the property potentially generated proceeds that could be used to pay penalty interest and/or gain-on-sale proceeds.  (*Id.*).  The queries that he ran to identify these loans resulted in 395 loans that potentially satisfied all criteria.  (*Id.*).  He then requested, from the applicable special servicer, the RLRs and posting instructions for each of those 395 loans, in order to determine which loans produced proceeds in excess of outstanding principal, non-penalty interest, fees, and costs, and if so, to understand how the special servicer applied and distributed proceeds from the liquidation of REO property.  (*Id.*).

In Appendix A, Greenspan explained the precise series of queries he conducted of the Intex database to identify CMBS loans that satisfied the following criteria:

(i)     denominated in United States dollars and issued between 1990 and 2008 (the end of the 1.0 cycle),

(ii)    the special servicer ultimately gained title to and sold the real estate which served as collateral for the CMBS loan (i.e., the loan turned into an REO), and

(iii)   the REO disposition potentially resulted in sale proceeds that exceeded outstanding principal, nondefault interest, fees and costs.

---

[49]     Appaloosa attacks Greenspan's reliance on Intex because it is an incomplete data source.  (Appaloosa MIL Br. 9).  But Greenspan never contended that Intex is a perfect data source, and he therefore culled data from Intex through multiple methods and relied on documents subpoenaed from special servicers to supplement the information he obtained through Intex.  (*See* Greenspan Report, App'x A).

(Greenspan Report 35).  Applying this first filter (Tier I) resulted in 116,649 loans.  (*Id.* at 36).

Greenspan then applied a second set of filters (Tier II) to identify which of the 116,649 loans involved liquidation of REO property, the proceeds of which potentially exceeded outstanding principal, non-penalty interest, fees, and costs owed on the REO loan:

(i)     Included loans that were identified by Intex as real estate owned;

(ii)    Excluded loans with a "current loan balance" greater than $0; and

(iii)   Excluded loans with a cumulative liquidated loss greater than 2%.

(Greenspan Report 37).  In so doing, Greenspan narrowed the Tier I population to 475 loans.  (*Id.* at 38).

This dataset was further refined by applying Tier III calculations to identify, more precisely, REO dispositions generating liquidation proceeds exceeding outstanding principal, non-penalty interest, fees, and costs. (Greenspan Report 38).  Using loan-specific data available on Intex, Greenspan created loan-by-loan calculations to identify instances of possible default interest and/or gain-on-sale distributions.  (*Id.*).  Loans that met at least one of the following four criteria were included in the final set of loans for which Greenspan requested RLRs from the special servicers:

(i)     A loan where Greenspan identified a penalty interest and/or gain-on-sale "Gap" using the Intex data;

(ii)    If the available cash at (or after) liquidation was greater than the amount shown in the "Current Balance" data

field in the month prior to liquidation, the loan was included in the potential data set because such excess could have been on account of a distribution of penalty interest and/or gain-on-sale (since they are not separately reported by Intex).

(iii)    If the Intex data field "Loss After Payoff" reported a negative number this indicated that additional proceeds were received after the date of liquidation and therefore may have been applied to penalty interest and/or gain-on-sale.

(iv)    If the cumulative loss in the most recent reported month (generally a date post liquidation) is less than $0 (a "negative" loss is positive and therefore indicates liquidation proceeds in excess of outstanding principal, non-default interest, fees and costs) then the cumulative cash inflows exceeded the cumulative cash out flows generated by the operation and/or sale of the asset and therefore the loan was included in the potential data set.

(Greenspan Report 38-41). By applying the Tier III criteria, Greenspan narrowed down the 475 loans identified by the Tier I and Tier II filters to 314 loans with potential payment of penalty interest and/or gain-on-sale proceeds. (*Id.* at 41).

Greenspan instructed his staff to perform an additional review of the 116,649 loans to ensure that the filters that he applied did not miss relevant loans. (Greenspan Report 41). First, to ensure that the Tier I filters did not exclude relevant loans, Greenspan's staff reviewed the 116,649 loans and found 282 loans that did not have data populated in the Intex "REO Date" field, but that did have data captured in the "REO Comment" field. (*Id.*). Greenspan found that 20 of these loans may have been REOs. (*Id.*). His staff obtained and reviewed remittance reports for these 20 loans and then concluded that 7

potentially included payments of penalty interest and/or gain-on-sale proceeds. (*Id.*). Accordingly, Greenspan added these 7 loans to the list of loans for which he requested RLRs and posting instructions. (*Id.*).

Greenspan then conducted a separate analysis of the 161 loans that had been filtered out by the Tier II and Tier III filter criteria. (Greenspan Report 42). He observed that the Intex "Net Proceeds Received on Liquidation" data field was not populated for 123 of the 161 loans, and therefore that these 123 loans would not have been identified by application of the Tier III filters. (*Id.*). He reviewed the remittance reports for these 123 loans to identify any signs of penalty interest or gain-on-sale distributions by looking at comments and notes on the status of the REOs, changes in balances and payoff amounts, as well as classifications in the remittance reports. (*Id.*). Greenspan and his staff determined that 66 of the 123 loans showed signs of possible penalty interest and/or gain-on-sale payments, and that 8 of the 123 loans had no remittance reports available, for a total of 74 loans. (*Id.*). He therefore added these 74 loans to the 314 loans derived from application of his Tier III filters and the 7 additional loans derived from his cross-check of the Tier I filters, to arrive at a total of 395 loans (out of 116,649) where liquidation proceeds potentially exceeded outstanding principal, non-penalty interest, fees, and costs due and from which penalty interest and/or gain-on-sale might have been paid. (*Id.* at 42-43).

Out of this total, 119 loans were specially serviced by CWC and 276 by other special servicers. (Greenspan Report 43). Greenspan requested that

CWC's counsel obtain the RLRs for these 395 loans. (*Id.*). CWC collected the RLRs for the 119 REO Loans that it specially serviced. (*Id.*). For the remaining 276 loans, CWC's counsel issued subpoenas requesting RLRs and supporting documents to the special servicers where they could be identified. (*Id.*). With respect to 54 of the 276 loans, either information was insufficient to identify the special servicer or the special servicer responded that the loan was not in fact REO. (*Id.*). This left a total of 222 loans, serviced by special servicers other than CWC, with potential penalty interest and/or gain-on-sale. (*Id.*). CWC's Counsel received 188 (84.7%) responses to the subpoenas. (*Id.*). Greenspan explained that the special servicers from which counsel subpoenaed documents provided one additional relevant loan that was not requested, but which they believed generated REO sale proceeds in excess of outstanding principal, non-penalty interests, fees, and costs, and two additional relevant loans that were related to one of the loans requested, bringing the total number of loans for which documents were received to 191 loans. (*Id.*).

With respect to the 119 CWC loans, CWC informed Greenspan that 37 of the loans were not REO or did not pay penalty interest or gain-on-sale. (Greenspan Report 43). Greenspan confirmed that these loans did not in fact have liquidation proceeds in excess of outstanding principal, non-penalty interest, fees, and costs. (*Id.*). For the remaining 82 loans, CWC provided the requested data and provided data on 19 additional loans that it believed eventuated in an REO disposition with proceeds in excess of outstanding principal, non-penalty interest, fees, and costs. (*Id.* at 44).

Greenspan then determined that 249 of the 292 loans for which he had obtained RLRs were in fact REO Loans in which penalty interest and/or gain-on-sale was in fact paid. (Greenspan Dep. 109:13-112:21). Greenspan reviewed these 249 RLRs and determined that in 99.2% of REO sales, penalty interest was paid to the special servicer. (Greenspan Report 17, 43).

As the Court outlined above, Appendix A to Greenspan's expert report provides a detailed description of the sources on which he relied and the methodology he used to collect his dataset. (Greenspan Report, App'x A). Appaloosa's challenges to Greenspan's methodology go to the weight to be afforded to, rather than the admissibility of, Greenspan's empirical analysis. *See, e.g., Tiffany & Co.,* 127 F. Supp. 3d at 250-51 (holding that defendant's attacks on methodology of survey went to weight, not admissibility, of testimony, and attacks were insufficient to raise an issue of material fact on summary judgment where defendant did not offer any evidence that affirmatively disputed the findings of plaintiff's expert); *accord Schering Corp.* v. *Pfizer,* 189 F.3d 218, 228 (2d Cir. 1999); *In re Scotts EZ Seed*, No. 12 Civ. 4727 (VB), 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017).

All of the materials on which Greenspan relied were produced to Appaloosa during fact discovery, prior to the delivery of Greenspan's report. (Greenspan Report 7). Appaloosa concedes that one could replicate Greenspan's analysis by following the methodology he outlines in Appendix A. *See Nat'l Envelope Corp.* v. *Am. Pad & Paper Co.*, No. 06 Civ. 12988 (SHS) (RLE), 2009 WL 5173920, at *6 (S.D.N.Y. Dec. 30, 2009) (*Daubert* "only asks

whether the methodology can be or has been tested, and here [expert] has shown that, at the very least, this methodology can be tested."). Appaloosa's rebuttal experts chose not to do as much. Notably, for all of Appaloosa's critique of Greenspan's methodology, it does not identify a single loan that should have been included in Greenspan's analysis but was not.

The Court also rejects Appaloosa's contention that Greenspan's empirical study must be excluded because CWC somehow manipulated Greenspan's survey. That CWC provided Greenspan with information regarding certain loans for which it was special servicer does not make Greenspan's analysis fundamentally unreliable. CWC merely provided Greenspan with information that he independently verified. *See Lee Valley Tools* v. *Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013) (rejecting argument that expert's opinions were unreliable: defendant "has not demonstrated that [expert] relied upon unverified information provided by [plaintiff] or that the financial summaries were inaccurate, incomplete or inherently unreliable").

Separately, Appaloosa contends that Greenspan's empirical study must be excluded because certain of the loans he included in his analysis reflected a realized loss passed on to the relevant trust that, under Greenspan's theories, should not have occurred. In particular, Appaloosa points to 23 loans from Greenspan's sample in which penalty interest was paid, but a realized loss was passed on to the trust. (*See* Appaloosa MIL Br.14-15). From this, Appaloosa argues that Greenspan's conclusions are contradicted by the data on which he relies. (*See id.* at 15).

118

After reviewing the detailed analysis of Greenspan's methodology, the Court agrees with CWC that Appaloosa's argument is a red herring. Greenspan explained at his deposition and noted in his report that CMBS liquidation fees are customarily netted from the aggregate trust recovery, such that a full recovery of a specially serviced loan often equals 99% (since the trust paid a 1% liquidation fee) and therefore the trust recognizes a nominal "loss" even though the trust is paid everything it is entitled to be paid. (*See* CWC/GSE Appaloosa MIL Opp. 11). This is precisely why Greenspan's filter of Intex data included REO loans with a cumulative loss of 2% rather than 0%. (*See* Greenspan Report 37). Despite Appaloosa's attempt to identify a contradiction in Greenspan's survey, Greenspan explicitly stated that "[b]ecause some special servicers include their fees in the calculation of cumulative liquidated loss percentage there could be instances where a loan was paid in full but because the servicer fees are included in the cumulative loss percentage calculation, this data field might indicate a cumulative liquidated loss somewhat greater than 0%." (*Id.* at 37 n.50). Therefore, the Court observes no inconsistencies between Greenspan's dataset and the conclusions he draws from same.

Appaloosa has not come close to showing that Greenspan's empirical analysis is unreliable enough to merit exclusion. *See Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. The judge should only exclude he evidence if the flaw is large

enough that the expert lacks 'good grounds' for his or her conclusion." (internal quotation marks omitted)).

Appaloosa's remaining challenges to Greenspan's opinions can be swiftly rejected. Appaloosa contends that Greenspan's study of industry custom and practice is not relevant to any issue before the Court because Greenspan's use of the term "industry custom and practice" differs materially from the legal definition of that term. (*See* Appaloosa MIL Br. 16-17). The Court, however, does not rely on Greenspan's definition of "industry custom and practice," but rather analyzes the data provided by Greenspan to determine for itself whether such data meets the legal standard of an industry custom and practice. Other challenges are simply irrelevant: The Court has not considered Greenspan's opinions about the intent of the parties to the C30 PSA or his understanding of the definition of "Purchase Price." (*See id.* at 17). And, further, the Court need not decide whether Greenspan is qualified to offer a rebuttal opinion of Hartzmark because the Court has not relied on Greenspan's rebuttal opinion of Hartzmark. (*See id.* at 18-19).

### b.    Nealon's Expert Opinions

The Court relied on two of the expert opinions offered by Nealon: (i) that it is the custom and practice in the CMBS industry that amounts collected from an REO sale are allocated to default interest before gain-on-sale is realized (*see supra* at 57-59); and (ii) that the gain-on-sale concept was not designed to disrupt the payment system and priority established under existing PSAs and accepted servicing practices (*see supra* at 62-63). The Court found

the first opinion, concerning custom and practice, to be reliable and helpful

based on:

(i) Nealon's knowledge of and familiarity with the fundamental priority structure established by payment waterfalls that are contained in virtually all PSAs for CMBS 1.0 deals (Nealon Report 10-11);

(ii) His experience in allocating REO sale proceeds, for example, in connection with the Astor Crowne Plaza sale (*id.* at 11-12);

(iii) Nealon's discussions with asset managers at LNR where only after all sums deemed owing on the corresponding loan, including penalty interest, had been paid in full did a discussion of gain-on-sale take place (*see id.* at 11);

(iv) His knowledge of and familiarity with how other special servicers in the CMBS industry — such as C-III, CWCAM, and Midland — allocated REO sale proceeds, which was consistent with LNR's application of such proceeds (*id.* at 2, 12); and

(v) The fact that never over the course of his 25 plus years in special servicing did he see a "gain" of any kind recognized before all amounts due and owing on the subject loan, including penalty interest, had been paid in full (*id.* at 12).

The Court found the second opinion, concerning the design of the gain-on-sale concept, to be reliable and helpful based on those five facts as well as five additional facts:

(i) Nealon's recollection of when the gain-on-sale concept was first discussed and incorporated into PSAs, and the impetus for it — the uncertainty of where the excess funds (money that was left over after all amounts owing to the trust and trust parties, including penalty interest, was paid in full) should go, and the industry's view that it should not be distributed to the trust's residual holder (a shell entity) but rather to certificateholders (Nealon Report 13-14);

(ii)    His regular and continuous discussions with the Cadwalader firm that drafted the vast majority of WBCMT PSAs (including C4 and C30), which discussions confirmed that Nealon's understanding was correct (Nealon Dep. 195-205; CWC 56.1 C141, C154-C155);

(iii)    Nealon's negotiation, review, and application of hundreds of PSAs, including the C3 and C5 PSAs, which were drafted within months of the C4 PSA (Nealon Report 1; CWC 56.1 C138-C139);

(iv)    His knowledge of and familiarity with how LNR, as well as other special servicers and master servicers, applied proceeds from the sale of REO properties when the applicable PSAs contained "Gain-on-Sale Proceeds" and the related gain-on-sale references (Nealon Report 12); and

(v)    The absence of changes made to the fundamental payment priority structure/waterfall in PSAs after "Gain-on-Sale Proceeds" and related gain-on-sale references were added (*id.* at 14-15).

Appaloosa advances three arguments to exclude Nealon's expert opinions, none of which succeeds. *First*, Appaloosa contends that Nealon speculates about the contracting parties' intent in drafting the C30 PSA. (*See* Appaloosa MIL Br. 21). The Court disagrees with this characterization of Nealon's expert report. Nealon does not opine specifically on the intent of the parties to the C30 PSA. Rather, his report communicates observations he made about the introduction of the concept of gain-on-sale in the CMBS industry and the general history and purpose of the concept — on which topics Nealon is qualified to speak. He was actively involved in special servicing when the gain-on-sale concept was first introduced, and he negotiated, reviewed, and

applied hundreds of PSAs over the course of his career at LNR, including PSAs from the WBCMT Shelf.

The cases Appaloosa cites in which an expert testifies about a party's motive, intent, or state of mind are irrelevant here (*see* Appaloosa MIL Br. 20), because Nealon provides permissible opinions regarding the concept of gain-on-sale obtained from his firsthand observations. *See, e.g., Liberty Media Corp.* v. *Vivendi Universal*, 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012) (concluding that industry expert could opine on purpose of a particular type of contractual clause in the industry); *NIC Holding Corp.* v. *Lukoil Pan Americas*, No. 05 Civ. 9372 (LAK) (FM), 2007 WL 1467424, at *2-4 (S.D.N.Y. May 16, 2007) (considering expert opinions as to how a particular contractual clause is typically understood in an industry); *Media Sport & Arts* v. *Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (finding that industry expert could opine on whether actions of a party to a transaction conform with industry custom and practice).

*Second*, Appaloosa claims that Nealon's industry custom and practice opinion is unreliable because Nealon did not provide specific examples, did not tie his own conduct to specific contractual language, and did not demonstrate why the actions he took or understandings he developed at LNR were consistent with the rest of the industry. (Appaloosa MIL Br. 23). But these challenges to the reliability of Nealon's opinions are actually attacks on the weight that should be afforded to them, and not their admissibility. As an initial matter, Nealon is entitled to rely on his 25 years at LNR to provide an

opinion on industry custom and practice. *See SR Int'l Bus. Ins.* v. *World Trade Ctr. Props.*, 467 F.3d 107, 132 (2d Cir. 2006) (upholding introduction of expert's opinions on industry custom and practice as reliable, where expert had over 30 years of experience in the relevant industry; was familiar with practices in the industry, including those at issue; and, through his experience, was able to identify an industry practice); *Pension Comm. of Univ. of Montreal* v. *Banc of Am. Sec. LLC*, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010) (noting that expert's description of his job experience and communications with others as part of his job "provides a sufficient link between his experience and his opinions to satisfy the reliability requirement of Rule 702"). And, in any event, Appaloosa's attacks on Nealon's opinions are factually incorrect: (i) Nealon provides an example to support his custom and practice opinion, in the form of the Astor Crowne Plaza sale; (ii) he ties his opinions to the language of the WBCMT PSAs for which LNR was special servicer; and (iii) he explains that his actions at LNR were consistent with other special servicers' actions based on discussions he had with them and his observations of the industry.

*Third*, and finally, Appaloosa contends that Nealon's opinions should be excluded because he is not impartial. Appaloosa explains that as an expert for CWC, Nealon is effectively defending positions he took and decisions he made as an employee of LNR, for which LNR could be exposed to liability if Nealon is wrong. (Appaloosa MIL Br. 26-27). Accordingly, Appaloosa contends that Nealon has a "particular reputational and potentially pecuniary interest in seeing Appaloosa's reading of the contract be rejected by the Court." (*Id.* at

27). CWC responds that Nealon retired from LNR in early 2018 before he was engaged as an expert in this case, and that since his retirement he has had no involvement or affiliation with LNR. (CWC/GSE MIL Opp. 27).

Having been provided with nothing more than speculation that Nealon "must be biased" due to reputational concerns, the Court agrees with CWC that Appaloosa's claim of bias goes to the weight, rather than admissibility of his opinions. *See, e.g., Int'l Cards Co.* v. *MasterCard Int'l*, No. 13 Civ. 2576 (LGS), 2016 WL 7009016, at *8 (S.D.N.Y. Nov. 29, 2016) ("[T]he mere fact that [the expert] is an employee of a party "does not automatically disqualify him from rendering expert testimony.""); *Tedone* v. *H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (holding that the fact that an expert was an employee for one of the defendants for over 30 years and an interested party was not disqualifying); *Knowledge Based Techs.* v. *Int'l Bus. Machines*, No. 96 Civ. 9461 (JSR), 1998 WL 164791, at *1 (S.D.N.Y. Apr. 8, 1998) ("[C]ourts routinely permit expert testimony by parties, employees, and others with financial and other plain interests in the outcome of the litigation"). Appaloosa does not cite any relevant authority to the contrary.

The Court need not consider the remainder of Appaloosa's challenges to Nealon's opinions, as it has already found admissible the opinions that it relies upon in granting summary judgment to CWC and the GSEs. Appaloosa's motion to exclude is thus denied in part and denied as moot.

**C.    The Court Denies as Moot CWC's and the GSEs' Motions to Exclude Appaloosa's Expert Witnesses**

CWC and the GSEs have also moved to exclude the expert testimony offered by Appaloosa's witnesses, Ann Hambly, Michael Hartzmark, and Andrew Berman, on various grounds.  (*See generally* CWC/GSE MIL Br.).  As with the prior motion to exclude, the Court accepts, for purposes of resolving the motion, that these three witnesses are qualified as experts in their field, and that their methodologies are sufficiently reliable.  But even more than with the prior motion, the Court has focused on issue of helpfulness, which it considers — in the context of summary judgment motions preparatory to a bench trial — to be a largely academic exercise.  Particularly as to Hartzmark and Berman, the Court equivocated whether even to accept the opinions, since such acceptance would imply a determination of helpfulness.  Ultimately, however, the Court admitted each of the opinions, considered them with care, and found them insufficient to raise a genuine dispute of material fact that could forestall summary judgment in favor of CWC and the GSEs.

The Court has outlined several deficiencies in these expert reports in this Opinion.  Dr. Hartzmark's economics "think piece" was, in the Court's estimation, too attenuated from the contract interpretation issues at hand to be useful, and far outweighed by contemporaneous and other empirical evidence.  (*See supra* at 84-85).  The Court also discounted Hambly's claim of "scrivener's error" in the definition of "Liquidation Expenses" because she disregarded several key pieces of evidence — including the practical operation of the 94 PSAs that Hambly reviewed and the industry practice (which Hambly

acknowledged) of lumping penalty interest in with liquidation expenses. (*See supra* at 77-78). And the Court ascribed little significance to Berman's testimony, other than his recollection of C-III collecting and sharing penalty interest in REO liquidations. (*See supra* at 89). But that is because the majority of Berman's opinions offered in rebuttal to Thomas Nealon comprised naked attempts at contract interpretation coupled with vague incantations of "training and experience."

Ultimately, Appaloosa's expert opinions were insufficient to stave off summary judgment. But they were considered, and carefully so. For this reason, the Court denies as moot the motions to exclude filed by CWC and the GSEs.

## CONCLUSION

For the foregoing reasons, CWC's motion for summary judgment is GRANTED; the GSEs' motion for summary judgment is GRANTED; Appaloosa's motion for partial summary judgment is DENIED; CWC's and the GSEs' motions to exclude are DENIED as moot; and Appaloosa's motion to exclude is DENIED insofar as the Court considered it above.

The Clerk of Court is directed to terminate the motions at Docket Entries 301, 311, 317, 322, 324, and 327. The parties are directed to submit a joint letter on or before **April 3, 2020**, concerning next steps in this action.

SO ORDERED.

Dated:    March 19, 2020
          New York, New York

                                  _____
                                  KATHERINE POLK FAILLA
                               United States District Judge