UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Trusts Established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30; COBALT CMBS Commercial Mortgage Trust 2007-C2 Commercial Mortgage Pass-Through Certificates, Series 2007-C2; Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C31; ML-CFC Commercial Mortgage Trust 2007-5 Commercial Mortgage Pass-Through Certificates, Series 2007-5; and ML-CFC Commercial Mortgage Trust 2007-6 Commercial Mortgage Pass-Through Certificates, Series 2007-6

17 Civ. 1998 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:[1]

This Opinion and Order resolves a lingering dispute between the remaining parties to this litigation, CWCapital Asset Management LLC ("CWC") on the one hand, and Appaloosa Investment L.P. I and Palomino Master Ltd. (collectively, "Appaloosa," and together with CWC, the "Parties") on the other. The underlying litigation was precipitated when, in early 2010, the owners of the Peter Cooper Village and Stuyvesant Town property ("Stuy Town") defaulted on their mortgage. Appaloosa was one of several investors (the "Certificateholders") in five CMBS trusts (the "CMBS Trusts" or "Trusts") that held loans (collectively, the "Senior Loan") secured by the doomed Stuy Town

---

[1]     Unless otherwise noted, citations to specific pages in docket entries reflect the page numbers provided by the Court's Electronic Case Filing ("ECF") system.  In addition, the Court uses the citing and abbreviation conventions adopted in prior opinions in this case.

mortgage.  One of the CMBS Trusts, the C30 Trust, was charged with administering the Senior Loan on behalf of the Trusts in accordance with a Pooling and Servicing Agreement (the "PSA").  CWC was appointed as the Special Servicer of the C30 Trust and was responsible for servicing the Senior Loan.

The instant dispute concerns the allocation and distribution of certain funds attributable to the eventual sale of Stuy Town in October 2015.  The Court considers both the Parties' proposed settlement of the dispute and Appaloosa's related request for attorneys' fees and expenses.  For the reasons set forth in the remainder of this Opinion, the Court approves the Parties' proposed settlement and Appaloosa's proposed allocation of that settlement, overrules the objection of interested party CWCapital Cobalt Vr Ltd. ("Cobalt") to the allocation, and grants in part Appaloosa's request for attorneys' fees and expenses.

## BACKGROUND

Familiarity with the extensive procedural history of this case, outlined in the prior opinions of this Court and the Second Circuit, is presumed.  *See Matter of Pooling & Servicing Agreements*, No. 17 Civ. 1998 (KPF), 2018 WL 1229702, at *2-5 (S.D.N.Y. Mar. 9, 2018) (denying cross-motions for judgment on the pleadings) ("*PSA I*"); *Matter of Trusts Established under the Pooling & Servicing Agreements relating to the Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 445-46 (S.D.N.Y. 2019) (granting CWC's motion to dismiss cross-claim filed by

Appaloosa) ("*PSA II*"); *CWCapital Cobalt Vr Ltd.* v. *U.S. Bank Nat'l Ass'n*, 790 F.

App'x 260, 264 (2d Cir. 2019) (summary order) (affirming the Court's denial of

motion to intervene by proposed intervenor Cobalt) ("*PSA III*"); *Matter of Trusts*

*Established under Pooling & Servicing Agreements relating to Wachovia Bank*

*Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, No. 17

Civ. 1998 (KPF), 2020 WL 1304400, at *1-16 (S.D.N.Y. Mar. 19, 2020)

(resolving cross-motions for summary judgment and challenges to expert

testimony) ("*PSA IV*"), *aff'd in part, rev'd in part and remanded sub nom.*

*Appaloosa Inv. L.P.I.* v. *Fed. Home Loan Mortg. Corp.*, No. 20-1708, 2022 WL

2720520 (2d Cir. July 14, 2022) (summary order) ("*PSA V*"); *see also* Dkt. #163

(order denying without prejudice motion to intervene of proposed intervenor

Inessoft LLC).

## A.    The Appeal and the Remand

In its last substantive decision in this case, this Court summarized its

relevant holdings as follows:

> As it currently stands, approximately $614 million in
> disputed funds have been allocated to CWCapital Asset
> Management LLC ("CWC"), which served as the Special
> Servicer for the Stuy Town property, in the form of
> Penalty Interest; and an additional $53 million has been
> allocated to the Federal Home Loan Mortgage
> Corporation ("Freddie Mac") and the Federal National
> Mortgage Association ("Fannie Mae," and together with
> Freddie Mac, the "Government-Sponsored Enterprises"
> or "GSEs") in the form of Yield Maintenance. Appaloosa
> Investment L.P.I. and Palomino Master Ltd. (collectively,
> "Appaloosa"), investors in various trusts that held
> assets secured by a mortgage on Stuy Town, contest
> those allocations. In Appaloosa's view, the disputed
> funds constitute Gain-on-Sale Proceeds that must be

directly deposited in a Gain-on-Sale Reserve Account for the benefit of certificateholders like it.

The evidence disclosed after more than a year of discovery makes clear that the funds in dispute are Penalty Interest and Yield Maintenance, and not Gain-on-Sale Proceeds. … Accordingly, and for the many reasons detailed in this Opinion, CWC's and the GSEs' motions for summary judgment are granted; Appaloosa's motion for partial summary judgment is denied; Appaloosa's motion to exclude CWC's and the GSE's expert testimony is denied in part on the merits and denied in part as moot; and CWC's and the GSEs' motions to exclude Appaloosa's expert testimony are denied as moot.

*PSA IV*, 2020 WL 1304400, at *1.

On appeal, the Second Circuit found that this Court had not erred in "concluding that extrinsic evidence supports CWC's and the GSEs' position that Penalty Interest and Yield Maintenance must be paid prior to Gain-on-Sale Proceeds." *PSA V*, 2022 WL 2720520, at *3. The Court of Appeals disagreed, however, with this Court's rejection of Appaloosa's argument that CWC was required to reimburse the Trusts for certain Interest on Advances, finding instead that "any portion of the $67.2 million attributable to Interest on Advances accruing after June 3, 2014 must be paid out of Gain-on-Sale Proceeds from the sale of Stuy Town; any portion attributable to Interest on Advances accruing on or before June 3, 2014 must be paid out of late payment charges and Penalty Interest." *Id.* at *4. The Second Circuit then remanded the matter to this Court to determine the relevant accrual dates and concomitant amounts. *Id.*

**B.**    **The Proposed Settlement**

After the mandate issued from the Second Circuit, the Court entered an order on August 30, 2022, directing the Parties to file a joint letter proposing next steps in the litigation.  (Dkt. #428 (mandate); Dkt. #429 (order)).  On September 29, 2022, the Parties advised the Court that they were "engaged in discussions over a potential consensual resolution of the post-remand issues," and sought additional time to discuss settlement, which the Court granted. (Dkt. #430 (joint letter); Dkt. #431 (endorsement)).  Cobalt also announced its reservation of rights to renew its motion for leave to intervene, though no such motion was made.  (Dkt. #432 (reservation of rights); Dkt. #433 (Court endorsement acknowledging that Cobalt was not then renewing its motion, and directing Cobalt to "inform the Court promptly should circumstances change")).

By letter dated November 14, 2022, the Parties advised the Court that "Appaloosa and [CWC] have reached an agreement in principle concerning the amount of Interest on Advances to be reimbursed to the CMBS Trusts," and sought time to prepare the relevant documents and to discuss related issues with the trustee of the C30 Trust (the "Trustee").  (Dkt. #434 (letter); Dkt. #435 (endorsement); *see also* Dkt. #436 (proposed schedule); Dkt. #437 (endorsement adopting schedule); Dkt. #438 (proposed order regarding notice to certificateholders); Dkt. #439 (endorsed Order)).  The cornerstone of the proposed settlement was a $27.5 million payment from CWC (the "Settlement Payment"), which payment would be distributed to the Certificateholders net of

5

fees and expenses.  (*See* Dkt. #452-1 (Proposed Settlement Agreement) at 37-41).

According to the Parties' recitals, in order to avoid protracted litigation on remand, the Parties stipulated that "the amount of Interest on Advances that accrued on or before June 3, 2014 is $27.5 million."  (Dkt. #452-1 at 38).  To be clear, however, the Parties made no similar stipulation regarding the portion of Interest on Advances that had accrued after that date.[2]  Moreover, the Parties agreed that execution of and/or performance pursuant to the Settlement Agreement was *not* to be "understood as an acknowledgment of responsibility, admission of liability, or other expression reflecting upon the merits of any dispute or claim between the Parties; and any such responsibility or liability is expressly denied."  (*Id.* at 39).

CWC agreed to transfer the $27.5 million Settlement Payment into an escrow account for distribution to Certificateholders to reimburse Interest on Advances.  (Dkt. #452-1 at 38).  Appaloosa then proposed that the Settlement Payment, net of attorneys' fees and expenses, be distributed *pro rata* among the five Trusts based on their respective shares of the Senior Loan as of the date of distribution, and that within each of the Trusts, the resulting funds be characterized as principal and distributed in accordance with their respective

---

[2]     This was not an oversight, nor did the Parties intend for the Court to subtract the Settlement Payment from the $67.2 million figure used by the Second Circuit to calculate the portion of Interest on Advances that had accrued after June 3, 2014.  To the contrary, CWC explained that the $67.2 million figure "wasn't the right number" from which to make calculations, and that the Second Circuit had "shorthanded" PSA § 3.05 such that "there weren't, in fact, $67 million of advances that were reimbursed when the distribution was made."  (Dkt. #462 at 24-25).

PSAs.  (*Id.* at 4-5; *see also* Dkt. #455 at 2).  CWC took no position regarding characterization of the Settlement Payment or Appaloosa's proposed allocation of it.

On December 27, 2022, Appaloosa filed its motion for attorneys' fees and expenses (the "Fee Petition").  (Dkt. #445-448).[3]  Broadly speaking, Appaloosa sought to recover $7,912,052.80 in attorneys' fees, as well as $1,063,359.85 in expenses from the $27.5 million settlement fund, noting that the Settlement Payment was entirely attributable to its efforts over "more than six years of intensive, hard-fought litigation."  (Dkt. #446 at 5).

On January 13, 2023, the Trustee filed a copy of the notice (the "Notice" (Dkt. #452-1)) that was being distributed to the Certificateholders to advise them that

> (i) CWC and the objecting investors have reached a settlement concerning the remaining unresolved issue concerning the proper allocation of the Disputed Funds, (ii) the objecting investors have filed a motion seeking attorneys' fees, and (iii) the deadline to appear in the Proceeding and submit a memorandum of law objecting to the settlement or opposing the objecting investors' motion seeking attorneys' fees is February 10, 2023.

(Dkt. #452-1 at 2; *see also* Dkt. #452 (declaration of Christopher Nuxoll regarding dissemination of Notice)).  The Notice included among its exhibits the Court's April 2020 Judgment, the Second Circuit's July 2022 summary order,

---

[3]     Earlier filings of this motion on December 23 and 24, 2022, were rejected by the Clerk's Office.  (*See* Dkt. #441-443).

the Settlement Agreement between the Parties, a proposed Post-Remand Order Issuing Judicial Instructions, and a copy of Appaloosa's Fee Petition.

Pursuant to the Notice, objections to the proposed settlement were due on or before February 10, 2023.  Only one objection was received, and it was from Cobalt.  (Dkt. #453, 454).[4]  Cobalt objected both to the allocation of the Settlement Payment and to the attorneys' fees sought by Appaloosa.  As to the former, Cobalt argued that the Settlement Payment should be construed as a reimbursement of Gain on Sale Proceeds:

> [T]he amount of Interest on Advances that accrued before June 2014 was $27.5 million.  In other words, [CWC]'s Penalty Interest was *over*stated by $27.5 million, and Gain-on-Sale Proceeds were *under*stated by $27.5 million.  The settlement payment is thus a return to the [CMBS] Trusts and their [C]ertificateholders of $27.5 million of Gain-on-Sale Proceeds that should have been distributed on the January 2016 distribution date from the Stuy Town sale proceeds.

(Dkt. #453 at 5).  According to Cobalt, the PSA "require[d] that these additional Gain-on-Sale Proceeds be applied as of that January 2016 distribution date," and that it be applied "to reimburse Realized Losses of written-down certificates, in order of priority, that existed when the liquidation sale that generated those proceeds occurred."  (*Id.*).  With respect to the Fee Petition, Cobalt contended that the figure sought by Appaloosa was excessive, inasmuch as (i) most of its arguments had been rejected by this Court and the Second

---

[4]   The Court received one letter from another Certificateholder, DW Partners, LP, supporting both the settlement agreement and the proposed allocation, and requesting immediate distribution of the unchallenged portion of the funds pending resolution of the attorneys' fees issue.  (Dkt. #459).

Circuit, and (ii) the basis for remand that had engendered the Settlement

Payment had not been argued by the Parties.  (*Id.* at 17-19).

Appaloosa replied in further support of its request for fees, and in

opposition to Cobalt's objection, on February 22, 2023.  (Dkt. #455).  Focusing

first on the allocation issue, Appaloosa contended that Cobalt was misreading

the PSA, and raising arguments that had been rejected by another court that

had examined that PSA.  (*Id.* at 4).  In particular, Appaloosa explained that

"[n]ew money is coming into the Trusts that is now available for distribution to

Certificateholders, and in accordance with the PSAs' terms, those funds must

be distributed to existing Certificateholders as of the next Distribution Date."

(*Id.* at 5).  Conversely, Appaloosa opposed construction of the Settlement

Payment as Gain on Sale Proceeds.  (*Id.* ("The $27.5 million constitutes

reimbursement of Interest on Advances to the Trusts, which CWC was required

to make out of Penalty Interest under Sections 3.05(a)(ix) and 3.11(d) of the

PSA.  In no way can the settlement fund be characterized as Gain-on-Sale

Proceeds.")).  As legal support for its arguments, Appaloosa cited decisions from

Minnesota and New York state courts.  (*Id.* at 6-8, 12-13).

Of note, Appaloosa explained that the Parties' proposed settlement had

obviated the inquiry that the Second Circuit had directed this Court to conduct

on remand:

> The Second Circuit could not have been clearer on this
> point when it held that "any portion of the $67.2 million
> attributable to Interest on Advances accruing after
> June 3, 2014 must be paid out of Gain-on-Sale
> Proceeds from the sale of Stuy Town; any portion

attributable to Interest on Advances accruing on or before June 3, 2014 must be paid out of late payment charges and Penalty Interest." *Appaloosa Investment L.P. I* v. *Federal Home Loan Mortgage Corp.*, 2022 WL 272052, at *4 (2d Cir. July 14, 2022) (emphasis modified). The issue the Court of Appeals resolved was which source of funds — Penalty Interest or Gain-on-Sale Proceeds — would be used to reimburse the Trusts for Interest on Advances. Regardless of which source is used, however, the funds themselves are still reimbursement for Interest on Advances — the reimbursed amounts do not magically become Gain-on-Sale Proceeds merely because the reimbursement comes from Penalty Interest. *On remand, the parties reached an agreement that CWC would repay $27.5 million of the Penalty Interest it retained to resolve the factual issue identified by the Second Circuit concerning what portion of the Trusts' unreimbursed Interest on Advances accrued on or before June 3, 2014.* The Settlement Payment themselves thus constitute reimbursement to the Trusts for Interest on Advances. They are not Gain-on-Sale Proceeds, and the Second Circuit has never said they are.

(Dkt. #455 at 8-9 (emphasis added)).[5]

## C.  The May 5, 2023 Hearing on the Proposed Settlement

The Court held a lengthy hearing on the proposed settlement on May 5, 2023. (Dkt. #462 (transcript)). With somewhat greater detail, the Parties explained to the Court how the proposed settlement resolved the dispute between them (and thus obviated the need for further proceedings), but did not fully resolve the issue on which the Second Circuit had predicated its remand.[6]

---

[5]     Appaloosa also addressed Cobalt's arguments regarding its Fee Petition, and requested again that the Court award that motion in its entirety. (Dkt. #455 at 10-19).

[6]     The Court also heard oral argument on Appaloosa's Fee Petition, which arguments are discussed later in this Opinion.

Appaloosa emphasized that "[t]he only thing that the Second Circuit held was that [CWC] had an obligation under the PSA to use penalty interest to reimburse interest on advances that accrued prior to June of 2014 and then remanded to this court to determine what the amount of that figure was, what the amount of those interests on advances were."  (Dkt. #462 at 12; *see also id.* at 13 ("[T]he Second Circuit did not hold that [CWC] had an obligation to remit $27.5 million to the [T]rust[s] back in December of 2015."); *id.* at 17 ("The only thing CWC had an obligation to do, according to the Second Circuit, was to use penalty interest to reimburse some portion of the interest on advances that had accrued as of the time of sale.")).  According to Appaloosa, had there been proceedings on remand, the Parties were fully prepared to return to the trenches to litigate the amount of Interest on Advances reimbursable to the Trusts, irrespective of accrual date.  Indeed, and perhaps not surprisingly, CWC was prepared to argue that "the amount of reimbursable interest on advances was still zero."  (*Id.* at 14).

The Parties explained that to avoid adding more years to the six that had already been spent in litigation, they had agreed to settle the matter by having CWC contribute $27.5 million as reimbursement for Interest on Advances that could then be distributed to Certificateholders.  (Dkt. #462 at 17).  CWC underscored the point, making clear that the $27.5 million was a "true settlement" in three ways.  (*Id.* at 24).  *First*, it resolved what CWC alleged to be a "shorthand" in the Second Circuit's read of PSA § 3.05 that had yielded erroneous mathematical calculations by the Circuit.  (*Id.* at 24-25).  *Second*, it

11

forestalled what would have been extensive disputes with the Trustee regarding CWC's liability under a negligence standard.[7]  (*Id.* at 25-26; *cf. id.* at 28-31 (counsel for Trustee explaining how such a dispute might have proceeded)).[8]  *Third*, counsel emphasized that CWC was only willing to be party to a settlement that had no finding, implicit or explicit, that it did something wrong:

> [T]he one thing I was going to say today — and now I get a chance to say it — is it is a crucial component of the settlement that there is no admission of liability by [CWC] of wrongdoing because I think the record is very clear that their reading was reasonable, that the ruling that we got was one-off and sort of a surprise to everyone, and we are still in litigation with Cobalt separately where they want to point to the outcome here as some sort of admission of wrongdoing.  *And if it is going to be written up that way or interpreted that way, we are out with our [$27.5 million].*  That was a key thing in the settlement.  We are willing to put the [$]27.5 [million] in and say we are done and nobody objects to that determination and that number, but we don't want to do it if it results in that we somehow are admitting that we did something wrong because we don't believe we did.

---

[7]    *See also* Dkt. #462 at 25-26:

> What it would have resulted in is your excellent opinion and then the Second Circuit layered on top; guidance with respect to how these provisions should be interpreted in the PSA, and then that guidance would have gone to the [T]rustee and then I would have started arguing with Mr. Biron and he would have had more of a speaking role because CW[C] would have said that's a nice reading but we are not tasked with perfection, we are only liable for negligence.  And your Honor's opinion had said early on that our reading of the PSA was reasonable. And the Second Circuit applied a reasoning which had never been applied.  And we came forward with evidence that no one in the industry had ever adopted that. And we would have said, well, that might be a perfect reading on a going-forward basis, CW[C]'s reading in 2015 was reasonable, and therefore we have no liability.

[8]    The Trustee did not take a position on the reasonableness of the settlement, but simply sought instruction from the Court.  (Dkt. #462 at 30).

(*Id.* at 26 (emphasis added)).[9]  Precisely for this reason, CWC was unwilling to characterize the Settlement Payment as anything other than a "pot of money," and was particularly resistant to efforts by Cobalt to characterize the funds in a manner that suggested error or misconduct on the part of CWC.  (*See id.* at 61 ("But we did just put a pot of money as a settlement, and paragraph 8 of the settlement agreement is — actually, without paragraph 8 we would not settle, we won't pay the [$27.5 million], and that's what you were being asked to step behind in order to reach Cobalt's argument which is to characterize this as a mistake or an error.")).

At the May 5, 2023 hearing, Cobalt maintained its objection to the allocation of the Settlement Payment.  (*See* Dkt. #462 at 33-35).  Cobalt considered Appaloosa's proposed allocation to be "grossly inequitable and unfair because the harm that was identified, the calculation error that was finally determined to exist in front of the Second Circuit, was an error that nobody here disputes caused harm to the holders of the senior-most written down certificates as of January 2016."  (*Id.* at 36; *see also id.* (noting that such a settlement was not "appropriate relief in a proceeding like this where the Court is tasked with instructing the [T]rustee on how to fairly and equitably administer the [C30 Trust]")).  According to Cobalt, the Court's authority on remand was "quite narrow," and did not include approval of the proposed settlement agreement.  (*Id.*).  Instead, Cobalt offered a modified Realized Loss

---

[9]     As a corollary to this position, CWC made clear that it was not taking a position with respect to allocation of the Settlement Payment.  (*See* Dkt. #462 at 27, 47, 61).

Report that purported to explain how the Court could equitably allocate the Settlement Payment. (*Id.* at 40-43).

In the course of the hearing, the Court discussed with the litigants its authority *vel non* to modify the settlement proposal. Cobalt suggested that the Court retained the ability to "re-characterize [the Parties'] settlement" by accepting the $27.5 million figure but allocating it differently. (Dkt. #462 at 44). To the extent that its view was not accepted by the Court, Cobalt asked that the proposed settlement be rejected, going so far as to argue that Appaloosa lacked standing to participate in the proceedings on remand and, as such, ought not be able to "achieve, by settlement, money that they had no right to in the first place." (*Id.* at 49). Appaloosa stated its view of the Court's discretion more directly:

> OK, so taking the elephant in the room, because I think it is important, our position is that your Honor does have the authority to decide the allocation as part of this and I don't think any of the parties to this litigation would be interested or believe it is in the best interests of the [C30 Trust] for the Court to reject the settlement so that we can enter into settlement negotiations over an allocation that I will virtually guarantee you will not lead to a settlement and the issue is just going to come right back to the Court.

(*Id.* at 52). And finally, CWC believed that the Court could theoretically reallocate the Settlement Payment, so long as it did so in a manner that did not indicate liability on CWC's part. (*Id.* at 61-62).

## D.   The Request for Supplemental Briefing

On September 22, 2023, the Court requested supplemental briefing concerning "the legal standards pursuant to which the Court should evaluate

the proposed settlement," noting the complications to the analysis occasioned "by choice-of-law issues, as well as the Trustee's decision to take no position concerning the proposed settlement." (Dkt. #464). Appaloosa and Cobalt each submitted a written letter brief articulating its respective position on October 13, 2023. (Dkt. #465 (Appaloosa); Dkt. #466 (Cobalt)).

The litigants agreed as to two elements of the Court's discretion. *First*, both recognized that New York law governs the Court's determination of the substantive issues in play. (Dkt. #465 at 1 ("Because the Pooling and Servicing Agreement ('PSA') for the C30 Trust contains a New York choice-of-law provision, New York law provides the substantive standards for approval of the settlement."); Dkt. #466 at 2 n.1 ("Though this action was brought under Minnesota's trust-instruction statute, … New York law governs here.")).

*Second*, both litigants agreed as to the implications of the Trustee's decision to take no position regarding the disputed settlement: The Trustee's indifference rendered inapposite a line of cases espousing a deferential standard pursuant to which the Court should approve the settlement so long as the Trustee acted "reasonably and in good faith." (Dkt. #465 at 2 ("While the decision to remain neutral is in itself an exercise of the Trustee's discretion, it does not fit the paradigm for application of the 'reasonableness' and 'good faith' standards from *Bank of New York Mellon* and similar cases, where the [t]rustee affirmatively sought judicial approval on behalf of the trust as a whole of its proposed resolution of litigation in accord with its duties as trustee. We have not found a case that directly addresses the standard of review for approval of

a settlement in a [trust instruction] proceeding where the [t]rustee is taking a neutral position on the settlement's merits."); Dkt. #466 at 1 ("Cases that review a trustee's discretionary decision to enter into a settlement agreement for abuse of discretion do not apply because, here, the trustee has not exercised its discretion (or, necessarily, undertaken the process required to ensure a good-faith and reasonable exercise of its discretion).")).

From this point, the legal standards proposed by the litigants varied. Appaloosa suggested a specific standard, *viz.*, the standard of "fair and reasonable" that New York courts have employed in evaluating settlements in shareholder derivative actions.  (Dkt. #465 at 2-3).  Such a standard, Appaloosa argued, would "enable[ ] the Court to safeguard the interests of the Trusts as a whole by kicking the tires on the proposed settlement and guarding against the risks of collusion between the settling parties."  (*Id.* at 2).  By contrast, Cobalt argued a more generalized position, observing that "[w]here, as here, a trustee asks for the court's guidance on the proper distribution of funds returned to the trust, the court exercises its equitable powers to fashion an appropriate remedy."  (Dkt. #466 at 1; *see also id.* at 2 ("The 'power to grant instructions to trustees has long been viewed, in prior Restatements and in most states, as inherent in the equitable powers of courts having jurisdiction over trusts[.]'" (citing RESTATEMENT (THIRD) OF TRUSTS § 71 cmt. a))).[10]

---

[10]    Both sides also took the opportunity to reargue their positions concerning the fairness of the proposed settlement.  (*See* Dkt. #465 at 2-4; Dkt. #466 at 3-6).

**DISCUSSION**

**A.    The Court Approves the Proposed Settlement**

   **1.    Applicable Law**

   To evaluate the proposed settlement in this case, this Court has adopted
Appaloosa's suggestion of the legal framework that New York courts employ to
evaluate settlements shareholder derivative actions, as supplemented by New
York's comparable framework for evaluating class action settlements.  As
contrasted with Cobalt's suggestions, Appaloosa's suggested framework
provides actual guideposts for the Court's exercise of its discretion.  In
addition, the Court finds that the interests sought to be achieved by these
frameworks, including protection of minority/absent class members,
prevention of collusion between the parties to the litigation, and ensuring an
equitable distribution of assets obtained as part of the settlement, are also
applicable in this setting.  And as suggested by the preceding section of the
Opinion, there is substantial overlap in the two proposals, and Appaloosa's
differs from Cobalt's principally in its granularity.

   Because this case began with a trust instruction proceeding ("TIP") in
Minnesota state court that was then removed to the United States District
Court for the District of Minnesota before being transferred to this District, the
applicable choice-of-law rules are those of Minnesota.  *See* 12 U.S.C.
§ 1452(f)(2)-(3); 28 U.S.C. §§ 1404(a), 1442, 1446; *see also Ferens* v. *John Deere
Co.*, 494 U.S. 516, 523 (1990) (requiring transferee forum, in cases transferred
pursuant to 28 U.S.C. § 1404(a), to apply the law of the transferor court,

17

irrespective of which party initiated the transfer); *U.S. Bank Nat'l Ass'n* v. *Bank of Am. N.A.*, 916 F.3d 143, 154 (2d Cir. 2019) ("Transfers under § 1404(a) by a court that has jurisdiction are adjudicated in the transferee state under the law of the transferor state.  This is to avoid the unfairness of having a discretionary transfer done for convenience change the law under which the case will be decided.").  Courts in Minnesota, in turn, have consistently applied New York law in mortgage-backed securities cases where the underlying agreements contain a New York choice-of-law provision.  *See, e.g.*, *Matter of Merrill Lynch Mortg. Invs. Tr., Series 2006-RM4*, No. A21-1350, 2022 WL 1769074, at *4 (Minn. Ct. App. May 31, 2022) ("The PSAs contain identical New York choice-of-law provisions.  We uphold choice-of-law provisions 'and will interpret and apply the law of another state where such an agreement is made.'" (internal citation omitted) (collecting cases)); *Matter of Am. Home Mortg. Assets Tr. 2007-5*, No. A18-0768, 2019 WL 1431923, at *4 (Minn. Ct. App. Apr. 1, 2019) ("While Minnesota law governs the procedural aspects of this court's review, interpretation of the PSA and Servicing Agreement is governed by New York law under the choice-of-law provisions included in the trust documents.").

New York courts analyze shareholder derivative action and class action settlements under a "fair and reasonable" standard, which considers, among other factors, "the likelihood of success, the extent of support from the parties, the judgment of counsel, the presence of bargaining in good faith, and the nature of the issues of law and fact."  *Klurfeld* v. *Equity Enterprises, Inc.*, 436 N.Y.S.2d 303, 308 (2d Dep't 1981) (collecting cases); *accord Gordon* v. *Verizon*

18

*Commc'ns, Inc.*, 46 N.Y.S.3d 557, 561 (1st Dep't 2017); *cf. Carson* v. *American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement[.]" (citing *Protective Comm. for Independent Stockholders* v. *Anderson*, 390 U.S. 414, 424-425 (1968))); *In re Colt Indus. S'holder Litig.*, 553 N.Y.S.2d 138, 141 (1st Dep't 1990) ("While [New York Civil Practice Law and Rules ('CPLR')] Rule 908 does not prescribe specific guidelines for a Court to follow in determining the merits of a proposed class action settlement 'case law suggests the components which should be considered in reviewing a settlement: the likelihood of success, the extent of support from the parties, the judgment of counsel, the presence of bargaining in good faith, and the nature of the issues of law and fact[.]" (internal citations omitted)), *aff'd as modified sub nom. Colt Indus. S'holder Litig.* v. *Colt Indus. Inc.*, 77 N.Y.2d 185 (1991).[11]  Such a

---

[11]    *Cf. Fiala* v. *Metro. Life Ins. Co.*, 899 N.Y.S.2d 531, 537-38 (Sup. Ct. N.Y. Cnty. 2010):

> CPLR § 908 requires the court to approve any compromise of a class action.  Although the statute does not define the criteria for such approval, New York's courts have recognized that its class action statute is similar to the federal statute [*In re Colt Indus. Shareholder Litig.* v. *Colt Indus. Inc.*, 77 N.Y.2d 185, 194, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991); *Avena* v. *Ford Motor Co.*, 85 A.D.2d 149, 152, 447 N.Y.S.2d 278 (1st Dept. 1982); *Friar* v. *Vanguard Holding Corp.*, 78 A.D.2d 83, 93, 434 N.Y.S.2d 698 (2d Dept. 1980)] and have looked to federal case law for guidance. *Klein* v. *Robert's Am. Gourmet Food, Inc.*, 28 A.D.3d 63, 808 N.Y.S.2d 766 (2d Dept. 2006); *In re Colt Indus. Shareholder Litigation* v. *Colt Indus., Inc.*, 155 A.D.2d 154, 160, 553 N.Y.S.2d 138 (1st Dept. 1990), *modified on other grds.* 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991).  Hence, court approval is determined by the fairness of the settlement, its adequacy, its reasonableness and the best interests of the class members. *Klein, id.* at 73, 808 N.Y.S.2d 766; *Rosenfeld* v. *Bear Stearns & Co.*, 237 A.D.2d 199, 655 N.Y.S.2d 473 (1st Dept.), *lv. denied* 90 N.Y.2d 811,

standard allows courts to strike an appropriate balance "balance between the tyranny of majority shareholders and the selfish recalcitrance of minority shareholders." *Klurfeld*, 436 N.Y.S.2d at 309.[12]

## 2. Analysis

The Court begins its analysis of the proposed settlement by considering several threshold issues that were occasioned by the Parties' and Cobalt's arguments on May 5, 2023, and reiterated in the supplemental submissions of

---

666 N.Y.S.2d 100, 688 N.E.2d 1382 (1997). *See Joel A.* v. *Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000); *Grunin* v. *International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (settlement should be fair, reasonable and adequate).

Adequacy requires "balancing the value of that settlement against the present value of the anticipated recovery following a trial on the merits, discounted for the inherent risks of litigation." *Klein, id. See Colt Indus.*, 155 A.D.2d at 154, 553 N.Y.S.2d 138 (fairness is determined by weighing plaintiff's likelihood of success against settlement offered). Other factors to be considered are the support of the class members, the opinion of counsel, lack of collusion and counsels' and class representatives' adherence to fiduciary standards. *Hibbs* v. *Marvel Enters.*, 19 A.D.3d 232, 233, 797 N.Y.S.2d 463 (1st Dept. 2005); *Avena*, 85 A.D.2d at 153, 447 N.Y.S.2d 278. *See Klurfeld* v. *Equity Enterprises, Inc.*, 79 A.D.2d 124, 133, 436 N.Y.S.2d 303 (2d Dept. 1981) (factors to be considered in reviewing class settlement are: likelihood of success, support of parties, judgment of counsel, good faith and nature of law and fact); *Joel A.*, 218 F.3d at 139 (lack of collusion is factor to be considered); *Wal-Mart Stores Inc.* v. *Visa USA Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."). Consideration of the relevant criteria weigh in favor of approval here.

12    The Court recognizes that the fit is not perfect, inasmuch as courts in the shareholder derivative setting lack the power to modify the settlement, and certain of the litigants here have suggested that this Court, sitting in equity, has such power. *See generally Benedict* v. *Whitman Breed Abbott & Morgan*, 910 N.Y.S.2d 474, 475 (2d Dep't 2010) ("The court must determine whether a proposed settlement of a shareholder derivative claim is fair and reasonable to the corporation and its shareholders, then 'either approve or disapprove the settlement.'" (collecting cases)). However, the Court agrees with Appaloosa that the factors used to ascertain the fairness of shareholder derivative and other class actions are also useful in this context.

October 13, 2023. *First*, given the foundational premise of many of Cobalt's claims, the Court considers whether the proposed settlement is the product of collusion between the Parties, and finds easily that it is not.[13]  The Parties have agreed on precious little during this litigation, as the number of entries in this docket attests.  Even now, CWC demurs in characterizing the Settlement Payment, and takes no position on Appaloosa's proposed allocation.

This Court also agrees with the Parties that a remand proceeding focusing on identifying accrual dates and correlative amounts of Interest on Advances would entail more of the same, with hard-fought litigation on both sides followed by an appeal to the Second Circuit from the losing side.  What is more, having considered the issue in greater detail after the May 5, 2023 hearing, the Court agrees with CWC that it has creditable (albeit not slam-dunk) arguments regarding its obligation to make *any* payments to Certificateholders.  In other words, were the Court to reject the proposed settlement and attempt the historical reconstruction envisioned by the Second Circuit, there would be both the certainty of protracted litigation *and* the possibility of the Court arriving at the exact same conclusions, although for different reasons, at the end of those proceedings.

---

[13]    Related to this point is the question of whether Cobalt was improperly excluded from the settlement discussions.  (Dkt. #453 at 4 ("That Proposed Allocation contravenes the [ ] Trusts' PSAs and reflects a blatant effort by Appaloosa, the only [C]ertificateholder at the negotiating table, to benefit itself at the expense of the affected [C]ertificateholders who are the rightful recipients of those amounts.")).  It was not.  Cobalt's prior motion to intervene was denied and that denial upheld by the Second Circuit; it was, accordingly, not entitled to a seat at the table.  And to the extent that Appaloosa's and Cobalt's interests diverged regarding the proper allocation of the Settlement Payment, Cobalt was given a full and fair opportunity to object, including the opportunity to speak at oral argument and to submit supplemental briefing.

21

*Second*, the Court has considered Cobalt's argument that the proposed settlement is an impermissible end-run around the Second Circuit's remand order.[14]  For similar reasons, the Court finds in the negative.  CWC has clarified for the Court how the Second Circuit's analysis may have departed from the text of PSA § 3.05 and the underlying record, and such imprecision would almost certainly have yielded extensive litigation on remand.  Put somewhat differently, the task suggested by the Circuit's summary order cannot be completed with simple arithmetic.  And if the two parties who have spent the most and fought the most in this litigation wish to resolve it in a way that yields millions of dollars for Certificateholders, it would confound logic for this Court to force them to continue fighting.  *See Klein* v. *Robert's Am. Gourmet Food, Inc.*, 808 N.Y.S.2d 766, 774 (2d Dep't 2006) ("Where, as here, the action is primarily one for the recovery of money damages, determining the adequacy of a proposed settlement generally involves balancing the value of that settlement against the present value of the anticipated recovery following a trial on the merits, discounted for the inherent risks of litigation[.]" (internal citations omitted)); *Conolly* v. *Universal Am. Fin. Corp.*, 873 N.Y.S.2d 232 (Table), 2008 WL 4514098, at *8 (Sup. Ct. Westchester Cnty. Oct. 8, 2008) ("The court should also take into account the risks and costs of continued

---

[14]    The Court adds "impermissible" because, by obviating the need for proceedings on remand, the Parties' proposed settlement is, technically, an end-run around the Second Circuit's decision.

litigation and balance those risks and costs against the benefits to be derived from the settlement[.]" (citing *Klein, Inc.*, 808 N.Y.S.2d at 775)).

As its *third* and final antecedent issue, the Court has considered the Parties' and Cobalt's positions regarding the Court's ability to modify the proposed allocation, rather than reject the proposed settlement outright. Even assuming the Court had such discretion, there is an information asymmetry that forecloses its practical ability to characterize, much less carve up, the Settlement Payment. In this regard, the Court accepts the fact that the $67.2 million figure cited in *PSA V* is overstated (*see* Dkt. #462 at 24 ("CW[C] would have argued that if you were doing the math you would have been at $19.1 million against $33.3 million, so that when you applied [PSA §] 305(a) and you look at [*PSA V*], you could have been at either of those places.")), and acknowledges that it lacks sufficient information to calculate either the correct figure of reimbursable Interest on Advances or the dates on which each accrued.[15] The Court also shares CWC's concern that re-characterization of the Settlement Payment could not be accomplished without ascribing some degree of liability to CWC, which would then imperil the entire settlement. (Dkt. #462 at 61 ("We are specifically putting forward a pot of money to resolve everything.... And anything that goes beyond that in order to get to a resolution, we object to and that is contrary to what we agreed to do.")). Faced

---

[15]   Echoing its prior point, the Court is not going to force the Parties to continue this litigation just to obtain that information.

then with a binary decision on the proposed settlement, the Court chooses approval.

Having addressed the antecedent issues raised by the Parties and Cobalt, the Court evaluates the settlement in view of the factors set forth in cases like *Colt Industries*, *Klurfeld*, and *Klein*. As just noted, the proposed settlement was reached after extensive, good-faith negotiations. The Settlement Payment would be a sum certain distributed to Certificateholders in the short term, rather than a potentially larger (but also potentially much smaller) sum distributed to Certificateholders, if at all, after additional years of litigation and net of even more attorneys' fees and costs. And only one Certificateholder has objected to the proposed settlement.

The Court's decision to approve is aided by the fact that it agrees with Appaloosa's factual and legal arguments regarding the characterization (and thus the allocation) of the Settlement Payment. The Second Circuit found that any portion of the $67.2 million "attributable to Interest on Advances accruing on or before June 3, 2014 must be paid out of late payment charges and Penalty Interest." *PSA V*, 2022 WL 272052, at *4. The parties have stipulated that that amount is $27.5 million. But as Appaloosa notes (Dkt. #455 at 8-9), what the Second Circuit actually resolved was from which bucket the reimbursement would come, Penalty Interest or Gain on Sale Proceeds; in either case, the funds still constituted reimbursements to the Trusts for

Interest on Advances.[16]  Under the PSA, these funds are to be deposited in the Distribution Account, from which they would be distributed to Certificateholders on the next Distribution Date.  (*See, e.g.*, C30 PSA §§ 1.01 (definitions), 3.04(b) (distribution accounts), 4.01(a) (distributions to certificateholders), 4.05(a) (calculation of distributions and allocations)).

The allocation Appaloosa proposes accords with that adopted by the Ramsey County (MN) District Court in a separate trust proceeding involving the C30 Trust (the "Wells TIP").  *See In re the Trust Established Under the Pooling and Servicing Agreement Relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30*, Court File No. 62-TR-CV-19-33 (Minn. Dist. Ct.) (Dkt. #455-3 (opinion granting senior certificateholders' motion for summary judgment); Dkt. #455-4 (order issuing judicial instructions)).  In brief, the *Wells* court construed the PSA both to allow CWC to establish litigation reserves and to require that unused reserves be distributed by the Paying Agent to Certificateholders "on the Distribution Date immediately following the entry of this order," without consideration of "how

---

[16]     *See also* Dkt. #455 at 10:

> Because the reimbursement of Interest on Advances with Penalty Interest does not reduce the Purchase Price of the loan, it by definition also does not increase Gain-on-Sale Proceeds.  The effect of using Penalty Interest for reimbursement of Interest on Advances is simply to reduce the Penalty Interest retained by CWC, which is outside the Purchase Price calculation altogether.  It does not convert the money used for reimbursement of Interest on Advances into Gain-on-Sale Proceeds.  Appaloosa's proposed allocation of the settlement funds thus fully accords with the PSA.

such funds would have been distributed in December 2018." (Dkt. #455-4 at 4).[17]

Conversely, the Court disagrees with Cobalt's request that the Settlement Payment "be treated as 'Gain-on-Sale Proceeds' in accordance with the PSAs and distributed according to the capital structures of the Stuy Town Trusts as of the distribution date in January 2016." (Dkt. #453 at 4). For starters, the Parties to the settlement went out of their way to construe the payment as reimbursement of Interest on Advances in accordance with the Second Circuit's directive — indeed, CWC refuses to characterize the Settlement Payment at all, and certainly not in any manner that suggests liability. That said, even if one were obligated to characterize the Settlement Payment, the Court agrees with Appaloosa that "the reimbursed amounts do not magically become Gain-on-

---

[17]   *See also U.S. Bank Nat'l Ass'n* v. *Fed. Home Loan Bank of Boston,* No. 652382/2014, 2016 WL 9110399, at *14 (Sup. Ct. N.Y. Cnty. Aug. 12, 2016):

> More significant than the burden of W&L's proposal is W&L's failure to point to any provision in the Governing Agreements authorizing, let alone requiring, BNYM to distribute settlement proceeds as if they had been acquired years earlier in the form of repurchase payments, or to discriminate among certificates on any basis other than their contracted-for level of seniority. W&L does not explain how the representation in the Prospectus Supplements, that repurchase payments would be distributed to investors "in the month following the month of [the] repurchase," is inconsistent with the Distribution Methodology, given that there has been no formal repurchase of loans, and the settlement proceeds will not come into the Trust collection accounts until some time in the future. As the Trustees further convincingly argue, W&L's argument reduces to the untenable contention that the Trustees must "roll back the clock" and distribute the settlement payment as if it had been paid before W&L's certificates were written down, at the time losses from breaches of representations and warranties were realized. (Pets.' Suppl. Memo., at 4.) Any such distribution would be a significant departure from the way in which funds are distributed to certificateholders under the PSAs in the regular course of the Trustees' business.

Sale Proceeds merely because the reimbursement comes from Penalty Interest."
(*See, e.g.*, Dkt. #455 at 9)).  Moreover, the Court believes that Appaloosa has
the better of the argument regarding the proper construction of the PSA, and
thus adopts it here:

> "Gain-on-Sale Proceeds" for a given loan is defined in
> Section 1.01 of the PSA as "the excess of (i) Liquidation
> Proceeds of the Mortgage Loan or related REO Property
> net of any related Liquidation Expenses, over (ii) the
> Purchase Price for such Mortgage Loan on the date on
> which such Liquidation Proceeds were received." (PSA
> at 41.) ...

> \*\*\*

> [W]hat matters for purposes of calculating the Purchase
> Price is when the Interest on Advances accrued, not how
> it is reimbursed.  Here, the Interest on Advances at
> issue accrued before Stuy Town was sold in December
> 2015 and remained accrued, yet unpaid, as of the sale
> date (the "date of purchase"), which means it was
> included in Purchase Price for the Stuy Town loan.  The
> fact that Penalty Interest is now being used to
> reimburse the Trusts for the Interest on Advances does
> not affect the calculation of Purchase Price at all,
> because it does not change the fact that said Interest on
> Advances was still accrued as of the date of the sale.
> Cobalt's argument is the equivalent of saying that,
> because the loan principal was paid off from the
> proceeds of selling the property, principal is excluded
> from the Purchase Price because it was no longer
> "outstanding."  That obviously makes no sense.

> Because the reimbursement of Interest on Advances
> with Penalty Interest does not reduce the Purchase
> Price of the loan, it by definition also does not increase
> Gain-on-Sale Proceeds.  The effect of using Penalty
> Interest for reimbursement of Interest on Advances is
> simply to reduce the Penalty Interest retained by CWC,
> which is outside the Purchase Price calculation
> altogether.  It does not convert the money used for
> reimbursement of Interest on Advances into Gain-on-

> Sale Proceeds.  Appaloosa's proposed allocation of the
> settlement funds thus fully accords with the PSA.

(*Id.* at 9-10).

After six years of litigation, the Court is sympathetic to the Parties' desire to distribute the remaining disputed funds and move on.  On review, the Court finds that the proposed settlement accords with the factors that courts in New York have developed to evaluate fairness and adequacy in analogous settings. With respect to procedural reasonableness, the proposed settlement was reached in the course of extensive, arm's-length negotiations between exceptionally sophisticated parties and their counsel.  With respect to substantive reasonableness, Appaloosa's characterization — and proposed allocation — of the Settlement Payment is fair, faithful to the provisions of the PSAs, and respectful of the particular priority rights for which the Certificateholders bargained.  It results in a tangible, and significant, benefit to the Certificateholders.  Finally, Appaloosa's position does not require the Court to prolong this litigation in order to imagine counterfactual timelines. Accordingly, for all of the reasons set forth in this section, the Court approves the proposed settlement, and rejects Cobalt's objection to it.

**B.      The Court Grants in Part Appaloosa's Motion for Attorneys' Fees and Expenses**

**1.      Appaloosa's Arguments**

There remains the issue of the fees and costs, if any, to which Appaloosa is entitled.  In its opening brief, Appaloosa argued that full reimbursement from the Settlement Payment of the attorneys' fees and expenses it had incurred in

the instant litigation was warranted.  (Dkt. #446).  Among other things, it

argued that "[g]iven how hard CWC fought this case and how persistently it

denied owing the Trusts any portion of the Penalty Interest it retained, this is a

remarkable result."  (*Id.* at 5-6; *see also id.* at 17 ("[B]y any measure, Appaloosa

achieved a superlative result.")).  During the May 5, 2023 hearing, the Court

was a bit more realistic about what Appaloosa had achieved, and expressed

some concern about awarding the totality of the fees and expenses sought:

> I am fine with people bringing lawsuits to clarify issues
> and I actually wrote a decision saying that the provision
> was ambiguous ....   But my fear is I don't want to
> incentivize someone to bring a lawsuit that makes an
> argument that is legally tenable in the sense that the
> relevant agreements don't exclude it, however it goes
> entirely against the course of practice in the industry,
> the understanding of the parties and things of that
> nature.  So, that's the problem that I have.  So, I would
> welcome your thoughts.  If you just want to stand on
> your papers that's fine too, but I wanted you to be aware
> that these were the concerns that I have.

(*Id.* at 65).  To his credit, Appaloosa's counsel then tempered his arguments,

focusing first on the benefits to Certificateholders and the prevention of unjust

enrichment.  (*Id.* at 65-66).  From there, counsel outlined the extensive efforts

Appaloosa had undertaken — at its own expense — to address CWC's

treatment of Penalty Interest, from the initial action in New York State Supreme

Court through the Minnesota TIP that was ultimately transferred to this Court.

(*Id.* at 66-68).  Counsel also acknowledged that Appaloosa had failed with

respect to its claims against the GSEs.  (*Id.* at 69).  Ultimately, Appaloosa

argued, $9 million was reasonable to spend to achieve a $27.5 million result,

but it asked the Court to determine "what you think a reasonable percentage of

the fund is to award for the work that was done and the result that was achieved." (*Id.* at 70-71).

### 2. Applicable Law

In the United States, "the general rule [is] that, absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co.* v. *Wilderness Soc'y*, 421 U.S. 240, 257 (1975). That said, the Supreme Court has recognized that "[l]imited exceptions to the American rule have, of course, developed. They have been sanctioned by this Court when overriding considerations of justice seemed to compel such a result." *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U.S. 714, 718-19 (1967).

In *Boeing Co.* v. *Van Gemert*, the Supreme Court stated that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." 444 U.S. 472, 478 (1980); *see also Goldberger* v. *Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The exception exists not only to incentivize counsel to take on appropriate cases, but also to prevent unjust enrichment. *See Fleischmann Distilling Corp.*, 386 U.S. at 719 ("[T]o have allowed the others to obtain full benefit from the plaintiff's efforts without requiring contribution or charging the common fund for attorney's fees would have been to enrich the others unjustly at the expense of the plaintiff.").[18]

---

[18]     *See also Fresno Cnty. Employees' Ret. Ass'n* v. *Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 68 (2d Cir. 2019):

> In contrast to fees awarded pursuant to fee-shifting provisions, fees awarded pursuant to the common-fund doctrine do not extract a tax on the losing party but instead confer a benefit on the victorious

For purposes of evaluating the reasonableness of attorneys' fees, courts in the Second Circuit consider the following factors: (i) counsel's time and effort in connection with the litigation; (ii) the quality of the representation; (iii) the complexity of the litigation; (iv) the risks of litigation; (v) the relationship of the fee to the settlement; and (vi) public policy concerns. *Goldberger*, 209 F.3d at 50. Of these factors, "[g]enerally, the factor given the greatest emphasis is the size of the fund created, because 'a common fund is itself the measure of success ... [and] represents the benchmark from which a reasonable fee will be awarded.'" MANUAL FOR COMPLEX LITIGATION (FOURTH), § 14.121 (2004) (quoting 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 14:6, at 547, 550 (4th ed. 2002)); *see also Hensley* v. *Eckerhart*, 461 U.S. 424, 436 (1983) (the "critical factor is the degree of success obtained").

Appaloosa maintains, however, that the determination of attorneys' fees and costs should be undertaken under New York law, and Cobalt does not

---

attorney for her representation of her client and the class members. *See Boeing*, 444 U.S. at 478, 100 S. Ct. 745. "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id.* The common-fund doctrine is therefore rooted in the courts' "historic power of equity to permit" a person who secures a fund for the benefit of others to collect a fee directly from the fund. *Alyeska Pipeline Serv. Co.*, 421 U.S. at 257, 95 S. Ct. 1612 (citing *Trustees* v. *Greenough*, 105 U.S. 527, 531-33, 26 L. Ed. 1157 (1881)). Under the common-fund doctrine, a district court may select "either the lodestar or percentage of the recovery methods" to calculate fees. *Goldberger* v. *Integrated Res., Inc.*, 209 F.3d 43, 45 (2d Cir. 2000); *see also McDaniel* v. *County of Schenectady*, 595 F.3d 411, 419 (2d Cir. 2010). A common-fund-percentage fee must still be evaluated for reasonableness, *see, e.g.*, *McDaniel*, 595 F.3d at 423, but may exceed the lodestar — *i.e.*, it may be less than, equal to, or greater than the lodestar, *see, e.g.*, *Goldberger*, 209 F.3d at 47.

disagree.  (Dkt. #446 at 12 ("The law of New York thus also governs Appaloosa's entitlement to attorneys' fees." (first citing *RLS Assocs.* v. *United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006), and then citing *Ancile Inv. Co.* v. *Archer Daniels Midland Co.*, 992 F. Supp. 2d 316, 320 (S.D.N.Y. 2014))); Dkt. #453 at 14 (discussing New York state courts' approach to fee awards)).  *See generally Fed. Ins. Co.* v. *Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law."); *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (applying New York law and stating that "implied consent ... is sufficient to establish choice of law" (quotation marks and internal citation omitted)).

New York courts allow the recovery of attorneys' fees and expenses from a common fund for reasons identical to their federal counterparts.  *See, e.g.*, *Ital Assocs.* v. *Axon*, 90 N.Y.S.3d 164, 165-66 (1st Dep't 2018) (allowing recovery of attorneys' fees against parties who did not sign retainer agreement with plaintiffs' counsel but still benefited, finding that to hold otherwise "would be inconsistent with the purpose of the common fund doctrine to prevent unjust enrichment by 'allow[ing] the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses'" (internal citations omitted)); *see generally Woodruff* v. *New York, Lake Erie & W. R.R. Co.*, 129 N.Y. 27, 30-31 (1891) ("one who successfully conducts a litigation ... for the benefit of a fund, shall be protected in the distribution of such fund for the expenses necessarily incurred by him in the performance of

his duty").  Similarly, in awarding attorneys' fees, New York courts consider

factors analogous to those in *Goldberger*, which factors include: (i) the time and

labor required, the difficulty of the questions involved, and the skill required to

handle the problems presented; (ii) the lawyer's experience, ability, and

reputation; (iii) the amount involved and benefit resulting to the client from the

services; (iv) the customary fee charged for similar services; (v) the contingency

or certainty of compensation; (vi) the results obtained; and (vii) the

responsibility involved.  *See, e.g.*, *RMP Cap. Corp.* v. *Victory Jet, LLC*, 32

N.Y.S.3d 231, 235 (2d Dep't 2016) (collecting cases); *accord In re Freeman's

Est.*, 34 N.Y.2d 1, 9 (1974).  As in federal cases, "[c]ourts have used the

lodestar method and the percentage approach as a way of cross-checking the

appropriateness of the legal fees in common fund cases[.]"  *M.F.* v. *Amida Care,

Inc.*, 167 N.Y.S.3d 771 (Sup. Ct. Kings Cnty. 2022).

> ### 3.   Analysis

The instant case implicates both the lodestar method and the percentage

method.  Appaloosa seeks reimbursement for the entirety of the fees and costs

it expended in this matter, comprising $7,912,052.80 in attorneys' fees (which

it notes is approximately 28.7% of the Settlement Payment), as well as

$1,063,359.85 in expenses.  Many of the factors just listed counsel in favor of

an award of attorneys' fees at or near the amount requested.  As evidenced by

the billing statements that accompanied Appaloosa's Fee Petition (Dkt. #447),

numerous attorneys spent numerous hours addressing esoteric issues of

contract law in a protracted litigation that yielded three decisions from this

Court (one exceeding 100 pages) and two from the Second Circuit.  The quality of representation on all sides was exceptional, as it needed to be in order to address the issues presented.  Appaloosa has actually paid all of the fees and expenses sought in its petition (Dkt. #447 at ¶¶ 9-11), which is "solid evidence" of their reasonableness in the market.  *Bleecker Charles Co.* v. *350 Bleecker St. Apt. Corp.*, 212 F. Supp. 2d 226, 230-31 (S.D.N.Y. 2002); *see generally A.V.E.L.A., Inc.* v. *Estate of Monroe*, No. 12 Civ. 4828 (KPF) (JCF), 2014 WL 3610902, at *2 (S.D.N.Y. July 18, 2014) ("[T]he actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'" (alteration in original) (internal quotation marks and citation omitted)).  And, despite a few bumps in the District Court road, Appaloosa was ultimately able to garner a settlement fund of $27.5 million for Certificateholders.

There remain, however, several factors that counsel against complete reimbursement of Appaloosa's attorneys' fees.  The most obvious is the fact that this Court rejected all of Appaloosa's arguments at summary judgment, and to the extent that the Second Circuit disagreed with this Court as to one small piece of the approximately $615 million in challenged funds, it was on a basis not advanced by the Parties.  Furthermore, the whole of Appaloosa's case against the GSE's was rejected by this Court and upheld by the Second Circuit. This Court also remains critical of several of Appaloosa's expert witnesses, who offered minimal assistance to the Court in resolving the many issues in

dispute, but rather seemed intent on making abstruse, often irrelevant, points in the service of trying to generate material disputes of fact.

As suggested by its colloquy with Appaloosa's counsel, the Court appreciated counsel's pivot from the hyperbole of its written Fee Petition, to a more measured presentation of the timeline of its efforts and the actual benefits it realized.  Balancing the fact of the Settlement Payment, the complexity of the issues, and the intensity of the litigation, with the limited scope of success, the Court will reduce the legal fees sought by Appaloosa by 20%, and it thus finds that the reasonable amount of attorneys' fees in this matter is $6,329,642.24.

With respect to the issue of reimbursable litigation expenses, both federal and state courts allow the recovery of such expenses.  *See, e.g.*, *Fleisher* v. *Phoenix Life Ins. Co.*, Nos. 11 Civ. 8405 (CM), 14 Civ. 8714 (CM), 2015 WL 10847814, at *23 (S.D.N.Y. Sept. 9, 2015) ("Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." (internal quotations omitted)); *Ital Assocs.*, 90 N.Y.S.3d at 165-66. On this point, the Court agrees that the majority of Appaloosa's litigation-related expenses should be covered, but that a reduction is warranted to reflect the comparative unhelpfulness of certain of Appaloosa's expert witnesses. Accordingly, the Court will reduce the expenses figure by 30%, and it thus finds that $744,351.90 is the reasonable amount of reimbursable litigation expenses.

**CONCLUSION**

For the foregoing reasons, the Court REJECTS the objection to the proposed settlement filed by Cobalt and APPROVES the Parties' proposed settlement. The Court also finds that Appaloosa is entitled to reimbursement from the Settlement Payment in the amounts of **$6,329,642.24** in attorneys' fees and **$744,351.90** in litigation expenses. The Court directs the Trustee to submit a revised proposed Order Issuing Judicial Instructions on or before **March 22, 2023**.

The Clerk of Court is directed to unstay this case and terminate the motion at docket entry 445.

SO ORDERED.

Dated:  March 5, 2024
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge